RECEIVED

APR 4 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

ORIGINAL

FILED

APR 2 5 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ABE WILLIAMS, JR.,

       PETITIONER,

v.

M. MARTEL (A) WARDEN,

       RESPONDENT.

CASE NO. C-91-02589-JPV

E-filing

Hearing Date: June 23, 2008

Hearing Time: 10:00 a.m.

E-filing

CV 08 2167

MHP

(PR)

**NOTICE AND**

**MOTION TO VACATE HABEAS JUDGMENT,
PURSUANT TO F.R.C.P., RULE 60(B).**

ABE WILLIAMS, JR.
D-48163  B-9-127L
MULE CREEK STATE PRISON
P.O. BOX 409040
IONE, CA 95640-9000

( IN PRO PER )

RECEIVED

APR 2 4 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

# TABLE OF CONTENTS

| CONTENT | PAGE |
|---|---|
| I. INTRODUCTION | 2, |
| II. JURISDICTION | 2, |
| III. LEGAL STANDARD OF REVIEW | 2, |
| IV. PROCEDURAL HISTORY | 3, |
| V. FACTUAL HISTORY | 4, |
| VI. PETITIONER IS ENTITLED TO RELIEF PURSUANT TO F.R.C.P., RULE 60(b)(6) | 11, |
| A. RELIEF SHOULD BE GRANTED BECAUSE PETITIONER CHALLENGES THE PRIOR JUDGMENT **NOT** THE MERITS. | 11, |
| B. HABEAS DENIAL SHOULD BE VACATED BECAUSE DISTRICT COURT APPLIED AN ERRONEOUS STANDARD OF REVIEW TO PETITIONER'S CLAIM THAT HE WAS ABSENTED DURING REINSTRUCTION OF THE JURY. | 12, |
| C. HABEAS DENIAL SHOULD BE VACATED BECAUSE THE FAILURE TO DO SO WOULD CONSTITUTE A **MANIFEST INJUSTICE.** | 15, |
| VII. PETITIONER'S RULE 60(b)(6) MOTION IS TIMELY | 16, |
| Relevant Facts Regarding Timeliness | 17, |
| VIII. PETITIONER IS ENTITLED TO AN EVIDENTIARY HEARING IF THERE ARE ANY FACTUAL DISPUTES. | 21, |
| CONCLUSION | 22, |

1

TABLE OF CONTENT

2    CASES                                                PAGES

3    ARIZONA V. FULMINATE
     (1991) 499 U.S. 279                          18,

4    BAJA V. DUCHARME
5    (9th Cir. 1999) 187 F.3d 1075                21,

6    BRECHT V. ABRAHAMSON
     (1993) 507 U.S. 619                          18,
7
     BUTZ V. MENDOZA
8    2007 WL 2700116                               2,

9    CHAPMAN V. CALIFORNIA
     (1967) 386 U.S. 18                           13, 14, 15,
10
     COMTY. DENTAL SERVS. V. TANI
11   (9th Cir. 2002) 282 F.3d 1164                 3, 12,

12   DELAY V. GORDON
     (9th Cir. 2007)                               3, 5, 15,
13
     FERETTA V. CALIFORNIA
14   (1975) 422 U.S. 806                           5, 12, 13,

15   FRANTZ V. HAZEY
     2008 DJDAR 1110                  12, 13, 14, 15, 17, 18, 20,
16
     FRY V. PLILER
17   (2007) 127 S.Ct. 2321                        18,

18   GAUTT V. LEWIS
     489 F.3d at 1015                             16,
19
     GIBSON V. ORTIZ
20   (9th Cir. 2004) 387 F.3d 812                 18,

21   HAMILTON V. NEWLAND
     (9th Cir. 2004) 374 F.3d 822                  2, 15,
22
     INTERNATIONAL FIBERCOM INC., IN RE
23   (9th Cir. 2007) 2007 WL 261082               16,

24   KEENEY V. TAMAYO-REYES
     (1992) 504 U.S. 1                            21,
25
     LATSHAW V. TRAINER WORTHAM & CO., INC.
26   (9th Ci.r 2006) 452 F.3d 1097                15,

27   MARTINEZ V. GARCIA
     (9th Cir. 2004) 379 F.3d 1034                18,
28

TABLE OF CONTENT

CASES                                                    PAGES

McKASKLE V. WIGGINS
(1984) 465 U.S. 168                    12, 13, 14, 15, 16, 18,

MITCHELL V. ESPARAZA
(2003) 540 U.S. 12                              18,

MORRIS V. WOODFORD
(9th Cir. 2000) 229 F.3d 775                    21,

UNITED STATES V. ALPINE LAND & RESVOIR CO.
(9th Cir. 1993) 984 F.2d 1047                    3, 15. 17,

UNITED STATES V. HOLTZMAN
(9th Cir. 1985) 762 F.3d 720                    17,

UNITED WYLE (IN RE PAC. FAR EAST LINES, INC.
(9th Cir. 1989) 889 F.2d 242                    16, 17,

WILLIAMS V. TAYLOR
(2000) 529 U.S. 362                             21,

OTHER AUTHORITIES

FEDERAL

FEDERAL RULES OF CIVIL PROCEDURE (F.R.C.P.)

Rule 60(b)                                     1, 2, 3,

Rule 60(b)(6)              1, 2, 3, 5, 11, 15, 16, 22

CCALIFORNIA PENAL CODE (C.P.C.)

§187                                           7,

§273(a)(1)                                      7,

§273(a)(2)                                      7,

ORIGINAL

1 | ABE WILLIAMS, JR.
D-48163   B-9-127L
2 | Mule Creek State Prison
P.O. BOX 409040
3 | IONE, CA 95640-9000
(In Pro Per)
4 |
5 |
6 | UNITED STATES DISTRICT COURT
7 | NORTHERN DISTRICT OF CALIFORNIA
8 |
9 | ABE WILLIAMS, JR.                      No. **C-91-02589-JPV**
10 |         Petitioner,                   **NOTICE AND**
11 | v.                                    **MOTION TO VACATE HABEAS JUDGMENT, PURSUANT TO**
12 |                                       **F.R.C.P., RULE 60(b)(6).**
13 | M. MARTEL, (A) Warden,                Hearing Date: June 23, 2008
14 |         Respondent.                   Hearing Time: 10:00 a.m.
15 | _____/
16 |     In an order filed July 1, 1992, Northern District Court
17 | Judge J.P. Vukasin, Jr., dismissed petitioner's habeas petition
18 | in Case No. C-91-02589 JPV.[1/]   Comes now the petitioner, seeking
19 | the District Court to vacate  that judgment and reconsider the
20 | claims on their merits, pursuant to F.R.C.P., Rule 60(b)(6),
21 | because the Court's order denying petitioner's habeas claims
22 | was based upon the erroneous application of federal law and
23 | erroneous conclusions of facts underlying the claims. Notice and
24 | Motion Hearing date, June 23, 2008; Time 10:00 a.m..
25 | Dated: April ___, 2008
                                          Abe Williams, Jr.
26 |                                       In Pro Per
27 | _____
      1/ Petitioner attaches as Exhibit **A**, a copy of the July 1, 1992
28 | , order denying habeas petition.

1

## I. **INTRODUCTION**

Petitioner (a state prisoner) plead not guilty at trial, and maintains his innocence, seeks relief from the Northern District Court's july 1, 1992, order denying habeas relief. Pursuant to F.R.C.P., Rule 60(b)(6), petitioner is entitled to relief, because the District Court applied an erroneous standard of law when reviewing and denying petitioner's habeas claim of: As a pro per at trial, he was involuntarily absented during the critical stage of jury reinstruction. The District Court, also, erroneously applied the facts. And, although it has been almost sixteen years since the July 1, 1992 order, petitioner nonetheless argues, this motion is timely based upon the unique facts and circumstances of this particular case. **Wherefore**, petitioner request the Court grant the requested relief.

## II. JURISDICTION

Pursuant to F.R.C.P., Rule 60(b)(6) the Federal District Courts have the power to review its prior judgments and orders and to grant relief from such judgment or order. No permission or preliminary petition in the appellate court is necessary to reopen in the district court. (Butz v. Mendoza, 2007 WL 2700116 (9th Cir. (Cal.) 2007).

## III. LEGAL STANDARD OF REVIEW

F.R.C.P., Rule 60(b) motion is appropriate when one wishes a court to reconsider claims it has already decided. Hamilton v. Newland, 374 F.3d 822, 825 (9th Cir. (Cal.) 2004).

Rule 60(b)(6)'s "catch-all" provision, applies only when

2

the reason for granting relief is not covered by any of the other reasons set forth in Rule 60(b). Delay v. Gordon 475 F.3d 1039, 1044 (9th Cir. (Or.) 2007), citing Comty. Dental Servs. v. Tani 282 F.3d 1164, 1168 n. 8 (9th Cir. 2002). Rule 60(b)(6) has been used sparingly as an equitable remedy to prevent **manifest injustice** and its to be utilized only where extraordinary circumstances prevented a party from taking a timely action to prevent **or** "correct an erroneous judgment." Delay v. Gordon, supra, at 1044, citing United States v. Alpine Land & Reservoir Co. 984 F.2d 1047, 1049 (9th Cir. 1993). A party seeking to reopen a case under Rule 60(b) must demonstrate both injury and circumstances beyond his control that prevented him from proceed-ing with the prosecution or defense of the action in a proper fashion. Comty. Dental, supra, 282 F.3d at 1168.

IV. PROCEDURAL HISTORY

Petitioner commitment offense of second degree murder occurred on May 27, 1984. On October 15, 1986, a jury found petitioner guilty of second degree murder. On January 13, 1987, petitioner was sentenced to 15-years to life, plus three 1-year consecutive enhancements, for a total sentence of 18-years to life. (Case No. 80451)

Petitioner filed an appeal raising (inter alia) that his constitutional rights were violated, when as a pro per at trial, he was absented during the critical stage of trial when the jury requested and received written reinstruction. In an opinion filed April 29, 1989, California's First District Court of Appeals, Fifth Division, affirmed the conviction. (See, attached Exhibit <u>B</u>, Copy of State Appellate Court 4-29-1989 Opinion, pp.

3

1 | 14 and 15.) (Case No. A037514).

2 | Petitioner submitted a Motion to Recall the Remitter in the
3 | State Appellate Court and the Court denied the motion in its
4 | response filed September 11, 1990. (See, attached Exhibit **C**.)

5 | Petitioner filed a Petition For Review in the State Supreme
6 | Court on April 29, 1988, and it was denied without comment or
7 | citation in an order filed November 20, 1990. (See, attached
8 | Exhibit **D**). (Case No. S005988)

9 | Petitioner filed a writ of habeas corpus in the United
10 | States Northern District Court, raising the ground for relief
11 | (inter alia) that his Federal Constitutional rights were violated
12 | when he was absented (as a pro per defendant) during jury
13 | reinstruction, a critical stage of trial. In an order filed
14 | July 1, 1992, the district court denied petitioner habeas relief.
15 | (See, attached Exhibit **A**). (Case No. CIV-91-02589-JPV)

16 | Petitioner filed for and received a certificate of Probable
17 | Cause from the Ninth Circuit Court of Appeals, and in an order
18 | filed October 13, 1993, the Ninth Circuit affirmed the District
19 | Court's habeas denial. (See, attached Exhibit **E**). (No. 92-16655)

20 | Petitioner filed for and received permission to file a
21 | Petition For Rehearing in the Ninth Circuit (Case. No. 92-16655).
22 | The Ninth Circuit denied petitioner's Petition For Rehearing,
23 | however, petitioner no longer has a copy of that denial or the
24 | date of that denial.

25 | ## V.  FACTUAL HISTORY

26 | Petitioner herein relates the factual background of his
27 | being absented during jury reinstruction solely for context as it
28 | relates to petitioner's Rule 60(b)(6) claim regarding the Court's

4

1  applying an erroneous legal standard of review in deciding that
2  habeas ground for relief. Petitioner does **not** argue as to the
3  merits of that ground, i.e., petitioner challenges on the Court's
4  denial of that claim and not as to the merits of any claim raised
5  in his habeas petition. Pursuant to Rule 60(b)(6), petitioner
6  seeking relief, must demonstrate injury from the Court's
7  erroneous application of law and "correct an erroneous judgment"
8  Dealy v. Gordon 475 F.3d 1039, at 1044. The following related
9  facts are solely for that purpose.

10      After a mistrial, petitioner and trial counsel had a
11  fundamental disagreement over trial tactics. Petitioner invoked
12  his Feretta rights, and the court granted his motion to proceed
13  pro per. The trial court appoints petitioner's former attorney
14  as advisory counsel. On 9-25-1986 (the Fifth day of trial), due
15  to an ongoing conflict with advisory counsel, petitioner motions
16  to remove counsel and seeks appointment of a new advisory counsel.
17  The court grants the motion, but denies petitioner's request for
18  new advisory counsel, and orders former advisory counsel to remain
19  in courtroom the remainder of the trial. (See, Exhibit **F**, copy
20  of Clerk's Transcript [hereafter, CT] p. 132). On 9-30-1986 (the
21  Sixth day of trial) the Court reappoints advisory counsel to
22  assist petitioner. (See attached Exhibit **G**, copy of CT p.137).
23  In reappointing advisory counsel, the Court imposes the following:

24           THE COURT: Well, the Court will reappoint you
                to sit at his elbow and **give advice**
25              **when it is asked for.** (emphasis added)

26           MR. SPEAR: I may have been interfering too much      2/
                before. (See, attached Exhibit **H**, RT p.12**73**)
27

28  The jury was reconvened, and the Court informed them as follows:

2/ RT = Reporter's Transcripts.

1                 THE COURT: Ladies and gentlemen, you will notice
                          Mr. Spear is back at counsel table. Mr.

2                          Williams has requested that **he come back
                          to assist him quietly.** However, Mr.

3                          Williams still continues as his own
                          attorney .... (emphasis added) (See,

4                          attached Exhibit **H**, RT pp. 1273-1274).

5      On 10-10-1986 (the second day of jury deliberations) the

6  jury sent the following note: "We wish the Law pertaining to the

7  3 verdicts." (See, attached Exhibit **I**). In open court, the Court

8  discusses if the jury wanted the instructions on the elements of

9  the crime of the three verdict choices. The jury was excused to

10  await the written instructions, and petitioner, advisory counsel

11  and the prosecutor remained and discussed the jury's request with

12  the court. Petitioner admonished to the Court not to include

13  P.C. §8.31 (felony murder instructions) which the Court had

14  unintentionally begun to read when originally instructing the

15  jurors before correcting itself. A short time later in the jury-

16  room the Court told the jury, court would reconvene on Tuesday the

17  14th, after the three day holiday weekend, and at that time the

18  requested written instructions would be provided. The Court

19  then informed petitioner and prosecutor it would see them at

20  10:00 a.m. Tuesday morning regarding the written instructions.

21  (See, attached Exhibit **J**, RT pp. 1927-1929).

22      When the court reconvened on 10-14-1986, it did not keep

23  its words as to both parties, instead the Court involuntarily

24  excluded pro per petitioner from that entire days procedings. Nor

25  did the Court record any of that days proceedings for future

26  review. The Clerk's Record, however, documents that the jury

27  reassembled at 9:58 a.m., and that Court held an in chambers

28  conference with the prosecutor and advisory counsel only. At this

1   in camera conference there were discussions on exactly which
2   written instruction were to be sent to the jury. (See, attached
3   Exhibit **K**, CT p.146).

4       At some point, the jury sent another note requesting the
5   following: "Definitions of the **4 Verdicts** only." (emphasis added,
6   See, attached Exhibit **L**, CT, jury note). The Court then sent the
7   following note, written at the bottom of the jury note: "This is
8   only the code section defining the crimes as used in the verdict
9   forms. Are you sure you do not want all the instructions defining
10  what those code sections mean more fully." (See, attached Exhibit
11  **L**). After conferring with the prosecutor and advisory counsel,
12  the Court sent written instructions to the jury.[3/]   While all this
13  was taking place, petitioner was being held in a holding cell two
14  floors above the courtroom and was never contacted or told what
15  what was going on the 14th.

16      On the following day, 10-15-1986, petitioner was brought to
17  the courtroom at 10:27 a.m., and as a fiat accompli, was told
18  by the Court what occurred on the 14th. The court explained, it
19  didn't call petitioner the day before because it felt there wasn't
20  any input petitioner could make because the issue was "highly
21  technical"(RT 1933). The Court stated it had instructions typed
22  up, but before giving them to the jury, conferred with advisory
23  counsel and the prosecutor because the Court felt they didn't
24  comply because they didn't include instructions defining wilful
25  and specific intent, and requested the written instructions be

26  ―――――――――――――――――――――――――――――――――――――――――――――――――――
    3/ Despite the clear discrepancy between the jury request for the
    **"4" Verdicts**, the Court never sought to clarify what the jury
27  considered the **4th Verdict** or to admonish the jury that there
    were only three possible verdict choices, i.e., P.C. 187 (second
28  degree murder) and P.C. §§ 273a (1) and (2) (felony and misdemean-
    nor child abuse.

                                    7

1   augmented to include those definitions;  But before it could
2   have the augmented instructions sent to the jury, the jury sent
3   another note stating that   they only wanted the verdict defini-
4   tions, meaning the crimes set forth in the verdicts. The Court
5   stated it then sent the "written instructions prepared without
6   the augmentation (RT 1933). The Court added, another reason it
7   did not bring petitioner into the courtroom on the 14th, was that
8   it took so long to get petitioner to the courtroom, although that
9   had never been a stated problem during the previous six (6)
10  weeks of trial. Petitioner requested to see a copy of the written
11  instructions given to the jury, but neither the Court, its clerk,
12  the prosecutor nor advisory counsel had a copy. The Court then
13  informed the parties that several jurors had informed the Court
14  that morning that they wished to be removed from the jury and
15  it would be discussed in chambers with all parties and the jurors
16  present. Petitioner's advisory counsel notified the Court he
17  would see to it that the petitioner received a copy of the
18  written instructions. After discussions with the jurors wanting
19  to be removed, petitioner's was taken back to the holding cell to
20  await receiving a copy of the written instructions.

21      At approximately 2:35 p.m., petitioner was brought to the
22  courtroom and told the jury had reached a verdict, at that point
23  advisory counsel gave petitioner multiple pages of the written
24  instructions, however, they were the augmented instructions and
25  not the ones containing only the verdict choices. However, before
26  petitioner could read the written instructions the jury entered
27  and rendered its verdict finding petitioner guilty of second
28  degree murder. After the jury left, petitioner objected:

8

1    MR. WILLIAMS: REGARDLESS OF IT, IF IT'S A FACTOR
     OR NOT, I, AS YOU KNOW, I GOT THROUGH **THREE**
2    **JURY INSTRUCTIONS,** I, FOR THE RECORD, I WANT
     TO SAY THAT I HIGHLY DISAPPROVE OF THE FACT,
3    THE WAY THIS WAS GIVEN AND THE FACT THAT I
     WASN'T ABLE TO SEE THEM. I KNOW THE JURY VERDICT
4    IS FINAL. I STILL WANT TO SAY THAT I FEEL THAT
     I SHOULD HAVE HAD SOME INPUT ON THESE. I THINK
5    THAT I WAS VERY -- **I THINK THIS HAD A LOT TO DO
     WITH THE FINAL FINDING OF THE JURY VERDICTS.**
6    I THINK I SHOULD HAVE HAD INPUT. I DON'T FEEL
     IT WAS ANYTHING TO TECHNICAL THAT I SHOULD HAVE
7    BEEN LEFT OUT. I SPECIFICALLY REQUESTED THAT I
     SHOULD BE HERE EVERY TIME THAT SOMETHING WAS
8    BROUGHT UP OF THIS NATURE. I MANAGED TO DEAL
     WITH THIS WHOLE TRIAL. I DON'T CARE, REGARDLESS
9    OF HOW TECHNICAL IT'S BEEN. I DEALT WITH IT AND
     I THINK I DID A GOOD JOB CONSIDERING WHAT I HAD
10   TO DEAL WITH. I DON'T THINK THAT WAS RIGHT.

11            (emphasis added, RT 1956.)

12   In response the Court restated that it only sent the written

13   instructions that had been previously read to the jury at the

14   beginning of jury deliberations.$^{4/}$

15       There is ample evidence that not only did the jury not

16   receive the written instructions the Court told petitioner it

17   sent the jury, there is ample evidence that an unknown **4th Verdict**

18   4/ Despite the Court's reassurances that the written instructions
     given to the jury in petitioner's absence were those without the
19   augmentations such as wilful and specific intent, and that nothing
     improper went to the jury, the record disputes these claims. E.g.,
20   there is ample evidence the jury received **4-Verdict** choices and
     not 3, even though there were only three possible verdicts. The
21   evidence supporting this conclusion is the 10-14-86 jury note
     requesting the "**4 Verdicts** (Exhibit **L**); A copy of the RT in
22   chamber discussions with juror Cruz requesting to be removed from
     the jury where he talks about "DEFINING THE FOUR" verdicts (See
23   Exhibit **M**, copy of RT 1940). Also see, Exhibits **N** and **O**, copies
     Jury Foreman W. H. Hara's two declarations dated January 10th and
24   23rd 1993 which confirm that the jury did receive four verdict
     choices, although he could not remember in 1993 exactly what the
25   the **4th Verdict** was. (the declarations include Hara's hadwritten
     declaration, a typed transcription and notarized declaration of
26   Investigator McCarthy who interviewed Juror Hara.)
         Further, there was no copy of the written instructions in the
27   State court records, that the court claimed were given to the jury,
     i.e., the ones without the augmentation containing only the bare
28   definitions of the crimes.

                            9

1  was given to the jury during petitioner's absence, and that **4th**

2  **Verdict** adversely affected petitioner and was highly prejudicial

3  to petitioner. That evidence is: (1) Jury Foreman Hara's 1-23-86,

4  stating the jury was tied "6 to 6 for the longest time" (See,

5  attached Exhibit O). And, although Hara's declaration does not

6  expressly pin-point at exactly what point the six jurors voting

7  not guilty changed their minds, however, the record does reflect

8  that the following day after the jury was given the written

9  instructions in petitioner's absence, three jurors requested to

10  be removed from the jury. Juror Cruz, one of those three, indicat

11  -ed during the October 14th in-chamber proceedings, that he was

12  one of the 6 jurors voting for not guilty, but suddenly requested

13  to be removed from the jury the day after written instructions were

14  given to the jury and a dramatic shift of voting took place.   At

15  that point, juror Cruz felt he was     unfairly attacked by other

16  jurors, 5/   and being pressured to change his verdict decision.

17       Finally it must be emphasized, the Court intentionally and

18  deliberately absented pro per petitioner during the reinstruction

19  of the jury, and just as deliberately and intentionally, the

20  Court did not record any of those proceedings for any future

21  review; Instead we have only the Court's description of what took

22  place in petitioner's absence, and unfortunately much of that has

23  proven not to be correct: At least regarding exactly what written

24  instructions were actually given to the jury.

25
26  5/ See juror Cruz's declaration dated January 10, 1993 (attached
    Exhibit Q, 3 pages), stating he was "forced or cohersed" into
    voting for the murder conviction. Also see attached Exhibit R,
27  copy of CT dated October 15, 1986, i.e., jury note stating juror
    Cruz wanted to be replaced on the jury. Also see, attached
28  Exhibit P, RT 1936-1947, transcripts of Cruz's in-chambers.

1

VI. PETITIONER IS ENTITLED TO RELIEF PURSUANT
TO F.R.C.P., RULE 60(b)(6)

2

3

In a July 1, 1992, order the District Court denied petition-

er's habeas petition and the Ninth Circuit affirmed the denial,

4

and then denied petitioner's petition for rehearing. Petitioner's

5

federal habeas raised Grounds A through D, and under Ground "C",

6

raised seven sub-claims for relief, for a total of eleven grounds

7

of relief. Of those eleven grounds, petitioner's Rule 60(b)(6)

8

motion concerns only the district court's denial of three, i.e.,

9

Ground B (Absenting petitioner during jury reinstruction) at pp.

10

6-9 of petition; Ground C (Ineffective Assistance of Appellate

11

Counsel) at sub-claims #1 pp. 10-11 and #2 pp. 11-13 (both sub-

12

claims are ineffective assistance of appellate counsel addressing

13

the issue of absenting petitioner during jury reinstruction).

14

(See, attached Exhibit S).

15

Because Rule 60(b)(6) allows a party to obtain relief and/or

16

correct an erroneous judgment, petitioner contends he is entitled

17

to both, from the Court's July 1, 1992 judgment related to the

18

stated above three grounds for relief, because the Court applied

19

an erroneous standard of review when denying his petition with

20

respect to being absented during jury reinstruction. 6/

21

A. RELIEF SHOULD BE GRANTED BECAUSE PETITIONER
CHALLENGES THE PRIOR JUDGMENT **NOT** THE MERITS.

22

23

Petitioner herein, does not argue the merits of his claims,

24

he addresses only the facts as related to the claims as necessary

25

to prosecute his 60(b)(6) motion, which requires that movant

26

"must demonstrate injury", which requires a thorough venting of

27

6/ The Court's error here is compounded, because the State Courts
also applied the same erroneous legal standard of review when

28

reviewing this ground. (See, attached Exhibit B, pp. 14-15).

11

1  the facts. (Community Dental Services v. Tani 282 F.3d 1164,
2  1168 (9th Cir. 2002)). Therefore, because petitioner does not
3  attack the merits, but rather, the judgment, he is entitled to
4  the requested relief.

5          B. HABEAS DENIAL SHOULD BE VACATED BECAUSE THE
              DISTRICT COURT APPLIED AN ERRONEOUS STANDARD
6           OF REVIEW TO PETITIONER'S CLAIM THAT HE WAS
              ABSENTED DURING REINSTRUCTION OF THE JURY

7      Petitioner was completely unaware of the basis for this
8  claim, until he read Frantz v. Hazey 2008 DJDAR 1110, in late
9  February 2008. Where the Ninth Circuit held, that the United
10 States Supreme Court's clearly established law holds that a
11 McKaskle error is "structural and therefore not subject to the
12 harmles error analysis." Frantz, supra, citing McKaskle v.
13 Wiggins (1984) 465 U.S. 168.[7/]

14     As noted above under "Factual History", in this case the
15 at issue counsel was appointed as "advisory counsel" by the
16 trial court. On the fifth day of trial, petitioner sought and
17 had advisory counsel removed, however the trial court had counsel
18 remain seated at the back of the courtroom in full view of the
19 jury, after having been seated at defense table. The court,
20 refused petitioner's request for another advisory counsel. The
21 next day, prior advisory counsel was reappointed, with the
22

23 7/ McKaskle noted that Ferretta established a criminal defendant's
   right to self-representation, but not the unqualified right to
24 stand alone in a courtroom, holding the states are allowed to
   appoint standby counsels to aid defendants if requested or in the
25 event termination of self-representation is necessary, citing
   Feretta 422 U.S. at 834 n.46. McKaskle clarifies the distinction
26 between permissible and impermissible interference by standby
   counsel. First, pro se defendant is entitled to preserve control
27 over the case he wishes to present to the jury, and second, the
   "participation of standby counsel without defendant's consent
28 should not be allowed to destroy the jury's perception that the
   defendant is representing himself." (continued on page 13)

12

1 | following restrictions imposed on advisory counsel's assistance:

2 |           THE COURT: Well, the court will reappoint
3 | you to sit at his elbow and **give advice when it is asked for.** (emphasis added)

4 |           MR. SPEAR: I may have been interfering too
5 | much before.

6 | The trial court, then informed the jury:

7 |           THE COURT: Ladies and gentlemen, you will
8 | notice Mr. Spear is back at counsel table. Mr. Williams has requested that **he come back to assist him**
9 | **quietly**....

10 | Thus, advisory counsel's role was expressly defined to "advice
11 | when asked for" and to "assist quietly". Nor did petitioner ever
12 | grant his advisory counsel the power to act without his permi-
13 | ssion or outside of his presence, nor did petitioner ever imply as
14 | much. Despite this fact, petitioner was absented during the
15 | critical stage of jury reinstruction and advisory counsel was
16 | substituted without petitioner's permission or knowledge.

17 |     As noted above, the state appellate court applied the
18 | Federal harmless error standard to its review of petitioner's
19 | claim that he was unconstitutionally absented during reinstruction
20 | of the jury. And though the Court found error, it deemed it
21 | harmless under Chapman.

22 |     On habeas review in the Northern District Court, the court

---

7/ Continued:
23 | McKaskle offers considerable guidance as to when a standby attorney's participation so reduces a defendant's control as to
24 | violate Ferretta. On one hand, "[i]f standby counsel's partici- pation over the defendant's objection effectively allows counsel
25 | to make or substantially interfere with any significant tactical decisions ... or to speak **instead** of the defendant on any matter
26 | of importance, the Faretta right is eroded." Id. at 178 (emphasis in the original). Frantz at n.2, noting that for the purpose of
27 | evaluating a McKaskle error, the term "standby" and "advisory" counsel are to be considered the same.

28 |

1 also applied the Chapman harmless error test when denying habeas
2 relief on that issue.

3   In its recent decision in Frantz, supra, the Ninth Circuit
4 held that a McKaskle error (such in petitioner's case) is
5 "structural" in nature and therefore is **not** subject to the
6 harmless error analysis. The Ninth Circuit, based its holding on
7 the fact "Supreme Court case law establishes unequivocally that
8 a violation of the right to self-representation recognized in
9 Faretta v. California, 422 U.S. 806 (1975), is structural and
10 thus is not susceptible to the harmless error review." See
11 McKaskle, 465 U.S. at 177 n.8 ("Since the right to self-represen-
12 tation is a right that when exercised usually increases the
13 likelihood of a trial outcome unfavorable to the defendant, its
14 denial is not amendable to 'harmless error' analysis."). McKaskle
15 describes two ways in which advisory counsel can assist and not
16 erode a defendant's Faretta rights: (1) "in overcoming routine
17 procedural or evidentiary obstacles to the completion of some
18 specific task, such as introducing evidence or objecting to
19 testimony, that the defendant has clearly shown he wishes to
20 complete," **id.** at 183; and (2) by "help[ing] to ensure the
21 defendant's compliance with basic rules of courtroom protocol
22 and procedure." **id.** However, neither of those circumstance were
23 at play in petitioner's case.

24   In Frantz, (whose factually situation is similar to what
25 occurred in petitioner's case, though petitioner's situation is
26 even more egregious than in Frantz'), the Ninth Circuit reversed
27 and remanded for an evidentiary hearing on question of whether
28 Frantz consented directly or implicitly to counsel's participation

14

1 | in his absence, due to a unclear record on that point. The
2 | Circuit Court, in so reversing emphatically stated, "Absent
3 | consent by Frantz, his exclusion from the chambers conference
4 | was unconstitutional, for all the reasons described above."
5 | Frantz, at 1118 (See, attached Exhibit T, copy of Frantz v.
6 | Hazey).

7 | In petitioner's case, there was no such ambiguities in State
8 | court record, and the record affirmatively demonstrates advisory
9 | counsel acted **without** either direct or implied permission of the
10 | petitioner. In fact, the State appellate court found error, but
11 | as noted deemed it harmless under Chapman.

12 | Although Frantz was not decided until 2008, nonetheless, its
13 | retroactively applicable to petitioner's district court judgment
14 | of 1992, because Frantz is predicated upon the Supreme Court's
15 | holding in McKaskle v. Wiggins, supra, filed January 23, 1984. [8/]
16 | Pursuant to Rule 60(b)(6) and Frantz v. Hazey 2008 DJDAR
17 | 1110, and Mckaskle v. Wiggins (1984) 465 U.S. 168, 79 L.Ed.2d
18 | 122, 104 S.Ct. 944, petitioner is entitled to the requested
19 | relief.

20 |
21 |

C. HABEAS DENIAL SHOULD BE VACATED BECAUSE
THE FAILURE TO DO SO WOULD CONSTITUTE A
**MANIFEST INJUSTICE.**

22 | Rule 60(b)(6) is to be used sparingly an an equitable remedy
23 | to prevent "manifest injustice" .... Delay v. Gordon 475 (9th Cir.
24 | 2007) 475 F.3d 1039, 1044; Latshaw v. Trainer Wortham & Co., Inc.,
25 | (9th Cir. (Cal.) 2006) 452 F.3d 1097, 1103; Hamilton v. Newland
26 | (9th Cir. (Cal.) 2004) 374 F.3d 822, 825, citing Alpine, 984 F.2d
27 | at 1049.

28 | 8/ Petitioner's commitment offense occurred on May 27, 1984, and McKaskle v. Wiggins was decided January 23, 1984, thus was law when petitioner was convicted in 1986.

The Supreme Court has distinguised between <u>structural error</u> that can be cured only by automatic reversal and those that can be corrected through harmless-error review. In 1984, in <u>Mckaskle v. Wiggins</u> (1984) 465 U.S. 168, the Supreme Court held that:

> "Since the right of self-representation is a right that when exercised usually increases the likelihood of a trial outcome unfavorable to the defendant, its denial is not amendable to "harmless error" analysis. The right is either respected or denied; its deprivation cannot be harmless."
> (465 U.S. 168 at n.8)

Thus, as in the present case, where advisory counsel was allowed infringe petitioner's right to self-representation by acting without pro per's permission or knowledge, and where pro per was involuntarily absented from the controversial proceedings which were then not recorded, such error is "structural" in nature and creates a **manifest injustice** that can only be cured by "automactic reversal". <u>Gautt v. Lewis</u>, 489 F.3d at 1015; <u>McKaskle</u> 465 U.S. at 950-951 and 953.

Based on the facts involved in petitioner's particular case, failure to grant the Rule 60(b)(6) motion would create a "manifest injustice", and because he is innocent of his commitment offense.

VII. <u>PETITIONER'S RULE 60(b)(6) MOTION IS TIMELY</u>

Motions based upon any other reason, including on "any other reason justifying relief from the operation of the judgment FRCP, Rule 60(b)(6), must be made within a reasonable time". (F.R.C.P., Rule 60(b). What qualifies as a reasonable time, however, "depends on the facts of each case." <u>International Fibercom Inc., In re</u>, (C.A. 9 (Ariz.) 2007) 2007 WL 261082 at p.15, citing <u>United v. Wyle</u> (In re Pac. Far East Lines, Inc.), 889 F.2d 242, 249 (9th

16

1  Cir. 1989) (quoting United States v. Holtzman, 762 F.2d 720, 725
2  (9th Cir. 1985)). The relevant facts may include the length and
3  circumstances of the delay and the possibility of prejudice to
4  the opposing party. Id.; Holtzman, 762 F.2d at 725. Relief under
5  Rule 60(b) should only be granted where the moving party is able
6  to demonstrate "that circumstances beyond its control prevented
7  timely action to protect its interest. Alpine, 984 F.2d 1049.

8                   Relevant Facts Regarding Timeliness

9      First: Although it has been almost 16 -years since the
10  District Court's erroneous judgment, nonetheless, any delay was
11  not the fault of petitioner, and once he became aware of the
12  Court's erroneous judgment, he immediately filed this motion;
13  Thus, it was brought within a reasonable time.

14     In this case, unlike most of those cited herein, petitioner
15  did not fail to appeal the erroneous judgment nor did he engage
16  in any undue delay in doing so. When the District Court rendered
17  its judgment in 1992, denying habeas relief, petitioner appealed
18  to the circuit court, but the lower court's judgment was affirmed.
19  Petitioner then requested and was granted a rehearing in the
20  circuit court, which was denied. Therefore, petitioner
21  acted timely and diligently in this case. After all, surely no
22  one is suggesting that layman-at-law petitioner is responsible for
23  the state and federal courts applying an erroneous standard of
24  harmless error law, instead of structural error, to the being
25  absented during jury reinstruction claim?

26     It was not until late February 2008 that petitioner discover-
27  ed and read Frantz v. Hazey 2008 DJDAR 1110, that he became aware
28  that the state and federal courts had applied an erroneous

                                17

1  standard of review on his issue of being absented durin the jury

2  reinstruction, and that the United States Supreme Court had held

3  in 1984 (prior to the ocurrance of petitioner's commitment

4  offense and conviction) that petitioner's claim of being absented

5  during jury reinstruction was **not** subject to harmless error

6  review, but rather, was "structural error". And upon this

7  discovery, petitioner immediately researched, prepared and filed

8  this timely 60(b) motion. (See, McKaskle v. Wiggins, supra,

9  465 U.S. 168; also see, Frantz, supra, 2008 DJDAR 1110). Therefore,

10  despite the passage of almost 16-years, based on this case's

11  particular facts, this motion is timely.

12  Second: Regarding injury; There is no doubt petitioner has

13  been injured, because based on the facts of this case, had the

14  correct standard of review been applied, petitioner case would

15  required reversal as a matter of law and fact. Frantz, at

16  pertinent part:

17  "Harmless error review of constitutional
   "trial errors" in the context of habeas
18  petitions differs from harmless error review
   on direct appeal. See generally Fry v. Pliler,
19  127 S.Ct. 2321 (2007). Where an error is
   structural, however, it is not subject to
20  harmless error review of any kind on direct
   appeal, see Arizona v. Fulminate, 499 U.S.
21  279, 309-10 (1991), and harmless error review
   also is not appropriate in habeas proceedings.
22  See Brecht v. Abrahamson, 507 U.S. 619, 629-30
   (1993) (importing Fulminante's distinction
23  between trial errors and structural errors into
   the habeas context); Gibson v. Ortiz, 387 F.3d
24  812, 820 (9th Cir. 2004) (applying direct appeal
   definition of structural error to habeas review);
25  Martinez v. Garcia, 379 F.3d 1034, 1039 (9th
   Cir. 2004) (similar); see also Mitchell v.
26  Esparza, 540 U.S. 12, 15-17 (2003) (per curiam)
   (on habeas review, consulting direct appeal
27  cases to determine whether an error was clearly
   established as "structural" or not).
28  (Frantz, supra, 1120 n.13).

18

The issue of injury in petitioner case, was further compounded by the following events:

(a) The fact that there are no reliable record of the trial court's contact with the jury during the period in which petitioner was absented, because the court failed to have them recorded. Just as the trial court failed to record its conversation between the prosecutor and advisory counsel in petitioner's absence, therefore insuring only its faulty account of what took place could be reviewed; (b) There was no copy the actual written instructions given to the jury in the state appellate record for review, because the trial court failed to have a copy stamped, dated and placed in the record. Instead, on appeal, the trial reporter created a copy of what the trial court claimed went to the jury. These were the augmented ones (the same ones given to petitioner when the jury rendered its verdict) which the trial court claimed did not go to the jury. Therefore, the trial court's description of what was given to the jury and took place in petitioner's absence, cannot be relied upon; (c) Four verdict choices were given to the jury on reinstructions, even though there were only three possible verdict choices. And, there is no way to ascertain what that fourth verdict choice was, because the trial court deliberately did not preserve an actual copy of written instructions given to the jury nor the record surrounding the giving of the instructions; (d) immediately after being reinstructed in petitioner's absence, the jury that had been split "6 to 6 for the longest time" suddenly shifted almost wholly toward guilty; (e) The day after receiving written instructions in petitioner's absence, **three** jurors requested to be removed

19

1  from the jury. And the record demonstrates at least one of them
2  (jury Cruz) was one of the 6 leaning toward acquital prior to
3  being reinstructed. (f) Although the jury was reconvened in open
4  court, in petitioner's absence, in front of the prosecutor  and
5  advisory counsel, the record does not reflect the trial court
6  having admonished the jury not to speculate regarding petitioner's
7  absence or otherwise explain to the jury why petitioner was not
8  there. That is, the jury may have speculated petitioner had been
9  removed because of misconduct or that petitioner had given-up,
10 interpreting that as a sign of guilt; (h) Nor does the record
11 reflect that the trial court ever sought to clarify what the
12 jury considered to be a fourth verdict, nor did the court attempt
13 to admonish the jury that there were only three possible verdict
14 choices.

15     In this case, the record is undisputed that petitioner never
16 gave advisory counsel permission, express or implied, to act in
17 his behalf regarding the jury reinstruction or at any other time
18 during the lengthy trial. In fact, the evidence is to the
19 contrary, i.e., the court gave strict instructions to counsel
20 to advice only when asked, explaining to the jury, counsel was
21 to advice quitely. And, the trial court broke its word to
22 petitioner, that it would call him into the courtroom to discuss
23 what written instructions to send the jury, once it recovened on
24 the 14th. As the Ninth Circuit noted  in Frantz: "Absent consent
25 ... his exclusion from  the chambers conference was unconstitu-
26 tional ...." (Frantz, supra, 2008 DJDAR at 1118).

27     Third: on the issue of prejudice to the government, there
28 is none. The records are still available, and if any is lacking

, petitioner can supply them. And, surely neither state or federal governments have any interest in seeing that a clearly erroneous judgment is enforced and maintained.

Based on the above, petitioner's motion falls within the "extraordinary circumstances" exception and is timely based on the particular facts in this case. Petitioner is entitled to relief.

### VIII. PETITIONER IS ENTITLED TO AN EVIDENTIARY HEARING IS THERE ARE ANY FACTUAL DISPUTES.

Petitioner insists, the record is sufficiently established to demonstrate that the District Court's judgment is based on an erroneous legal standard, and that underlying his claim of being absented during jury reinstruction, he did not by either express or implied consent, allow advisory counsel to act in his absence or speak for him. This assertion is backed-up by the fact, that at no time during petitioner's state appellate review or subsequent state or federal litigation, did any party or any court ever claim or infer, that petitioner consented (expressly or implicitly) to advisory counsel's advocacy on his behalf in his absence. Therefore, it would be impossible to make such an allegation now. Nonetheless, should this or any other relevant or material fact be at issue, petitioner is entitled to an evidentiary hearing. Keeney v. Tamayo-Reyes (1992) 504 U.S. 1; Morris v. Woodford (9th Cir. 2000) 229 F.3d 775; Williams v. Taylor (2000) 529 U.S. 362, 431; Baja v. Ducharme (9th Cir. 1999) 187 F.3d 1075, 1078.

date, every court (both state and federal) has unfairly placed the burden on petitioner to "prove" what that **4th Verdict** was. This is an outrageously unfair burden to place on petitioner, especially since the trial court "intentionally" and "deliberately" absented him from those proceedings, and then just as "intentionally" and "deliberately" silenced the record during the absented proceedings.

The record is conclusive, that a **4th Verdict** was given to the jury in petitioner's absence, however, without having the power of **clairvoyance** or other supernatural powers, petitioner has no way of knowing exactly what was given to the jury. And, as demonstrated above, the record clearly reflects, the jury was not given the written instructions the trial court claimed it sent, i.e., they were not given a copy of the unaugmented instructions that didn't contain elements such as "willful", etc. The written instructions placed into the state appellate record by the Clerk of the trial court, contained the "augmented" written instructions the trial court claimed that was not given to the jury; And, the augmented instructions contained no court stamp or seal or date indicating when it was placed into the record.

Based on the above, petitioner request an evidentiary hearing on this issue, if the court does not grant this motion outright.

CONCLUSION

Petitioner request the court grant his Rule 60(b)(6) Motion and reverse its July 1, 1992 judgment and appoint counsel.

Dated: April _23_, 2008

Abe Williams, Jr.
In Pro Se

# EXHIBIT COVER PAGE

A

EXHIBIT

Description of this Exhibit:

Number of pages to this Exhibit: __*21*__ pages.

JURISDICTION: (Check only one)

☐ Municipal Court
☐ Superior Court
☐ Appellate Court
☐ State Supreme Court
☐ United States District Court
☐ State Circuit Court
☐ United States Supreme Court
☐ Grand Jury



proved for
with
icial
incil forms
. 1, 1997)

FILED

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| ABE WILLIAMS, | ) | No.  C-91-2589 JPV |
| Petitioner | ) | |
| | ) | ORDER DENYING |
| v. | ) | HABEAS CORPUS |
| | ) | PETITION PURSUANT TO |
| EDDIE YLST, | ) | 28 U.S.C. § 2254 IN |
| | ) | PART AND ORDERING |
| Respondent | ) | EXPANSION OF RECORD |
| | ) | IN PART |

## INTRODUCTION

On October 5, 1986, petitioner was convicted by a jury in state court of second degree murder of an adolescent.  After exhausting his appeals, he filed this habeas corpus petition pursuant to 28 U.S.C. § 2254. Petitioner raises four grounds:  A) Denial of a continuance; B) Absenting petitioner from jury reinstruction; C) Ineffective assistance of appellate counsel; and D) Bias of the trial court.

## BACKGROUND

Petitioner was convicted on a second degree murder charge for the murder of Tequila Harris, the adolescent

1

daughter of Debra Harris, who was Petitioner's girlfriend at the time.  On May 27, 1984, after having been whipped several times with a belt and tied to a door by her hands for several hours, Tequila was beaten on the head by a broom handle, causing death by severe trauma and massive hemorrhaging to the brain.  Petitioner admitted to the police to having beaten the child, but later argued that the child's mother was the true killer of Tequila.

Petitioner was provided the counsel of Scott Spear of the Alameda County Public Defender's Office.  The first trial began on September 2, 1986 in Alameda County Superior Court before the Honorable Jacqueline Taber.  On September 5, 1986, Spear moved for a mistrial when Officer Matthews mistakenly testified that petitioner was under a parole hold.  The court granted the motion on September 10.  On September 11, petitioner moved to have Spear removed as counsel due to an irreconcilable conflict.  The motion was granted and petitioner was granted self-representation, with Spear as advisory counsel, for the second trial.

During voir dire, petitioner moved for a continuance of ten and then five days.  The motion was denied and jury selection commenced on the afternoon of September 11 and continued the next day.  On September 15, Spear was ill and petitioner accepted the option of continuing the case until Spear recovered.  Jury selection recommenced September 23 and the prosecution called its first witness the next day.  On September 25, petitioner's motion to remove Spear as advisory counsel was granted.  Spear was reappointed

advisory counsel on September 30.  The jury was instructed on October 9 and rendered its verdict on October 15.

## DISCUSSION

### A. Denial of a Continuance

The petitioner alleges that the court's unwillingness to grant a continuance when he became a pro per defendant denied him the opportunity to prepare for trial.  Petitioner requested the continuance for five or ten days in order to "look up" jury instructions and "basic laws governing trial procedures" (RT 635), to learn general proceedings and acquire a strategy (RT 636), to research the law (RT 639-640), and to decide whether to subpoena additional witnesses. (RT 641).

Not every refusal of a continuance violates due process, even if it means the party is denied the opportunity to offer evidence or have counsel.  Ungar v. Sarafite, 376 U.S. 575, 589 (1964).  Denial of such a motion will only be reversed upon a showing of a "clear abuse of discretion" by the trial judge.  United States v. Gonzalez, 800 F.2d 895, 898 (9th Cir. 1986).  This abuse is only shown if the court unreasonably and arbitrarily insisted upon expeditiousness in the face of a justifiable request for delay.  Id.

Armant v. Marquez, 772 F.2d 552 (9th Cir. 1985), established four factors for courts to consider in reviewing a denial of a continuance.  First, the degree of diligence made by the appellant prior to the date beyond which a continuance is sought.  Second, the usefulness to appellant

3

if the continuance had been granted.  Third, the inconvenience that would have been placed on the court or the government if the continuance had been granted.  Fourth, the amount of prejudice suffered by the appellant due to the denial.  Id. at 556-57.

Petitioner's allegations fail to meet these standards. First, petitioner was not diligent in the period prior to when the continuance was denied.  Petitioner was aware before his first trial, on September 2, of the conflict he had with his counsel.  RT 610.  Yet petitioner was willing to undergo the trial without representing himself.  It was only due to the granting of a mistrial, completely unrelated to this conflict, that allowed petitioner the opportunity to represent himself.

Second, the usefulness of a continuance to petitioner is questionable.  While the ten or five day request might have given petitioner the opportunity to investigate some legal factors, it may also have confused and complicated matters, as implied by the trial judge.  Furthermore, as legal practitioners in these matters have years of experience, it is doubtful that five days would have been more than minimally useful for petitioner.  Finally, petitioner had 19 months to analyze the facts and the legal arguments.  Since his disagreement with the attorney focused on divergent views involving the legal process of the case, petitioner had clearly been contemplating the issues for a long period.  In comparison to his nineteen month period of reflection, the requested five days would not have been

extremely useful.

Third, the inconvenience to the court and the government would have been considerable. The government expressed that it was seriously backlogged. Furthermore, the case had already been mistried, through no fault of the petitioner, and jury selection had already been a four week process.

Fourth, the petitioner was not excessively prejudiced by the denial of a continuance. During the voir dire, the judge had already told the petitioner that no time for continuance would be allotted to him if petitioner was granted pro per status. RT 635. In addition, petitioner received a de facto eight-day continuance due to his advisory counsel's illness. While part of this period was consumed by requiring petitioner to be at the courthouse every day, the petitioner was accorded a significant period to evaluate his case and legal arguments. Last, petitioner still acquired the assistance of advisory counsel and was accorded the opportunity to view a "practice run" of the case by viewing the first trial before it was declared mistried.

Overall, petitioner's need for a continuance did not reach the level necessary to overturn the trial court's denial. There was no clear abuse of discretion by the trial judge. Rather, the decision to deny the continuance was reasonable and not based solely on a desire to move expeditiously. The judge's belief that petitioner had already been accorded sufficient time, as well as the aid of

1    counsel and the warning that additional time would not be

2    granted, sustains the trial court's decision.

3        B.  Absenting Petitioner from Jury Reinstruction

4        Petitioner alleges that the court's action in failing

5    to have petitioner present during reinstruction to the jury

6    was a constitutional error.  However, an error is not

7    unconstitutional if it is merely harmless.  Chapman v.

8    California, 386 U.S. 18, 24 (1967); United States v. Frazin,

9    780 F.2d 1461, 1469 (9th Cir. 1986) cert. denied, 479 U.S.

10   844 (1986).  To establish harmlessness, the government must

11   "prove beyond a reasonable doubt that the error complained

12   of did not contribute to the verdict obtained."  Chapman,

13   386 U.S. at 24.

14       Three factors need to be analyzed to determine whether

15   the court's failure to consult with petitioner before giving

16   the jury any instruction contributed to the jury's return of

17   the verdict:  1) the probable effect on the jury of the

18   message actually sent; 2) the likelihood that the trial

19   court would have sent a different message had it consulted

20   with petitioner; and 3) whether any changes in the message

21   that the jury might have obtained would have affected the

22   verdict in any way.  Frazin, 780 F.2d at 1470.

23       Applying these guidelines to petitioner's case,

24   petitioner's allegation of constitutional error is without

25   merit.  According to the Reporter's transcript, the jury

26   requested only a written set of the definitions for the

27   crimes charged to petitioner.  RT 1933-34.  These

28   definitions had already been read to the jury in court and

6

1   were merely transcribed by the reporter and submitted to the

2   jury.  The only addition was the court's notation that all

3   the instructions were to be considered as a whole and none

4   excluded.  Id.  Present during this conference were

5   petitioner's advisory counsel and the government's

6   attorneys.  Petitioner, himself, was not present as the

7   judge believed the matter to be purely technical and felt

8   that the time to acquire petitioner from the holding cell

9   would outweigh the use of his presence.  The petitioner did

10   not receive a copy of the reinstructions given to the jury

11   until the jury verdict was announced later that afternoon.

12       Even assuming that the judge's decision was erroneous,

13   it was clearly harmless error under Frazin.  First, the

14   probable effect of the message actually sent was not

15   exceptional.  It merely restated the exact instructions

16   which had been read to the jury in the court.  At best, it

17   clarified the precise wording used in determining the crimes

18   charged.

19       Second, it is unlikely that the court would have issued

20   a different set of instructions if petitioner had been

21   present.  The trial judge had intended to add instructions

22   defining willful and specific intent.  However, the jury's

23   declaration that it wanted only the definitions of the

24   verdicts thwarted the judge from inserting further

25   instructions.  It is unlikely that any of petitioner's

26   suggestions for further instructions would have been

27   inserted, due to the specific request of the jury.  Lastly,

28   petitioner's advisory counsel was present and able to insure

7

1  petitioner's interests were considered.

2  Petitioner, however, asserts that a different set of
3  instructions would have been sent had he been present.
4  Petitioner alleges that the instructions he was provided
5  with were not necessarily those given to the jury.  However,
6  from the comments of the court, the government, and the
7  advisory counsel, it is clear that the instructions given to
8  the jury were reinstructions from the original oral
9  instructions and were faithfully given to petitioner.

10  Petitioner also asserts that his advisory counsel did
11  not possess the legal capability to raise objections.
12  Nonetheless, the advisory counsel not only claimed to have
13  protected petitioner's interest, but also stated that the
14  instructions eventually given to petitioner were also those
15  submitted to the jury.  Despite petitioner's allegations to
16  the contrary, advisory counsel's assertion, in a private
17  letter to petitioner, stating that "I was not, of course
18  present when any written copies of instructions were given
19  physically to the jury" cannot be misconstrued.  The
20  assertion merely states the obvious.  Attorneys are not
21  present when the jury is actually handed the document.
22  However, they are present when the document is sent to the
23  jury.

24  Furthermore, the role that the advisory attorney played
25  was significant and sufficient for petitioner's needs.
26  Since the request by the jury was specific in its interests,
27  the advisor's role, even if he had had legal power to
28  object, could not have been greater than it was.

8

Evaluating the third factor in <u>Frazin</u>, as no changes were likely to have been made by petitioner's attendance, the verdict would not have been affected in any way. Even if petitioner's changes had been allowed, these would also not have affected the verdict. Petitioner notes that his major concern was the supposed confusion of the jury over whether there were three or four crimes of which he was accused. Petitioner argues he would have made it explicit by expressly stating only three crimes were at stake. However, since the court handed written instructions in which only the three crimes were articulated, it is difficult to perceive how petitioner would have made this more explicit than with the instructions actually given, while still abiding by the jury's request.

Furthermore, the supposed "fourth" possible crime theory does not promote petitioner's case. It is doubtful that the jury could have found petitioner guilty on this ground since only a few words were spoken about it by the trial judge before it was decided to exclude this as a possible verdict. Furthermore, the fourth possible verdict was felony murder. This crime requires a higher degree of culpability than the other three charges considered. To have found petitioner guilty on the felony murder charge, the jury would have had to have found petitioner had also met the lesser culpability requirements of the other three charges. Thus, even an alleged confusion over felony murder would not have rendered petitioner a different verdict.

/ / /

9

C.   Ineffective Assistance of Appellate Counsel

Petitioner has made seven claims of ineffective assistance by his appellate counsel.  Appellate counsel has no duty to raise every nonfrivolous or colorable issue requested by the client when counsel's professional judgment dictates otherwise.  Jones v. Barnes, 463 U.S. 745, 751-754 (1983).  The "weeding out of weaker issues is widely recognized as one of the hallmarks of effective appellate advocacy."  Miller v. Keeney, 882 F.2d 1428, 1434 (9th Cir. 1989) (footnote omitted).

The proper standard of attorney performance is a two part test.  First, defendant must demonstrate that counsel's representation fell below an objective standard of reasonableness.  Strickland v. Washington, 466 U.S. 668, 688 (1984).  Thus, "a reviewing court is not free to engage in after-the-fact second guessing of strategic decisions made by counsel" unless no plausible reason exists for the decision.  U.S. v. Claiborne, 870 F.2d 1463, 1468-1469 (9th Cir. 1989).  Second, defendant must have suffered sufficient prejudice due on the error, such that the error affected petitioner's judgment.  Strickland, 466 U.S. at 691-92.

Claim #1

Petitioner alleges counsel's ineffectiveness for failing to seek the unreported proceedings of the reinstruction meeting (discussed above).  Petitioner cannot be denied a "record of sufficient completeness."  Mayer v. City of Chicago, 404 U.S. 189, 198 (1971).  However, petitioner is not automatically entitled to a full verbatim

transcript.  Id.  To determine petitioner's need for the
transcripts, the Ninth Circuit has identified two criteria:
1) the value of the transcript to the defendant in
connection to his appeal or trial for which it is sought;
and 2) the availability of alternative devices which would
fulfill the same functions as a transcript.  Madera v.
Risley, 885 F.2d 646, 648 (9th Cir. 1989).  Alternative
devices which could be deemed equivalent are:  a statement
of facts agreed to by both sides, a full narrative statement
based on the trial judge's minutes taken during trial or on
the court reporter's untranscribed notes, or a bystander's
bill of exceptions.  Id.;  Mayer, 404 U.S. at 195.

In petitioner's case, alternative devices are available
that will fulfill the same function as a transcript.  Both
the prosecuting attorney and the advisory counsel agreed, in
the record, to the same set of facts on the reinstruction
conference.  Furthermore, a full narrative statement of the
issues discussed was provided by the trial judge and placed
on the record.  Last, both attorneys and the trial judge
stipulated that petitioner was provided a copy of the exact
reinstructions given to the jury.  Thus, petitioner's
request for the exact transcript is without merit.

Claim #2

Petitioner also alleges appellate counsel was
incompetent for failing to acquire a declaration from trial
advisory counsel on the reinstruction meeting.  Petitioner
alleges that, based on a letter he received from advisory
counsel after the trial, advisory counsel was not present

11

1 during the conference on reinstruction, advisory counsel did
2 not approve the written instructions, and advisory counsel
3 was not present when the written instructions were given to
4 the jury.  Petitioner asserts that appellate counsel was
5 ineffective for failing to acquire a declaration from
6 advisory counsel based on these issues.

7 However, petitioner's argument misconstrues the factual
8 evidence.  The declaration and letter of advisory counsel,
9 upon which petitioner relies, do not support petitioner's
10 allegations.  Advisory counsel Spear declares that he has no
11 present recollection of a conference on October 14, when the
12 reinstruction occurred.  However, the declaration does not
13 assert that he denies being present at such a meeting.  In
14 fact, the trial record demonstrates that Spear was at such a
15 meeting.  According to the Reporter's Transcript, the trial
16 judge stated that she called both attorneys, including
17 advisory counsel, into the conference.  Spear did not object
18 to the judge's statement.  RT 1934.

19 In addition, the declaration does state that counsel,
20 even if he had attended the conference, would not have
21 provided any input.  However, no input was necessary as the
22 instructions given were merely a restatement of earlier
23 approved instructions.  Furthermore, the record shows that
24 advisory counsel stated that the copy given to petitioner
25 was the same as given to the jury.

26 As to advisory counsel's presence when the written
27 instructions were given to the jury, counsel's letter states
28 only that he was not present when the instructions were

12

1  "given physically to the jury."  As indicated above, this
2  simply means that the instructions were sent to the jury
3  room through the bailiff, and thus counsel was obviously not
4  in the jury room.  The record supports this interpretation
5  for the court stated that it "sent the instructions" to the
6  jury, thus implying transmission from one place to another.
7  Based on the factual evidence, appellate counsel was
8  justified in refusing to raise this issue on appeal and
9  petitioner suffered no prejudice due to the omission.

10      Claim #3

11      Petitioner contends appellate counsel was incompetent
12  for failing to raise the invalidity of his two prior
13  convictions.  Petitioner alleges that in pleading guilty to
14  crimes in 1978 and 1979, he was not advised of the parole
15  consequences of his pleas.  Petitioner asserts that had he
16  known of the parole consequences of his 1978 and 1979
17  convictions, he would not have pled guilty to those
18  offenses.   Thus, according to petitioner, the prison
19  enhancements of two years, that were attached to this
20  conviction due to the prior 1978 and 1979 convictions,
21  should have been appealed by appellate counsel.

22      However, this is an incorrect interpretation of case
23  law.   The requirement that information on parole
24  consequences must be given to a defendant pleading guilty is
25  inapplicable to pleas occurring before 1983 as a matter of
26  state law, In re Carabes, 144 Cal.App.3d 927, 932, n. 4
27  (1983), and before 1987 as a matter of federal law.   Allen
28  v. Bunnell, 891 F.2d 736 (9th Cir. 1989).  As petitioner's

original guilty pleas occurred in 1978 and 1979, they are inapplicable under state and federal law.

Petitioner, however, wishes to distinguish between motions to strike and those to reverse the original plea bargain.  There is no measure of untimely action for a motion to strike an enhancement.  People v. Sumstine, 36 Cal.3d 909, 920-921 (1984).  However, Sumstine can be distinguished from this case.  In Sumstine, the issue concerned the alleged failure of police in a prior conviction to accord the defendant the rights of confrontation, jury trial, and against self-incrimination. These rights had been established by 1969 cases, which were prior to the 1974 pleadings of Sumstine's first conviction. Thus, the requirements of confrontation, jury, trial, and against incrimination had already been established.

In this case, the requirement of parole information was not case law prior to petitioner's 1978 and 1979 guilty pleas.  As both In re Carabes and Allen v. Bunnell refused retroactive considerations and were decided after petitioner's 1978 and 1979 pleas, the enhancements were correctly employed.  Cases prior to 1978 did recognize that a defendant was required to be informed of his constitutional rights when pleading guilty, Boykin v. Alabama, 395 U.S. 238 (1969); In re Tahl, 1 Cal.3d 122 (1969).  However, California state law did not assert information regarding parole consequences to be such a constitutional right until In re Carabes in 1983.  Thus, appellate counsel was correct in refusing to consider these

14

1  frivolous claims and no assertion of ineffectiveness can be
2  maintained.

3      Claim #4

4      Petitioner alleges ineffectiveness of counsel for
5  refusal to raise on appeal an alleged racially prejudiced
6  and biased comment made by the trial judge during jury voir
7  dire.  However, no transcript of the voir dire appears to be
8  on record.  Without this factual evidence, this Court is
9  unable to rule on the merits of petitioner's claim.  Rule 7,
10  of the Rules following 28 U.S.C. § 2254, authorizes the
11  expansion of the record.  Therefore, pursuant to this rule,
12  this Court hereby directs respondent to provide this court,
13  within thirty (30) days, a transcript of the September 11 to
14  September 23, 1986, voir dire proceedings from the second
15  trial in this case.

16      Claim #5

17      Petitioner next alleges that appellate counsel's
18  refusal to attempt to acquire a police finger print report
19  was incompetent.  Petitioner alleges the report claims the
20  child's mother, Debra Harris, as a suspect.  According to
21  petitioner, this would have two implications.  First, since
22  Harris was later considered a citizen informant, testifying
23  against petitioner, her evidence could diminish if she was
24  found to have been a co-suspect.  Second, since police
25  testimony held that the child's mother had never been a
26  suspect, this report would diminish the testimony of these
27  witnesses.

28      However, there are serious problems with petitioner's

15

assertions.   Petitioner sought to suppress his confession on the ground that his arrest lacked probable cause.   Harris' testimony was part of the basis for the probable cause of the arrest.   To determine probable cause, the court is required to evaluate the totality of circumstances. Illinois v. Gates, 462 U.S. 213, 231-2 (1983).   The reviewing court need have only a substantial basis for believing that probable cause existed and great deference should be given the trial court.   Id. at 236.

By evaluating Harris' testimony as a citizen informant under "all the circumstances," the court fulfilled its obligation.   The trial court was aware of Harris' original statement when the child was first brought to the doctor, Harris' psychiatric difficulties, and the circumstances under which the testimony was taken.   Nonetheless, under all the circumstances, there still remained probable cause to believe petitioner's guilt and accept the mother's testimony.   The police report would not have altered the court's opinion sufficiently to require its presence as new evidence.

Petitioner further claims that the missing document would impeach Officer Medsker's testimony.   However, petitioner provides no support whatsoever for this claim and the evidentiary record before this court contradicts his assertions.   Upon review of the record, this court can find no statement in Officer Medsker's testimony which falsely indicates that Harris was not a suspect.   In any event, petitioner has completely failed to demonstrate the required

16

prejudice under <u>Strickland</u>.

## Claim #6

Petitioner alleges that appellate counsel was ineffective in not raising claims against Spear for failing to protect petitioner's Fourth Amendment claims. Petitioner alleges Spear failed in several ways. First, Spear failed to make the judge aware that no homicide warrant had been issued. Instead, Spear allowed a police report containing Harris' incriminating statement to be placed into evidence as a homicide arrest warrant. Second, Spear failed to put forth evidence maligning Harris. This included failures to: a) address Harris' state of mind when she provided information to the police that led to petitioner's arrest; b) raise evidence that Harris was a suspect in the crime; and c) discover and raise evidence of Harris' confession to the murder. Third, pre-trial counsel refused to file petitioner's writ of habeas corpus on Fourth Amendment issues.

All of these claims, however, are without merit. Both counsels had reason not to address the warrant claim. In a letter to petitioner on May 29, 1985, Spear explained the warrant issue. He feared that raising this issue during the hearing would force the District Attorney to "make good on the parole warrant, and we would lose the whole thing forever." Furthermore, Spear did not want the District Attorney to file a complaint, which would justify the arrest warrant and push Officer Medsker to testify. Regardless of the success of this legal ruse, Spear's actions possessed

17

logical reasoning.  This court will not second-guess such

decisions nor evaluate legal strategies.[1]

As to allowing the police reports of Harris' assertion

of petitioner's guilt, the attorneys were not unreasonable

in not attempting to suppress these reports.  Again, the

information was allowed into the court as part of counsel's

strategy.  The evidence would have been provided even

without the police reports.  However, it would have been

provided in a more damaging manner, namely through testimony

by the police officer.  The officer would be able to attest

not only to Harris' assertions, but also to petitioner's

confession, the probable cause, the parole warrant, etc.

Spear's determination to keep the officer from testifying

was part of a logical strategy and will not be second-

guessed by this Court.

Spear and advisory counsel were also not unreasonable

in deciding not to raise petitioner's second request to

undermine Harris' testimony.  The issue of Harris being a

suspect in the case is frivolous (as discussed above).  The

issues of Harris' confession and mental state are also

without merit.  It is not surprising that a mother whose

child was just murdered would appear anguished and possibly

even blame herself for the child's death, especially if her

boyfriend was the culprit.  Furthermore, the evidentiary

record indicates at least one doctor on duty at the mental

hospital to which Harris was sent noted that she "was

[1] Furthermore, the record indicates that the police had
sufficient cause to make a warrantless arrest.  See U.S.
v. Watson, 423 U.S. 411 (1976).

18

obviously trying to protect her boyfriend."  Based on these
facts, it was a reasonable decision by counsel to ignore
Harris' confession and mental state.  Harping on such issues
may have forced Harris to testify at trial, which could have
further damaged petitioner's case.

As to the third point, counsel was not unreasonable in
not aiding petitioner's filing of a habeas corpus petition
on these Fourth Amendment claims.  Where the State has
provided an opportunity for full and fair litigation of a
Fourth Amendment claim, a state prisoner cannot be granted
federal habeas corpus relief based on an unconstitutional
search and seizure.  Stone v. Powell, 428 U.S. 465, 494
(1976); In re Sterling, 63 Cal.2d 486 (1965).  As petitioner
did not allege an unfair litigation of his Fourth Amendment
claim, it was reasonable for counsel not to assist
petitioner in filing such a claim.

Claim #7

Petitioner further alleges ineffectiveness for
appellate counsel's failure to raise on appeal petitioner's
inability to acquire assistance of counsel in preparing a
motion for a new trial.  There is a constitutional right to
counsel at the time of a new trial hearing.  Menfield v.
Borg, 881 F.2d 696, 699 (1989).  In the absence of
extraordinary circumstances, or a governmental showing that
the request was made in bad faith, an accused who requests
an attorney at the time of a motion for a new trial is
entitled to have one appointed.  Id. at 701.  If petitioner
made a motion in court for assistance of counsel for the new

1  trial motion, his request must be fulfilled.

2      However, there is no record of petitioner having
3  requested such counsel.  While petitioner alleges such
4  counsel was requested in a meeting on November 12, 1986,
5  petitioner alleges there is no evidence in the record of
6  such a meeting, much less the request.  In addition, letters
7  from advisory counsel Spear indicate that he was willing to
8  aid petitioner in preparing the new trial motion but that
9  petitioner spurned such a request.

10     With this evidentiary record, this Court cannot find
11 that appellate counsel was ineffective under Strickland for
12 failing to raise this claim.  Appellate counsel's actions
13 were reasonable and petitioner has failed to demonstrate the
14 required prejudice.

15                  D. Bias of the Trial Court

16     Petitioner alleges the court was biased in its overall
17 treatment of the trial.  Petitioner alleges that the court
18 violated his constitutional right to an impartial hearing by
19 denying petitioner's attendance at the reinstruction,
20 refusing a continuance, and often denying petitioner the
21 opportunity to fully voice his views.  Petitioner further
22 alleges bias by the court for failing to preserve all key
23 court documents and making a racial comment at the beginning
24 of trial.

25     However, petitioner asserts no new facts or arguments
26 in this section, nor any legal basis for his claim.  Rather,
27 he relies solely upon the prior allegations and assertions,
28 which have been found to be without merit.  Based on the

1  evidentiary record in this case, and the foregoing
2  discussion, petitioner's allegation of bias is likewise
3  without merit.

ORDER

4

5  For the reasons stated above, the Habeas Corpus
6  Petition pursuant to 28 U.S.C. § 2254 is DENIED except with
7  respect to petitioner's claim relating to prejudicial
8  statements allegedly made by the trial judge.[2]  As to this
9  remaining claim, respondent shall provide this court with a
10 transcript of the September 11 to September 23, 1986, voir
11 dire within thirty (30) days from the date of this order.

12

13 IT IS SO ORDERED

14 DATED: JUL - 1 1992

15

16                              J. P. VUKASIN, JR.
                                UNITED STATES DISTRICT JUDGE
17

18

19

20

21

22

23

24

25

26

27  [2] See Claim #4 under allegations of ineffectiveness of
28  counsel (Pg. 15).

21

# EXHIBIT COVER PAGE

B

EXHIBIT

Description of this Exhibit:

Number of pages to this Exhibit: __**2**__ pages.

JURISDICTION: (Check only one)

☐ Municipal Court
☐ Superior Court
☐ Appellate Court
☐ State Supreme Court
☒ United States District Court
☐ State Circuit Court
☐ United States Supreme Court
☐ Grand Jury

V

Defendant argues that his right to have counsel assist him at all critical stages of the proceedings was violated when the trial court reinstructed the jury in his absence. On October 10, the second day of deliberations, the jury sent the following note to the court: "We wish to have the Law pertaining to the 3 Verdicts. We wish more question forms." In open court, the trial court discussed this request with defendant and the prosecutor. The court sent the jury back to the jury room to await the written instructions requested and had a brief discussion with defendant, his advisory counsel and the prosecutor. At one point, defendant cautioned the court that it give only the first portion of CALJIC No. 8.31 on second degree murder. There were no objections made to submitting written instructions to the jury. The court then excused the jury until October 14, at which time she told them they would be supplied with the requested written instructions. The jury reassembled on that day, but the proceedings were not reported. Apparently, the court submitted the written instructions to the jury in the presence of the prosecutor and defendant's advisory counsel only. The next day, October 15, the judge informed defendant that she delivered written instructions on the charged and lesser offenses which were identical to the instructions it gave orally.

After lunch that same day, the jury returned with its verdict. At that point, defendant objected to the procedure of reinstructing the jury in his absence.

14

The reinstruction of the jury is a "critical stage" of the proceedings, requiring the presence of defendant or counsel. (People v. Weatherford (1945) 27 Cal.2d 401, 417-418; People v. Dagnino (1978) 80 Cal.App.3d 981, 988; see also Rogers v. United States (1975) 422 U.S. 35, 38-39; see Pen. Code, § 1138.)  It was error for the trial court to present the written instructions to the jury in defendant's absence.  However, under the circumstances we conclude that it was harmless beyond a reasonable doubt.  (See Chapman v. California (1967) 386 U.S. 18, 24; People v. Stewart (1983) 145 Cal.App.3d 967, 972-973.)  Although we have no record of what actually transpired, we are confident that the jury requested the definitions of second degree murder (Pen. Code, § 187) and felony-and-misdemeanor child abuse (Pen. Code, § 273a, subds. (1), (2)) be reread.  After consulting with the prosecutor and advisory counsel, the court gave the jury written copies of the instructions previously read.  The instructions were not defective and they favored neither the prosecutor's nor the defendant's version of the facts.  We deem it critical that defendant's advisory counsel, whom defendant considered to be extremely competent, was present and did not object to the content or to the presentation of written instructions.  We find no likelihood that the jury could have focused on one particular offense to the exclusion of the others since the jury was reinstructed on all the possible crimes.  We are satisfied beyond a reasonable doubt that the circumstances establish that defendant was not prejudiced.  (See People v. Wingo (1973) 34 Cal.App.3d 974, 984.)

15

# EXHIBIT COVER PAGE

| C |
| --- |

EXHIBIT

Description of this Exhibit:

Number of pages to this Exhibit: __|__ pages.

JURISDICTION: (Check only one)

☐ Municipal Court
☐ Superior Court
☐ Appellate Court
☐ State Supreme Court
☒ United States District Court
☐ State Circuit Court
☐ United States Supreme Court
☐ Grand Jury

ived for
ith
al
il forms
, 1997)

COURT OF APPEAL OF THE STATE OF CALIFORNIA

IN AND FOR THE

FIRST APPELLATE DISTRICT

DIVISION FIVE

# FILED

SEP 1 1 1990
Court of Appeal - First Dist.
RON D. BARROW, Clerk
By _____ DEPUTY

No. A0375

Alameda County
Superior Court
No. 80451

PEOPLE OF THE STATE OF CALIFORNIA
       Plaintiff/Respondent,

       v.

ABE WILLIAMS, JR.,
       Defendant/Appellant.

       )
       )
       )
       )
       )
       )
       )

BY THE COURT:

    Appellant's motion to recall the remittitur is denied.

Dated    SEP 1 1 1990

LOW, P.J.

                                                                          P.J.

The Justices participating in the above entitled matter are:
Low, P.J., King, J. Haning, J.

# EXHIBIT COVER PAGE

| D |
| --- |

EXHIBIT

Description of this Exhibit:

Number of pages to this Exhibit: ___1___ pages.

JURISDICTION: (Check only one)

- ☐ Municipal Court
- ☐ Superior Court
- ☐ Appellate Court
- ☐ State Supreme Court
- ☒ United States District Court
- ☐ State Circuit Court
- ☐ United States Supreme Court
- ☐ Grand Jury

# ORDER DENYING REVIEW

## AFTER JUDGMENT BY THE COURT OF APPEAL

### First Appellate District, Division Five, No. A037514
### S005988

## IN THE SUPREME COURT OF THE STATE OF CALIFORNIA

# IN BANK



SUPREME COURT
FILED

NOV 20 1990

Robert Wandruff Clerk

---

THE PEOPLE, Respondent

v.

ABE WILLIAMS, Jr., Appellant

---

Appellant's petition for review DENIED.

**LUCAS**

**Chief Justice**

# **EXHIBIT COVER PAGE**

E

EXHIBIT

Description of this Exhibit:

Number of pages to this Exhibit: __**|**__ pages.

JURISDICTION: (Check only one)

- ☐ Municipal Court
- ☐ Superior Court
- ☐ Appellate Court
- ☐ State Supreme Court
- ☒ United States District Court
- ☐ State Circuit Court
- ☐ United States Supreme Court
- ☐ Grand Jury

ved for
th
il
l forms
1997)

JUDGMENT

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

---------------

NO. 92-16655
CT/AG#: CV-91-02589-JPV

ABE WILLIAMS, JR.

     Plaintiff - Appellant

  v.

EDDIE YLST

     Defendant - Appellee

---------------------

APPEAL FROM the United States District Court for the
Northern District of California (San Francisco) .

THIS CAUSE came on to be heard on the Transcript of the
Record from the United States District Court for the
Northern District of California (San Francisco)
and was duly submitted.

ON CONSIDERATION WHEREOF, It is now here ordered and
adjudged by this Court, that the judgment of the said
District Court in this cause be, and hereby is AFFIRMED.

Filed and entered July 22, 1993.

TRUE COPY
CATHY A. CATTERSON
Clerk of Court
ATTEST

OCT 0 7 1993

by: _____
     Deputy Clerk

# EXHIBIT COVER PAGE

F

EXHIBIT

Description of this Exhibit:

Number of pages to this Exhibit: ___**1**___ pages.

JURISDICTION: (Check only one)

☐ Municipal Court
☐ Superior Court
☐ Appellate Court
☐ State Supreme Court
☒ United States District Court
☐ State Circuit Court
☐ United States Supreme Court
☐ Grand Jury

ved for
h
l
l form
1997)

102-753 5M 7/61 (new)

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**
IN AND FOR THE COUNTY OF ALAMEDA

**DEPT.** 7

ate: Sept. 25, 1986    Hon.    JACQUELINE TABER    , Judge    Joanne Norcup    , Deputy Clerk
, Deputy Sheriff    Jean Boothe    , Reporter

| THE PEOPLE OF THE STATE OF CALIFORNIA | | |
|---|---|---|
| Plaintiff | Counsel appearing for Plaintiff | Robert Platt, Assistant Public Defender |
| vs. ABE WILLIAMS, JR. | Counsel appearing for Defendant | Pro Per |
| Defendant | | |

NATURE OF PROCEEDINGS:    JURY TRIAL - FIFTH DAY    ACTION No. 80451

The above entitled matter comes on this date for further trial, having been continued from September 24, 1986.

At 10:07am the Court, counsel, defendant are all present in open court.  There is colloquy on the record out of the presence of the jury.  The defendant requests a continuance.  The motion is denied.

At 10:16am the jury is now present.  BURNY MATTHEWS is sworn and examined on behalf of the People.  The following exhibits are introduced for Identification, having previously been marked:

People's #9 - 2 pages of notes on yellow legal paper
    "    #10- 2 pages of notes on yellow legal paper
    "    #1 - Copy of a Miranda statement form signed by the defendant

At 10:32am the jury is admonished and recessed.  There is further colloquy on the record, out of the presence of the jury.  The defendant moves to have Scott Spear, his advisory counsel removed.  The motion is granted.  The Court orders that Mr. Spear is to remain in the courtroom during the remainder of the case but is not to have any contact with the defendant.  The defendant requests another attorney to serve as his advisory counsel.  The Court denies said motion.  At 11:27am the Court calls a recess.

At 11:46am all parties are present without the jury.  The defendant requests then withdraws his motion for a Marsden hearing.  At 12:00pm the Court calls the noon recess.

At 2:11pm all parties and the jury are present.  The witness resumes the stand.
The following exhibit is introduced for Identification, having previously been marked:

People's #8 - Group of notes on yellow legal paper, 35 pages

The following exhibits are marked for Identification:

People's #2AAA- Audio cassette tape, statement of defendant (1338), sides
            1 and 2, edited
    "    #2BB - Audio cassette tape, statement of defendant (1338), side
            3, edited
    "    #3AA - Audio cassette tape, statement of defendant (1549), edited

The tapes are played for the benefit of the jury.  At 3:05pm the jury is admon-

Page 1 of 2

# EXHIBIT COVER PAGE

G

EXHIBIT

Description of this Exhibit:

Number of pages to this Exhibit: __1__ pages.

JURISDICTION: (Check only one)

- ☐ Municipal Court
- ☐ Superior Court
- ☐ Appellate Court
- ☐ State Supreme Court
- ☒ United States District Court
- ☐ State Circuit Court
- ☐ United States Supreme Court
- ☐ Grand Jury

ved for
th
il
l forms
1997)

102-753 5M 7/61 (new)

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**
**IN AND FOR THE COUNTY OF ALAMEDA**

137 **DEPT.** 7

.e: Sept. 30, 198° Hon. JACQUELINE TABER     , Judge     Joanne Norcup     , Deputy Clerk
     , Deputy Sheriff     Jean Boothe & Reporter
     Jerry Dohrmann after 3:00pm

| THE PEOPLE OF THE STATE OF CALIFORNIA | Counsel appearing for Plaintiff | Robert Platt, Assistant District Attorney |
|---|---|---|
| Plaintiff | | |
| vs. ABE WILLIAMS, JR. | Counsel appearing for Defendant | Pro Per |
| Defendant | | |

NATURE OF PROCEEDINGS:     JURY TRIAL - SIXTH DAY     ACTION No. 80451

The above entitled matter comes on this date for further trial, having been continued from September 26, 198°.

At 9:56am the Court, defendant and defense investigator are present for an "in camera" hearing out of the presence of the jury and District Attorney. The Court orders that Warrants of Attachment be issued for Tommy Ford, Ruthie Ross, Shirley Taylor and Joyce Taylor with bail set at $25,000.00 each. Said warrants are to be held until October 1, 1985. At 10:25am the Court calls a recess to await a witness.
At 10:41am an "in camera" hearing is held in chambers on the record, with the defendant, defense investigator, judge and reporter present only.
At 11:03am the Court, counsel defendant and jury are all present in open court. The defendant presents his opening statement.
At 11:08am RALPH M. LACER is sworn and examined on behalf of the defense. At 12:00 pm the jury is admonished and recessed. There is further colloquy on the record, out of the presence of the jury. The following witnesses are ordered to return to this court at 1:30pm: Ralph Lacer, Clint Ojala, Ruthie Ross, and Tommie Ford. Witnesses Gerald Medsker and Daniel Murray are ordered to return at 9:45am on October 1, 198°.
At 12:17pm the Court calls the noon recess.

At 1:37am all parties and the jury are present. The witness resumes the stand for further examination. The following exhibit is introduced for Identification, having previously been marked:
  People's #6 - 2 page certified copy of a Medical Prescreen form
The following exhibit is marked for Identification:
  People's #21- 15 pages of notes on white lined paper
At 2:50pm the jury is admonished and recessed. There is further colloquy on the record out of the presence of the jury. An "in camera" hearing is held with the defendant and court personnel only present. At 2:55pm the Court calls a recess. At 3:09pm the Court and defendant are present on the record. Scott Spear, Asst. Public Defender is present and the Court now appoints Mr. Spear to assist the defendant as advisor in this trial. At 3:11pm all parties and the jury are now present. The witness resumes the stand for further examination. At 3:55pm TOMMIE FORD is sworn and examined on behalf of the defense. The warrant previously ordered held for Mr. Ford is hereby withdrawn. At 4:18pm the jury is admonished and recessed until Oct. 1, 1986. The witness, Tommie Ford, and Ruthie Ross are ordered to return on Oct. 1, 1986 at 2:00pm. Potential witness Clint Ojala is ordered to return at 10:00am on Oct. 1, 1986. At 4:25pm the Court calls the evening recess and this matter is continued to 9:30am on October 1, 1986 for further trial.
          Last Exhibits Being: People's #21, Defendant's "B"

# EXHIBIT COVER PAGE

| H |
|---|

EXHIBIT

Description of this Exhibit:

Number of pages to this Exhibit: __2__ pages.

JURISDICTION: (Check only one)

- ☐ Municipal Court
- ☐ Superior Court
- ☐ Appellate Court
- ☐ State Supreme Court
- ☒ United States District Court
- ☐ State Circuit Court
- ☐ United States Supreme Court
- ☐ Grand Jury

```
 1                         - AFTER RECESS -
 2                            ---o0o---
 3              (Whereupon, the following proceedings were had
 4     in chambers outside the presence of the jury)
 5              THE COURT:  All right.  Mr. Spear, are you in a
 6     position you can represent Mr. Williams?
 7              MR. SPEAR:  Well, there's too much of a
 8     difference between us, Your Honor.  I understand he wants
 9     to go pro per, but he wants me to back up there at the
10     table.
11              THE COURT:  Well, I hadn't heard that request
12     before.
13              Is that true?
14              THE DEFENDANT:  Yeah, well, it can kind of came
15     out what we were doing.
16              THE COURT:  You would like him at your elbow.
17              THE DEFENDANT:  I would like him for the
18     attorney, but we can't agree.
19              THE COURT:  Well, the Court will reappoint you
20     to sit at his elbow and give advice when asked for.
21              MR. SPEAR:  I may have been interfering too much
22     before.
23              THE COURT:  I doubt that, but I don't know what
24     went on between you.  But when you are asked, and only, is
25     that the way you want it, or how do you want it?
26              THE DEFENDANT:  No, I want his input.
27              THE COURT:  You want him to volunteer
28     information and make suggestion?
```

```
 1                 THE DEFENDANT:  Yes.
 2                 THE COURT:  All right.  You are the attorney of
 3      record.  Your motion to be substituted out is denied as
 4      untimely.
 5                           ---o0o---
 6                 (Whereupon, the following proceedings were had
 7      in open court with the presence of the jury)
 8                 THE COURT:  Ladies and gentlemen, you will
 9      notice Mr. Spear is back at counsel table.  Mr. Williams
10      has requested that he come back to assist him quietly.
11      However, Mr. Williams still continues as his own attorney,
12      but he would like that additional resource, and the Court
13      has allowed it.
14                 The record will reflect all twelve jurors are
15      present, the alternates, Mr. Platt, Mr. Spear, and Mr.
16      Williams.
17                 And, Sergeant, you are still under oath just as
18      if we hadn't had that recess.
19                 THE WITNESS:  Yes, Your Honor.
20                 THE COURT:  All right.  We were just starting
21      with you, Mr. Williams.  Do you have any further questions
22      of the Sergeant?
23                 MR. WILLIAMS:  Not at this time, Sergeant.
24                 THE COURT:  Well, no subject to recall.  There
25      is an end to doing these things.  You ask any and all
26      questions you want now, please.
27                 MR. WILLIAMS:  Well, Your Honor, I would like to
28      have some time to go through these transcripts.
```

# EXHIBIT COVER PAGE

| I |
|---|

EXHIBIT

Description of this Exhibit:

Number of pages to this Exhibit: __1__ pages.

JURISDICTION: (Check only one)

☐ Municipal Court
☐ Superior Court
☐ Appellate Court
☐ State Supreme Court
☒ United States District Court
☐ State Circuit Court
☐ United States Supreme Court
☐ Grand Jury

ved for
th
I
I forms
1997)

# FILED

OCT 10 1986

SUPERIOR COURT OF THE STATE OF CALIFORNIA RENE C. DAVIDSON, County Clerk

By _____ *Joanne M. Norcup*

IN AND FOR THE COUNTY OF ALAMEDA    JOANNE M. NORCUP, DEPUTY

| | |
|---|---|
| THE PEOPLE OF THE STATE OF CALIFORNIA, | ACTION NO. __80451__ |
| | PFN/CEN _____ |
| VS. | DEPT. NO. ___7___ |
| ABE WILLIAMS, JR | |

WE, THE JURY IN THE ABOVE ENTITLED ACTION, REQUEST THE FOLLOWING:

*We wish to see the law pertaining to the 3 Verdicts*

*who need not Return Enter forms.*

DATE: _____

TIME: _____

_____
FOREPERSON

40

# EXHIBIT COVER PAGE

J

EXHIBIT

Description of this Exhibit:

Number of pages to this Exhibit: __**2**__ pages.

JURISDICTION: (Check only one)

☐ Municipal Court
☐ Superior Court
☐ Appellate Court
☐ State Supreme Court
☒ United States District Court
☐ State Circuit Court
☐ United States Supreme Court
☐ Grand Jury

red for
h
l
form:
1997)

1927

1    READ ONE OR TWO WORDS AND THEN STOPPED.

2         THE COURT:  YES.  ALL RIGHT.  THAT'S WHAT YOU'RE

3    ALLUDING --

4              ALL RIGHT.

5

6        (THE FOLLOWING PROCEEDINGS WERE HEARD IN THE JURY ROOM:)

7

8         THE COURT:  I HEARD A RUMOR, COULD IT BE TRUE, YOU WANT TO

9    GO HOME?  ALL RIGHT.  FINE.  THEN AS YOU KNOW, MONDAY IS A LEGAL

10   HOLIDAY.  AND SO, YOU'RE COMING IN TUESDAY; IS THAT RIGHT?

11        THE FOREPERSON:  UH-HUM.

12        THE COURT:  10 O'CLOCK.  SO IN THE MEANTIME IT'S SO

13   IMPORTANT THAT YOU CAREFULLY AND CONSCIENTIOUSLY ABIDE BY THESE

14   INSTRUCTIONS.  DON'T DISCUSS THE CASE WITH ANYONE, EITHER AMONG

15   YOURSELVES OR BETWEEN YOURSELVES OR WITH YOUR FAMILY OR ANYONE

16   ELSE.

17             DON'T START YOUR DELIBERATIONS AGAIN UNTIL 10 O'CLOCK

18   TUESDAY WHEN YOU'RE CALLED TO ORDER BY YOUR FOREMAN WHEN YOU'RE

19   ALL TWELVE ARE PRESENT AND CAN HEAR THE DISCUSSION.  AVOID

20   RECEIVING ANYTHING THAT PURPORTS TO TO BE INFORMATION OR GOSSIP

21   ABOUT THE CASE OR THE PEOPLE IN IT.  AND HAVE NO CONVERSATION

22   WITH ANYONE WHO HAS BEEN OR IS A ACTIVE PARTICIPANT IN THE CASE

23   OR WHO YOU THINK ARE THEIR FAMILY OR FRIENDS NOW.

24             THE REPORTER WILL HAVE THE INSTRUCTIONS YOU REQUESTED

25   FOR YOU AT 10 O'CLOCK.  AND I THINK THAT'S ALL YOU'RE EXPECTING

26   FROM US.

27        A JUROR:  THAT'S RIGHT.  THANK YOU.

28        THE COURT:  ALL RIGHT.  HAVE A GOOD, GOOD HOLIDAY.

1      SEVERAL JURORS:  YOU HAVE IT TOO.

2

3      (THE FOLLOWING PROCEEDINGS WERE HEARD IN OPEN COURT:)

4

5      THE COURT:  THEN I'LL SEE BOTH OF YOU TUESDAY AT 10

6   O'CLOCK.  OKAY.

7      THE ALTERNATES:  AND COME HERE?

8      THE COURT:  NO, I THINK THAT WILL BE FINE.  TUESDAY GO

9   DIRECTLY TO THE JURY ROOM.  DON'T COME HERE BECAUSE WHAT WE'RE

10  GOING TO DO IS SEND YOU OUT TO LUNCH.

11      IF THE JURY -- WE'LL SEND YOU OUT TO LUNCH SO YOU

12  DON'T HAVE TO PUT YOUR ORDER IN FOR SANDWICHES.

13      THE ALTERNATES:  ALL RIGHT.

14      THE COURT:  NOW, OVER THIS WEEKEND, AGAIN, CAREFULLY AND

15  CONSCIENTIOUSLY FOLLOW THESE ADMONISHMENTS:

16      DON'T DISCUSS THE CASE AMONG YOURSELVES NOR WITH

17  ANYONE ELSE, OR IF YOU RUN INTO ANY MEMBER OF THE JURY, DON'T

18  ASK THEM WHAT THEY'RE DOING OR DISCUSS THE CASE WITH THEM.  HAVE

19  NO CONVERSATION ON ANY SUBJECT WITH ANYONE WHO HAS BEEN OR IS

20  STILL AN ACTIVE PARTICIPANT IN THE CASE OR YOU THINK ARE THEIR

21  FAMILY OR FRIENDS.  AND AVOID RECEIVING ANYTHING THAT PURPORTS

22  TO BE INFORMATION OR GOSSIP ABOUT THE CASE OR THE PEOPLE IN IT.

23      BUT DO HAVE A GOOD HOLIDAY.  MONDAY IS A LEGAL HOLIDAY

24  AND WE'RE MEETING ON TUESDAY.  SO GO DIRECTLY TO THE JURY ROOM,

25  AND THEN, IF WE NEED YOU, WE'LL CALL YOU.  OTHERWISE, WE'LL GET

26  AHOLD OF YOU AT LUNCH TIME.

27      THE ALTERNATES:  OKAY.  THANK YOU.

28

1329

1    (THE PROCEEDINGS IN THIS MATTER WERE ADJOURNED.)

2

3                        ---oOo---

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT COVER PAGE

| K |

EXHIBIT

Description of this Exhibit:

Number of pages to this Exhibit: __1__ pages.

JURISDICTION: (Check only one)

- ☐ Municipal Court
- ☐ Superior Court
- ☐ Appellate Court
- ☐ State Supreme Court
- ☒ United States District Court
- ☐ State Circuit Court
- ☐ United States Supreme Court
- ☐ Grand Jury

ed for

form)
1997)

146

102-753 5M 7/61 (new)

**DEPT.** 7

SUPERIOR COURT OF THE STATE OF CALIFORNIA
IN AND FOR THE COUNTY OF ALAMEDA

Date: Oct. 14, 1986    Hon. JACQUELINE TABER    , Judge    Joanne Norcup    , Deputy Clerk
                                                , Deputy Sheriff    Jean Boothe    , Reporter

| THE PEOPLE OF THE STATE OF CALIFORNIA | | |
|---|---|---|
| | Plaintiff | Counsel appearing for Plaintiff | Robert Platt, Assistant District Attorney |
| vs. ABE WILLIAMS, JR. | | Counsel appearing for Defendant | Pro Per |
| | Defendant | | |

NATURE OF PROCEEDINGS:    JURY TRIAL - 13TH DAY    ACTION No. 80451

The above entitled matter comes on this date for further trial, having been con-
tinued from October 10, 1986.

At 9:58am the jury is all present and resumes deliberations.  Alternates #2 and #3 are
on standby in the jury assembly room.  Alternate #1 remains on telephone standby at
his home.

At 10:01am the Court and counsel confer in chambers.  At 10:35am the Court calls a
recess to await the call of the jury.

At 12:18am the jury and 2 alternates are taken to lunch by deputies P. Garcia and
A. Mongi.

At 2:07pm the jury returns and resumes deliberations.

At 3:10pm the jury and alternates are each admonished separately and the Court calls
the evening recess.  This matter is continued to 10:00am on October 15, 1986 for
further jury deliberations.

Last Exhibits Being: People's #24, Defendant's "D"

# EXHIBIT COVER PAGE

L

EXHIBIT

Description of this Exhibit:

Number of pages to this Exhibit:  __**1**__ pages.

JURISDICTION: (Check only one)

☐ Municipal Court
☐ Superior Court
☐ Appellate Court
☐ State Supreme Court
☒ United States District Court
☐ State Circuit Court
☐ United States Supreme Court
☐ Grand Jury

ved for
h
I
I forms
1997)

# FILED

OCT 14 1988

SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF ALAMEDA

RENE C. DAVIDSON, County Clerk

By _Joanne M. Norcup_

JOANNE M. NORCUP, DEPUTY

THE PEOPLE OF THE
STATE OF CALIFORNIA,

VS.

_Eric Williams_

ACTION NO. _80451_

PFN/CEN _____

DEPT. NO. _7_

---

WE, THE JURY IN THE ABOVE ENTITLED ACTION, REQUEST THE FOLLOWING:

_Definition of the 4 Verdicts only._

This is only the code section defining the crime as
used on the verdict forms. Are you sure you
do not want all the instructions defining what
those code sections mean more fully?

J. Taber

DATE: _____

TIME: _____

_William Nash_
FOREPERSON

# EXHIBIT COVER PAGE

M

EXHIBIT

Description of this Exhibit:

Number of pages to this Exhibit: ___**l**___ pages.

JURISDICTION: (Check only one)

☐ Municipal Court
☐ Superior Court
☐ Appellate Court
☐ State Supreme Court
☒ United States District Court
☐ State Circuit Court
☐ United States Supreme Court
☐ Grand Jury

ved for
h
l
l forms
1997)

1    THE COURT:  DO YOU HAVE ANY PROBLEM -- DO YOU THINK THAT
2    THE LAW IS INFLEXIBLE?  DO YOU HAVE ANY PROBLEM FOLLOWING THE
3    LAW?
4         I DON'T MEAN UNDERSTANDING IT.  I KNOW YOU UNDERSTAND
5    IT.  BUT DO YOU HAVE ANY PROBLEM.
6    THE JUROR:  DEFINING THE FOUR?
7    THE COURT:  NO, NO, SIMPLY SAYING, WELL, THE LAW SAYS THIS
8    BUT I DON'T AGREE WITH THE LAW.
9    THE JUROR:  NO, NO.
10   THE COURT:  YOU DON'T HAVE ANY, NO PROBLEM?
11   THE JUROR:  NO, NO PROBLEMS THERE.  I AGREE WITH THE LAW.
12   THE COURT:  OKAY.
13   THE JUROR:  NO. I'M NOT THAT, THAT KIND OF A MAN.
14   THE COURT:  ALL RIGHT.  DO YOU HAVE ANY PROBLEM IN BEING
15   ABLE, ALLOWED IN THE JURY ROOM TO EXPRESS YOUR VIEWS?
16   THE JUROR:  WELL, I TRY TO THE BEST OF MY ABILITIES TO
17   EXPRESS.
18   THE COURT:  OKAY.
19   THE JUROR:  BUT WHEN OTHER PEOPLE TRY TO DISSECT
20   EVERYTHING, I SAY THEN I FIGURE THAT I'M NOT DOING A GOOD JOB.
21   LET, WE GOT TWO ALTERNATES, LET ONE OF THE ALTERNATES TAKE MY
22   PLACE AND GO UP THERE.  THAT'S WHAT I SAY.
23   THE COURT:  WELL, WAIT A MINUTE.  WAIT A MINUTE.  NO, NO,
24   THOSE ARE SAVED FOR REAL EMERGENCIES.  AND ARE YOU, YOU'RE
25   WILLING, AS I UNDERSTAND YOU.  TELL ME IF THIS IS RIGHT.
26   THE JUROR:  YES.
27   THE COURT:  YOU'RE WILLING TO DISCUSS THE MERITS OF IDEAS.
28   THE JUROR:  I HAVE.

# EXHIBIT COVER PAGE

N

EXHIBIT

Description of this Exhibit:

Number of pages to this Exhibit: __*3*__ pages.

JURISDICTION: (Check only one)

- [ ] Municipal Court
- [ ] Superior Court
- [ ] Appellate Court
- [ ] State Supreme Court
- [x] United States District Court
- [ ] State Circuit Court
- [ ] United States Supreme Court
- [ ] Grand Jury

red for
h
t
forms
1997)

I - 2

## Michael G. McCarthy

Investigator
1050 54th Street
Sacramento, California 95819
(916) 453-0508

JANUARY 11,1993

TO THE U.S. COURT OF APPEALS FOR THE NINTH DISTRICT:

I, MICHAEL G. MCCARTHY, A CALIFORNIA LICENSED PRIVATE INVESTIGATOR, DO HEREBY SWEAR, THAT ON JANUARY 10, 1992, I MET WITH WILLIAM H. HARA AT HIS RESIDENCE IN HAYWARD, CALIFORNIA AND ACQUIRED HIS AFFADAVIT, WHICH A TRUE COPY OF SAID AFFADAVIT IS HEREIN ATTACHED.

ALSO, WILLIAM H. HARA UNDERSTANDS THAT HIS STATEMENT IS TO BE SUB- MITTED TO THE NINTH DISTRICT COURT OF APPEALS ON BEHALF OF ABE WILLIAMS JR..

I, MICHAEL G. MCCARTHY, DO HEREBY SWEAR UNDER THE PENALTY OF PER- JURY AND THE LAWS OF THE STATE OF CALIFORNIA, THAT THE AFOREGOING IS TRUE AND CORRECT.

VERY TRULY YOURS,

MICHAEL G. MCCARTHY

SUBSCRIBED AND
THIS 11th DAY OF January 93



LUPE M. RANGEL
NOTARY PUBLIC
SACRAMENTO COUNTY, CALIFORNIA
My Commission Expires August 19, 1993

Lic. No. PI14404

$I-3$

Statement of ___WILLIAM H. HARA_____   Phone_____

Business Address ____N/A_____   Phone_____
         270 POPLAR   (510)
Home Address HAYWARD, CA. 94541_____   Phone__538-4642___

     I WILIAM H. HARA, DO HEREBY SWEAR THAT THE FOLLOWING
IS TRUE AND CORRECT.  I VIEWED TWO DOCUMENTS INITIALLED  AND
NUMBERED BY ME ON 1-10-93 IN THE PRESENCE OF INVESTIGATOR
MICHEAL G. McCARTHY, ABE WILLIAMS JR.'S INVESTIGATOR.  THE
DOCUMENTS WERE WRITTEN BY ME ASKING FOR DEFINITIONS OF THE
THREE VERDICTS AND THEN SUBMITTED A REQUEST FOR THE FOUR
VERDICTS.  I DO NOT SPECIFICALLY RECALL EXACTLY ALL THE
VERDICTS, BUT RECALL FELONY ABUSE AND SECOND DEGREE MURDER.
THE INITIALLED DOCUMENTS ARE A TRUE COPY OF THE ORIGINAL
REQUEST SUBMITTED BY ME.

     WILLIAM HARA

#1    Page No. _____

Statement of _William H. Hara_

Business Address _____ Phone _____

Home Address _____ Phone _____

I William H. Hara, Do hereby swear that
the following is true and correct. I signed
two documents initialed and numbered by
me on _____ in the presence _____
_____, the William his inspection. The
documents were written by me asking for _____
of the _____ verdict, and the _____ a
_____ for John's verdict. I do not _____ specifically
recall exactly all the verbals but I could
_____ the above and _____ come _____. The
initialed documents are a true copy of the original
requests submitted by me.


William Hara




Signed at _____ this ___ day of January 19 __

Witness _____    1 - 10 - 03

# EXHIBIT COVER PAGE

| O |
| EXHIBIT |

Description of this Exhibit:

Number of pages to this Exhibit: __$\mathcal{S}$__ pages.

JURISDICTION: (Check only one)

☐ Municipal Court
☐ Superior Court
☐ Appellate Court
☐ State Supreme Court
☒ United States District Court
☐ State Circuit Court
☐ United States Supreme Court
☐ Grand Jury

oved for
ith
al
il forms
, 1997)

# Michael G. McCarthy

Investigator
1050 54th Street
Sacramento, California 95819
(916) 453-0508

January 29, 1993

TO THE NINTH DISTRICT COURT OF APPEAL:

I Michael G. McCarthy, a California licensed private investigator,
do hereby swear under penalty of perjury and laws of the state of
California that the following is true and correct.

On January 23, 1993, I met with William H. Hara at his residence in
Hayward, California and acquired a further statement from him that
will do much to clarify his recollection of being the jury foreman
of my client's, Abe Williams Jr., trial jury and his present feel-
ings regarding the outcome of their de beration.

I swear under penalty of perjury and the laws of the state of Calif-
ornia that attached statement is in fact the statement I acquired
from William H. Hara on January 23, 1993.

If you have any questions, please feel free to contact me at your
convenience.

Dated  _1 - 29 - 93_

SUBSCRIBED AND SWORN TO BEFORE ME

THIS. 29th DAY OF. January .19. 93

NOTARY PUBLIC
Sacramento, California
My commission expires: 8/19/93



LUPE M. RANGEL
NOTARY PUBLIC
SACRAMENTO COUNTY, CALIFORNIA
My Commission Expires August

13

| Statement of | William H. Hara | Phone | |
|---|---|---|---|
| Business Address | | Phone | |
| | 270 Poplar | (510) | |
| Home Address | Hayward, Ca. 94541 | Phone 538-4642 | |

I, WILLIAM H. HARA, DO HEREBY SWEAR THAT THE FOLLOWING IS TRUE
AND CORRECT TO THE BEST OF MY KNOWLEDGE AND RECOLLECTION.

MR. McCARTHY, MR. WILLIAMS'S INVESTIGATOR, HAS ASKED ME
AGAIN TO PROVIDE A STATEMENT AS TO MY JURY RECEIVING 4 VERDICT
DEFINITIONS.   THIS IS TO CLARIFY MY MEMORY OF US ACTUALLY
RECEIVING DEFINITIONS FOR 4 VERDICTS.   I DO RECALL RECEIVING
THOSE 4 VERDICT DEFINITIONS, BUT I DO NOT ACTUALLY RECALL
THE VERDICTS THEMSELVES.

ALSO, MR. McCARTHY AND I HAD PREVIOUSLY DISCUSSED MY
FEELINGS IN REGARD TO THE CASE FACTS AND I FELT THAT IF AN
INSTRUCTION WAS GIVEN FOR INVOLUNTARY MANSLAUGHTER, PER A
PHOTOCOPY OF SUCH DEFINITION PROVIDED TO ME BY MR. McCARTHY,
I WOULD HAVE VOTED FOR IT BECAUSE IT'S DEFINITION FIT THE
FACTS.   IN FACT, THE JURY, WHICH I WAS FOREMAN, HAD VOTED
6 TO 6 FOR THE LONGEST TIME.   I CANNOT RECALL HOW OR WHEN
WE EVENTUALLY ALL VOTED FOR 2ND DEGREE MURDER.

THE FOREGOING IS TRUE AND CORRECT, AND I SWEAR UNDER
THE PENALTY OF PERJURY AND THE LAWS OF THE STATE OF CALIFORNIA
, THAT IT IS THUS - TRUE.

WILLIAM HARA

Signed at Hayward, Ca.   this 23 day of January      1993

Note: This is an exact transcription of William H. Hara's
      Affidavit, except scratched out mistakes with initials
      of Hara, have been excluded.

Page No. 1 of 1

Statement of William H. Hara

Business Address

Phone

Home Address 270 Poplar Hayward Ca 94541.    Phone (510) 538.4642

I, William H. Hara, Do HEREBY SWEAR tHAT THE lLowing is TRUE AND correct to tHe BEST OF MY knowledge & Recollection.

MR. McCarthy, MR William's INVestigator, has asked me again to provide a statement as to my jury receiving VERDict Definitions. That is to clarify my memory of Actually receiving Definitions for 4 VERDicts. I do recall receiving those 4 verdict definitions, but do not actually recall the verdicts themselves.

Also, MR. McCarthy AND I had previously discussed my my feelings IN regard to the CASE facts and I felt that if N instruction was given for involuntary manslaughter, per photocopy of such definition provided me by MR. McCarthy, I would have voted for it because its definition fit the facts. In fact, the jury, which I was foreman, had voted 6 to 6 for the longest time. I cannot recall how or when we eventually all voted for 2nd Degree murder.

The aforegoing is true and correct, and I swear under the penalty of perjury And the laws of the State of California, that it is true - True.

William Hara

Signed at Hayward, Ca   this 23rd day of January   19 93

# EXHIBIT COVER PAGE

| P |
| --- |

EXHIBIT

Description of this Exhibit:

Number of pages to this Exhibit: __//__ pages.

JURISDICTION: (Check only one)

☐ Municipal Court
☐ Superior Court
☐ Appellate Court
☐ State Supreme Court
☒ United States District Court
☐ State Circuit Court
☐ United States Supreme Court
☐ Grand Jury

ived for
th
al
it forms
, 1997)

1    HIM, GET A GOOD LOOK.

2          THE COURT:  HELLO, MR. CRUZ.  COME IN AND SIT HERE IF YOU

3    WILL, PLEASE.

4          THE JUROR:  YES, YES.

5          THE COURT:  BE SEATED.

6          THE CLERK:  CAN THEY TAKE A SMOKING BREAK?

7          THE COURT:  YES, THAT'S FINE.

8          THE CLERK:  DO I NEED TO GO UP?  THERE IS A DEPUTY ON GUARD

9    WATCHING THERE, BUT DO YOU NEED TO ME TO GO UP?

10         THE COURT:  YES, I DO, BECAUSE YOU'RE THE ONE THAT'S

11   WATCHING THEM.

12         THE CLERK:  ALL RIGHT.  THE PHONE WILL RING IN THERE.

13         THE COURT:  MR. CRUZ?

14         THE JUROR:  YES?

15         THE COURT:  WOULD LIKE TO BE REPLACED, WOULD LIKE TO TALK

16   TO JUDGE TO BE REPLACED.

17         THE JUROR:  YES, MA'AM.

18         THE COURT:  ALL RIGHT.  NOW, I WANT TO STRESS SOMETHING:  I

19   DON'T WANT TO GO INTO, I DON'T WANT TO KNOW HOW YOU PERSONALLY

20   ARE VOTING.

21         THE JUROR:  RIGHT.

22         THE COURT:  IF IN FACT SOME VOTES HAVE BEEN TAKEN.

23         THE JUROR:  RIGHT.

24         THE COURT:  AND I DO NOT WANT TO KNOW HOW ANYONE ELSE IS

25   VOTING.

26         THE JUROR:  RIGHT.

27         THE COURT:  I DON'T EVEN WANT TO KNOW WHAT THE DIVISION, IF

28   THERE IS A DIVISION, IS.

1037

1        THE JUROR:  YES, YES.

2        THE COURT:  IN YOUR VOTING.  I WANT TO AVOID THAT.

3        THE JUROR:  YES.

4        THE COURT:  UNLESS I COME OUT AND SAY THAT'S WHAT I DO WANT

5   TO KNOW.

6        THE JUROR:  YES.

7        THE COURT:  AND I CAN'T IMAGINE MY WANTING TO KNOW THAT.

8   EXCUSE ME JUST A MOMENT.

9            ALL RIGHT.  THEN CAN YOU TELL ME WHAT THE NATURE OF

10  YOUR PROBLEM IS?

11       THE JUROR:  WELL, I TELL YOU THE TRUTH, JUDGE, I DON'T KNOW

12  IF I CAN PUT IT IN THE RIGHT PERSPECTIVE; BUT, ANYHOW, I WAS

13  BORN AND RAISED IN WEST OAKLAND.  I WENT TO THE 9TH GRADE.  MY

14  EDUCATION ISN'T THE BEST THERE IS, BUT I SURVIVED FOR 71 YEARS

15  IN THIS WORLD AND I KNOW LOTS ABOUT THIS WORLD.

16           NOW, I'M A VERY SENSITIVE MAN.  TO ME THIS IS SERIOUS

17  BUSINESS.

18       THE COURT:  I THINK THAT'S TRUE.

19       THE JUROR:  AND I'M TRYING TO MAKE A DECISION.  I MADE A

20  DECISION.  I MADE THE DECISION AND I, I'VE TRIED TO EXPRESS

21  MYSELF.  BUT I DON'T LIKE EVERYTHING WAS BROUGHT DOWN HERE AND I

22  DON'T MIND WHEN WE GET UP THERE, EVERYBODY WANTS TO BRING ALL

23  THE EVIDENCE AGAINST.  THEY HEARD, THEY PAID ATTENTION JUST LIKE

24  I DID, BOTH SIDES, BOTH SIDES.  NOTHING WAS -- I GOT TO WATCH

25  HOW I TALK BECAUSE I DON'T WANT TO MAKE A --

26       THE COURT:  NO, I CAN SEE YOU'RE DEEPLY MOVED.

27       THE JUROR:  NOW, I'M DEEPLY MOVED THAT'S RIGHT.  I COULDN'T

28  SLEEP LAST NIGHT.  I COULDN'T SLEEP BEFORE AND I WENT TO EAT

1038

1    OVER AT THAT, THE RESTAURANT AND I COULDN'T EAT.   BUT YOU SEE,

2    YOU CAN'T LAUGH AND JOKE.   YOU GOT TO LOOK AT IT AND YOU GOT TO

3    HAVE A CERTAIN AMOUNT OF LENIENCY.   YOU CAN'T SAY THIS IS THIS

4    AND BOY, BAM, THAT'S IT.   THERE'S GOT TO BE A LITTLE

5    FLEXIBILITY, ALTHOUGH SOMETHING WAS DONE.   WE ALL ADMITTED THAT.

6    BUT I DON'T WANT THEM PEOPLE TO KIND OF DISECT EVERY WORD YOU

7    SAY.   THAT'S WHY WE GOT LAWYERS FOR.

8         THE COURT:   WELL --

9         THE JUROR:   THE DISTRICT ATTORNEY PRESENTED HIMSELF --

10        THE COURT:   MR. WILLIAMS --

11        THE JUROR:   THE YOUNG FELLA PRESENTED HIMSELF.   THEY

12   BROUGHT A, THEY BROUGHT IT, EVERYTHING OUT.   NOW, I CONCUR WITH

13   THAT.   I BROUGHT OUT WHAT I THOUGHT WAS LEGITIMATE.

14        THE COURT:   UH-HUM.

15        THE JUROR:   MY OWN THOUGHTS.

16        THE COURT:   ALL RIGHT.

17        THE JUROR:   NOT ONLY THAT.   MY GOOD COMMON SENSE, WHICH I

18   GOT BY IN THIS 71 YEARS IN THIS WORLD.   BUT ALSO A TOLERANCE, OF

19   A CERTAIN DEGREE.   NOW, I DON'T KNOW IF YOU FOLLOW THAT.

20        THE COURT:   WELL, LET ME --

21        THE JUROR:   THERE'S CERTAIN THINGS IN THIS WORLD THAT,

22   HUMM, BOY, IF YOU -- YOU KNOW, SOMETHING HAPPENED TO ME A LONG

23   TIME IN MY LIFE THAT I COULD BE SITTING RIGHT IN THAT BOY'S

24   CHAIR YOU SEE.   A MAN MADE ME MAD.   I HIT THE MAN AND HE WENT BY

25   AND HE HIT HIS HEAD IN THE CEMENT, BUT HE MOVED, SHOVED ME.   I

26   LOST MY HEAD IN THAT MOMENT.   IT'S, THERE IS A LITTLE BIT

27   TOLERANCE I GIVE THERE.   I DON'T, I DON'T CONDONE WHAT I DID AND

28   EVERYTHING ELSE, BUT I DON'T WANT TO GET INTO IT.

1930

1    THE COURT:   WERE YOU EVER CHARGED WITH ANYTHING?

2    THE JUROR:   NO, MA'AM, I WAS NOT.  I WAS NOT.  BUT ONLY

3    THROUGH GOD, I'M A CHURCH MAN.  I DON'T DRINK.  I DON'T SMOKE.

4    TWO OF THE WORSE THINGS IN THE WORLD.

5    THE COURT:   ALL RIGHT.  NOW --

6    THE JUROR:   WORSE THINGS IN THE WORLD IS SMOKE AND DOPE;

7    TWO OF THE WORSE THINGS.  THAT'S WHAT GETS EVERYBODY OVER THEIR

8    HEADS.  IT'S NOT THEIR DOING IF WE COULD KILL THIS DOPE OUT,

9    MAN, WE'D HAVE A GOOD SOCIETY.  ALL THESE DOGOODERS AND

10   EVERYTHING ELSE.  A PERSON IS NOT RESPONSIBLE IF HE DOES NOT

11   DRINK, IF HE, IF HE, IF HE DOESN'T TAKE DOPE OR HE SMOKES, AND

12   PEOPLE TRYING AND TELL ME THEY WOULD DO THIS.

13   WHEN YOU'RE UNDER THEIR INFLUENCE, YOU TAKE YOUR TIME.

14   YOU DON'T, DON'T ACT IN THE FASTNESS THAT YOU CAN; EVERYTHING IS

15   LACADASICAL AND THE WORLD SEEMS TO BE GOING BYE.

16   THE COURT: I'M NOT FOLLOWING THIS THOUGHT.

17   THE JUROR:  I KNOW YOU'RE NOT FOLLOWING BECAUSE YOU,

18   BECAUSE THAT'S THE WAY DOPE PEOPLE ARE.

19   THE COURT:  NO.  WAIT A MINUTE.  WAIT A MINUTE.  ARE YOU

20   SAYING THAT EVERYONE WHO USES DOPE, AS YOU CALL IT, HAS THE SAME

21   REACTIONS.

22   THE JUROR:  NO, MA'AM, I'M SAYING JUST OPPOSITE.  THEY DO

23   NOT HAVE THE SAME, THEY DO NOT HAVE THE SAME ACTIONS; AND WHEN

24   THEY'RE UNDER THAT INFLUENCE, THEY'RE NOT THEMSELVES.  THEY ARE

25   NOT THEMSELVES.  BUT AFTER ALL, WHEN THEY GET IN TROUBLE, WE ALL

26   GOT TO ANSWER TO OURSELVES.  BUT STILL, YOU CAN'T, YOU CAN'T GO

27   ABOVE IT.  YOU GOT, THIS IS WHERE THAT LITTLE, THAT LITTLE

28   SOMETHING COMES IN.

1941

1    THE COURT:  IS THAT RIGHT?

2    THE JUROR:  OVER AND OVER AND OVER AGAIN WITH THOSE PEOPLE

3    UP THERE, OVER AND OVER AGAIN.

4    THE COURT:  ALL RIGHT.  AND ARE YOU WILLING TO CONSIDER

5    WITH THEM, YOU SHARED WITH THEM YOUR VIEWPOINT?

6    THE JUROR:  I SHARED A LOT OF THINGS WITH THEM.

7    THE COURT:  OKAY.

8    THE JUROR:  BUT THERE IS A LOT OF THINGS I DIDN'T SHARE

9    WITH THEM TOO.  NOBODY IS GOING TO MAKE ME FOLLOW THE SHEEP.  I

10   GOT A MIND OF MY OWN.  I WILL --

11   THE COURT:  OKAY.

12   THE JUROR:  A STRONG MIND TOO, AND I KNOW WHAT'S RIGHT AND

13   WHAT'S WRONG.

14   THE COURT:  WELL, ALL RIGHT.  YEAH, I CAN TELL YOU HAVE

15   VERY STRONG FEELINGS.

16   THE JUROR:  THAT'S RIGHT.

17   THE COURT:  AND YOU'VE HAD A LOT OF LEARNING -- A LOT OF

18   LIVING IN 71 YEARS.

19   THE JUROR:  YOU BETTER BELIEVE IT, AND I'VE SEEN A LOT OF

20   THINGS HAPPEN.  IF THERE IS ANYTHING I HATE IN THIS WORLD IS TWO

21   THINGS IS BOOZE AND DOPE.

22   THE COURT:  WELL, YOU KNOW, AGAIN WE'RE NOT, IT'S NOT, IN

23   JURY WORK IT'S NOT A MATTER --

24   THE JUROR:  THAT'S RIGHT.

25   THE COURT:  IT'S NOT A MATTER OF WHETHER YOU LIKE OR DON'T

26   LIKE --

27   THE JUROR:  THAT'S RIGHT.  THAT'S RIGHT.

28   THE COURT:  WHETHER YOU DO OR YOU DON'T, NO MATTER.

1042

1       THE JUROR:  IT'S WHAT HAPPENED.

2       THE COURT:  WHAT DID HAPPEN ON THE DAY IN QUESTION.

3       THE JUROR:  WHAT HAPPENED.  I CONCUR WITH BOTH OF THEM.

4   THEY BOTH MADE VERY GOOD REPRESENTING, IT WAS ESTABLISHED.

5       THE COURT:  WAIT A MINUTE.  NOW, I WANT TO STAY AWAY FROM

6   THE EVIDENCE.

7       THE JUROR:  I WON'T SAY --

8       THE COURT:

9       THE JUROR:  ALL RIGHT.  I WILL DISCORD MYSELF.

10      THE COURT:  I DON'T WANT TO GO INTO THE DYNAMICS.

11      THE JUROR:  I KNOW WHAT WENT ON.  I LISTENED INTENTLY

12  THERE.

13      THE COURT:  BUT ARE YOU SAYING, ARE YOU WILLING TO LISTEN

14  AND CONSIDER WHAT THE OTHER JURORS SAY?

15      THE JUROR:  I HAVE.

16      THE COURT:  ALL RIGHT.

17      THE JUROR:  I HAVE FOR THE LAST 3 DAYS.  WHAT DO THEY DO?

18  RIGHT AWAY, SEE, IT'S THEIR PREROGATIVE IF THEY DON'T UNDERSTAND

19  SOMETHING TO BRING IT RIGHT AWAY, THE FIRST DAY THEY BRING ALL

20  THE TYPE UP AND ALL THE BOOK UP AND EVERYTHING ELSE.

21      THE COURT:  WELL, DOES THAT OFFEND YOU?

22      THE JUROR:  NO, IT DOESN'T OFFEND ME.  I SAYS, WELL, I GOT

23  MY IDEA AND I CAN, I CAN BRING THEM UP AND TELL YOU.

24      THE COURT:  UH-HUH.

25      THE JUROR:  SEE, BUT YOU HAVE YOUR PREROGATIVE TO GO OVER

26  THINGS, EVERYTHING; AND IF YOU DON'T UNDERSTAND, NOW IS THE

27  TIME --

28      THE COURT:  SURE.

1    THE JUROR:  YOU DON'T MAKE SNAP JUDGMENTS, YOU HAVE TO BE
2  TOLERANT, LISTEN TO THE OTHER PEOPLE SAYING IT.

3    THE COURT:  AND WELL, THEN WHAT'S THE PROBLEM WITH BRINGING
4  UP THE EVIDENCE?

5    THE ~~COURT~~ CRUZ:  THERE IS NO PROBLEM.  THE ONLY THING IS I DON'T
6  WANT THEM TO ZERO IN ON ME.

7    NOW, I CAN TAKE THE EASY WAY OUT AND GO UP THERE AND
8  KEEP MY MOUTH SHUT; BUT I DON'T WANT TO SEE THEM GOING ON THE
9  WRONG TRACK AND TAKING THE HIGH ROAD, WHICH IS AWFUL HIGH TO ME.
10  BOTH OF THEM HAS THE SAME WORDING, BOTH OF THEM HAS THE SAME
11  WORDING.  ONE'S, IS THE EXTREME AND ONE'S THE LESSER.

12    THE COURT:  MR. CRUZ, I WONDER IF YOU WOULD MIND STEPPING
13  BACK BACK INTO THE COURTROOM JUST A MOMENT, PLEASE?

14    THE JUROR:  SURE, SURE.

15    (THE JUROR MR. CRUZ LEAVES CHAMBERS.)

16    THE COURT:  WELL, I MUST CONFESS, I CAN'T FIGURE OUT HOW TO
17  HANDLE THIS.  I, I EVALUATE THIS MAN AS SIMPLY HAVING A VERY
18  DECIDED POINT OF VIEW, WHICH IS NOT FOR ME TO EITHER APPROVE OR
19  CONDEMN.  I DON'T, I HONESTLY DON'T SEE ANY JUSTIFICATION FOR
20  REMOVING HIM FROM THE JURY; AND YET, IT'S OBVIOUS TO ME IT WILL
21  RESULT IN A HUNG JURY.  BUT I DON'T SEE ANY, ANY, HE'S MENTALLY
22  SOUND.  HE'S ADAMANT.  HE HAS STRONG FEELINGS.  HE'S VERY ANGRY
23  WITH THE REST OF THE JURY WHO DON'T AGREE WITH HIM OR THAT PART
24  WHICH DOESN'T AGREE WITH HIM, BUT I DON'T THINK THAT'S A
25  JUSTIFICATION FOR REMOVING HIM.

26    MR. SPEAR:  UH-HUM.

27    MR. PLATT:  I WOULD ASK MERELY THE COURT CONSIDER ASKING
28  MR. CRUZ, IF YOU WILL CONFINE HIMSELF TO THE EVIDENCE IN THE

1944

1    CASE AND APPLY THE LAW AS YOU HAVE INSTRUCTED HIM TO THE

2    EVIDENCE AND MAKE HIS CALL BASED THEREON.  BUT THAT'S THE ONLY

3    ADDITIONAL QUESTION I WOULD ASK.

4         THE COURT:  ANY SUGGESTION FROM YOU, MR. WILLIAMS?

5         MR. WILLIAMS:  WELL, THAT'S KIND OF AN ASSUMPTION THAT HE'S

6    NOT DOING THAT TO ME.

7         THE COURT:  I KNOW, BUT IT'S JUST A REPEAT OF THE

8    INSTRUCTIONS.

9         MR. WILLIAMS:  YEAH, AS LONG AS HE UNDERSTANDS THAT THAT

10   DOESN'T MEAN THAT HIS POSITION HAS TO CHANGE, IF IT WAS GIVEN IN

11   A CERTAIN MANNER, IT'S COULD, POSSIBLE THAT YOU COULD ASSUME

12   BASED ON THAT, THAT YOU'RE NOT DOING THAT.

13        THE COURT:  I THINK THE LESS SAID TO HIM THE BETTER.

14             ALL RIGHT.  WOULD YOU ASK HIM TO STEP BACK IN?

15        THE COURT:  MR. CRUZ, THE LAW PUTS ON ME A VERY -- SIT DOWN

16   AND BE COMFORTABLE --  A VERY SERIOUS AND SEVERE BURDEN.

17        THE JUROR:  I KNOW.  I'M SORRY TO CAUSE THIS TROUBLE.

18        THE COURT:  WELL, YOU'RE NOT CAUSING THE TROUBLE.  YOU'VE

19   DONE EXACTLY THE RIGHT THING IN ASKING TO SPEAK WITH ME.  I

20   CANNOT REPLACE YOU, THOUGH.  THAT'S THE UNPLEASANT PART HAVE MY

21   JOB.  YOU KNOW, IF WE MET SOCIALLY --

22        THE JUROR:  YES, THAT'S ALL RIGHT.

23        THE COURT:  THAT'S A DIFFERENT THING.

24        THE JUROR:  IT'S UNDERSTANDABLE.  ALL THAT I'M SORRY ABOUT.

25        THE COURT:  NOW, HOLD ON A MINUTE.

26        THE JUROR:  THAT I CAN'T PRESENT IT IN A BETTER, UP, UP

27   THERE ON ACCOUNT OF MY EDUCATION.

28        THE COURT:  NO.  WAIT A MINUTE.  I THINK I UNDERSTAND YOU

1945

1  AND THERE ARE A COUPLE OF THINGS I WANT TO POINT OUT THAT, YOU
2  KNOW, YOU MUST USE YOUR OWN HEAD, YOUR OWN GOOD SENSE AND NOONE,
3  LET ALONE A JUDGE, IS TO EITHER SAY YOU'RE RIGHT OR YOU'RE
4  WRONG.  YOU DO WHAT TO THE VERY BEST OF YOUR ABILITIES,
5  CONSCIENTIOUSLY AND CAREFULLY.
6       THE JUROR:  YES, MA'AM.
7       THE COURT:  AND ALONG THAT LINE I AGAIN REMIND YOU AS I DID
8  IN THE INSTRUCTIONS THAT YOU LOOK AT THE EVIDENCE IN THIS CASE.
9       THE JUROR:  I HAVE.
10      THE COURT:  NOW, OKAY.
11      THE JUROR:  THAT'S ALL I GO BY, NOT WORDS OR DISSECTION OF
12  WORDS LIKE THE DISTRICT ATTORNEY SAYS, AND HE SAID, JUST BY THE
13  FAIR EXTENT OF WHAT THEY SAID AND WHAT IS EVIDENCE, EVIDENCE
14  ONLY.
15      THE COURT:  ALL RIGHT.  ALL RIGHT.  IT'S THE EVIDENCE THAT
16  COUNTS IN THIS.
17      THE JUROR:  YES, YOUR HONOR.  THAT'S ALL.
18      THE COURT:  IN THIS CASE.
19      THE JUROR:  THAT'S ALL I GO BY.
20      THE COURT:  BUT THAT DOESN'T EXCLUDE, OF COURSE, LISTENING
21  TO WHAT YOUR FELLOW JURORS AND HOW THEY EVALUATE THAT EVIDENCE;
22  BUT YOU'RE NOT TO CHANGE YOUR OPINION --
23      THE JUROR:  NO, I WOULDN'T.
24      THE COURT:  -- LONG AS YOU FEEL YOU'RE RIGHT; BUT YOU WANT
25  TO FAIRLY AND OPENLY CONSIDER AND WEIGH --
26      THE JUROR:  AND THEY KNEW I WOULDN'T EITHER.
27      THE COURT:  -- CONSIDER AND WEIGH THE THINGS THEY SAY.
28      THE JUROR:  OKAY.

1046

1    THE COURT:  NOW, OH, AND THEN OF COURSE FOLLOWING THE LAW.

2    THE JUROR:  THAT I WILL.

3    THE COURT:  YOU AND I AND EVERYBODY, EVERYONE IN THIS ROOM

4    IS BOUND BY THAT.

5    THE JUROR:  BUT I'M GOING TO TELL YOU, I'M GOING UP THERE,

6    JUDGE.  I'M NOT GOING TO TAKE NO MORE OF YOUR TIME; BUT I'M

7    GOING TO TELL YOU THIS, JUDGE:  IN MY 71 YEARS A PERSON IS

8    ASCARED TO GO OUT THE DOOR NOW.  YOU DON'T TALK TO YOUR

9    NEIGHBOR.

10   THE COURT:  WAIT A MINUTE.  WAIT A MINUTE.  OKAY.  WAIT A

11   MINUTE.  I REALLY DON'T WANT YOU TO SHARE THAT AT THIS TIME.

12   THE JUROR:  ALL RIGHT.  OKAY.

13   THE COURT:  WHEN THE CASE IS ALL OVER --

14   THE JUROR:  OKAY.

15   THE COURT:  IF YOU WANT TO COME AND TALK TO ME, THAT WILL

16   BE FINE.

17   THE JUROR:  NO, NO, I DON'T WANT TO TAKE UP YOUR TIME.

18   THE COURT:  BUT THERE ARE SOME THINGS THAT I DON'T WANT TO

19   HEAR SIMPLY BECAUSE I DON'T WANT TO GIVE THE IMPRESSION --

20   THE JUROR:  RIGHT.

21   THE COURT:  OF ATTEMPTING TO INFLUENCE ANYONE ONE-WAY OR

22   THE OTHER, BECAUSE I'M NOT.

23   THE JUROR:  OKAY.

24   THE COURT:  YOU MUST BE THE JUDGE OF YOUR CAREFUL

25   CONSCIENTIOUS APPLICATION OF THE LAW TO THE FACTS AS YOU --

26   THE JUROR:  OKAY.

27   THE COURT:  -- FIND THEM TO EXIST.

28   THE JUROR:  ALL RIGHT, YOUR HONOR.  ALL RIGHT, YOUR HONOR.

1947

1          THE COURT:  ALL RIGHT.  I'M SORRY TO TAKE UP YOUR TIME.

2              WOULD YOU MIND, WHEN YOU GO BACK UP, ASK MRS. JOSE TO

3     COME DOWN.  I WANTED TO CHAT WITH HER A MOMENT AND, AGAIN, NO

4     DELIBERATIONS OR DISCUSSION OF THE CASE.

5          THE JUROR:  I WON'T SAY NOTHING.

6          THE COURT:  UNTIL ALL TWELVE OF YOU ARE BACK TOGETHER.

7          THE JUROR:  ALL RIGHT.

8              (PAUSE IN THE PROCEEDINGS)

9          THE COURT:  HELLO, MRS. JOSE.

10         THE JUROR:  GOOD MORNING.  GOOD MORNING.

11         THE COURT:  COME IN.  I GOT YOUR NOTE.

12         THE JUROR:  YEAH.

13         THE COURT:  AND WHAT I WANTED TO ASK YOU, I WANT TO JUST

14    FIND OUT YOU'RE NOT GETTING PAID.  DO YOU WANT TO SHUT THIS

15    DOOR?

16         THE BAILIFF:  JOANNE WAS NOT OUT THERE AND I THOUGHT IT WAS

17    SOMEONE.

18         THE COURT:  YOU'RE NOT GETTING PAID, HUH?

19         THE JUROR:  NO.  I TRIED TO WORK IT OUT, BUT IT'S IN THEIR

20    POLICY AND THEY CAN'T JUST CHANGE IT JUST FOR ME.  THEY'RE GOING

21    TO WORK ON IT, BUT THEY CAN'T JUST CHANGE IT RIGHT AWAY.

22         THE COURT:  WELL, CAN I GET YOU TO DO THIS:  JUST YOU'RE

23    NOT GETTING PAID TODAY OBVIOUSLY?

24         THE JUROR:  UH-HUM.

25         THE COURT:  SO LET'S WORK TODAY AND SEE --

26         THE JUROR:  OKAY.

27         THE COURT:  AND THEN REMIND ME.

28         THE JUROR:  UH-HUM.

# EXHIBIT COVER PAGE

| Q |
|---|

EXHIBIT

Description of this Exhibit:

Number of pages to this Exhibit: **3** pages.

JURISDICTION: (Check only one)

- ☐ Municipal Court
- ☐ Superior Court
- ☐ Appellate Court
- ☐ State Supreme Court
- ☒ United States District Court
- ☐ State Circuit Court
- ☐ United States Supreme Court
- ☐ Grand Jury

*Michael G. McCarthy*

Investigator
1050 54th Street
Sacramento, California 95819
(916) 453-0508

JANUARY 11, 1993

TO THE U.S. COURT OF APPEALS FOR THE NINTH DISTRICT:

I, MICHAEL G. MCCARTHY, A CALIFORNIA LICENSED PRIVATE INVESTIGATOR,
DO HEREBY SWEAR, THAT ON JANUARY 11,1992, I MET WITH LAWRENCE J. CRUZ AT
HIS RESIDENCEIN SAN LEANDRO, CALIFORNIA AND ACQUIRED HIS AFFADAVIT, WHICH
A TRUE COPY OF SAID AFFADAVIT IS HEREIN ATTACHED.

ALSO, LAWRENCE J. CRUZ UNDERSTANDS THAT HIS STATEMENT IS TO BE SUB-
MITTED TO THE NINTH DISTRICT COURT OF APPEALS ON BEHALF OF ABE WILLIAMS
JR..

I, MICHAEL G. MCCARTHY, DO HEREBY SWEAR UNDER THE PENALTY OF PER-
JURY AND THE LAWS OF THE STATE OF CALIFORNIA, THAT THE AFOREGOING IS
TRUE AND CORRECT.

VERY TRULY YOURS,

MICHAEL G. MCCARTHY

SUBSCRIBED AND SWORN TO BEFORE ME

THIS 11th DAY OF January 19 93

NOTARY PUBLIC



LUPE M. RANGEL
NOTARY PUBLIC
SACRAMENTO COUNTY, CALIFORNIA
My Commission Expires August 19, 1993

Lic. No. PI14404

H-3

Page No. 1 of 1

Statement of  LAWRENCE J. CRUZ                    Phone_____

Business Address   N/A                             Phone_____
                   1099 - BELLEAU STREET           (510)
HOme Address  SAN LEANDRO, CA. 94579               Phone 357-2726


I, LAWRENCE J. CRUZ, DO HEREBY SWEAR THAT THE FOLLOWING
IS TRUE AND CORRECT IN ACCORDANCE WITH MY ACTUAL FEELINGS
AND THOUGHTS.

I DO STATE THAT IF AN INSTRUCTION FOR INVOLUNTARY
MANSLAUGHTER HAD BEEN GIVEN BY JUDGE TAYER, I DID AND DO
BELIEVE THAT I WOULD HAVE CHOSEN TO VOTE FOR THAT VERDICT DUE
TO THE FACT THAT THE CASE FACTS WOULD AND DID SHOW THAT BOY AND
WILLIAMS JR. HAD BEEN DRINKING AND DUE TO SOME EXTENT WERE
PRECLUDED HIS HAVING MALICE OR INTENT REGARDING HIS ACTIONS.
THUS, I DO FEEL THAT MY CREDIT WOULD HAVE DEFINITELY BEEN
A GUILT VOTE FOR INVOLUNTARY MANSLAUGHTER.

ALSO BECAUSE THERE WAS A DEAD PERSON (CHILD) I DIDN'T
FEEL I COULD VOTE FOR EITHER FELONY OF MISDAMEANOR CHILD
BATTERY, AND WAS EITHER FORCED OR COHERSED INTO VOTING AS I
DID FOR THE MURDER CHARGE.


                    LAWRENCE J. CRUZ

Page No. 1 of 1

3

Statement of _Laurence J. Cruz_

Business Address _N/A_                                          Phone _N/A_

Home Address _1099 - DelReau Street_                        (510) 357-2026
_San Leandro, CA  94579_                                      Phone

I, Laurence J. Cruz, do hereby swear that the following is true and correct in accordance with my actual feelings and thoughts.

I do state that if an instruction for involuntary manslaughter had been given by Judge Tales, I did and do believe that I would have chose it, vote for that verdict, due to the fact that the case facts would and did show the boy Che Wellams Jr. had been drinking and driving some drugs which preckded his [...] malice or intent regarding his actions, thus, I do feel that [...] my choice would have definitely been for a guilt vote for Involuntary Manslaughter.

Also because there was a dead person (Child) I didn't feel I could vote for either Felony or Misdemeanor Child Battery. And was either forced or coerced into voting as I did for the murder charge.

_Laurence J Cruz_

Signed at _San Leandro CA_ this _10_ day of _January_  19_93_.

Witness _[signature]_          _1-10-93_

# EXHIBIT COVER PAGE

R

EXHIBIT

Description of this Exhibit:

Number of pages to this Exhibit:  __/__ pages.

JURISDICTION: (Check only one)

☐ Municipal Court
☐ Superior Court
☐ Appellate Court
☐ State Supreme Court
☒ United States District Court
☐ State Circuit Court
☐ United States Supreme Court
☐ Grand Jury

red for
h
l forms
1997)

# FILED

OCT 16 1986

SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF ALAMEDA

RENE C. DAVIDSON, County Clerk
By _____ Joanne M. Norcup
JOANNE M. NORCUP, DEPUTY

THE PEOPLE OF THE
STATE OF CALIFORNIA,

VS.

_John Williams_

_Lawrence J Cruz_

ACTION NO. _80451_

PFN/CEN _____

DEPT. NO. _7_

WE, THE JURY IN THE ABOVE ENTITLED ACTION, REQUEST THE FOLLOWING:

_Would like to be replaced_

_would like to talk to Judge to be replaced_

DATE: _Oct 13, 1986_

TIME: _10:03_

_William Nara_
FOREPERSON

,5

# EXHIBIT COVER PAGE

S

EXHIBIT

Description of this Exhibit:

Number of pages to this Exhibit: __✄__ pages.

JURISDICTION: (Check only one)

☐ Municipal Court
☐ Superior Court
☐ Appellate Court
☐ State Supreme Court
☒ United States District Court
☐ State Circuit Court
☐ United States Supreme Court
☐ Grand Jury

proved for
with
icial
incil forms
. 1, 1997)

### C.  Ineffective Assistance of Appellate Counsel

Petitioner has made seven claims of ineffective assistance by his appellate counsel.  Appellate counsel has no duty to raise every nonfrivolous or colorable issue requested by the client when counsel's professional judgment dictates otherwise.  Jones v. Barnes, 463 U.S. 745, 751-754 (1983).  The "weeding out of weaker issues is widely recognized as one of the hallmarks of effective appellate advocacy."  Miller v. Keeney, 882 F.2d 1428, 1434 (9th Cir. 1989) (footnote omitted).

The proper standard of attorney performance is a two part test.  First, defendant must demonstrate that counsel's representation fell below an objective standard of reasonableness.  Strickland v. Washington, 466 U.S. 668, 688 (1984).  Thus, "a reviewing court is not free to engage in after-the-fact second guessing of strategic decisions made by counsel" unless no plausible reason exists for the decision.  U.S. v. Claiborne, 870 F.2d 1463, 1468-1469 (9th Cir. 1989).  Second, defendant must have suffered sufficient prejudice due on the error, such that the error affected petitioner's judgment.  Strickland, 466 U.S. at 691-92.

### Claim #1

Petitioner alleges counsel's ineffectiveness for failing to seek the unreported proceedings of the reinstruction meeting (discussed above).  Petitioner cannot be denied a "record of sufficient completeness."  Mayer v. City of Chicago, 404 U.S. 189, 198 (1971).  However, petitioner is not automatically entitled to a full verbatim

transcript.  Id.  To determine petitioner's need for the
transcripts, the Ninth Circuit has identified two criteria:
1) the value of the transcript to the defendant in
connection to his appeal or trial for which it is sought;
and 2) the availability of alternative devices which would
fulfill the same functions as a transcript.  Madera v.
Risley, 885 F.2d 646, 648 (9th Cir. 1989).  Alternative
devices which could be deemed equivalent are:  a statement
of facts agreed to by both sides, a full narrative statement
based on the trial judge's minutes taken during trial or on
the court reporter's untranscribed notes, or a bystander's
bill of exceptions.  Id.; Mayer, 404 U.S. at 195.

In petitioner's case, alternative devices are available
that will fulfill the same function as a transcript.  Both
the prosecuting attorney and the advisory counsel agreed, in
the record, to the same set of facts on the reinstruction
conference.  Furthermore, a full narrative statement of the
issues discussed was provided by the trial judge and placed
on the record.  Last, both attorneys and the trial judge
stipulated that petitioner was provided a copy of the exact
reinstructions given to the jury.  Thus, petitioner's
request for the exact transcript is without merit.

Claim #2

Petitioner also alleges appellate counsel was
incompetent for failing to acquire a declaration from trial
advisory counsel on the reinstruction meeting.  Petitioner
alleges that, based on a letter he received from advisory
counsel after the trial, advisory counsel was not present

11

during the conference on reinstruction, advisory counsel did
not approve the written instructions, and advisory counsel
was not present when the written instructions were given to
the jury.   Petitioner asserts that appellate counsel was
ineffective for failing to acquire a declaration from
advisory counsel based on these issues.

However, petitioner's argument misconstrues the factual
evidence.   The declaration and letter of advisory counsel,
upon which petitioner relies, do not support petitioner's
allegations.   Advisory counsel Spear declares that he has no
present recollection of a conference on October 14, when the
reinstruction occurred.   However, the declaration does not
assert that he denies being present at such a meeting.   In
fact, the trial record demonstrates that Spear was at such a
meeting.   According to the Reporter's Transcript, the trial
judge stated that she called both attorneys, including
advisory counsel, into the conference.   Spear did not object
to the judge's statement.   RT 1934.

In addition, the declaration does state that counsel,
even if he had attended the conference, would not have
provided any input.   However, no input was necessary as the
instructions given were merely a restatement of earlier
approved instructions.   Furthermore, the record shows that
advisory counsel stated that the copy given to petitioner
was the same as given to the jury.

As to advisory counsel's presence when the written
instructions were given to the jury, counsel's letter states
only that he was not present when the instructions were

12

"given physically to the jury." As indicated above, this simply means that the instructions were sent to the jury room through the bailiff, and thus counsel was obviously not in the jury room. The record supports this interpretation for the court stated that it "sent the instructions" to the jury, thus implying transmission from one place to another. Based on the factual evidence, appellate counsel was justified in refusing to raise this issue on appeal and petitioner suffered no prejudice due to the omission.

Claim #3

Petitioner contends appellate counsel was incompetent for failing to raise the invalidity of his two prior convictions. Petitioner alleges that in pleading guilty to crimes in 1978 and 1979, he was not advised of the parole consequences of his pleas. Petitioner asserts that had he known of the parole consequences of his 1978 and 1979 convictions, he would not have pled guilty to those offenses. Thus, according to petitioner, the prison enhancements of two years, that were attached to this conviction due to the prior 1978 and 1979 convictions, should have been appealed by appellate counsel.

However, this is an incorrect interpretation of case law. The requirement that information on parole consequences must be given to a defendant pleading guilty is inapplicable to pleas occurring before 1983 as a matter of state law, In re Carabes, 144 Cal.App.3d 927, 932, n. 4 (1983), and before 1987 as a matter of federal law. Allen v. Bunnell, 891 F.2d 736 (9th Cir. 1989). As petitioner's

13

# EXHIBIT COVER PAGE

T

EXHIBIT

Description of this Exhibit:

Number of pages to this Exhibit: __*11*__ pages.

JURISDICTION: (Check only one)

☐ Municipal Court
☐ Superior Court
☐ Appellate Court
☐ State Supreme Court
☒ United States District Court
☐ State Circuit Court
☐ United States Supreme Court
☐ Grand Jury

## CRIMINAL LAW AND PROCEDURE

*Defendant's Sixth Amendment right to self-representation is violated because his standby counsel went into chambers conference without obtaining his consent or opinion.*

Cite as 2008 DJDAR 1110

KARL ADOLPH FRANTZ,
Petitioner-Appellant,

v.

HERBERT HAZEY;
DORA B. SCHRIRO,
Director,
Respondents-Appellees.

No. 05-16024
D.C. No. CV-04-00135-WDB
United States Court of Appeals
Ninth Circuit
Filed January 22, 2008

Appeal from the United States District Court
for the District of Arizona

William D. Browning,
District Judge, Presiding

Argued and Submitted En Banc
March 22, 2007—San Francisco, California

Before: Alex Kozinski,
Chief Circuit Judge,

Mary M. Schroeder,
Harry Pregerson,
Diarmuid F. O'Scannlain,
Pamela Ann Rymer,
Sidney R. Thomas,
Barry G. Silverman,
Susan P. Graber,
Kim McLane Wardlaw,
Ronald M. Gould,
Richard A. Paez,
Marsha S. Berzon,
Consuelo M. Callahan,
Carlos T. Bea, and
Sandra S. Ikuta,
Circuit Judges.

Opinion by Judge BERZON,
with whom Chief Circuit Judge KOZINSKI,
and Judges SCHROEDER,
PREGERSON, THOMAS,
GRABER, WARDLAW, PAEZ, and BEA join;
Concurrence by Chief Judge Kozinski;
Concurrence by Judge Gould

### COUNSEL

Jon M. Sands, Federal Public Defender, for the petitioner-appellant.

Michael L. Burke, Phoenix, Arizona, for the petitioner-appellant.

Paula K. Harms, Phoenix, Arizona, for the petitioner-appellant.

Megan Moriarty, Assistant Federal Public Defender, for the petitioner-appellant.

Terry Goddard, Attorney General, for the respondents-appellees.

Randall M. Howe, Chief Counsel, Criminal Appeals Section, State of Arizona Attorney General's Office, for the respondents-appellees.

### OPINION

BERZON, Circuit Judge:

Karl Frantz appeals the district court's denial of his petition for a writ of habeas corpus. Invoking the Sixth Amendment right to self-representation and the limits on advisory attorneys' participation described in *McKaskle v. Wiggins*, 465 U.S. 168 (1984), Frantz challenges his exclusion from a chambers conference in which his advisory counsel participated and discussed how the judge should respond to a query from the deliberating jury.[1] The Arizona Court of Appeals denied Frantz's claim on harmless error grounds. Clearly established Supreme Court law holds, however, that a *McKaskle* error is structural and therefore not subject to harmless error analysis. Deciding this appeal first requires that we clarify our approach to reviewing state court decisions that rely on legal principles contradicting clearly established Supreme Court law but do not necessarily reach the wrong result. Having done so, we then proceed to consider the *McKaskle* issue on its constitutional merits.

### I. BACKGROUND

#### A.

Karl Frantz was indicted for and later convicted of attempted armed robbery of a McDonald's restaurant in Arizona. At the outset of the judicial proceedings, attorney Paul Bates was appointed to represent Frantz and began to do so. Before trial began, Frantz waived his right to counsel and chose to represent himself. The trial court found Frantz competent to do so but directed Bates to remain involved as "advisory counsel." Later, but still before trial began, attorney Raymond Lamb replaced Bates as advisory counsel.[2]

At trial, Frantz was limited to questioning witnesses from behind the defense table. For reasons not fully explained in the record before us, Frantz was required to wear a leg brace. The limitation on his movement, the state appellate court later explained, minimized the risk of prejudice from the jury's viewing his shackles. Further, "[t]o avoid any appearance that [Frantz] was penalized by representing himself, the prosecutor also examined witnesses and argued her case while seated at the prosecution's table."

Notwithstanding these restrictions, Frantz undertook most of his own defense. He gave a statement to the jury venire; examined and cross-examined all of the witnesses; responded

er-appellant.
1ael L. Burke, Phoenix, Arizona,
er-appellant.
a K. Harms, Phoenix, Arizona,
er-appellant.
an Moriarty, Assistant Federal
r, for the petitioner-appellant,
y Goddard, Attorney General,
ents-appellees.
1all M. Howe, Chief Counsel, Criminal
Section, State of Arizona Attorney
's Office, for the respondents-appellees.

OPINION

N, Circuit Judge:

Frantz appeals the district court's denial
ition for a writ of habeas corpus. Invoking
1 Amendment right to selfrepresentation
imits on attorney's attorney's participation
d in *McKaskle v. Wiggins*, 465 U.S. 168
Frantz challenges his conviction from
ers conference in which his advisory
participated and discussed how to
hould respond to a query from the
ing jury. The Arizona Court of Appeals
rantz's claim on harmless error grounds
stablished Supreme Court law holds
that a *Mc Kaskle* error is structural and
not subject to harmless error analysis
this appeal first requires that we clarify
bach to reviewing state court decisions
on legal principles contradicting clearly
ed Supreme Court law but do not
ly reach the wrong result. Having done
ien proceed to consider the *McKaskle*
ts constitutional merits.

## I. BACKGROUND

### A.

rantz was indicted for and later convicted
ted armed robbery of a McDonald's
in Arizona. At the outset of the judicial
gs, attorney Paul Bates was appointed
nt Frantz and began to do so. Before
, Frantz waived his right to counsel and
epresent himself. The trial court found
npetent to do so, but directed Bates to
olved as "advisory counsel." Later, as
trial began, attorney Raymond Lamb
ates as advisory counsel.
l, Frantz was limited to questioning
from behind the defense table. For
it fully explained in the record before
was required to wear a leg brace that
on his movement, the state appealed
explained, minimized the risk to
rom the jury's viewing his shackles,
t]o avoid any appearance that [Frantz]
ized by representing himself, the
also examined witnesses and argued
hile seated at the prosecution's table.
standing these restrictions, Frantz
most of his own defense. He gave
it to the jury venire, examined and
ined all of the witnesses, responded

to the state's motions to admit exhibits, stated
objections to testimony, and gave a closing
argument before the jury. Frantz also participated
during trial in one bench conference regarding
questions for a witness submitted by the jury,
and in two conferences in which the judge and
the parties discussed jury instructions out of the
presence of the jury.

At the first conference regarding jury
instructions, both Lamb and Frantz were present.
Lamb told the court that he believed Frantz should
ask for instructions to "cover" the lesser included
offense of disorderly conduct. After the judge said
he would consider the suggestion, Frantz made a
separate request, without any apparent direction
or input from Lamb. Beginning, "if I may, one
other thing," Frantz asked the court also to
consider instructing the jury on a separate lesser
included offense: assault. Frantz described why
he believed assault was a lesser included offense
and rebutted the state's argument to the contrary,
telling the court that "there is an abundance of
different types of assaults" that "can take place
[and] some of them don't necessitate . . . any type
of weapon or anything."

After a recess, the judge conferred with the
parties once more regarding the jury instructions.
Although Lamb was present, when the court
asked first whether the proposed verdict forms
were "agreeable" and, later, whether the parties
wanted to raise other matters related to the
instructions, only Frantz and the state prosecutor
answered.

At this latter conference regarding jury
instructions, and at other junctures during trial,
Frantz also repeatedly asked the court to admit as
evidence either the tape or the transcript of the
911 call made from the McDonald's restaurant
during the incident. Frantz argued that the tape
or transcript was admissible to impeach Diana
Villalobos, a McDonald's employee who testified
that Frantz approached her, demanded money,
and threatened her with a gun. Although the
911 caller stated that the intruder had a gun
— information that bolstered the state's case —
Frantz maintained that the 911 call also contained
impeachment material because "a woman" on
the tape — whom Frantz contends is Villalobos
— identified "the robber" as blond, while Frantz
describes his hair as brown and gray.

Despite Frantz's active and vocal advocacy,
Lamb was not silent during Frantz's twoday trial.
Lamb presented needed exhibits to witnesses
and also spoke briefly, in Frantz's presence, on
a number of issues. He stated, for example, that
there were no further questions for potential
jurors during voir dire and that there was no
objection to admission of certain state exhibits.
He verified exhibit labels, cautioned Frantz to
slow down his questioning, requested aspirin for
Frantz, and counseled Frantz to "shut up" when
Frantz identified himself in a photograph shown
to a testifying police officer.

Lamb also participated, unaccompanied by
Frantz, in a bench conference during voir dire and
in seven bench conferences that took place during
trial.[1] During voir dire and in the first five of these
conferences during trial, the judge requested
"counsel" to approach the bench, and Lamb

proceeded instead of Frantz. At the conference
during voir dire, Lamb stated that he had no
followup questions for a prospective juror. In one
bench conference during trial, Lamb conceded
the prosecutor's objection to a report that Frantz
previously stated he wished admitted. In three
others, Lamb reviewed questions submitted by
the jury for specific witnesses and stated that
he had no objection; the record does not show
whether Frantz also reviewed the questions or
whether Frantz and Lamb discussed them prior
to the bench conferences. In the fifth conference
during trial, the court reminded Frantz to reserve
Frantz's "Rule 20" right,[2] and Lamb advised the
court that he was going to try to persuade Frantz
not to make an opening statement before the
presentation of defense witnesses.[3]

In the final two bench conferences, Lamb
argued for the admission of several pieces of
evidence: an officer's testimony about what
a witness told her, portions of Frantz's bank
records, and the tape or transcript of the 911 call.
The first such conference began when Frantz
asked, "Can we approach?" Lamb approached the
bench without Frantz and began the discussion
by stating that "Frantz want[ed] [him] to suggest"
that the door had been opened for the officer's
testimony about what witnesses told her. In the
discussion that followed, the judge changed
the subject to the 911 tape, which Frantz had
previously asked the court to admit. Lamb told the
court that Frantz was "fixated" on the question of
the robber's hair color. But the judge did not rule
on the admissibility of the tape; he simply upheld
the objection to the officer's testimony.

The last bench conference began after Lamb
told the court in Frantz's presence, "We have some
proposed exhibits." Lamb and the prosecutor
approached the bench and discussed admission
of the bank records and the transcript of the 911
call. The judge ruled admissible a portion of the
bank records and suggested that, with the proper
foundation, he would allow into evidence at least
portions of the 911 call transcript, either under
an exception to the hearsay rule or as admissible
nonhearsay. Lamb stated, however, that he would
advise Frantz that "the bank records should
suffice, that that is [sic] — that will give him better
grounds to argue [the call transcript], and maybe
we can dispense with that." The judge never
explicitly ruled on the 911 call transcript. Shortly
after Lamb asked "for a minute to talk to [his]
client" and the court ruled on the bank records,
Frantz withdrew his request for the transcript.

Neither the 911 tape nor the transcript of the
call was thus ever presented to the jury at trial.
But, critically for this appeal, the question of the
tape arose again, and Lamb, alone, addressed the
question before the court.

While deliberating, the jury's submitted
questions related to the tape of the 911 call and to
a statement from a "manager," presumably of the
McDonald's restaurant. The judge addressed the
two questions in a chambers conference attended
by Lamb and the prosecutor, but not Frantz.
As we explain in more detail below, nothing in
the record explains the circumstances of Frantz's
exclusion from the chambers conference, but
the record does explain what happened at the

conference. The state agreed to release the tape "if that's what the defendant wants to do." Lamb rejected the state's offer, replying, "He doesn't want it," and stating that the answer to the jurors' question "will be as [the judge] originally framed it." Responding "okay," to Lamb's statement, the court denied the jury's request, and later instructed the jurors that they should simply rely on their recollection of the evidence admitted during trial.

Frantz was convicted and sentenced to a 135-month prison term.

### B.

Upon affirmance of his conviction and sentence on direct appeal, Frantz filed a petition for postconviction relief pursuant to Arizona Rule of Criminal Procedure 32. Among other claims, he contended that his exclusion from the chambers conference regarding the jury's inquiries during deliberations violated his Fifth, Sixth, and Fourteenth Amendment rights. In support of his proposition, he cited *McKaskle*, which establishes limitations on a standby counsel's assistance to a criminal defendant who has exercised his Sixth Amendment right to self-representation. Frantz argued that he should have been able to discuss the jury's request with the judge himself. He claimed that Lamb either inaccurately communicated with him about the jury's request or failed to communicate with him at all. Specifically, Frantz's petition stated that "advisory counsel told Defendant that *part* of [the] 911 transcript was wanted, but only the part the State wanted to further prove guilt of Defendant and not *all* [the] 911 tape as requested by the jury." The declaration that Frantz submitted with the petition worded the allegation differently, that "[o]n the final day of trial . . . advisory counsel, Ray Lamb, did not tell [him] the jury wanted to hear [the] 911 tapes, nor to have them played to the jury."

The state trial court rejected Frantz's contentions without holding a hearing on them. In particular, the trial court accepted the averment in the state's response brief that, as the court summarized, "[w]hen the question was presented to the Petitioner [sic] was in a holding cell and was not present in the courtroom. Advisory counsel consulted with the Petitioner and advised the court that the Petitioner did not wish the tape to be played." The state's brief had so asserted, but included no evidence proving the allegation. The state Court of Appeals rejected the trial court's factual finding, noting that Frantz had submitted a contrary allegation under oath and that, under state law, the trial court was therefore obliged for purposes of summary determination to assume that Frantz's allegation was true. Nevertheless, the Court of Appeals held, Frantz's exclusion from the chambers conference did not merit relief.

The appellate court did not address whether Frantz's exclusion from the conference was unconstitutional under *McKaskle*. Rather, it denied relief because it concluded that any error did not prejudice Frantz. "[W]e fail to see how [playing the tape to the jury] would have changed the verdict," the court held. "Petitioner's

argument focuses on the fact that the 911 caller described the suspect as having blond hair, whereas he claims he has brown and gray hair. But petitioner did not pursue a misidentification defense at trial."

Upon denial of all his claims for relief, Frantz petitioned for further review by the Arizona Supreme Court. After the state Supreme Court denied review, Frantz filed the federal habeas petition that resulted in this appeal, challenging, inter alia, his exclusion from the chambers conference. The district court denied relief but granted a certificate of appealability (COA) with regard to that claim and two others.

We address only Frantz's exclusion from the chambers conference. [8] Based on the uncontested record evidence, we conclude that Frantz's Sixth Amendment rights could have been violated by his exclusion from the conference. But we remand for an evidentiary hearing on several critical questions unanswered by the record before us. Before we analyze the merits of Frantz's *McKaskle* claim, however, we clarify the scope of our review of the Arizona Court of Appeals' decision.

## II. AEDPA ERROR AND SCOPE OF REVIEW

Here is the dilemma we face: The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, § 104, 110 Stat. 1214, 1218-19, provides that, if a claim was adjudicated on the merits in state court proceedings, then

> [a]n application for a writ of habeas corpus . . . shall not be granted . . . unless the adjudication of the claim—
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). As we develop later, the state appellate court's decision in this case was, on the merits, but was "contrary to . . . clearly established Federal law, as determined by the Supreme Court," because it applied an improper rule in determining that any constitutional error was not prejudicial. But the state Court of Appeal never addressed whether there was constitutional error in excluding Frantz from the conference regarding the jury's requests.

Our case law concerning the appropriate approach under AEDPA cases like this one, in which the state court decision satisfies the § 2254(d)(1)[11] standard for the grant of habeas corpus relief but leaves a dispositive constitutional issue undecided, is murky.[12]

With the aid of recent Supreme Court decisions, we begin by delineating the proper approach to federal habeas in such circumstances,

11-220

from . . . . . . . or prejudice,
. . . has busily relief . . .
(2) . . . . . . **Substantial pr** . . .
[11:822] . . . . . . M/V Rozlia (1st Cir.
dice is not shown simply . . .
culy in proving the previously . . .
would have to be proved. Rat . . .

focuses on the fact that the 911 caller
the suspect as having blond hair,
e claims he has brown and gray hair.
ner did not pursue a misidentification
trial."

enial of all his claims for relief, Frantz
for further review by the Arizona
Court. After the state Supreme Court
iew, Frantz filed the federal habeas
at resulted in this appeal, challenging,

his exclusion from the chambers
. The district court denied relief but
certificate of appealability (COA) with
hat claim and two others.[9]

iress only Frantz's exclusion from the
conference.[10] Based on the uncontested
lence, we conclude that Frantz's Sixth
at rights could have been violated by
on from the conference. But we remand
dentiary hearing on several critical
unanswered by the record before us.
analyze the merits of Frantz's *McKaskle*
ever, we clarify the scope of our review
ona Court of Appeals' decision.

## A ERROR AND SCOPE OF REVIEW

the dilemma we face: The Antiterrorism
ve Death Penalty Act of 1996 (AEDPA),
. 104-132, § 104, 110 Stat. 1214, 1218-
s that, if a claim was adjudicated on the
ate court proceedings, then

application for a writ of habeas
s . . . shall not be granted . . . unless
judication of the claim —

resulted in a decision that
s contrary to, or involved an
reasonable application of, clearly
ablished Federal law, as determined
the Supreme Court of the United
tes; or

resulted in a decision that
s based on an unreasonable
ermination of the facts in light of
evidence presented in the State
art proceeding.

§ 2254(d). As we develop later, the
ate court's decision in this case was
its, but was "contrary to . . . clearly
Federal law, as determined by the
ourt" because it applied an improper
ermining that any constitutional error
judicial. But the state Court of Appeal
essed whether there was constitutional
cluding Frantz from the conference
he jury's requests.

se law concerning the appropriate
nder AEDPA cases like this one, in
state court decision satisfies the §
standard for the grant of habeas
f but leaves a dispositive constitutional
ided, is murky.[12]

he aid of recent Supreme Court
ve begin by delineating the proper
federal habeas in such circumstances,

---

with a focus on two questions: (1) Does a state
court's use of the wrong legal standard meet the §
2254(d)(1) criteria even if the state court's ultimate
conclusion that the conviction was constitutional
may have been correct for a different reason?
And (2) if so, what manner of constitutional
review should follow our identification of this §
2254(d)(1) error? In section III, we return to the
merits of Frantz's *McKaskle* claim.

### A.

We have recognized a "latent confusion in
our case law concerning whether, under [§
2254(d)(1)], it is necessary or permissible for
us to review the 'reasoning' used by the state
court, or whether we are simply to review the
'decision' of that court adjudicating the merits of
the petitioner's claim." *Sims v. Rowland,* 414 F.3d
1148, 1152 n.2 (9th Cir.), *cert. denied,* 546 U.S. 1066
(2005). It is now firmly established, however, that
"a decision by a state court is 'contrary to' [the]
clearly established law [of the Supreme Court] if
it '*applies a rule* that contradicts the governing
law set forth in [Supreme Court] cases.'" *Price
v. Vincent,* 538 U.S. 634, 640 (2003) (quoting
*Williams v. Taylor,* 529 U.S. 362, 405 (2000))
(emphasis added); *see also Early v. Packer,*
537 U.S. 3, 8 (2002) (per curiam) ("Avoiding [a
'contrary to' error] does not require citation . .
. . [or] *awareness* of [Supreme Court] cases, so
long as neither the *reasoning* nor the result of the
statecourt decision contradicts them." (second
emphasis added)); *cf. Panetti v. Quarterman,* 127
S. Ct. 2842, 2855-58 (2007) (finding a § 2254(d)(1)
error under the "unreasonable" prong because
the state court unreasonably applied the Supreme
Court's procedural standards for considering such
claims). In other words, mistakes in reasoning or
in predicate decisions of the type in question here
— use of the wrong legal rule or framework – do
constitute error under the "contrary to" prong of
§ 2254(d)(1).

Indeed, except in the extremely rare
circumstance in which a state case presents facts
that are materially identical to those in a Supreme
Court case, it is difficult to imagine many situations
in which the *result* of a state court adjudication
could be contrary to clearly established Supreme
Court precedent. In this case, for example, asking
whether the state court's ultimate denial of Frantz's
*McKaskle* claim was "contrary to" established
Supreme Court law is pointless, because Supreme
Court law dictates only the intermediate steps of
analysis. Consequently, the "decision" referred
to in § 2254(d)(1) necessarily encompasses the
conclusions of law on which the ultimate result
in state court was based. *See Williams,* 529 U.S. at
412-13 ("Under the 'contrary to' clause, a federal
habeas court may grant the writ if the state court
arrives at a conclusion opposite to that reached
by this Court on a *question of law* . . . ." (emphasis
added)).

With this guiding principle in mind, we return
to the state court error in this case. By inquiring
into prejudicial effect, the Arizona Court of
Appeals conducted harmless error review of
Frantz's *McKaskle* claim. But, contrary to the
state court's assumption, Supreme Court case law

---

establishes unequivocally that a violation of the
right to selfrepresentation recognized in *Faretta
v. California,* 422 U.S. 806 (1975), is structural
and thus is not susceptible to harmless error
review.[13] *See McKaskle,* 465 U.S. at 177 n.8 ("Since
the right of selfrepresentation is a right that when
exercised usually increases the likelihood of a trial
outcome unfavorable to the defendant, its denial
is not amenable to 'harmless error' analysis.");
*see generally United States v. GonzalezLopez,* 126
S. Ct. 2557, 2564 (2006) (surveying constitutional
errors characterized as structural and not subject
to harmless error analysis). Because the Arizona
Court of Appeals "applie[d] a rule that contradicts
the governing law set forth in [Supreme Court]
cases," *Price,* 538 U.S. at 640 (internal quotation
marks omitted), the § 2254(d)(1) standard for the
grant of habeas relief is satisfied.

### B.

Having so concluded, what do we do next? Do
we simply grant habeas relief? Or do we decide
the constitutional issue that the state Court of
Appeals did not decide: whether the exclusion of
Frantz from the mid-jury-deliberations conference
was unconstitutional under *McKaskle*?

As we noted at the outset, our own cases
are somewhat unclear on that point. The
Supreme Court, however, has recently clarified
our responsibility once we have found a state
court error that satisfies § 2254(d)(1): When
"the requirement set forth in § 2254(d)(1) is
satisfied[, a] federal court must then resolve
the [constitutional] claim without the deference
AEDPA otherwise requires." *Panetti,* 127 S. Ct.
at 2858; *see also Rompilla v. Beard,* 545 U.S. 374,
390 (2005) (reviewing the prejudice requirement
for an ineffective assistance of counsel claim de
novo after identifying a § 2254(d)(1) error in
the state court's evaluation of the performance
requirement); *Wiggins v. Smith,* 539 U.S. 510, 534
(2003) (similar); *Penry v. Johnson,* 532 U.S. 782,
795 (2001) (holding that even if the state court's
decision was contrary to Supreme Court case
law, "that error would justify overturning Penry's
sentence only if Penry could establish that the
error" was prejudicial under the preAEDPA
standard for evaluating prejudice); *Williams,* 529
U.S. at 406 (explaining that when a federal habeas
court identifies a "contrary to" error, it "will be
unconstrained by § 2254(d)(1)"). So it is now
clear both that we may not grant habeas relief
simply because of § 2254(d)(1) error and that, if
there is such error, we must decide the habeas
petition by considering de novo the constitutional
issues raised.

The Supreme Court has not fully explained,
however, why that is true. We do so now, briefly,
as the underlying reasoning may prove useful to
habeas courts applying these principles.

As the Eleventh Circuit has explained, "Section
2254 presumes that federal courts already have
the authority to issue the writ of habeas corpus
to a state prisoner . . . . [I]t is not itself a grant
of habeas authority, let alone a discrete and
independent source of postconviction relief."
*Medberry v. Crosby,* 351 F.3d 1049, 1059-60 (11th
Cir. 2003); *see also id.* at 1056-58 (explaining the

**Daily Appellate Report** Thursday, January 24, 2008

evolution of § 2254). Instead, it is § 2241 that provides generally for the granting of writs of habeas corpus by federal courts, implementing "the general grant of habeas authority provided by the Constitution." *White v. Lambert*, 370 F.3d 1002, 1006 (9th Cir.), *cert. denied*, 543 U.S. 991 (2004). In turn, § 2254(d), like other subsections of § 2254, implements and limits the authority granted in § 2241 for "a person in custody pursuant to the judgment of a State court." § 2254(a). *See White*, 370 F.3d at 1008 ("[Section] 2254 is properly seen as a limitation on the general grant of habeas authority in § 2241."); *see also Felker v. Turpin*, 518 U.S. 651, 662 (1996) ("Our authority to grant habeas relief to state prisoners is limited by § 2254 . . . ."). Just as, for example, § 2254(b) restricts our underlying § 2241 and constitutional authority by creating an exhaustion requirement, § 2254(d) establishes certain kinds of state court error as a predicate to habeas relief "with respect to any claim that was adjudicated on the merits in State court."

Where, as here, the limitations established by other subsections of § 2254 are satisfied, § 2254(a) sets out the general standard that must be satisfied by a petition "for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court": The petition must rely "on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." *See also* § 2241(c) (extending federal courts' general habeas authority not only to prisoners in custody in violation of the Constitution or federal laws but also to several other groups of prisoners).[11] It is that more general — but still limited — provision that alone governs, where the other limitations set out in § 2254(d) (and in § 2244) are no obstacle to the grant of habeas relief. Further, the text of both § 2254(a) and § 2241(c) refers only to the substantive invalidity of the confinement under the Constitution and contains no requirement of deference to state court adjudications. Federal courts governed only by those sections, therefore, necessarily decide the issues before them de novo, as was done before AEDPA's addition of § 2254(d) in 1996. *See Gratzer v. Mahoney*, 397 F.3d 686, 689-90 (9th Cir.); *Chizen v. Hunter*, 809 F.2d 560, 561 (9th Cir. 1986); *cf. Fry*, 127 S. Ct. at 2327 (in the context of harmless error review, concluding that when a state court has made a § 2254(d)(1) error, the preAEDPA habeas review standard is appropriate for a question that the state court did not reach).

We caution that this analysis does not dictate either a two-stage process or any particular order of decision. For one thing, a holding on habeas review that a state court error meets the § 2254(d) standard will often simultaneously constitute a holding that the § 2254(a)/§ 2241 requirement is satisfied as well, so no second inquiry will be necessary. *See, e.g., Goldyn v. Hayes*, 444 F.3d 1062, 1070-71 (9th Cir. 2006) (finding § 2254(d)(1) error in the state court's erroneous conclusion that the state had proved all elements of the crime); *Lewis v. Lewis*, 321 F.3d 824, 835 (9th Cir. 2003) (finding § 2254(d)(1) error in the state court's failure to conduct a constitutionally sufficient inquiry into a defendant's jury selection challenge). In this case, however, the Arizona court's § 2254(d)(1) error

— inappropriate use of harmless error review — does not tell us whether Frantz's conviction and custody were unconstitutional. Whether it was depends on whether *McKaskle* error occurred when Frantz, although representing himself, was excluded from the chambers conference on the jury's inquiry during deliberations. If no such error occurred then, quite obviously, the state Court of Appeal's bottom line was right — the conviction was not infected by constitutional error and should not have been reversed. In that event, we may not grant habeas relief under §§ 2241 and 2254(a).

Moreover, "AEDPA does not require a federal habeas court to adopt any one methodology in deciding the only question that matters under § 2254(d)(1)." *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003). Nor does it require any particular methodology for ordering the § 2254(d) and § 2254(a) determination. *See Inthavong v. Lamarque*, 420 F.3d 1055, 1061 (9th Cir. 2005). Sometimes, we may be able to decide the § 2254(d)(1) issue better by deciding the constitutional issue de novo first, when doing so would illuminate the § 2254(d)(1) analysis. *See, e.g., Weeks v. Angelone*, 528 U.S. 225 (2000). In other cases, it may make sense to address § 2254(d)(1) first. *See, e.g., Panetti*, 127 S. Ct. at 2858.

In sum, where the analysis on federal habeas, in whatever order conducted, results in the conclusion that § 2254(d)(1) is satisfied, then federal habeas courts must review the substantive constitutionality of the state custody de novo. C. Having established the appropriate mode of review once the § 2254(d)(1) standard is met, we address one additional point: Respondents suggest that, even upon de novo review, we should consider only rationales supporting the state court conviction that "were . . . within the contemplation of the state court." We generally agree, with some caveats. Representative of the issue that Respondents raise is *Van Lynn*, a case in which the state court had erroneously denied a defendant's motion for selfrepresentation by applying the wrong standard to evaluate the defendant's competence for such representation. 347 F.3d at 741. The respondent argued that, although the state court had erroneously deemed the defendant incompetent, habeas relief was inappropriate because the court could have denied the motion on the alternative ground that it was untimely. *Id.* Reviewing the state's arguments, we concluded that we could not "invent an alternative rationale for the state court's decision which requires application of an entirely different *and unrelated* legal principle . . . and then . . . review the trial court's decision as if it had been made pursuant to that alternative rationale." *Id.* (emphasis added).

When we are reviewing a state court decision to decide whether there is a § 2254(d)(1) error, the conclusion that we reached in *Van Lynn* is undoubtedly correct. We confine our § 2254(d)(1) analysis to the state court's *actual* decisions and analysis. The text of § 2254(d)(1) demands this approach, by pointing us to the "decision[s]" that result from state courts' "adjudication of . . . claim[s]" and the "application[s] of . . . law" that were "involved" in such decisions. Consistent

of harmless error review — ther Frantz's conviction and stitutional. Whether it was r McKaskle error occurred ough representing himself, the chambers conference y during deliberations. If no l then, quite obviously, the al's bottom line was right — ot infected by constitutional t have been reversed. In that grant habeas relief under §§

PA does not require a federal pt any one methodology in uestion that matters under ver v. Andrade, 538 U.S. 63, es it require any particular dering the § 2254(d) and § m. See Inthavong v. Lamarque, (9th Cir. 2005). Sometimes, lecide the § 2254(d)(1) issue the constitutional issue de ng so would illuminate the § See, e.g., Weeks v. Angelone, . In other cases, it may make § 2254(d)(1) first. See, e.g., 2858.

ie analysis on federal habeas, conducted, results in the 2254(d)(1) is satisfied, then is must review the substantive the state custody de novo. ied the appropriate mode of 2254(d)(1) standard is met, dditional point: Respondents upon de novo review, we aly rationales supporting the on that "were . . . within the ie state court." We generally aveats. Representative of the cnts raise is Van Lynn, a case court had erroneously denied on for selfrepresentation by ug standard to evaluate the ence for such representation. The respondent argued that, ourt had erroneously deemed competent, habeas relief was mse the court could have i on the alternative ground dy. Id. Reviewing the state's ncluded that we could not ative rationale for the state uch requires application of an nd unrelated legal principle . . w the trial court's decision as e pursuant to that alternative shasis added).

viewing a state court decision there is a § 2254(d)(1) error. d we reached in Van Lynn is ct. We confine our § 2254(d)(1) e court's actual decisions and of § 2254(d)(1) demands this iting us to the "decision[s]" ate courts' "adjudication of . . . 'application[s] of . . . law" that n such decisions. Consistent

with the statutory text, the Supreme Court has twice cautioned federal courts to read state court decisions carefully to determine the rule that *actually* governed the state court's analysis. *Holland v. Jackson*, 542 U.S. 649, 654-55 (2004) (per curiam); *Woodford v. Visciotti*, 537 U.S. 19, 23-24 (2002) (per curiam).[15]

Indeed, if we were to defer to some *hypothetical* alternative rationale when the state court's *actual* reasoning evidences a § 2254(d)(1) error, we would distort the purpose of AEDPA. AEDPA "plainly sought to ensure a level of 'deference to the determinations of state courts.' " *Williams*, 529 U.S. at 386 (Stevens, J., concurring) (quoting H.R. Conf. Rep. No. 104- 518, at 111 (1996)). Applying § 2254(d)(1) to a state court's *actual* analysis accords such deference. But applying the deferential standards in § 2254(d)(1) to evaluate analysis a state court did not conduct is inconsistent with AEDPA deference. Such an approach would require us to ignore rather than respect the state court's analysis, and it would effectively require us to defer to states in their role as respondents in habeas actions rather than as independent adjudicators. Such a presumption in favor of a state party is distinct in both purpose and effect from respect afforded to state courts.

Our approach is not quite so straightforward, however, when we are reviewing legal questions without AEDPA deference. Unlike § 2254(d)(1) analysis, § 2254(a) review will often require consideration of legal arguments not addressed by the state court in its opinion. In this case, for example, we must consider the *McKaskle* question that the state court avoided and, in doing so, we consider the "alternative rationale" advanced by the respondents for affirming the Arizona court's decision.

Nevertheless, even on § 2241 de novo review, we would reject an alternative and unrelated legal argument of the type advanced by the respondent in *Van Lynn*. As with any de novo review, our § 2241 review is confined to the alleged wrong and the actual course of events at trial and on appeal. We cannot invent a constitutional sequence of events to justify that which simply did not happen. *Cf. Hirschfield v. Payne*, 420 F.3d 922, 928-29 (9th Cir. 2005) (holding that the federal court could not consider under § 2254(d)(1) a rationale offered by the state for the trial court's denial of the petitioner's motion for selfrepresentation when that rationale would have constituted a discretionary denial of the motion). Moreover, when the constitutional right itself is tied to the reasons for a trial court's decision, see, e.g., *Van Lynn*, 347 F.3d at 740 (discussing the Supreme Court's guidance on the reasons why a trial court can deny a criminal defendant's motion for self representation), even on de novo review we must focus on the trial court's reasoning to determine whether a constitutional violation occurred.

We need not elaborate further today on the precise line between those undecided issues that we will address on de novo consideration of constitutional issues and those that we will not. Here, the undecided issue was the logical predicate to the one that was decided by the state Court of Appeals, and was decided, albeit on a procedurally improper factual basis, by the

state trial court. And the U.S. Supreme Court has repeatedly considered such inherently linked issues de novo on habeas once the § 2254(d)(1) requirement is met.

In sum, then, we hold the following: To identify a § 2254(d)(1) "contrary to" error, we analyze the court's actual reasoning, to the extent that the Supreme Court has dictated how a state court's reasoning should proceed. Identification of such an error is not the end of a federal habeas court's analysis, however, unless that identification necessarily means that the state court's determination of the ultimate constitutional or legal question is also wrong. Instead, pursuant to § 2254(a) and preAEDPA standards of review, we must also evaluate de novo the petitioner's constitutional claims, without limiting ourselves to the reasoning of the state court.

### III. *McKaskle* ERROR

Because we have identified a § 2254(d)(1) error in the Arizona state court's opinion, we review de novo Frantz's Sixth Amendment claim regarding his exclusion from the chambers conference.

#### A.

*Faretta* established a criminal defendant's right to represent himself, "provided only that he knowingly and intelli gently forgoes his right to counsel and that he is able and willing to abide by rules of procedure and courtroom protocol." *McKaskle*, 465 U.S. at 173. But *Faretta* did not recognize an unqualified right for *pro se* defendants to stand alone in a courtroom. Instead, the Supreme Court allowed states to appoint "standby counsel" to aid *pro se* defendants "if and when [they] request[ ] help, and to be available to represent the accused in the event that termination of the defendant's selfrepresentation is necessary." *Faretta*, 422 U.S. at 834 n.46.

In *McKaskle*, the Supreme Court reiterated *Faretta's* holding concerning standby counsel and indicated that rather than creating an "absolute bar on standby counsel's unsolicited participation," 465 U.S. at 176, *Faretta* allows standby counsel sometimes to participate without violating an individual's right to selfrepresentation. *Id.* at 177. But to clarify the distinction between permissible and impermissible interference by standby counsel, *McKaskle* "impose[d] some limits on the extent of standby counsel's unsolicited participation," *id.* at 177, so as to protect the *Faretta* right.

Those limitations are, first, that "the *pro se* defendant is entitled to preserve actual control over the case he chooses to present to the jury," and, second, that "participation of standby counsel without the defendant's consent should not be allowed to destroy the jury's perception that the defendant is representing himself." *Id.* at 178. Because the conference that Frantz challenges took place out of sight of the jury, we are concerned today with the first, but not the second, of *McKaskle's* two core limitations.

*McKaskle* offers considerable guidance as to when a standby attorney's participation so reduces a defendant's control as to violate

*Faretta.* On the one hand, "[i]f standby counsel's participation over the defendant's objection effectively allows counsel to make or substantially interfere with any significant tactical decisions . . . or to speak *instead* of the defendant on any matter of importance, the *Faretta* right is eroded." *Id.* at 178 (emphasis in original). On the other hand, standby counsel may assist in two ways: (1) "in overcoming routine procedural or evidentiary obstacles to the completion of some specific task, such as introducing evidence or objecting to testimony, that the defendant has clearly shown he wishes to complete," *id.* at 183; and (2) by "help[ing] to ensure the defendant's compliance with basic rules of courtroom protocol and procedure." *Id.*

Applying this guidance, we conclude that Lamb's solo participation in the chambers conference may well have violated Frantz's right to self-representation, but that we need some further development of the record before we can decide the ultimate constitutional question. We first hold that, even if Lamb accurately portrayed Frantz's wishes, unconsented to exclusion from the conference would so substantially reduce Frantz's ability to shape and communicate his own defense as to violate his *Faretta* rights. Having so concluded, we then consider whether we can determine from the present record that Frantz did not accede to Lamb's participation, or whether instead we must remand for an evidentiary hearing on the question.

### B.

The chambers conference involved two questions relevant to this case: (1) whether the jury, at its own request, should be allowed to hear the 911 tape; and (2) if the tape was not admitted, how the judge should respond to the jury's request.[16] Neither question fell within *McKaskle*'s categorical exceptions to *Faretta* protection. Certainly, neither involved the basic procedural issues contemplated by *McKaskle* as appropriate for intercession by standby counsel. *See* 465 U.S. at 184 (excusing standby counsel's participation in matters of "basic mechanics" such as "informing the court of the whereabouts of witnesses, supplying [the defendant] with a form needed to elect to go to the jury at the punishment phase of trial, explaining to [the defendant] that he should not argue his case while questioning a witness"). And both questions discussed at the chambers conference involved far more than "routine . . . obstacles to the completion of some specific task . . . that the defendant ha[d] clearly shown he wishe[d] to complete." *Id.* at 183. Both the substance of the jury's request — for evidence not admitted at trial — and the judge's apparent willingness to consider granting it were highly unusual.[17] Moreover, Frantz had not earlier established his position on the jury's inquiry, as the request had just then been made. The upshot is that Lamb's participation was entirely distinct from that of the standby attorney in *McKaskle*, who — with the Supreme Court's approbation — questioned a witness to establish "an appropriate predicate" only after the defendant sought in open court to introduce the very evidence himself and

encountered difficulty because of the lack of such predicate. *Id.* at 184.

As neither of the roles for standby counsel recognized in *McKaskle* pertains, we must turn to the more general standard enunciated in *McKaskle*: Was the inchambers proceeding in which Frantz did not participate one involving "any significant tactical decisions" or "any matter of importance"? *Id.* at 178. We hold that it involved both and that, therefore, Frantz had to be allowed to make the tactical decisions involved and to speak for himself about them, unless he consented to Lamb's doing so instead.

In considering these issues, we are aware of the Tenth Circuit's observation that *McKaskle* "seems to stop short of a per se rule when it states that [standby counsel's interference in such matters] only 'erode[s]' *Faretta* rights. 'Erode' is not a synonym for 'violate.'" *United States v. McDermott,* 64 F.3d 1448, 1454 (10th Cir. 1995). In some cases, it may be that standby counsel can "erode" *Faretta* rights without violating them.

This case, however, is not a borderline one of that kind. The chambers conference involved two issues with undoubted tactical importance. Particularly because the conference involved discussions that Lamb and Frantz could not have accurately predicted or rehearsed in advance, Frantz's exclusion resulted in a complete silencing of Frantz's voice on the matters.

We take the two matters discussed at the inchambers conference in turn:

(1) *Whether the jurors should be allowed to hear the 911 tape*

The jurors' request raised an issue that we have often found quintessentially strategic: the choice of whether to admit evidence that could either help or harm a defendant's case. *See generally Darden v. Wainwright,* 477 U.S. 168, 186 (1986); *Boyde v. Brown,* 404 F.3d 1159, 1174 (9th Cir.), *amended by* 421 F.3d 1154 (9th Cir. 2005); *Bonin v. Calderon,* 59 F.3d 815, 834 (9th Cir. 1995). Whether the jurors should have been allowed to hear the 911 tape is no exception.

Throughout the trial, Frantz indicated that he thought the requested tape had particular significance to his defense. Despite the damaging statement on the tape that the robber was armed, Frantz believed that the tape could impeach the credibility of the government's most knowledgeable witness, Diana Villalobos. Villalobos, the cashier whom Frantz allegedly approached to rob, was the sole witness who described the entire sequence of the robbery. She was also the only witness to testify that she saw Frantz with a gun; the police officers who responded to the scene did not report seeing Frantz with a gun and never recovered one. Accordingly, during his twoday trial, Frantz three times tried to introduce the tape or its transcript, and Lamb told the judge during one bench conference that Frantz was "fixated" on the issue.

After the judge suggested to Lamb that he would grant Frantz's request to admit the transcript of the 911 call, Frantz withdrew the request; the record before us does not explain

ficulty because of the lack of such 184.

of the roles for standby counsel *McKaskle* pertains, we must turn general standard enunciated in the inchambers proceeding in lid not participate one involving it tactical decisions" or "any rtance"? *Id.* at 178. We hold that and that, therefore, Frantz had to ake the tactical decisions involved or himself about them, unless he amb's doing so instead.

ng these issues, we are aware of :uit's observation that *McKaskle* short of a per se rule when it states counsel's interference in such 'erode[s]' *Faretta* rights. 'Erode' rm for 'violate.' " *United States v.* F.3d 1448, 1454 (10th Cir. 1995). it may be that standby counsel can rights without violating them. lowever, is not a borderline one ie chambers conference involved i undoubted tactical importance. :ause the conference involved t Lamb and Frantz could not have dicted or rehearsed in advance, on resulted in a complete silencing e on the matters.

e two matters discussed at the iference in turn:

*the jurors should be allowed to hear*

request raised an issue that we nd quintessentially strategic: the her to admit evidence that could harm a defendant's case. *See* *n v. Wainwright*, 477 U.S. 168, 186 *Brown*, 404 F.3d 1159, 1174 (9th *by* 421 F.3d 1154 (9th Cir. 2005); *on*, 59 F.3d 815, 834 (9th Cir. 1995). rors should have been allowed to pe is no exception.

the trial, Frantz indicated that e requested tape had particular his defense. Despite the damaging the tape that the robber was believed that the tape could credibility of the government's :zeable witness, Diana Villalobos. cashier whom Frantz allegedly rob, was the sole witness who entire sequence of the robbery. he only witness to testify that she :h a gun; the police officers who the scene did not report seeing gun and never recovered one. luring his twoday trial, Frantz ied to introduce the tape or its Lamb told the judge during one ice that Frantz was "fixated" on the

judge suggested to Lamb that it Frantz's request to admit the he 911 call, Frantz withdrew the :cord before us does not explain

why. Still, Frantz's change of position does not diminish the importance of any decision about the call tape or transcript. Admitted or not, the content of the 911 call – on tape or as transcribed – maintained its potential strategic relevance, as the very request from the jury to hear the tape indicated.[18]

As a result, we conclude that, to the extent that the chambers conference involved a decision about whether to admit the 911 tape, participation in it was central to Frantz's *Faretta* right to control his defense. *See generally McDermott*, 64 F.3d at 1454 (holding that a defendant's *Faretta* rights were violated by his exclusion from bench conferences addressing issues including admissibility of testimony and other evidence); *Oses v. Massachusetts*, 961 F.2d 985, 986 (1st Cir. 1992) (per curiam) (holding that a defendant's *Faretta* rights were violated by his exclusion from bench conferences covering "important issues" including "the admission of evidence").

(2) *How the reply to the jury's request should be worded*

Independently of our concern regarding the decision about the tape, we also hold that the conference triggered Frantz's *Faretta* rights because it resolved the content of the judge's response to the jurors' request. The chance to shape the jury's interpretation of an important tactical decision is at least as important as the chance to make the decision itself. And regardless of the judge's leeway in granting the jurors' request, the substance and wording of the judge's response could have influenced the jurors' interpretation of the tape's absence.

We have repeatedly recognized how seriously jurors consider judges' responses to their questions. In federal court, we allow trial judges substantial latitude in addressing jury questions. But we know that "analytically correct" answers to a jury may unnecessarily – and improperly - – influence a jury. *See Arizona v. Johnson*, 351 F.3d 988, 994 (9th Cir. 2003); *see also id.* at 994-98 (discussing cases). Furthermore, even if not improper, we recognize that *some* influence on the jury's deliberations is difficult to avoid when the jury is troubled enough to seek advice. "The influence of the trial judge on the jury is necessarily and properly of great weight .... Particularly in a criminal trial, the judge's last word is apt to be the decisive word." *Bollenbach v. United States*, 326 U.S. 607, 612 (1946) (internal quotation marks and citations omitted); *cf. United States v. Sacco*, 869 F.2d 499, 501-02 (9th Cir. 1989) (recognizing that a careful response to a jury's request for specific pieces of evidence can keep the jury from overvaluing any one piece of evidence); *United States v. Frazin*, 780 F.2d 1461, 1469 (9th Cir. 1986) (recognizing that "[a] defendant's participation in formulating a response to a deadlocked jury . . . may be important to ensuring the fairness of the verdict," particularly because there may be holdout jurors).

Because of the delicate nature of such middeliberation inquiries, we have recognized that defendants or their attorneys have a due process right to be present in conferences when jurors'

notes are discussed, *United States v. Barragan Devis*, 133 F.3d 1287, 1289 (9th Cir. 1998), or "when a trial court prepares a supplemental instruction to be read to a deliberating jury," *United States v. RosalesRodriguez*, 289 F.3d 1106, 1110 (9th Cir. 2002). Presence is critical when a jury's questions are discussed because "[c]ounsel might object to the instruction or may suggest an alternative manner of stating the message," *id.* at 1110 – a critical opportunity given the great weight that jurors give a judge's words. The defendant's or attorney's presence may also be an important opportunity "to try and persuade the judge *to* respond." *BarraganDevis*, 133 F.3d at 1289.[19]

In this case, the transcript shows that the judge chose between two instructions. He first proposed the following response: "The 911 tape was not admitted into evidence and no manager's statement was ever taken." He discarded that initial proposal, however, after Lamb objected that it was not clear that "no manager's statement was ever taken." Instead, the judge instructed jurors much more generally – that they "must rely on [their] collective recollection of the testimony and the exhibits admitted into evidence."

It is difficult to discern how the difference between the initial proposed instruction and the judge's actual instruction to jurors might have affected them differently. But the two responses were quite different, and Frantz, because he was not present, had no opportunity to make any strategic decision concerning them, or to develop on the spot an alternative proposal once the judge changed his mind about his original, proposed wording. That opportunity to strategize and to speak for himself is a *Faretta* right protected by *McKaskle*.

C.

Respondents argue that despite the conference's importance, Frantz's exclusion was constitutional because Lamb consulted Frantz and accurately repeated Frantz's desire not to give the jury the 911 tape. But for reasons we explain below, faithfully repeating Frantz's opinion is not sufficient under *McKaskle*, unless Frantz consented to have Lamb speak for him at the conference.

Absent consent by Frantz for Lamb to participate in his stead, whether or not Lamb accurately relayed Frantz's position on the tape is not dispositive of Frantz's claim. *See generally McDermott*, 64 F.3d at 1453-54 (holding that a defendant's rights were violated by his exclusion from sidebar conferences even though he did not allege that he would have conducted the conference differently than did the standby attorney who participated). *Faretta* grants defendants the right not only to manage, but also to conduct, their own defenses, *see* 422 U.S. at 816-17, 834, a right that *McKaskle* recognized as focusing "on whether the defendant had a fair chance to present his case in his own way." 465 U.S. at 177. Given *Mc Kaskle*'s references to the defendant's right "to have his voice heard," *id.* at 174, and to "speak" for himself, *id.* at 177, an advisory attorney's appearance is not automatically an acceptable substitute for the defendant's as to matters of importance.

For similar reasons, Lamb's solo participation in the chambers conference was not constitutional simply because the record contains no objection by Frantz. The parties do not dispute that the trial court found Frantz competent to represent himself. Nor do they dispute that, despite the appointment of advisory counsel, the trial began with the understanding that Frantz alone was directing his representation at the trial. Under such circumstances, *McKaskle* makes clear that — absent some basis for concluding that Frantz consented to representation by Lamb as to the particular matter — Frantz's *Faretta* right remained intact. *McKaskle* does not place the burden on *pro se* defendants to regulate each of their standby attorneys' actions. To the contrary, *McKaskle* limits standby counsel's *"unsolicited* participation" during critical proceedings. 465 U.S. at 177 (emphasis added). When standby counsel is appointed only to advise, the initial invocation of the right of selfrepresentation is generally sufficient to establish that any participation by standby counsel other than for the routine matters mentioned in *McKaskle* is "over the defendant's objection." *Id.* at 178; *see generally United States v. Lorick*, 753 F.2d 1295, 1299 (4th Cir. 1985) (A defendant's assertion of "the right [to selfrepresentation] at the outset of trial proceedings constituted an express and unambiguous request that 'standby counsel be silenced.' This, under *Mc Kaskle*'s analysis, must be given effect as a reassertion of the general right to pro se representation as to further proceedings . . . ."). Moreover, Frantz, according to the government was in "lockup" during the conference, so it is particularly unlikely that implied consent can be inferred from the failure to object. As far as appears on the current record, Frantz was never in the presence of the judge after the jury had retired, so he could not have raised an objection to him.

*McKaskle*'s rules are not, however, without exception. *Faretta* established that standby attorneys can assist *pro se* defendants "if and when" their help is requested. 422 U.S. at 834 n.46. And *McKaskle* further explained *Faretta* by cautioning that

"[i]n measuring standby counsel's involvement against the [*McKaskle*] standards . . . it is important not to lose sight of the defendant's own conduct. A defendant can waive his *Faretta* rights. . . . A defendant . . . who vehemently objects at the beginning of trial to standby counsel's very presence in the courtroom, may express quite different views as the trial progresses."

*McKaskle*, 465 U.S. at 182. It is this exception that we must investigate further to determine whether Frantz merits relief. Absent consent by Frantz, his exclusion from the chambers conference was unconstitutional, for all the reasons we described above.

More specifically, *McKaskle* refers to two types of permissible consent to a standby attorney's participation. The first is express approval for a particular action. Participation by a standby

attorney under such circumstances "is, of course, constitutionally unobjectionable. A defendant's invitation to counsel to participate in the trial obliterates any claim that the participation in question deprived the defendant of control over his own defense." *Id.* The second type of consent is implied: "Even when he insists that he is not waiving his *Faretta* rights, a *pro se* defendant's solicitation of[,] or acquiescence in[,] certain types of participation by counsel substantially undermines later protestations that counsel interfered unacceptably." *Id.* Thus, *McKaskle* concluded, "[o]nce a *pro se* defendant invites or agrees to any substantial participation by counsel, subsequent appearances by counsel must be presumed to be with the defendant's acquiescence, at least until the defendant expressly and unambiguously renews his request that standby counsel be silenced." *Id.* at 183 (emphasis added).

Implicit consent from the overall course of the trial proceedings appears unlikely. Frantz asserted that his right to selfrepresentation extended to all matters involving jury instructions. During trial, Frantz fully participated in the primary discussion regarding final jury instructions. Although Lamb made one request during that discussion, Frantz made an entirely separate request, arguing at length concerning why the instructions should address assault as a lesser included offense and responding to the judge's queries on his proposal. The bench conferences in which Frantz did not participate did not concern jury instructions; although they did concern some evidentiary questions, Lamb was always within consulting distance of Frantz and did sometimes consult with him during the conference.

Nevertheless, our record is far from complete. We know that Frantz declared under oath that "[o]n the final day of trial . . . advisory counsel, Ray Lamb, did not tell [him] the jury wanted to hear [the] 911 tapes, nor to have them played to the jury." But we have no specific evidence concerning the circumstances that gave rise to Lamb's solo participation in the chambers conference concerning the jury's request. The parties did not develop the relevant factual record in state court because the state trial court decided Frantz's *McKaskle* claim on summary adjudication, concluding that no facts were necessary. The state court of appeals rejected that conclusion but then went on, incorrectly, to find any *McKaskle* error harmless. As a result, the failure to hold an evidentiary hearing in state court was not in any way the fault of the petitioner. The hearing should be held now.

We thus remand to the district court for an evidentiary hearing concerning the circumstances during the course of the trial and after the jury retired that gave rise to Frantz's exclusion from the chambers conference, including whether Frantz was accurately informed of the purpose of the conference and given the opportunity to appear but declined to do so, and for a determination consistent with this opinion regarding whether Frantz's *Faretta/McKaskle* rights to selfrepresentation were violated by that exclusion. *See* § 2254(e)(2).

der such circumstances "is, of course, ally unobjectionable. A defendant's ɔ counsel to participate in the trial any claim that the participation in ɔprived the defendant of control over ense." *Id.* The second type of consent "Even when he insists that he is not ; *Faretta* rights, a *pro se* defendant's of[,] or acquiescence in[,] certain articipation by counsel that gave rise s later protestations that counsel unacceptably." *Id.* Thus, *McKaskle*

"[o]nce a *pro se* defendant invites to any substantial participation by ubsequent appearances by counsel resumed to be with the defendant's ce, at least until the defendant ind unambiguously renews his request by counsel be silenced." *Id.* at 183 added).

consent from the overall course of the ɔdings appears unlikely. Frantz asserted ht to selfrepresentation extended to all volving jury instructions. During trial, ʒ participated in the primary discussion final jury instructions. Although Lamb request during that discussion, Frantz entirely separate request, arguing at icerning why the instructions should ɔsault as a lesser included offense and g to the judge's queries on his proposal. ɔ conferences in which Frantz did not · did not concern jury instructions; they did concern some evidentiary Lamb was always within consulting ɔf Frantz and did sometimes consult luring the conference.

heless, our record is far from complete. that Frantz declared under oath that final day of trial . . . advisory counsel, ɔ, did not tell [him] the jury wanted to | 911 tapes, nor to have them played ʒy." But we have no specific evidence ɔg the circumstances that gave rise s solo participation in the chambers ʒe concerning the jury's request. The ɔ not develop the relevant factual record ɔurt because the state trial court decided *IcKaskle* claim on summary adjudication, ɔg that no facts were necessary. The ʒ of appeals rejected that conclusion but t on, incorrectly, to find any *McKaskle* ɔmless. As a result, the failure to hold an ʒry hearing in state court was not in any ɔult of the petitioner. The hearing should ɔw.

ɔus remand to the district court for an ʒry hearing concerning the circumstances ɔe course of the trial and after the jury ʒhat gave rise to Frantz's exclusion ɔe chambers conference, including Frantz was accurately informed of ɔose of the conference and given the ɔity to appear but declined to do so, and ʒermination consistent with this opinion ʒg whether Frantz's *Faretta/McKaskle* ɔ selfrepresentation were violated by that ʒ. *See* § 2254(e)(2).

## CONCLUSION

We conclude that, in addition to contradicting the clearly established law of the Supreme Court, *see* § 2254(d)(1), the decision of the Arizona Court of Appeals may have resulted in a denial of Frantz's constitutional right to represent himself, but the record before us is insufficient to resolve the issue fully. Because this court concludes in a separate disposition that Frantz's other claims are not meritorious, we reverse the district court's denial of Frantz's petition and remand for an evidentiary hearing on the consent question described above.

### REVERSED AND REMANDED.

[1] We recite here the facts evident from the portions of the state record before us. While we have the transcript of the entire trial through the close of evidence, our record lacks substantial portions of the transcripts from various pretrial proceedings, offtherecord discussions during the jury's deliberations, and sentencing.

[2] The trial court described Bates's and later Lamb's role as "advisory counsel." *McKaskle*, by contrast, refers to "standby counsel." The two terms may refer to slightly different roles. *See Locks v. Sumner*, 703 F.2d 403, 407 & n.3 (9th Cir. 1983) (suggesting that "standby counsel" is one form of "advisory counsel"). For the purposes of the limitations described in *McKaskle*, however, the two terms are interchangeable, and we use them as such.

[3] Wherever possible, we have noted whether the tape of the call or the transcript is at issue.

[4] More specifically: During the first day of trial, Frantz told the judge he hoped to introduce at least part of the 911 tape. After the judge dismissed the jury for the day, the judge inquired: "Is there anything we need to cover before tomorrow [when the jury returns] at 11?" Frantz responded, "The 911 tapes, because I want that entered into evidence about the bloodhaired thing, description." The judge replied, "I'll see you at 11." The trial transcript shows no further response to the request.

On the second day of trial, when the issue surfaced again during the conference regarding jury instructions, Frantz responded to the judge's concern that the tape was hearsay by stating that he "want[ed] to use it to impeach the victim due to the fact that she gives totally arbitrary testimony." The judge did not rule on the question, stating that he would "consider [the request] as individual events take place."

Frantz again pursued the issue when he called Villalobos, who had previously testified for the state, as a witness for the defense. After Frantz examined Villalobos about her memory of the interview's face, Lamb asked in Frantz's presence to admit into evidence the call transcript. A bench conference then began, at which Lamb represented Frantz on the topic.

[5] We use the term "bench conferences" to refer to conferences with the judge that took place while the jurors were present, but presumably out of their earshot.

The bench conferences are distinct from the earlier described conferences in which jury instructions were discussed. During those conferences, the jury was not in the courtroom.

Neither any conference in the record nor the state court's factual findings clearly explain why Lamb alone attended these conferences.

[6] Arizona Rule of Criminal Procedure 20 allows defendants to make motions for a judgment of acquittal.

[7] A few seconds later, Lamb reported back that he had successfully persuaded Frantz not to make the statement. Shortly thereafter, Frantz followed up on the Rule 20 discussion, moving on his own behalf for a judgment of acquittal.

[8] The state's brief simply stated: "[A]s the Court will recall, during deliberations when the jury questions came in, advisory counsel went to the holding cell in Superior Court and discussed the questions with the defendant. After the question was discussed, advisory counsel reported the defendant's position to the State and the Court in chambers."

[9] The COA also covers Frantz's claims that he was improperly denied access to a law library and that his appointed counsel, Bates, was ineffective during plea negotiations when he failed to investigate the state's allegation that Frantz committed the offense while on probation for a Florida offense. We deny both these claims in a memorandum disposition filed simultaneously with this opinion.

In addition to several other claims, the COA did not cover a claim closely related to the one we discuss here. On direct appeal, Frantz challenged his exclusion from bench conferences during trial. The state court concluded that the claim was first raised in state postconviction relief proceedings, in which Frantz could develop a record. Frantz did not raise the issue again in his petition for postconviction relief in state court. On habeas review, the district court concluded that the claim was not properly raised because "Petitioner failed to clearly state the federal law bases for his claim and he failed to follow the [state] appeals court's instruction to develop a record on the issue in postconviction proceedings."

[10] In doing so, we must accept any state court factual findings as true, absent any evidence to the contrary. 28 U.S.C. § 2254(e). Unlike the Judge Gould's concurrence, Gould concurrence at 753-54, we do not consider the federal district court's statements that Frantz "was not in the courtroom but in a holding cell" at the time of the conference and that "[a]dvisory counsel consulted with [Frantz]" regarding the conference. The finding is clearly erroneous on the present record. The state trial court's findings to that effect were vacated by the state Court of Appeals and thus merit no deference. *See Buckley v. Terhune*, 441 F.3d 688, 694 (9th Cir. 2006). Furthermore, as explained earlier, the record includes only an unsupported averment to this effect. The sole evidence submitted in state or federal court regarding this matter is Frantz's affidavit, which contradicts the district court's statement.

[11] Unless otherwise stated, all statutory citations in this opinion are to sections of 28 U.S.C.

[12] We have not, for example, always reviewed a state court's choice of legal standards under the "contrary to" prong of § 2254(d)(1), as we do today. Some of our earlier cases have suggested that the choice of an appropriate legal standard is unreviewable because it constitutes a court's "reasoning," *see, e.g., Hernandez v. Small*, 282 F.3d 1132, 1140 (9th Cir. 2002), or that such a choice is reviewable only under the "unreasonableness" prong of § 2254(d)(1), *see, e.g., Williams v. Warden*, 422 F.3d 1006, 1010 (9th Cir. 2005), *cert. denied*, 547 U.S. 1003 (2006).

We have also not consistently stated whether identification of a § 2254(d)(1) error is alone sufficient to warrant habeas relief. One line of cases, exemplified by *CooperSmith v. Palmateer*, 397 F.3d 1236 (9th Cir.), *cert. denied*, 546 U.S. 944 (2005), has held that a state court's

choice of the wrong legal standard — or some other § 2254(d)(1) error — does not alone justify habeas relief, and that further review of a petitioner's claim is necessary to grant a writ of habeas corpus. *See, e.g., id.* at 1243; *see also Inthavong v. Lamarque,* 420 F.3d 1055, 1059 (9th Cir. 2005) (collecting cases), *cert. denied,* 547 U.S. 1059 (2006). In conflict with our holding today, another line of cases has suggested — if not explicitly decided — that a § 2254(d)(1) error alone is sufficient to merit relief, even when that error does not necessarily resolve the constitutionality or legality of a prisoner's confinement. *See, e.g., Kaua v. Frank,* 436 F.3d 1057, 1062 (9th Cir. 2006), *cert. denied,* 127 S.Ct. 1233 (2007); *Van Lynn v. Farmon,* 347 F.3d 735, 741 (9th Cir. 2003).

[12] Harmless error review of constitutional "trial errors" in the context of habeas petitions differs from harmless error review on direct appeal. *See generally Fry v. Pliler,* 127 S. Ct. 2321 (2007) Where an error is structural, however, it is not subject to harmless error review of any kind on direct appeal, *see Arizona v. Fulminante,* 499 U.S. 279, 309-10 (1991), and harmless error review also is not appropriate in habeas proceedings. *See Brecht v. Abrahamson,* 507 U.S. 619, 629-30 (1993) (importing *Fulminante*'s distinction between trial errors and structural errors into the habeas context); *Gibson v. Ortiz,* 387 F.3d 812, 820 (9th Cir. 2004) (applying direct appeal definition of structural error to habeas review); *Martinez v. Garcia,* 379 F.3d 1034, 1039 (9th Cir. 2004) (similar); *see also Mitchell v. Esparza,* 540 U.S. 12, 15-17 (2003) (per curiam) (on habeas review, consulting direct appeal cases to determine whether an error was clearly established as "structural" or not).

[14] Section 2241(c) reads:

> The writ of habeas corpus shall not extend to a prisoner unless—

> (1) He is in custody under or by color of the authority of the United States or is committed for trial before some court thereof; or

> (2) He is in custody for an act done or omitted in pursuance of an Act of Congress, or an order, process, judgment or decree of a court or judge of the United States; or

> (3) He is in custody in violation of the Constitution or laws or treaties of the United States; or (

> (4) He, being a citizen of a foreign state and domiciled therein is in custody for an act done or omitted under any alleged right, title, authority, privilege, protection, or exemption claimed under the commission, order or sanction of any foreign state, or under color thereof, the validity and effect of which depend upon the law of nations; or

> (5) It is necessary to bring him into court to testify or for trial.

[15] In the related context of "unreasonable application" errors, too, the Supreme Court has focused its analysis on state courts' actual reasoning rather than hypothetical alternative lines of analysis. *See Holland,* 542 U.S. at 652 ("The Sixth Circuit erred in finding the state court's application of [federal law] unreasonable on the basis of evidence not properly before the state court."); *Wiggins,* 539 U.S. at 528-29 (holding unreasonable a state court's conclusion that an attorney's performance was sufficient because the attorney's investigation was too narrow, without considering separate justifications based on alternative readings of the record); *see also Oswald v. Bertrand,* 374 F.3d 475, 483 (7th Cir. 2004) ("A state court can of course be wrong without being unreasonable, and the reasonableness of a decision ordinarily cannot be assessed without considering the quality of the court's reasoning . . . .").

[16] The transcript in our record of the conference reads:

> THE COURT: Let's go on the record.

> Show the presence of counsel but not the defendant.

> We received jury questions No. 1 and 2. I understand there were no managers' statements taken; is that correct?

> MS. GARCIA [for the state]: Yeah.

> MR. LAMB: That's correct.

> THE COURT: And I further agree that — further understand that the State would agree to play the 911 tape to the jury; is that correct?

> MS. GARCIA: Yeah, if that's what the defendant wants to do.

> MR. LAMB: He doesn't want it.

> THE COURT: Okay.

> MR. LAMB: The question will be as you originally — the answer will be as you originally framed it.

> THE COURT: What we might do is clarify that — my proposed answer was, The 911 tape was not, nor was any manager's statement, admitted into evidence. Please refer to my instructions.

> What we might do to clarify this and state: The 911 tape was not admitted into evidence and no manager's statement was ever taken.

> MS. GARCIA: That's fine, or —

> MR. LAMB: Well, I'm sure somebody must have talked to the manager.

> [discussion follows between Lamb and Garcia] . . .

> THE COURT: I could simply say, You must rely on your collective recollection of the facts and the exhibits already admitted into evidence.

> MR. LAMB: That's fine.

> THE COURT: Okay. What I have written here is: "You must rely on your collective recollection of the testimony and the exhibits admitted into evidence. Please refer to my instructions."

> MR. LAMB: Fine, Judge.

> THE COURT: Okay That's fine.

[17] The court's request for input and the state's acquiescence in providing the tape indicate that the judge was willing to consider granting the jurors' request. *See supra* note 16 (transcript of proceeding). At oral argument before the en banc court, the respondents' counsel stated that under state law the tape could have been presented to the jurors on their request even though it had not been introduced at trial.

[18] The respondents urge us to consider the proceeding unimportant because the 911 tape could not have helped Frantz's defense. Whether or not the tape could actually have affected the jury's decision is irrelevant to the question we confront here. As *McKaskle* recognizes, the "core of the *Faretta* right" is the defendant's "actual control over the case he chooses to present to the jury." 465 U.S. at 178. Our primary concern is which choices were important to Frantz's conception of his strategy, not whether those choices were smart or necessary.

[19] Although the *McKaskle* standards do not exactly mirror the "right to be present" due process jurisprudence, the *McKaskle* standards do draw upon the presence jurisprudence. *McKaskle,* 465 U.S. at 178.

KOZINSKI, Chief Judge, with whom Judges WARDLAW, PAEZ and BEA join, concurring:

Judge Gould spends much effort proving something that no one disputes: That a criminal

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ABE WILLIAMS, JR.

v.

Case Number: C-91-02589-JPV

M. MARTEL (A) WARDEN

**PROOF OF SERVICE
BY MAIL**

/

I hereby certify that on  APRIL 23, 2008 , I served a copy

of the attached  F.R.C.P., RULE 60(b)(6) MOTION ,

by placing a copy in a postage paid envelope addressed to the person(s) hereinafter listed, by

depositing said envelope in the United States Mail at  IONE, CALIFORNIA 95640  :

Clerk, of the United States Northern District Court
450 GOLDEN GATE AVE.,
SAN FRANCISCO, CA 94102-3483

Office of The State Attorney General
455 Golden Gate Ave, Suite 11000
San Francisco, CA 94002-3664

I declare under penalty of perjury that the foregoing is true and correct.

ABE WILLIAMS, JR.