*NEW MATTER NOT JPV*

**ORIGINAL**

*FILED*

*APR 25 2008*

*RICHARD W. WIEKING*
*CLERK, U.S. DISTRICT COURT*
*NORTHERN DISTRICT OF CALIFORNIA*

IN THE STATE OF CALIFORNIA

FOR THE SUPREME COURT

ABE WILLIAMS, JR.,                    )         CASE NO. _____
                                      )
          PETITIONER,                 )
                                      )
v.                                    )         PETITION FOR WRIT OF HABEAS
                                      )         CORPUS
M. MARTEL, (A) WARDEN,                )
                                      )                              *MHP*
          RESPONDENT.                 )
_____)    CV  08         2167

*(PR)*

PETITIONER'S SEPARATELY BOUND

"SUPPORTING DOCUMENTS"          *E-filing*

THE FOLLOWING DOCUMENTS ARE INCLUDED:

1.) APPENDIX **A**, COPY OF THE FIRST DISTRICT COURT OF APPEAL'S HABEAS DENIAL

2.) APPENDIX **B**, COPY OF PETITIONER'S APPELLATE COURT HABEAS PETITION, AND ITS FOLLOWING ATTACHMENTS:

   I)   COPY OF ATTACHED EXHIBIT **#1**, COPY OF THE ALAMEDA COUNTY SUPERIOR COURT'S HABEAS DENIAL

   II)  COPY OF ATTACHED EXHIBIT **#2**, COPY OF PETITIONER'S SUPERIOR COURT HABEAS PETITION, WITH ITS ATTACHED PAGES I THROUGH VI, AND ATTACHED PAGES 1 THROUGH 53

   III) COPY OF ATTACHED EXHIBIT **#3**, COPY OF PETITIONER'S SEPRARTELY BOUND SUPPORTING DOCUMENTS, WITH ITS ATTACHED EXHIBITS **A** THROUGH **U**

                              ABE WILLIAMS, JR.
                              D-48163  B-9-127L
                                  M.C.S.P.
                              P.O. BOX 409040
                              IONE, CA 95640-9000

*PRO SE*
*RECD-*
*THESE A*
*DAY LATER*

                              ( IN PRO PER )

MC-275

Name  ABE WILLIAMS, JR. (In Pro Per)

Address  Mule Creek State Prison (MCSP)

P.O. BOX 409040

Ione, CA 95640-9000

CDC or ID Number  D-48163

COPY

Division Five

FILED

DIANA HERBERT, CLERK
BY                    DEPUTY CLERK

IN THE STATE OF CALIFORNIA

FIRST DISTRICT APPELLATE COURT

(Court)

ABE WILLIAMS, JR.

Petitioner

vs.

M. MARTEL (A) Warden

Respondent

PETITION FOR WRIT OF HABEAS CORPUS

A120300

No _____

(To be supplied by the Clerk of the Court)

## INSTRUCTIONS—READ CAREFULLY

- If you are challenging an order of commitment or a criminal conviction and are filing this petition in the Superior Court, you should file it in the county that made the order.

- If you are challenging the conditions of your confinement and are filing this petition in the Superior Court, you should file it in the county in which you are confined.

- Read the entire form *before* answering any questions.

- This petition must be clearly handwritten in ink or typed. You should exercise care to make sure all answers are true and correct. Because the petition includes a verification, the making of a statement that you know is false may result in a conviction for perjury.

- Answer all applicable questions in the proper spaces. If you need additional space, add an extra page and indicate that your answer is "continued on additional page."

- If you are filing this petition in the Superior Court, you need file only the original unless local rules require additional copies. Many courts require more copies.

- If you are filing this petition in the Court of Appeal, file the original and four copies of the petition and, if separately bound, one copy of any supporting documents.

- If you are filing this petition in the California Supreme Court, file the original and ten copies of the petition and, if separately bound, two copies of any supporting documents.

- Notify the Clerk of the Court in writing if you change your address after filing your petition.

- In most cases, the law requires service of a copy of the petition on the district attorney, city attorney, or city prosecutor. See Penal Code section 1475 and Government Code section 72193. You may serve the copy by mail.

Approved by the Judicial Council of California for use under rule 8.380 of the California Rules of Court [as amended effective January 1, 2007]. Subsequent amendments to rule 8.380 may change the number of copies to be furnished to the Supreme Court and Court of Appeal.

Form Approved for Optional Use
Judicial Council of California
MC-275 [Rev. January 1, 2007]

**PETITION FOR WRIT OF HABEAS CORPUS**

Penal Code, § 1473 et seq.,
Cal. Rules of Court, rule 8.380
www.courtinfo.ca.gov

American LegalNet, Inc.
www.FormsWorkflow.com

MC-275

**This petition concerns:**

- [ ] A conviction
- [X] Parole
- [ ] A sentence
- [X] Credits
- [ ] Jail or prison conditions
- [ ] Prison discipline
- [ ] Other *(specify):* _____

1. Your name:  Abe Williams, Jr.

2. Where are you incarcerated?     MCSP

3. Why are you in custody?   [X] Criminal Conviction   [ ] Civil Commitment

   *Answer subdivisions a. through i. to the best of your ability.*

   a. State reason for civil commitment or, if criminal conviction, state nature of offense and enhancements (for example, "robbery with use of a deadly weapon").

      Second Degree Murder

   b. Penal or other code sections:  P.C. §§ 190 and 12022.5

   c. Name and location of sentencing or committing court:  Alameda County Superior Court, 1225 Fallon Street, Oakland, California 94612

   d. Case number:  Superior Court No. 80451

   e. Date convicted or committed:  October 15, 1986

   f. Date sentenced:  January 18, 1987

   g. Length of sentence: 15-years to life, + 3 one-year priors= 18-years to life

   h. When do you expect to be released?  UNKNOWN

   i. Were you represented by counsel in the trial court?   [X] Yes.   [ ] No. If yes, state the attorney's name and address:

      Acted in Pro Per w/ Advisory Counsel Scott Spear of Alameda County Public Defender's Office, 1225 Fallon St., Oaklnad, CA 94612

4. What was the LAST plea you entered? *(check one)*

   [X] Not guilty   [ ] Guilty   [ ] Nolo Contendere   [ ] Other: _____

5. If you pleaded not guilty, what kind of trial did you have?

   [X] Jury   [ ] Judge without a jury   [ ] Submitted on transcript   [ ] Awaiting trial

6. GROUNDS FOR RELIEF                                                      **MC-275**

**Ground 1:** State briefly the ground on which you base your claim for relief. For example, "the trial court imposed an illegal enhancement." *(if you have additional grounds for relief, use a separate page for each ground. State ground 2 on page four. For additional grounds, make copies of page four and number the additional grounds in order.)*

PETITIONER'S STATE AND FEDERAL DUE PROCESS, EQUAL PROTECTION AND

EIGHTH AMENDMENT RIGHTS WERE VIOLATED WHEN HE WAS DENIED (1) MANDATED

CREDITS WITHOUT DUE PROCESS, AND (2) THE BPH ACTED IN A BIASED, UNFAIR

AND NON-IMPARTIAL MANNER WHEN DENYING PETITIONER PAROLE.

a. Supporting facts:

Tell your story briefly without citing cases or law. If you are challenging the legality of your conviction, describe the facts upon which your conviction is based. *If necessary, attach additional pages.* CAUTION: You must state facts, not conclusions. For example, if you are claiming incompetence of counsel you must state facts specifically setting forth what your attorney did or failed to do and how that affected your trial. Failure to allege sufficient facts will result in the denial of your petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.) A rule of thumb to follow is: *who* did exactly *what* to violate your rights at what time *(when)* or place *(where). (If available, attach declarations, relevant records, transcripts, or other documents supporting your claim.)*

On December 28, 2007, the Alameda County Superior Court denied

Petitioner's habeas petition, Case No. 80451 (See, attached Exhibit

#1, copy of denial). Because California law does not allow appeal

of lower court post-conviction habeas denials, Petitioner's only

remedy is to file another petition in the State appellate court.

Petitioner, therefore, filest this habeas petition in the First

District Appellate Court.

For the purpose of the Appellate Court's review of this petition's

Grounds for Relief (as to argument and authorities presented),

Petitioner submits his "Separately Bound Supporting Exhibits",

consisting of Exhibit #2, i.e., copies of Petitioner's Superior

Court habeas petition  #80451 (filed August 7, 2007), and Exhibit

#3, copy of supporting documents, Exhibits "A" through "U".

b. Supporting cases, rules, or other authority (optional):
*(Briefly discuss, or list by name and citation, the cases or other authorities that you think are relevant to your claim. If necessary, attach an extra page.)*

(See, attached Exhibit #2, Separately Bound Supporting Exhibits,

copy of Petitioner's superior court habeas petition Case No. 80451.)

**PETITION FOR WRIT OF HABEAS CORPUS**

7. Ground 2 or Ground _____ *(if applicable).* MC–275

(See: Petitioner's Attached Exhibit #2, at pages i and ii (Table of
Contents) and pages 1 through 53 for all additional Grounds For Relief
and supporting arguments and authorities; And attached Exhibit #3
copies of supporting documents, i.e., Exhibits "A" through "U".)

a. Supporting facts:
(See: Petitioner's Attached Exhibit #2, at pages 1 through 53 for
supporting facts and arguments. Also see: attached Exhibit #3, copies
of supporting documents, i.e., Exhibits "A" through "U".)

b. Supporting cases, rules, or other authority:
(See: Petitioner's Attached Exhibit #2, pages iii through vi, and at
pages 1 through 53.)

MC-275

8. Did you appeal from the conviction, sentence, or commitment?   [X] Yes   [ ] No.   If yes, give the following information:

   a.   Name of court ("Court of Appeal" or "Appellate Dept. of Superior Court"):

   _____ N/A _____

   b.   Result _____ N/A _____   c.   Date of decision: _____ N/A _____

   d.   Case number or citation of opinion, if known: _____ N/A _____

   e.   Issues raised:   (1) _____ N/A _____

        (2) _____ N/A _____

        (3) _____ N/A _____

   f.   Were you represented by counsel on appeal?   [X] Yes.   [ ] No. If yes, state the attorney's name and address, if known:

   _____ N/A _____

9. Did you seek review in the California Supreme Court?   [X] Yes   [ ] No.   If yes, give the following information:

   a.   Result _____ N/A _____   b.   Date of decision: _____ N/A _____

   c.   Case number or citation of opinion, if known: _____ N/A _____

   d.   Issues raised:   (1) _____ N/A _____

        (2) _____ N/A _____

        (3) _____ N/A _____

10. If your petition makes a claim regarding your conviction, sentence, or commitment that you or your attorney did not make on appeal, explain why the claim was not made on appeal:

    _____ N/A _____
    _____ N/A _____

11. Administrative Review:

    a.   If your petition concerns conditions of confinement or other claims for which there are administrative remedies, failure to exhaust administrative remedies may result in the denial of your petition, even if it is otherwise meritorious. (See *In re Muszalski* (1975) 52 Cal.App.3d 500 [125 Cal.Rptr. 286].) Explain what administrative review you sought or explain why you did not seek such review:

    There is no administrative appeal process for California inmates

    who are denied parole. _____

    _____

    _____

    _____

    _____

    _____

    _____

    b.   Did you seek the highest level of administrative review available?   [ ] Yes.   [ ] No.
         *Attach documents that show you have exhausted your administrative remedies.*

MC-275 [Rev. January 1, 2007]            **PETITION FOR WRIT OF HABEAS CORPUS**            Page 5 of 6

12. Other than direct appeal, have you filed any other petitions, applications, or motions with respect to this conviction,     **MC–275**
commitment, or **issue** in any court?  ☐ Yes. If yes, continue with number 13.  ☐ No. If no, skip to number 15.

13. a.  (1) Name of court: _____  N/A  _____

   (2) Nature of proceeding (for example, "habeas corpus petition"): ____ N/A  _____

   (3) Issues raised: (a) _____  N/A  _____

      (b) _____  N/A  _____

   (4) Result *(Attach order or explain why unavailable):* _____ N/A  _____

   (5) Date of decision: _____  N/A  _____

   b.  (1) Name of court: _____  N/A  _____

   (2) Nature of proceeding: ____  _____  N/A  _____

   (3) Issues raised: (a) _____  N/A  _____

      (b) _____  N/A  _____

   (4) Result *(Attach order or explain why unavailable):* _____ ____ N/A  _____

   (5) Date of decision: _____  N/A  _____

   c.  *For additional prior petitions, applications, or motions, provide the same information on a separate page.*

14. If any of the courts listed in number 13 held a hearing, state name of court, date of hearing, nature of hearing, and result:

   _____  N/A  _____

15. Explain any delay in the discovery of the claimed grounds for relief and in raising the claims in this petition. (See *In re Swain* (1949)
34 Cal.2d 300, 304.)

   _____  N/A  _____

16. Are you presently represented by counsel?  ☐ Yes.  ☒ No. If yes, state the attorney's name and address, if known:

   _____  N/A  _____

17. Do you have any petition, appeal, or other matter pending in any court?  ☐ Yes.  ☒ No. If yes, explain:

   _____  N/A  _____

18. If this petition might lawfully have been made to a lower court, state the circumstances justifying an application to this court:

   _____  N/A  _____

I, the undersigned, say: I am the petitioner in this action. I declare under penalty of perjury under the laws of the State of California
that the foregoing allegations and statements are true and correct, except as to matters that are stated on my information and belief,
and as to those matters, I believe them to be true.

Date February 18, 2008  ▶  *(signature)*
                                                    (SIGNATURE OF PETITIONER)

# EXHIBIT COVER PAGE

#1

EXHIBIT

Description of this Exhibit: Alameda County Superior Court
Habeas Denial

Number of pages to this Exhibit: ___8___ pages.

JURISDICTION: (Check only one)

☐ Municipal Court
☐ Superior Court
☒ Appellate Court
☐ State Supreme Court
☐ United States District Court
☐ State Circuit Court
☐ United States Supreme Court
☐ Grand Jury

roved for
with
:ial
cil forms
1, 1997)

# EXHIBIT 1

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF ALAMEDA**          Dept. No. 9

Date: December 28, 2007          Hon. LARRY GOODMAN, Judge          Nora Becerra, Dep.Clk.
                                                                    Not Reported, Reporter

IN RE:   WILLIAMS, ABE, JR.                       Counsel appearing:   No Appearance
                        Petitioner                for Petitioner

vs.                                               Counsel appearing:   No Appearance
                                                  for Respondent
**PEOPLE OF THE STATE OF CALIFORNIA**

                        Respondent

Nature of Proceedings:  **EX PARTE PETITION FOR WRIT OF HABEAS CORPUS**

                                                        Case No. 80451
                                                        PFN:  AGG441
                                                        CEN: 4052144

The petitioner is not present.

        This court having reviewed the petition for writ of habeas corpus ("Petition") filed on August 07, 2007 by Petitioner Abe

Williams, Jr. ("Petitioner"); the "Notice of Additional Authorities in Support of Petition" filed by Petitioner on September 7, 2007;

the informal response filed by the Attorney General for the State of California on September 24, 2007; the informal reply, along

with Petitioner's declaration and request for judicial notice, filed by Petitioner on October 12, 2007; and the request for judicial

notice filed by Petitioner on October 30, 2007, NOW HEREBY ORDERS:

The Petition is DENIED  (see attached order)

                        CLERK'S CERTIFICATE OF MAILING (CCP 1013a)

I certify that the following is true and correct:  I am a Deputy Clerk employed by the Alameda County Superior Court. I am over
the age of 18 years. My business address is 1225 Fallon Street, Oakland, California. I served this EX PARTE ORDER
REGARDING PETITION FOR WRIT OF HABEAS CORPUS by placing a copy in an envelope addressed as shown below and
then by sealing and placing it for collection, stamping or metering with prepaid postage, and mailing on the date stated below, in
the United States mail at Oakland, California, following standard court practices.

Abe Williams, Jr.  (D-48163)                      California State Attorney General
(MCSP) B-9-127L                                   Deputy Attorney General, Scott Mathers
P.O. Box 409040                                   455 Golden Gate Avenue, 12th Floor
Ione, CA  95640-9000                              San Francisco, CA 94102

Date:  December 28, 2007                          Executive Officer/Clerk of the Superior Court

                                              By _____
                                                  Nora Becerra, Deputy Clerk

(Rev. 5/3/07)

UNDORSED
FILED
**SUPERIOR COURT OF THE STATE OF CALIFORNIA** AMEDA COUNTY

**COUNTY OF ALAMEDA**

DEC 2 8 2007

CLERK OF THE SUPERIOR COURT
By _____ BEALAÑOLLERA
Deputy

IN RE

ABE WILLIAMS, JR.,

on Habeas Corpus.

No. 80451

ORDER DENYING PETITION
FOR WRIT OF HABEAS CORPUS

This court having reviewed the petition for writ of habeas corpus
("Petition") filed on August 07, 2007 by Petitioner Abe Williams, Jr. ("Petitioner");
the "Notice of Additional Authorities in Support of Petition" filed by Petitioner on
September 7, 2007; the informal response filed by the Attorney General for the State
of California on September 24, 2007; the informal reply, along with Petitioner's
declaration and request for judicial notice, filed by Petitioner on October 12, 2007;
and the request for judicial notice filed by Petitioner on October 30, 2007, NOW
HEREBY ORDERS:

The Petition is DENIED.

In 1986, a jury found Petitioner guilty of second degree murder of three-year-
old Tequila Hawkins. The jury also found that Petitioner had used a deadly weapon
("use clause") and that he intentionally inflicted great bodily injury ("great bodily
injury clause") on the victim. Petitioner admitted serving two prior prison terms.
Petitioner was sentenced to 15 years to life with the possibility of parole on the
murder, one year consecutive on the use clause, two years consecutive on the two
state prison priors, and the great bodily injury clause was stricken for sentencing, for a
total of 18 years to life in prison. On November 29, 2006, the Board of Parole
Hearings ("Board") found Petitioner unsuitable for parole.

Petitioner filed the instant Petition seeking relief from the Board's decision.
Petitioner raises a number of contentions: (1) the Board's decision to deny him parole

is not supported by some evidence and is arbitrary, therefore violating Petitioner's due process; (2) the Board's decision to deny him parole based solely on his commitment offense violates due process; and (3) the Board's denial of parole is unlawful because the Board denied him credits to which he is entitled to pursuant Penal Code §§ 190, 2931, 2932 and 3000. Petitioner has failed to meet his burden of making a prima facie relief under the first two claims. The last claim is not considered for it constitutes an abuse of the writ.

Our Supreme Court held in *Rosenkrantz* that "the judicial branch is authorized to review the factual basis of a decision of the Board denying parole in order to ensure that the decision comports with the requirements of due process of law, but that in conducting such a review, the court may inquire only whether some evidence in the record before the Board supports the decision to deny parole, based upon the factors specified by statute and regulation. If the decision's consideration of the specified factors is not supported by some evidence in the record and thus is devoid of a factual basis, the court should grant the prisoner's petition for writ of habeas corpus and should order the Board to vacate its decision denying parole ...." (*In re Rosenkrantz* (2002) 29 Cal.4th 616, 658 (*Rosenkrantz*); see also *In re Lowe* (2005) 130 Cal.App.4th 1405, 1429.)

"Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison." (Cal. Code of Regs., tit. 15, § 2402, subd. (a).) The Board has discretion in the manner in which the specified factors relevant to parole suitability are considered and balanced, and the resolution of any conflicts in the evidence and the weight to be given the evidence are matters within the authority of the Board. Petitioner claims that the positive factors supporting parole outweigh the negative factors. However, this court cannot reweigh the factors and substitute its judgment. (*Rosenkrantz, supra,* 29 Cal.4th at p. 677.) Despite Petitioner's contrary claim, the Board's decision is subject to limited review under the "some evidence" standard of review. (*Rosenkrantz, supra,* 29 Cal.4th at p.

652.) Only a modicum of evidence is required. (*Id.* at p. 626.) The evidence in support of the Board's decision "'must have some indicia of reliability,'" (*In re Scott* (2005) 133 Cal.App.4th 573, 591 (*Scott*), quoting *Biggs, supra,* 334 F.3d at p. 915) and "'must have some basis in fact [.]'" (*In re Elkins* (2006) 144 Cal.App.4th 475, 489, (*Elkins*), quoting *Scott, supra,* 133 Cal.App.4th at p. 590.)

Despite Petitioner's claim to the contrary, the record[1] reveals that the Board gave individualized consideration to all relevant factors in denying Petitioner parole. The Board's decision goes into detail as to many favorable circumstances in support of parole. The Board is not required to specify in detail every pertinent fact relied upon. (See *Elkins, supra,* 144 Cal.App.4th at p. 492, fn. 4.) The Board found Petitioner unsuitable for parole based on the commitment offense; Petitioner's prior criminal record; his institutional behavior, including the psychological report; and lack of documented parole plans.

As our Supreme Court noted in *Dannenberg,* "[t]he regulations do set detailed standards and criteria for determining whether a murderer with an indeterminate life sentence is suitable for parole. (Citation omitted.) Among the specified circumstances of the commitment offense that "tend to indicate unsuitability for release" are that "the prisoner committed the offense in an especially heinous, atrocious or cruel manner." (Citation omitted.)" (*In re Dannenberg* (2005) 34 Cal.4th 1061, 1080 (*Dannenberg*)).

In finding that Petitioner would pose an unreasonable risks of danger if released on parole, the Board found that the offense was carried out in an especially cruel and callous manner in that the murder involved a three year old girl who was particularly vulnerable, Petitioner had a special relationship of trust with the victim, and the victim was abused and mutilated during the offense. The Board noted that Petitioner tied the three year old victim's hands to one door and her feet to another door, and beat her with a belt until she lost consciousness. In his Petition, Petitioner

---

[1] Petitioner failed to make a prima facie case that the transcript of the proceedings in inaccurate.

wants to rely on the facts of the offense as described by his public defender to the
probation department before sentencing. Instead, this court relies on the facts of the
offense as detailed in the unpublished opinion of the court of appeal that affirmed
Petitioner's conviction. The facts, as stated in the unpublished opinion of the Court
of Appeal, First Appellate District, Division Five, *People v. Williams,* No. A037514,
pp. 1-3, are as follows:

> Debra Harris brought the victim, her daughter, to the emergency room
> of Merritt Hospital in Oakland. The child was unconscious, was not
> breathing and had no heartbeat. The child was pronounced dead
> approximately 20 minutes later. Dr. Henry Turkel diagnosed the child
> as having massive swelling over the left side of her head, and her left
> eye was swollen shut. Dr. Turkel testified that Harris told him the child
> fell off the porch, a distance of about four feet. Dr. Turkel was of the
> opinion that death was caused by a trauma to the brain. His opinion was
> borne out by the autopsy report prepared by Dr. Sharon Van Meter, a
> forensic pathologist. Dr. Van Meter noted that the brain was swollen
> and bruised. She observed massive hemorrhaging on the left side of the
> victim's brain and testified that the injury was consistent with repeated
> blows to the head from a broom handle. [¶] Defendant was arrested and
> was interviewed by Officer Berney Matthews and Sergeant Ralph
> Lacer. The tape-recorded statements were played for the jury. In the
> first of two statements he denied beating the child. He claimed not to
> know how the child received all her scars and claimed that he never hit
> her, except on her butt and only with his hand. He stated that Harris
> would punish the child, sometimes severely, with a strap or an extension
> cord. One time he saw Harris tie the child by her hands to a hook in a
> closet. [¶] The officers told him they did not believe his story, and after
> some discussion defendant stated, "I'll tell you the truth." He recounted
> that earlier in the day, he, Harris and the victim were visiting friends,
> and defendant became very angry when the child asked for a soda
> without permission. When they returned home, Harris beat the child
> with a belt for five minutes. Without intervening, defendant left to buy
> some liquor. When he returned 30 minutes later, he found the girl
> standing in the corner; she had soiled her underpants. [¶] Defendant
> became upset and beat the child 10 to 15 times with a belt. He then tied
> her hands to the kitchen doorknob with another belt, and every 15
> minutes or so he and Harris returned and whipped the child for being
> "defiant," a total of five or six times. When the child tried to hide
> behind the door, defendant "poked" her numerous times with a wooden
> broom handle. At one point, as the girl cowered behind the door, he

became enraged and slammed the broomstick against the door with
sufficient force to break it. To prevent her from running behind the
door out of his reach, he tied the girl's feet to another door handle and
left her hanging for 30 minutes to 45 minutes before taking her down.
Defendant estimated that the child was tied to the door by her hands or
both her hand and feet for up to two hours. [¶] A search of Harris's
apartment revealed a brown leather belt, a blue cloth belt, a woman's
necktie tied in a knot, a mop and a broom handle, both of which were
broken, and the child's soiled underpants. ....

Despite Petitioner's claim to the contrary, there is reliable evidence based in fact that
that Petitioner committed an especially heinous and callous murder.

The evidence also supports the findings that Petitioner had failed to profit from
society's previous attempts to correct his criminality, that he had a previous record, an
escalating pattern of criminal conduct and that he had an unstable social history. The
Board apparently misspoke when it stated that Petitioner had a long history of
violence and assaults. However, the record is clear that Petitioner did have a long
criminal history of nonviolent crime, which included burglary and receiving stolen
property. The record does support the finding that Petitioner had failed society's
attempts to correct his criminality in terms of adult probation, adult parole, and prior
commitments to county jail and prison. In addition to a long criminal history,
Petitioner admitted that he had an extensive drug history, which included heroin use
and addiction, all of which support the finding of an unstable social history.

The Board also relied on Petitioner's institutional behavior as a factor in
denying parole. Although the Board noted that Petitioner had programmed
commendably, it noted that Petitioner had engaged in self-help only up to 2004. And
as the Board also noted, the psychological report dated February of 2005 was not
supportive of parole. The report noted that despite the fact that substance abuse
played a large role in the commitment offense, Petitioner does not seem to have done
the work necessary to remain sober given his minimal participation in AA/NA.
Petitioner's institutional behavior as far as his conduct is far from spotless. There is
some evidence that Petitioner has engaged in serious misconduct while in prison,

which included 115s involving narcotics and fighting.[2]  There is "some evidence" to support this finding.

Lastly, the Board found that Petitioner did not present any documented parole plans.[3]  Although it does appear that Petitioner has developed marketable skills that could be put to use upon his release, the parole plans he articulated to the Board did not involve the use of those marketable skills.  When Commissioner Bryson asked Petitioner regarding his parole plans, Petitioner stated that he had not been able to secure a job, but that his sister had agreed to put up to $5000 in an account for him upon his release.  However, the letter from his sister confirming that information was dated 2003, and Petitioner did not provide the Board with a more recent letter confirming such information.  At the conclusion of the Parole Suitability Hearing Petitioner admitted that he did not have adequate parole plans.  Therefore, there is "some evidence" that Petitioner had not made realistic plans for release.

The Board's determination took into consideration all relevant and reliable factors.  Some evidence supports the Board's conclusion that Petitioner currently poses an unreasonable risk of danger to society if released.  Thus, the Board's denial of release on parole is not arbitrary, is supported by some evidence, and therefore does not violate due process.

Petitioner also claims that the Board's decision to deny him parole based solely on his commitment offense violates due process.  This claim lacks merit.  First, as discussed above, the Board did not deny Petitioner parole based solely on the commitment offense.  Second, this court is unpersuaded by the federal cases cited by Petitioner because under binding California Supreme Court precedent, the Board can

---

[2] CDC 115 documents misconduct that is believed to be a violation of law or is not minor in nature, and a CDC 128 documents incidents of minor misconduct. (See *In re Gray* (2007) 151 Cal.App.4th 379, 389 and Cal. Code Regs., tit. 15, § 3312, subd. (a)(2) & (3).)

[3] The court notes that Petitioner attached to his informal reply filed on October 12, 2007 letters documenting housing and financial support.  (See Exhibit EE to informal reply.)  These letters, dated July 2007, were not available to the Board and were not part of the record considered by the Board.

look at the circumstances of the offense and rely the facts of the crime alone, so long as it points to factors beyond the minimum elements of the crime, in determining that a prisoner is unsuitable for release. (*Dannenberg, supra,* 34 Cal.4th 1061, pp. 1070-1071; *Rosenkrantz, supra,* 29 Cal.4th 616.)

Finally, Petitioner also claims that the Board's denial of parole is unlawful because the Board denied him credits to which he is entitled to pursuant Penal Code §§ 190, 2931, 2932 and 3000. Petitioner has filed a habeas corpus petition in Monterey County in 2001 asserting this same claim. That petition was denied on July 24, 2001. (See Order of the Superior Court of Monterey, case no. HC3767.) Petitioner's attempt to relitigate the same claims constitutes an abuse of the writ. (*In re Clark* (1993) 5 Cal.4th 750, 797 (*Clark*).) After habeas petitions raising the same claim were denied by the California Court of Appeals and the California Supreme Court, Petitioner was able to litigate this claim in federal court. (See *Williams v. Knowles* (2006) 2006 U.S. Dist. LEXIS 71271.) Therefore, Petitioner does not demonstrate that a fundamental miscarriage of justice would result from the failure to entertain the claim. (See *Clark, supra,* 5 Cal.4h at pp. 797-798.)

DATED: 12/28/07

HON. LARRY GOODMAN
JUDGE OF THE SUPERIOR COURT

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, state bar number, and address)* | | FOR COURT USE ONLY |
|---|---|---|
| Abe Williams, Jr. (In Pro Per)<br>D-48163   B-9-127L<br>M.C.S.P.<br>P.O. BOX 409040<br>Ione, CA 95640-9000<br>TELEPHONE NO.:                        FAX NO.: | | |
| ATTORNEY FOR *(Name)* | | |
| COURT Alameda County Superior Court<br>STREET ADDRESS: 1225 Fallon Street<br>MAILING ADDRESS Oakland, CA 94612<br>CITY AND ZIP CODE<br>BRANCH NAME: | | |
| PETITIONER/PLAINTIFF: ABE WILLIAMS, JR.<br><br>RESPONDENT/DEFENDANT: M. Martel (A) Warden | | |
| **PROOF OF SERVICE BY MAIL** | | CASE NUMBER: |

1.  I am at least 18 years of age, not a party to this action, and I am a resident of or employed in the county where the mailing took place.

2.  My residence or business address is: Mule Creek State Prison, P.O. BOX 409040, Ione, California 95640

3.  I served a copy of the following documents *(specify):*    Petition for Writ of Habeas Corpus
    [x] Petition for Writ of Habeas Corpus      [ ] _____

    by enclosing them in an envelope AND
    a. [ ] **depositing** the sealed envelope with the United States Postal Service with the postage fully prepaid.
    b. [X] **placing** the envelope for collection and mailing on the date and at the place shown in item 4 following our ordinary business practices. I am readily familiar with this business's practice for collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service in a sealed envelope with postage fully prepaid.

4.  The envelope was addressed and mailed as follows:
    a. Name of person served: First Appellate District    [ ] STATE ATTORNEY GENERAL
    b. Address: Court, 350 McAllister Street          P. O. Box 944255
       San Francisco, CA 94102-3600          Sacramento, CA 94244
    c. Date mailed:
    d. Place of mailing *(city and state):* Ione , California

5.  I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: February 18, 2008

Abe Williams, Jr.
(TYPE OR PRINT NAME)

▶ _____
(SIGNATURE OF PERSON COMPLETING THIS FORM)

**PROOF OF SERVICE BY MAIL**

# EXHIBIT 2

*My Copy*

MC–275

Name  ABE WILLIAMS, JR.

Address  (MCSP)  B-9-127L

_P.O. BOX 409040_

_IONE, CA 95640-9000_

CDC or ID Number  D-48163

**ENDORSED
FILED**
ALAMEDA COUNTY

AUG 7 – 2007

By Cynthia Brown-Dominick

IN THE STATE OF CALIFORNIA

ALAMEDA COUNTY SUPERIOR COURT
(Court)

*80451*

ABE WILLIAMS, JR.,
Petitioner
vs.

R.J. SUBIA (WARDEN)
Respondent

**PETITION FOR WRIT OF HABEAS CORPUS**

No.  _80457_
(To be supplied by the Clerk of the Court)

## INSTRUCTIONS—READ CAREFULLY

- **If you are challenging an order of commitment or a criminal conviction and are filing this petition in the Superior Court, you should file it in the county that made the order.**

- **If you are challenging the conditions of your confinement and are filing this petition in the Superior Court, you should file it in the county in which you are confined.**

- Read the entire form *before* answering any questions.

- This petition must be clearly handwritten in ink or typed. You should exercise care to make sure all answers are true and correct. Because the petition includes a verification, the making of a statement that you know is false may result in a conviction for perjury.

- Answer all applicable questions in the proper spaces. If you need additional space, add an extra page and indicate that your answer is "continued on additional page."

- If you are filing this petition in the Superior Court, you need file only the original unless local rules require additional copies. Many courts require more copies.

- If you are filing this petition in the Court of Appeal, file the original and four copies of the petition and, if separately bound, one copy of any supporting documents.

- If you are filing this petition in the California Supreme Court, file the original and ten copies of the petition and, if separately bound, two copies of any supporting documents.

- Notify the Clerk of the Court in writing if you change your address after filing your petition.

- In most cases, the law requires service of a copy of the petition on the district attorney, city attorney, or city prosecutor. See Penal Code section 1475 and Government Code section 72193. You may serve the copy by mail.

RECEIVED
JUL 3 1 2007
By _____

Approved by the Judicial Council of California for use under rule 8.380 of the California Rules of Court [as amended effective January 1, 2007]. Subsequent amendments to rule 8.380 may change the number of copies to be furnished to the Supreme Court and Court of Appeal.

Form Approved for Optional Use
Judicial Council of California
MC-275 [Rev. January 1, 2007]

**PETITION FOR WRIT OF HABEAS CORPUS**

Penal Code, § 1473 et seq.
Cal. Rules of Court, rule 8.380
www.courtinfo.ca.gov
American LegalNet, Inc.
www.FormsWorkflow.com

| | FOR COURT USE ONLY |
|---|---|
| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, state bar number, and address):*<br><br>ABE WILLIAMS, JR.  (In Pro Per)<br>D-48163  B-9-127L<br>    M.C.S.P.<br>P.O. BOX 409040, Ione, CA 95640<br>TELEPHONE NO..                    FAX NO..<br>ATTORNEY FOR *(Name):* | |

| **COURT** |
|---|
| STREET ADDRESS:   Alameda County Superior Court |
| MAILING ADDRESS:   1225 Fallon Street |
| CITY AND ZIP CODE:   Oakland, CA 95612 |
| BRANCH NAME: |

| | |
|---|---|
| PETITIONER/PLAINTIFF:     ABE WILLIAMS, JR.<br><br>RESPONDENT/DEFENDANT:     R.J. SUBIA (WARDEN) | |

| PROOF OF SERVICE BY MAIL | CASE NUMBER:  80451 |
|---|---|

1. I am at least 18 years of age, not a party to this action, and I am a resident of or employed in the county where the mailing took place.

2. My residence or business address is:     SAME AS LISTED ABOVE

3. I served a copy of the following documents *(specify):*
   [x] Petition for Writ of Habeas Corpus        [l]   PETITION & ATTACHED SEPARATELY BOUND EXHIBITS.

   by enclosing them in an envelope AND
   a. ☐ **depositing** the sealed envelope with the United States Postal Service with the postage fully prepaid.
   b. ☒ **placing** the envelope for collection and mailing on the date and at the place shown in item 4 following our ordinary business practices. I am readily familiar with this business's practice for collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service in a sealed envelope with postage fully prepaid.

4. The envelope was addressed and mailed as follows:
   a. Name of person served:  Clerk, of the          [ ] STATE ATTORNEY GENERAL
   b. Address:       Alameda Co. Superior Court  P. O. Box 944255
                    1225 Fallon Street       Sacramento, CA 94244
   c. Date mailed:      Oakland, CA 94612
   d. Place of mailing *(city and state):*

5. I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: July 28, 2007

ABE WILLIAMS, JR.
(TYPE OR PRINT NAME)

▶ *Abe Williams Jr.*
(SIGNATURE OF PERSON COMPLETING THIS FORM)

**PROOF OF SERVICE BY MAIL**

My

MC–275

Name ABE WILLIAMS, JR.

Address (MCSP)  B-9-127L

        P.O. BOX 409040

        IONE, CA 95640-9000

CDC or ID Number  D-48163

IN THE STATE OF CALIFORNIA

ALAMEDA COUNTY SUPERIOR COURT
(Court)

**PETITION FOR WRIT OF HABEAS CORPUS**

ABE WILLIAMS, JR.,
Petitioner

            vs.

No. _____
        *(To be supplied by the Clerk of the Court)*

R.J. SUBIA (WARDEN)
Respondent

## INSTRUCTIONS—READ CAREFULLY

- **If you are challenging an order of commitment or a criminal conviction and are filing this petition in the Superior Court, you should file it in the county that made the order.**

- **If you are challenging the conditions of your confinement and are filing this petition in the Superior Court, you should file it in the county in which you are confined.**

- Read the entire form *before* answering any questions.

- This petition must be clearly handwritten in ink or typed. You should exercise care to make sure all answers are true and correct. Because the petition includes a verification, the making of a statement that you know is false may result in a conviction for perjury.

- Answer all applicable questions in the proper spaces. If you need additional space, add an extra page and indicate that your answer is "continued on additional page."

- If you are filing this petition in the Superior Court, you need file only the original unless local rules require additional copies. Many courts require more copies.

- If you are filing this petition in the Court of Appeal, file the original and four copies of the petition and, if separately bound, one copy of any supporting documents.

- If you are filing this petition in the California Supreme Court, file the original and ten copies of the petition and, if separately bound, two copies of any supporting documents.

- Notify the Clerk of the Court in writing if you change your address after filing your petition.

- In most cases, the law requires service of a copy of the petition on the district attorney, city attorney, or city prosecutor. See Penal Code section 1475 and Government Code section 72193. You may serve the copy by mail.

Approved by the Judicial Council of California for use under rule 8.380 of the California Rules of Court [as amended effective January 1, 2007]. Subsequent amendments to rule 8.380 may change the number of copies to be furnished to the Supreme Court and Court of Appeal.

Form Approved for Optional Use
Judicial Council of California
MC-275 (Rev. January 1, 2007)

**PETITION FOR WRIT OF HABEAS CORPUS**

Penal Code, § 1473 at seq.,
Cal. Rules of Court, rule 8.380
www.courtinfo.ca.gov
American LegalNet, Inc.
www.FormsWorkflow.com

MC–275

**This petition concerns:**

☐ A conviction     ☒ Parole

☐ A sentence     ☒ Credits

☐ Jail or prison conditions     ☐ Prison discipline

☐ Other *(specify):*

1. Your name: ABE WILLIAMS, JR.

2. Where are you incarcerated? MULE CREEK STATE PRISON (MCSP), IONE, CA 95640

3. Why are you in custody? ☒ Criminal Conviction ☐ Civil Commitment

   *Answer subdivisions a. through i. to the best of your ability.*

   a. State reason for civil commitment or, if criminal conviction, state nature of offense and enhancements (for example, "robbery with use of a deadly weapon").

   Second degree murder w/use of deadly weapon

   b. Penal or other code sections: P.C. §§187 and 12022.5

   c. Name and location of sentencing or committing court: ALAMEDA COUNTY SUPERIOR COURT, 1225 FALLON ST., OAKLAND, CA 94612

   d. Case number: Superior Court No. 80451

   e. Date convicted or committed: Convicted October 15, 1986

   f. Date sentenced: January 18, 1987

   g. Length of sentence: 15-years to life ± 3 one-year enhanc. = 18-years to life

   h. When do you expect to be released? UNKNOWN

   i. Were you represented by counsel in the trial court? ☐ Yes. ☒ No. If yes, state the attorney's name and address:

   Acted in Pro Per, with Advisory Counsel Scott Spear of the Alameda Public Defender's Office, 1225 Fallon St., Oakland, CA 94612

4. What was the LAST plea you entered? *(check one)*

   ☒ Not guilty ☐ Guilty ☐ Nolo Contendere ☐ Other:

5. If you pleaded not guilty, what kind of trial did you have?

   ☒ Jury ☐ Judge without a jury ☐ Submitted on transcript ☐ Awaiting trial

6. GROUNDS FOR RELIEF

**Ground 1:** State briefly the ground on which you base your claim for relief. For example, "the trial court imposed an illegal enhancement." *(if you have additional grounds for relief, use a separate page for each ground. State ground 2 on page four. For additional grounds, make copies of page four and number the additional grounds in order.)*

_____(SEE, ATTACHED TO WRIT OF HABEAS CORPUS)_____

_____

_____

_____

a. Supporting facts:

Tell your story briefly without citing cases or law. If you are challenging the legality of your conviction, describe the facts upon which your conviction is based. *If necessary, attach additional pages.* CAUTION: You must state facts, not conclusions. For example, if you are claiming incompetence of counsel you must state facts specifically setting forth what your attorney did or failed to do and how that affected your trial. Failure to allege sufficient facts will result in the denial of your petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.) A rule of thumb to follow is: *who* did exactly *what* to violate your rights at what time *(when)* or place *(where). (If available, attach declarations, relevant records, transcripts, or other documents supporting your claim.)*

_____(SEE, ATTACHED TO WRIT OF HABEAS CORPUS)_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

b. Supporting cases, rules, or other authority (optional):

*(Briefly discuss, or list by name and citation, the cases or other authorities that you think are relevant to your claim. If necessary, attach an extra page.)*

_____(SEE, ATTACHED TO WRIT OF HABEAS CORPUS)_____

_____

_____

_____

**PETITION FOR WRIT OF HABEAS CORPUS**

7. **Ground 2 or Ground** _____ *(if applicable):*                                          MC–275

_____ (SEE, ATTACHED TO HABEAS WRIT AS TO ALL GROUNDS RAISED)

a. Supporting facts:

_____ (SEE, ATTACHED TO HABEAS WRIT AS TO ALL FACTS RAISED)

b. Supporting cases, rules, or other authority:

_____ (SEE, ATTACHED HABEAS WRIT AS TO ALL SUPPORTING CASES RAISED)

MC-275

8. Did you appeal from the conviction, sentence, or commitment?    ☐ Yes.   ☐ No.  If yes, give the following information:

a. Name of court ("Court of Appeal" or "Appellate Dept. of Superior Court"):

_____ N/A _____

b. Result _____ N/A _____        c. Date of decision: ____ N/A ____

d. Case number or citation of opinion, if known: _____ N/A _____

e. Issues raised:  (1) _____ N/A _____

(2) _____ N/A _____

(3) _____ N/A _____

f. Were you represented by counsel on appeal?  ☐ Yes.  ☐ No. If yes, state the attorney's name and address, if known:

_____ N/A _____

9. Did you seek review in the California Supreme Court?  ☐ Yes  ☐ No.  If yes, give the following information:

a. Result _____ N/A _____        b. Date of decision: ____ N/A ____

c. Case number or citation of opinion, if known: _____ N/A _____

d. Issues raised:  (1) _____ N/A _____

(2) _____ N/A _____

(3) _____ N/A _____

10. If your petition makes a claim regarding your conviction, sentence, or commitment that you or your attorney did not make on appeal, explain why the claim was not made on appeal:

_____ N/A _____

_____ N/A _____

11. Administrative Review:

a. If your petition concerns conditions of confinement or other claims for which there are administrative remedies, failure to exhaust administrative remedies may result in the denial of your petition, even if it is otherwise meritorious. (See *In re Muszalski* (1975) 52 Cal.App.3d 500 [125 Cal.Rptr. 286].) Explain what administrative review you sought or explain why you did not seek such review:

California law, no longer requires or permits, inmates who have

been denied parole, the right of administrative appeal.

_____

_____

_____

_____

_____

_____

b. Did you seek the highest level of administrative review available?  ☐ Yes.   ☐ No.   N/A
*Attach documents that show you have exhausted your administrative remedies.*

12. Other than direct appeal, have you filed any other petitions, applications, or motions with respect to this conviction, **MC-275**
commitment, or **issue** in any court? ☐ Yes. If yes, continue with number 13. ☐ No. If no, skip to number 15.

13. a.  (1) Name of court: _____ N/A _____

(2) Nature of proceeding (for example, "habeas corpus petition"): _____ N/A _____

(3) Issues raised: (a) _____ N/A _____

(b) _____ N/A _____

(4) Result (Attach order or explain why unavailable): _____ N/A _____

(5) Date of decision: _____ N/A _____

b.  (1) Name of court: _____ N/A _____

(2) Nature of proceeding: _____ N/A _____

(3) Issues raised: (a) _____ N/A _____

(b) _____ N/A _____

(4) Result (Attach order or explain why unavailable): _____ N/A _____

(5) Date of decision: _____ N/A _____

c.  For additional prior petitions, applications, or motions, provide the same information on a separate page.

14. If any of the courts listed in number 13 held a hearing, state name of court, date of hearing, nature of hearing, and result:

_____ N/A _____

15. Explain any delay in the discovery of the claimed grounds for relief and in raising the claims in this petition. (See In re Swain (1949) 34 Cal.2d 300, 304.)

THERE HAS BEEN NO DELAY; IMMEDIATELY AFTER OBTAINING PETITIONER'S
NOVEMBER 2006 PSH TRANSCRIPTS AND PREPARING WRIT, HE FILED PETITION.

16. Are you presently represented by counsel? ☐ Yes. ☒ No. If yes, state the attorney's name and address, if known:

_____ _____

17. Do you have any petition, appeal, or other matter pending in any court? ☐ Yes. ☒ No. If yes, explain:

_____ N/A _____

18. If this petition might lawfully have been made to a lower court, state the circumstances justifying an application to this court:

_____ N/A _____

I, the undersigned, say: I am the petitioner in this action. I declare under penalty of perjury under the laws of the State of California that the foregoing allegations and statements are true and correct, except as to matters that are stated on my information and belief, and as to those matters, I believe them to be true.

Date: July 29, 2007            ▶ _____
                                 (SIGNATURE OF PETITIONER)

1

2

3        SUPERIOR COURT OF THE STATE OF CALIFORNIA

4                      COUNTY OF ALAMEDA

5

6   IN RE                  )         CASE No. 80451

                           )
7   ABE WILLIAMS, JR.      )         PETITION FOR WRIT OF HABEAS
                           )         CORPUS AND MEMORANDUM OF POINTS
8   ON HABEAS CORPUS       )         AND AUTHORITIES
                           )
9   _____)

10

11

12       PETITIONER, ABE WILLIAMS, JR., IN PRO PER, PETITIONS THE

13  ALAMEDA COUNTY SUPERIOR COURT FOR WRIT OF HABEAS CORPUS, AND SEEKS

14  RELIEF FROM THE NOVEMBER 29, 2006, DECISION OF THE BOARD OF PAROLE

15  HEARINGS' (HEREAFTER, BOARD), DENYING PAROLE AT PETITIONER'S SIXTH

16  SUBSEQUENT PAROLE HEARING.

17

18

19

20

21

22                              ABE WILLIAMS, JR.
                                D-48163  B-9-127L
23                                 M.C.S.P.
                                P.O. BOX 409040
24                              IONE, CA 95640-9000
                                IN PRO PER
25

26

27

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

CONTENTS                                                                PAGE

INTRODUCTION                                                              1

MEMORANDUM OF POINTS AND AUTHORITIES                                      3

   I. STATEMENT OF FACTS REGARDING COMMITMENT OFFENSE      3

  II. STATEMENT OF FACTS REGARDING 2006 BOARD HEARING           4

 III. STATEMENT OF FACTS REGARDING PRIOR BOARD HEARINGS             5

  IV. CALIFORNIA'S BOARD OF PAROLE HEARINGS ABROGATED
PETITIONER'S DUE PROCESS LIBERTY INTEREST IN
PAROLE BECAUSE THE GROUNDS RECITED BY THE PANEL
AND FINDINGS IT SET FORTH IN SUPPORT OF THOSE
GROUNDS, WERE ARBITRARY, UNSUPPORTED BY ANY
EVIDENCE, IS INOPPOSITE TO THE RECORD, AND INHERENT
IN ALL SECOND DEGREE MURDERS, AND/OR IRRELEVANT
TO PAROLE DETERMINATION PURSUANT TO THE BOARD'S
REGULATORY SCHEME.                                                       7

   V. THE PANEL'S DECISION, WHICH WAS PRIMARILY BASED
ON HIGHLY SUSPECT AND/OR INFLATED OFFENSE FACTORS,
ABROGATED DUE PROCESS BECAUSE THE PANEL DID NOT
ESTABLISH A NEXUS TO PETITIONER'S CURRENT PAROLE
RISK, AND BECAUSE IT LACKED THE PREREQUISITE
PREPONDERANCE OF EVIDENCE INDICATING PETITIONER'S
PAROLE WOULD POSE AN UNREASONABLE RISK OF DANGER
TO PUBLIC SAFETY; NO RATIONAL PANEL WHO REVIEWED
THE EVIDENCE OF HIS PAROLE SUITABILITY COULD HAVE
FOUND A PREPONDERANCE OF UNREASONABLE RISK.                              24

     A. PRESIDING BOARD COMMISSIONER SANDRA BYSON DENIED
PETITIONER DUE PROCESS AND HIS RIGHT TO A FAIR
HEARING WHEN SHE INFLATED AND/OR MANIPULATED
PETITIONER'S OFFENSE, CRIMINAL AND PERSONAL
HISTORY FACTORS TO JUSTIFY THE DENIAL OF PAROLE.                         29

     B. THE PANEL ESTABLISHED NO LINK BETWEEN
COMMITMENT OFFENSE (NO NEXUS), AND DENIAL
OF PAROLE BASED UPON PETITIONER CURRENTLY
BEING AN UNREASONABLE RISK OF DANGER TO
PUBLIC SAFETY IF PAROLED.                                                38

  VI. THE INTERMINABLE PRECLUSION OF PETITIONER'S PAROLE
BASED SOLELY ON HIS COMMITMENT OFFENSE OF SECOND
DEGREE MURDER ABROGATES DUE PROCESS; BECAUSE NEITHER
HIS OFFENSE FACTS NOR PAROLE SUITABILITY OTHERWISE
CAN IMPROVE, AND BECAUSE HE HAS SERVED MORE THAN THE
MAXIMUM PRISON TERM PRESCRIBED FOR THE PARTICULAR
FACTS OF HIS OFFENSE: DENIAL OF PAROLE BASED ON
UNCHANGING FACTS CONVERTS PRISON TERM TO LIFE WITHOUT
THE POSSIBILITY OR PAROLE.                                               39

1

# TABLE OF CONTENTS

2

CONTENTS                                                          PAGE

3

4

5

  VII. PETITIONER'S DUE PROCESS AND LIBERTY INTEREST
       WERE VIOLATED WHEN THE BOARD DID NOT PROPERLY
       CONSIDER AND EVALUATE HIS CIRCUMSTANCES OF
       SUITABILITY PURSUANT TO 15 CCR §2402(d)(1)-(9).          43

6

7

8

9

10

 VIII. PETITIONER'S DUE PROCESS IS VIOLATED BY BOARD
       PAROLE DENIAL TRANSCRIPTS WHICH DO NOT ACCURATELY
       REFLECT CRUCIAL AND CRITICAL DISCUSSIONS DEALING
       WITH THE COMMITMENT OFFENSE, CRIMINAL, DRUG AND
       SOCIAL HISTORIES, AND WHICH TRANSCRIPTS APPEARS
       TO BE PURPOSELY EDITED; THUS PETITIONER REQUEST
       THE COURT GRANT HIM **DISCOVERY** IN ORDER TO OBTAIN
       THE ORIGINAL TAPE RECORDING AND NEW TRANSCRIPTION
       IF REQUIRED, OF THE 2006 PAROLE SUITABILITY            44
       HEARING.

11

12

13

14

15

   IX. PETITIONER CANNOT BE FORCED TO ATTEND ALCOHOLIC'S
       OR NARCOTICS ANONYMOUS (AA/NA) BECAUSE THEY ARE
       RELIGIOUS BASED PROGRAMS AND PETITIONER NO LONGER
       MAINTAINS SUCH RELIGIOUS BELIEFS, AND WHOSE FORCED
       PARTICIPATION WOULD VIOLATE THE FIRST AMENDMENT
       OF THE FEDERAL CONSTITUTION: AND WHERE THERE IS NO
       EVIDENCE THAT PETITIONER HAS USED ANY ILLEGAL DRUG
       SINCE HIS COMMITMENT OFFENSE ARREST IN 1984.           45

16

17

18

19

20

    X. PETITIONER'S PAROLE DENIAL IS UNLAWFUL, BECAUSE
       PURSUANT TO THE INHERENT STATUTORY PROVISIONS OF
       CALIFORNIA'S CONTROLLING PAROLE STATUTE (**P.C. §
       3000** WHOSE PROVISIONS ARE CONTROLLING OVER AND
       SUPERCEDE THE PAROLING POWERS AND PROCEDURES
       GRANTED TO THE BOARD PURSUANT TO P.C. §3040 ET SEQ.),
       THE BOARD'S POWER TO GRANT AN "INITIAL PAROLE
       RELEASE" TO P.C. §190 PRISONERS, EXTENDS **ONLY** TO THE
       "EXPIRATION" OF THE MINIMUM-TERM, BASED UPON §190'S
       CREDIT REDUCTION PROVISIONS.                           46

21

22

   XI. BASED ON THE ARGUMENT AND AUTHORITIES HEREIN,
       PETITIONER REQUEST THE COURT GRANT **EVIDENTIARY
       HEARING.**                                             52

23

CONCLUSION                                                     53

24

25

26

27

28

1

<div align="center">TABLE OF CASES</div>

2

CASES                                                                    PAGE

3
BRIGGS V. TERHUNE,                                    14, 39, 40, 41, 51
4
(9th Cir. 2003) 334 F.3d 910

5
BOARD OF PARDONS V. ALLEN                             51,
(1987) 482 U.S. 396
6
DUNN V. U.S. PAROLE COMMISSION                        24,
7
(10th Cir. 1987) 818 F.2d 742

8
GREENHOLTZ V. INMATES OF NEBRASKA PENAL ....          51,
(1979) 442 U.S. 1
9
IN RE AVENA (1996) 12 C4th 694                        45,
10
12 C4th 694

11
IN RE BURNS                                           39,
136 Cal.App.4th 1318
12
IN RE CAPISTRAN                                       25,
13
(2003) 107 Cal.App.4th 1299

14
IN RE DANNENBERG                                      14, 39, 40,
(2005) 34 Cal.App.4th 1061
15
IN RE DAVID BAKER                                     44,
16
2007 DJDAR 7548

17
IN RE LUNA                                            39,
(2005) 126 Cal.App.4th 585
18
IN RE ERNEST SMITH                                    13, 25,
19
114 Cal.App.4th 343

20
IN RE LAWLER                                          52,
(1979) 23 C.3d 190
21
IN RE LOWE                                            39,
22
(2005) 130 Cal.App.4th 1405

23
IN RE MARRIAGE CUTLER                                 48,
79 Cal.App.4th 460
24
IN RE MARRIAGE DOVER                                  48, 49,
25
(1971) 15 Cal.App.3d 675

26
IN RE McCLENDON                                       39,
(2003) 113 Cal.App.4th 315
27
IN RE MONIGOLD                                        49,
28
(1984) 205 Cal.App.3d 1244

1

TABLE OF CASES

2

CASES                                                           PAGE

3

IN RE MORALL                                          39,
4    (2002) 102 Cal.App.4th 280

5    IN RE PACIFIC GAS AND ELEC. CO.                  48,
     (N.D. Cal. 2000)
6

IN RE POWELL                                          25,
7    (1988) 45 Cal.3d 394

8    IN RE RAMIREZ                                    14, 40,
     (2001) 94 Cal.App.4th 459
9

IN RE RICHARD GRAY                                    38,
10   2007 DJDAR 7363

11   IN RE ROSANKRANTZ                                13, 39, 40, 43,
     (2000) 80 Cal.App.4th 409
12

IN RE SANDRA LAWRENCE                                 15, 24, 38, 41,
13   2007 DJDAR 7363

14   IN RE SCOTT                                      45,
     (2003) 29 C4th 783
15

IN RE SCOTT                                           13, 46,
16   (2004) 119 Cal.App.4th 871

17   IN RE SCOTT                                      25, 29,
     (2005) 133 Cal.App.4th 573
18

IN RE SHAPUTIS                                        13,
19   (2005) 135 Cal.App.4th 217

20   IN RE VAN HUSTON                                 39,
     (2004) 116 Cal.App.4th 339
21

IRONS V. CAREY                                        40,
22   (9th Cir. 2007) 479 F.3d 658

23   IRONS V. WARDEN                                  40,
     (E.D. Cal. 2005) 358 F.Supp.2d 936
24

McQUILLION V. DUNCAN                                  24, 25,
25   (9th Cir. 2002) 306 F.3d 895

26   MONTOYA V. U.S. PAROLE COMMMISION                24,
     (10th Cir. 1990) 908 F.2d 635
27

PEOPLE V. BENITEZ                                     13,
28   (1992) 4 Cal. 91

TABLE OF CASES

CASES                                                                PAGE

PEOPLE V. BULLINGTON                                 32,
27 Cal.App.2d 396

PEOPLE V. COOPER                                     49,
(2002) 27 Cal.4th 38

PEOPLE V. FRANKLIN                                   48,
66 CR 742

PEOPLE V. JEFFERSON                                  49,
(1999) 21 Cal.4th 86

PEOPLE V. McNAMEE                                    49,
(2002) 96 Cal.App.4th 66

PEOPLE V. ROBERTS                                    12,
(1992) 2 Cal.4th 271

PEOPLE V. SANCHEZ                                    13,
(2001) 86 Cal.App.4th 970

PEOPLE V. SUPERIOR COURT HUBBARD                     48,
(1991) 230 Cal.App.3d 287

PEOPLE V. TILLMAN                                    48,
(1999) 73 Cal.App.4th 771

PEOPLE V. WATSON                                     13,
(1981) 30 Cal.3d 290

SASS V. CAL. BOARD OF PRISON TERMS                   14, 24, 41,
(9th Cir. 2006) 461 F.3d 1123

STATE OF CAL. V. SUPERIOR COURT                      48,
(1967) 252 Cal.App.2d 637

TOUSSAINT V. McCARTHY                                51,
(9th Cir. 1986) 801 F.2d 1080

TURNER V. HICKMAN                                    46,
(E,D, Cal. 2004) 342 F.Supp.2d 887

OTHER AUTHORITIES

ATTORNEY GENERAL OPINIONS

64 Ops.Cal.Atty.Gen. 660 (1981)                      48,

73 Ops.Cal.Atty.Gen. 296                             48,

94 Ops.Cal.Atty.Gen. 1906                            48,

1

OTHER AUTHORITIES

2

AUTHORITIES                                                    PAGE

3

PENAL CODE

4

P.C. §190                                        42, 46, 48, 49, 50,

5

P.C. §203                                        32,

6

P.C. §1168                                       47,

7

P.C. §1170                                       46,

8

P.C. §2930 et seq.                               1,

9

P.C. §2931                                       42, 47, 48, 49, 50,
                                                 52,

10

P.C. §2932(e)                                    49, 50,

11

P.C. §2933                                       49,

12

P.C. §3000                                       46, 47, 48, 50, 51,
                                                 52,

13

14

P.C. §3040 et seq.                               46, 47, 48, 49, 50,

15

P.C. §3041                                        8, 47,

16

CAL. CODE OF REGULATIONS

17

CCR §2281                                        44,

18

CCR §2302

19

CCR §2401                                        8,

20

CCR §2402                                        8, 10, 11, 25, 26, 27,
                                                 37, 38, 43,

21

22

CCR §2410                                        42,

23

CAL. PROPOSITIONS

24

Proposition 7                                    49,

25

Proposition 222                                  49,

26

FEDERAL CONSTITUTIONAL AMENDMENTS

27

EIGHTH AMENDMENT                                 52,

28

FOURTEENTH AMENDMENT                             52,

INTRODUCTION

Petitioner is a fifty-seven (57) year old male serving a sentence of eighteen years to life for his commitment offense of second degree murder that occurred on May 27, 1984. Petitioner was arrested on June 2, 1984, and has been continuously incarcerated since his arrest. Petitioner was convicted of second degree murder on October 15, 1986. Petitioner was sentenced on January 18, 1987, to a term of fifteen-years (15) to life for second degree murder, and received three (3) separate one-year (1) enhancements for a total term of eighteen-years to life. Petitioner's term began on January 21, 1987, when he was placed under the custody and jurisdiction of CDC (currently, and hereafter, CDCR). To date, since his arrest, petitioner has been incarcerated on his commitment offense for a total of over twenty-three (23) calendar years. Petitioner has served a total of over twenty (20) calendar years under the custody of CDCR. Petitioner has now served many years over his P.C. §190 statutory minimum-term of fifteen-years; And, petitioner has also served the maximum range of base terms provided for his sentence in the State regulatory "matrix" scheme of eighteen (18), nineteen (19) or twenty (20) years. (CCR §2403(c)). As a State prisoner sentenced pursuant to the provisions of P.C. §190, petitioner is entitled to "mandatory" (not discretionary credits like most lifers), which include both pre-sentence and post-conviction and vested credits. (P.C. §§ 190, 2931, 2932(e) and 3000). If, petitioner's mandatory credits are factored into the equation, petitioner has served a total of over twenty-nine (29) years on his commitment offense.

On November 29, 2006, petitioner was denied parole at his

1

1    sixth subsequent parole suitability hearing (hereafter, PSH) and
2    now challenges that denial via petition for writ of habeas corpus.

3        Petitioner received his copy of the transcripts of the Sixth
4    Subsequent PSH, with the Board's decision in May of 2007, thus
5    this petition is timely.

6        Petitioner's commitment offense occurred in Alameda County,
7    where petitioner was tried, convicted and sentenced, therefore,
8    this is the appropriate County of jurisdiction and venue.

9        At the 2006 PSH, the Board based its denial on thr following
10   finding:

11       1. Petitioner would pose an unreasonable risk of danger to
12   society or threat to public safety if released from prison. (See,
13   attached Exhibit **C, 2006 PSH Decision transcripts, at page 69.**).

14       Based on this finding, the Board recited the following:

15           A. The offense was carried out in an especially cruel
16   and callous manner. (Exh.**C**, p. 69).

17           B. The offense was carried out in a dispassionate manner.
18   (Exh.**C**, p.69).

19           C. The victim was abused, mutilated during this offense
20   and killed. (Exh.**C**, p.69).

21           D. Has unstable social history. (Exh.**C**, p.70).

22           E. Has long history of violence, or prior assaults, prior
23   criminality. (Exh.**C**, p.70).

24           F. Failed previous attempts to rehabilitate. (Exh.**C**,
25   p.70).

26           G. Has long drug history. (Exh.**C**, p.70).

27           H. Has seven CDC-115's. (Exh.**C**, p.71).

28           I. Dr. Weber does not support parole. (Exh.**C**, p.71).

1          J. No documented parole plans. (Exh. C, p.71).

2          K. Crime exceeded minimum necessary to sustain the
3  conviction. (Exh. C, p. 73).

4          L. Crime was carried out in a manner that demonstrating
5  an exceptionally callous disregard for human suffering. (Exh. C,
6  p.74).

7          M. Motive for crime was inexplicable. (Exh. C, p.74).

8          N. For the extreme gravity of this crime ... need to
9  improve insight into crime, to understand magnitude and nature of
10 criminal offense. (Exh. C, p.74).

11         O. Need to firm up residential and transitional parole
12 plans. (Exh. C, p.74).

13     Petitioner disagrees with the Board decision, and seek this
14 grant him the relief requested below, and petitioner additionally
15 argues his PSH was biased and lacked fundamental fairness.

16              **MEMORANDUM OF POINTS AND AUTHORITIES**

17         I. <u>STATEMENT OF FACTS REGARDING COMMITMENT OFFENSE</u>

18     In regards to the commitment offense, petitioner relies on the
19 facts as described in his attached Exhibit <u>**A**</u>, copy of petitioner's
20 comment offense "Probation Report", page 3, at section entitled
21 "<u>Offense Summary</u>" and facts in the 3-page letter attached to that
22 Probation Report by its author, entitled "<u>Defense Attorney's State-</u>
23 <u>ment</u>", and referenced by Probation Report author at page 3 of the
24 Probation Report. (See, attached Exh. **A**).

25     Petitioner notes, he plead **not guilty** to the crime for which
26 he was convicted, and has maintained his innocence since that time,
27 and still maintains that innocence to this day. And, petitioner
28 stated his innocence at each and every PSH.

3

1    II. <u>STATEMENT OF FACTS REGARDING 2006 BOARD HEARING</u>

2    On November 29, 2006, petitioner appeared before a two member
3    panel for his "sixth subsequent" PSH, which included Presiding
4    Commissioner Sandra Bryson and Deputy Commissioner Chuck Wolf.

5    After the hearing was conducted, petitioner was denied parole
6    and his next parole suitability hearing was scheduled in two-years
7    , i.e., at some  undetermined time in 2008. The Board did not
8    explain why petitioner would not be suitable in one year, as
9    opposed to two years.

10   The reasons given by the Board for denying parole primarily
11   related to petitioner's commitment offense of second degree murder
12   and his pre-commitment criminal, drug and social histories. The
13   Board also noted that it found petitioner's parole plans insuffi-
14   cient, largely because of no verifiable job offer. The Board
15   additionally complained that petitioner had not attended AA or NA
16   since 2004. Reasons for this will be addressed below in this
17   petition at Ground X., as well regarding petitioner's parole
18   plans. <u>1/</u>

19   .    The 2006 Board decision denied parole based on the following
20   "crime" facts: the crime was committed in an especially cruel and
21   callous manner (Exh.<u>C</u>, p. 69, 73); the crime was carried out in a
22   dispassionate manner (Exh.<u>C</u>, pp. 69, 73); the victim was abused,
23   mutilated during the offense and was killed (Exh.<u>C</u>, pp. 69, 74);
24   the crime exceeded the minimum necessary to sustain the conviction
25   (Exh.<u>C</u>, p.74); the crime was carried out in an exceptionally
26   callous regard for human suffering (Exh.<u>C</u>, p.74).

27   ────────────────────────────────────────────────────
     <u>1/</u> Petitioner's November 29, 2006, Board Denial is attached as
     Exhibit <u>B</u>, 1 page; Petitioner's 2006 Board Decision Transcripts
28   attached as Exhibit <u>C</u>, 9 pages; Petitioner's 2006 Board Hearing
     Transcripts attached as Exhibit <u>D</u>, 70 pages.

4

1    Under "Previous History" factors, Presiding Board Commissioner
2  Bryson, denied parole listing the following history factors:

3    Criminal History: petitioner has a long history of **violence**
4  (Exh.C, p. 70); petitioner has long history of **assaults** (Exh. C,
5  p. 70); petitioner has a long history of criminal conduct (Exh. C,
6  p. 70); petitioner has an esculating pattern of criminal conduct
7  (Exh.C, p.70).

8    Social History: petitioner has a unstable social history (Exh.
9  C, p. 70); extensive drug history (Exh.C, p. 70).

10    Institutional Behavior: petitioner has programed commendably
11  (Exh.C, pp. 70, 71); Dr. Weber (the Psychologist who prepared the
12  2005 clinical evaluation for the 2006 Board hearing) "basically
13  Dr. Weber does not support your parole with a **low** to **moderate** risk
14  for violence" (Exh.C, p.71); petitioner had a total of seven 115's
15  (Exh.C, p. 71); petitioner had insufficient parole plans (Exh.C,
16  p. 72).$^{2/}$

17    Finally, the Board made the following recommendations after
18  their denial: (1) remain disciplinary free; (2) attend self-help
19  , including AA or NA; (3) advance trade / education; (4) obtain a
20  solid job offer by the next parole hearing.

21    III. STATE OF FACT REGARDING PRIOR BOARD HEARINGS

22                   1996 PSH

23    The Board listed the following reasons for its denial: (1)
24  the commitment offense, noting it was "cruel and dispassionate;
25  (2) previous history, noting an escalating pattern of criminal
26  conduct, heavy drug use, unstable social history and previous

27  2/ Petitioner addresses the inaccuracies and fabrications of
    Presiding Board Commissioner Bryson's descriptions of his criminal
28  , social and institutional records, as well as parole plans,
    below at Ground V.(A) of this petition.

1  failed attempts to correct criminality; (3) <u>institutional behavior</u>
2  , noting petitioner had not completed a vocation that can be put
3  to use, not sufficient AA or NA, and only disciplinary free since
4  1993. (See, attached Exhibit **E**, copy of 1996 PSH decision, 4 pages).

5       The 1996 Board recommended: (1) petitioner remain discipli-
6  nary free, (2) upgrade vocationally as available, (3) attend self-
7  help or therapy program as available, and (4) improve parole plan.

8                          1999 PSH

9       The Board listed the following reasons for its denial: (1)
10 the <u>commitment offense</u>, noting it was carried out in a callous
11 manner with disregard for suffering of another in a dispassionate
12 manner; (2) <u>previous history</u>, esculating pattern of criminal
13 conduct and drug use; (3) <u>institutional behavior</u>, noting insuffi-
14 cient participation in self-help and gains are recent.

15      The 1999 Board recommended: (1) remain disciplinary free, (2)
16 upgrade educationally and vocationally, (3) continue self-help.
17 (See, attached Exhibit **F**, copy of 1999 PSH decision, 4 pages).

18                          2003 PSH

19      The board listed the following reasons for its denial: (1)
20 the <u>commitment offense</u>, noting it was carried out in a cruel and
21 callous manner, dispassionate manner that demonstrates an excep-
22 tionally callous disregard for human suffering; (2) <u>previous</u>
23 <u>history</u>, noting an esculating pattern of conduct and violence,
24 history of unstable tumultuous relationships with others, alcohol
25 and drug use; (3) <u>institutional behavior</u>, noting insufficient
26 participation in self-help and therapy, prior CDC-115's, lack of
27 parole plans, no job and inadequate residential plans. (See,
28 attached Exhibit **G**, copy of 2003 PSH decision, 7 pages).

                              6

1    The 2003 Board recommended: (1) upgrade vocationally, (2)

2    continue self-help / therapy, (3) remain disciplinary free.

3                              2004 PSH

4    The Board listed the following reasons for its denial: (1)

5    the commitment offense, was carried out in an especially cruel

6    and callous manner, in a dispassionate and calculated manner, and

7    with callous disregard for another human; (2) previous history,

8    noting an esculating pattern of criminal conduct, failed attempts

9    at previous rehabilitation, unstable social history, and long

10   drug history; (3) institutional behavior, noting petitioner had

11   realistic residential plans (TR, p.60), petitioner had realistic

12   job skills and marketable skills (RT, p.60), needs to work on

13   employment plans (RT, p.61). (See, attached Exhibit H, copy of

14   2004 PSH decision transcripts, 7 pages).

15                IV. CALIFORNIA'S BOARD OF PAROLE HEARINGS ABROGATED
                  PETITIONER'S DUE PROCESS LIBERTY INTEREST IN
16                PAROLE BECAUSE THE GROUNDS RECITED BY THE PANEL
                  AND FINDINGS IT SET FORTH IN SUPPORT OF THOSE
17                GROUNDS, WERE ARBITRARY, UNSUPPORTED BY ANY
                  EVIDENCE, IS INOPPOSITE TO THE RECORD, AND INHERENT
18                IN ALL SECOND DEGREE MURDERS, AND/OR IRRELEVANT
                  TO PAROLE DETERMINATION PURSUANT TO THE BOARD'S
19                REGULATORY SCHEME.

20   Petitioner's 2006 PSH panel found, "...you [Petitioner] are

21   not yet suitable for parole and would pose an unreasonable risk

22   of danger to society or a threat to public safety if released from

23   prison." (Exhibit C, p.69).

24   This ground is cited by all PSH panels for all decisions of

25   unsuitability. However, the only reliable evidence before the

26   panel that addressed petitioner's current parole suitability and

27   risk to public safety was the psychological evaluation of Dr.

28   Frank D. Weber, Ph.D., Clinical Psychologist, which assessed his

                                7

1  parole risk and danger to public safety as "low" to "moderate"
2  risk. (See, attached Exhibit J, 5 pages). In addition, the next
3  previous Board psychological evaluation, prepared by Dr. Joe Reed,
4  Staff Psychologist, Ph.d, J.D., prepared in 1999, whom also assess-
5  ed petitioners parole risk and threat to public danger, found that
6  "If released to the community, his violence potential is considered
7  to be no more than the average citizen in the community." (See,
8  attached Exhibit K, six pages, at page six). Under "Plans If
9  Granted Release", Dr. Reed, states: "His prognosis for successful
10  community living is very good." (Exh. K, at p. Three.)

11      In that the 2006 panel's ground for denial of parole is that
12  of "unreasonable risk" (P.C. §3041(a); 15 CCR §§ 2401,2402)   and
13  is unsupported by no evidence whatsoever, denying parole on that
14  basis abrogated due process and petitioner's **liberty interest** in
15  parole.

16                      FINDING #1: **THE OFFENSE**

17      " ... This offense was carried out in an especially cruel and
18  callous manner." (Exh. C, p.69). "This crime was carried out in a
19  dispassionate manner." (Exh. C, p. 69). "The offense was carried
20  out in a manner demonstrating exceptionally callous disregard for
21  for human suffering." (Exh. C, p.74). "This victim was abused,
22  mutilated during this offense, and she was killed." (Exh. C, p.69,
23  70).$\underline{3/}$

24      Title 15 CCR §**2402(c)(1)** list "Circumstances Tending to Show
25  Unsuitability". These circumstances include:

26      "(A) Multiple victims ..."

27  3/ Petitioner will address the finding by Presiding Commissioner
    Bryson that the victim was abused and mutilated below at Ground IV
28  and V(A) of this petition, and denies the truth of these findings.

                                8

1   "(B) The offense was carried out in a dispassionate and
2 calculated manner, such as an execution-style murder."

3   "(C) The victims was abused, defiled or mutilated during or
4 after  the offense."

5   "(D) The offense was carried out in a manner which
6 demonstrates an exceptionally callous disregard for human
7 suffering."

8   "(E) The motive for the crime is inexplicable or very trival
9 in relation to the offense."

10   The panel cited almost verbatem (as all panels do in such
11 decisions) the "especially cruel and callous" heading and then
12 language from subparts (C), (D) and (E). (See, Exh. <u>C</u>, pp. 69-74).

13   The codified criteria's modifers, "especially" and "Exception-
14 ally" are crucial because nearly all second degree murders are
15 cruel and callous, and all disregard human life by definition.
16 There is no evidence in this case that petitioner intended the
17 victim's death, although he maintains his innocence. There is no
18 evidence that he sought to prolong the victim's death or even
19 planned the beating that killed the victim. As a purely factual
20 matter, jury in this case found there was no **express malice** or
21 **intent to kill** (See, Exh. <u>A</u>, Probation Report's attached 3-page
22 letter, at page 2, paragraph 2, stating: "The district attorney
23 conceded in this case there was no intent to kill and no express
24 malice. Moreover, the evidence at trial showed that Mr. Williams
25 gave first aid to the victim and took her to the hospital. The
26 courts have expressly held that this is a circumstance in
27 mitigation.") (Also see, attached Exhibit Exh. <u>L</u>, copy of trial
28 transcripts (RT) page 1835, lines 14-20, of the prosector's

9

1  argument to the jury that there was no intent to kill or express
2  malice and that the crime was the result of an intentional act
3  involving a high degree or probability that it will result in
4  death ...." ).

5  Based on the fact, there was no express malice or intent to
6  kill in this case and petitioner gave CPR and took the victim to
7  the hospital, there is no evidence that petitioner's offense was
8  especially cruel and callous. Accordingly, finding petitioner
9  unsuitable for parole on this basis abrogated due process and his
10 liberty interest in parole.

11  "The crime was carried out in a dispassionate manner". The
12 truth behind Presiding Commissioner Bryson's cite of this circum-
13 stance can be easily ascertained from her exact words:

14                  "The offense was carried out in a dispassionate
                   and calculated -- or dispassionate. Strike the
15                 calculated manner ...."
                   (See, Exh. C, p. 73, lines 19-21.)
16
17  This direct quote demonstrates Bryson was taking this circumstance
    of unsuitability directly from CCR §2402(c)(1)(B), which refers
18
    to execution-style first degree murders. However, Bryson caught
19
    herself and removed the word "calculated" and went on to falsely
20
    coat petitioner's crime with the paint of first-degree murder.  Thus
21
    , Bryson's clearly discernible attempt to cloth petitioner's
22
    offense in the language and circumstances cited for first degree
23
    murder, nullifies its application to petitioner. Additionally, all
24
    second degree murders, by nature, can said to be carried out in a
25
    dispassionate manner. Due process liberty interest were abrogated.
26
        "The victim was abused, mutilated during the offense and kill-
27
    ed." Title 15 CCR §2402(c)(1)(C) applies  when the victim was
28

                                    10

1    "abused, defiled, or mutilated during or after the offense." There
2    is no evidence in this case that petitioner either defiled or
3    mutilated during or after the offense. The prosecutor's argument
4    to petitioner's jury was that the crime and death was the result
5    of a misguided attempt at discipline. Webster's Dictionary, 1996
6    Edition, defines "mutilate" as: "1. to injure or disfigure by
7    irreparably damaging parts. 2. to deprive (a person, or animal) of
8    an essential part, as a limb." Because the victim in petitioner's
9    case was not injured or disfigured so that the body parts were
10   irreparably damaged or deprived of limb's, this characterization of
11   petitioner's crime is unjustified and is in opposite to the trial
12   record, the evidence and the facts of this case. Petitioner would
13   add, in regards to the Board's use of the word abuse, CCR §2402(c)-
14   (1)(C) requirements denote a specific type of abuse, that is akin
15   or on par with type of conduct associated with the words "defile"
16   and "mutilate". That simply is not the evidence in petitioner's
17   case. This regulation is referring to a type of abuse that is
18   akin to torture. Again, it must be remembered, in this case the
19   prosecutor expressly argued there was no "express malice or intent
20   to kill", and although it is not necessary to harbor an intent to
21   kill in order to abuse and mutilate, it is however, difficult or
22   impossible to have those elements in a crime without the **express**
23   **malice**. Therefore, finding petitioner unsuitable for parole on
24   these basis abrogated due process and his liberty interest in
25   parole.

26        ""Crime exceeded the minimum necessary to sustain the
27   conviction." Petitioner notes that there are numerous cases no-less
28   egregious then his, in terms of facts and evidence, in which the

11

1  perpetrators were convicted of manslaughter, rather than murder.
2  Rather than argue why his offense does not exceed the minimum
3  necessary to sustain conviction, petitioner attaches Exhibit **M**,
4  which consists of the **affidavits** of three (3) of the jurors at
5  trial on the commitment offense, including one from the jury
6  forman. These affidavits are listed as Exhibits **M1**, **M2** and **M3**, and
7  contain the affidavit of Investigator Michael G. McCarthy who
8  interviewed all three jurors, and the handwritten statements of
9  all three jurors as well as a transcription of those handwritten
10 statements. In essence, all three jurors state they would have
11 found petitioner guilty of no more than manslaughter had such
12 instructions been given, which they weren't because of the trial
13 court's erroneous belief regarding state law in 1984.$^{4/}$  Petitioner
14 does not mean to minimize the pain and suffering of the victim or
15 minimize the crime in any way, however, he submits this case does
16 not fall under the legal standard of the "crime exceeding the
17 minimum necessary to sustain the conviction." Accordingly, finding
18 petitioner unsuitable for parole on this basis abrogated due
19 process and his liberty interest in parole.

20    "Exceptionally callous disregard for human suffering." No
21 evidence exist to suggest that petitioner disregarded the victim
22 to the extent greater than that harbored by any other perpetrator
23 of any other second degree murder. More germane, disregard for
24 life is  the definition of implied malice, and essential element
25 of second degree murder. (People v. Roberts (1992) 2 Cal.4th 271
26 ---------------------------------------------------------------------
27 4/ Although petitioner requested manslaughter instructions at trial,
   the trial judge erroneously denied them, believing that new State
   law in 1984, prevented the court from instructing on manslaughter
28 in adolescent homicide cases. The trial court, however, expressed
   its belief that the facts of the case constituted negligent
   homicide (See, Attached Exhibit **N**, Trial Transcripts, 4 pages.)

1  , 282-283; CALJIC 8.11; <u>People v. Benitez</u> (1992) 4 Cal.4th 91, 93

2  ; <u>People v. Watson</u> (1981) 30 Cal.3d 290, 299-301; <u>People v. Sanchez</u>

3  (2001) 86 Cal.App.4th 970, 975-976; <u>In re Ernest Smith</u> (2003) 114

4  Cal.App.4th 343, 366, citing Penal Code §§ 187, 189; CALJIC 8.11)

5  and theory on which petitioner was found guilty of the offense.

6       Court have repeatedly chatised BPH for its panel's repetitious

7  , baseless recitation of these offense factors to support every

8  finding of parole unsuitability. In <u>In re Rosenkrantz</u> (2000) 80

9  Cal.App.4th 409, rev.den., the court found that no evidence

10 supported the panel's finding that <u>Rosenkrantz</u> displayed "an

11 exceptionally callous disregard for human suffering." (<u>RozenKrantz</u>,

12 80 Cal.App.4th 217, 227-228. In <u>In re Shaputis</u> (2005) 135 Cal.App.

13 4th 217, 227-228, (recently ordered depublished by the court) no

14 evidence supported the finding that <u>Shaputis</u> engaged in conduct

15 reflecting an "exceptionally callous disregard for human suffering"

16 . The "exceptionally callous or cruel" factor must be supported by

17 evidence that the defendant cruelly or callously exacerbated the

18 victim's suffering before death or gratuitously increased or

19 provoked the victim's pain, suffering or death. (See also, <u>Smith</u>

20 114 Cal.App.4th at 367 [no evidence that Smith acted with the

21 requisite "cold, calculated dispassion"]).

22      In <u>In re Scott</u> (2004) 119 Cal.App.4th 871, 891, the Court

23 noted that "all murders involve some callousness, i.e., lack of

24 emotion or sympathy, emotional insensitivity, indifference to the

25 feeling and suffering of others"; to demonstrate an "exceptionally

26 callous disregard for human suffering" the offense in question must

27 have been committed in a more aggravated or violent manner than

28 that ordinarily shown in the commission of murder.

1   By definition, the "exceptionally callous disregard for human

2   suffering" factor applies to second degree murder akin to

3   execution style killing(s)" (15 CCR §2302(c)(1)(B), a category

4   inapplicable to petitioner's offense. Accordingly, parole denial

5   on this basis abrogated petitioner's due process and liberty

6   interest.

7   Finally, on petitioner's crime factors and the Boards findings

8   , past and recent court decisions have noted:

> "All violent crime demonstrates the perpetrator's potential for posing a grave risk to public safety, yet parole is mandatory for violent felons serving determinate sentences. (Pen. Code §3000, subd. (b)(1). And the Legislature has clearly expressed its intent that when murderers -- who are the great majority of serving indeterminate sentences -- approach their minimum eligible parole dates, the Board "shall normally set a parole release date." (Pen. Code § 3041, subd.(a)). The Board's authority to make an exception based on the gravity of a life term inmate's current or past offenses should not operate so as to swallow the rule that parole is "normally" to be granted." In re Ramirez (2001) 94 Cal.App.4th 459, 114 Cal.Rptr.2d 381 (Ramirez), disapproved on another ground in In re Dannenberg (2005) 34 Cal.4th 1061 1086-1087.

> "While relying upon petitioner's crime as an indicator of his dangerousness may be reasonable for some period of time, in this case, continued reliance on such unchanging circumstances--after nearly two decades of incarceration and half dozen parole suitability hearings--violates due process because petitioner's commitment offense has become such and unreliable predictor of his present and future dangerousness that it does not satisfy the 'some evidence' standard." (In re Jeffery David Wilkens 2006 DJDAR 14489, 14498.)

> "Specifically, in Biggs, Sass, and here the petitioners had not served the minimum number of years to which they had been sentenced at the time of the challenged parole denial by the Board. [Citations.] All we held in those cases and all we hold today, therefore, is that, given the particular circumstances of the offenses in these cases, due process was not violated when these prisoners were deemed unsuitable for parole prior to the expiration of their minimum terms."

1        "Thus, state courts are free to apply what they
     discern to be the proper interpretation of federal
2        due process standards in evaluating ... of a parole
     board's recommendation ... whether the source of the
3        federal standard derives directly from the Supreme
     Court or a federal circuit court interpretation of
4        that authority."

5        "Combining the California and federal standards of
     review, as they have been articulated thus far by the
6        California Supreme Court and the Ninth Circuit,
     respectively, the commitment crime can lack the power
7        to supply "some evidence" supporting a denial of
     parole because of the interplay between two factors-
8        the nature of that crime and the passage of time
     since its commission. That is, the fact there is
9        "some evidence" the crime was commited and committed
     a certain way at a certain time does not mean that
10       crime necessarily represents "'some evidence"' the
     prisoner's release on parole will pose and unreasonable
11       risk of danger to the public safety at present time.
     Whether it posses the necessary predictive value
12       depends both on the nature of the crime and how long
     ago it happened.
13       (In re Sandra Davis Lawrence 2007 DJDAR 7363, 7374-
     7375; See, also Irons v. Carey (9th Cir. 2007) 479, F.3d
14       658.)

15                  FINDING #2: **PREVIOUS HISTORY**

16     The 2006 panel found the following: (1) petitioner had an

17  unstable social history; (2) petitioner had a long history of

18  violence, assaults and criminal conduct; (3) petitioner has an

19  esculating pattern of criminal conduct; and (4) petitioner has

20  an extensive drug history.

21     Petitioner does not dispute that he has a long criminal

22  history, and extensive drug use history and to some degree an

23  unstable social history based on those two factors. However, there

24  is no evidence whatsoever, not a single shred, that petitioner

25  as any history of violence and assaults, much less a long history

26  of violence and assaults. In fact, although petitioner does have

27  a lengthy criminal history, petitioner has never been arrested

28  for any crime of violence or assault. Petitioner's criminal history

is almost entirely forgery, and forgery related crimes. Although there are several burglaries in his record in which he was charged and convicted, most of those were not physical burglaries but were charged to because petitioner forged checks that had come from burglaries. Most of these where plea bargain cases where he plead to the charges for less time. The two actual physical burglaries, were part of petitioner's earlier criminal history, not later, therefore, it cannot be considered as part of any esculating criminal pattern, nor was any violence involved in any burglaries. Therefore, until petitioner's commitment offense, despite his lengthy drug history, he had never been accused, charged or convicted of a crime involving violence. (See, attached Exhibit O, copies of petitioner's "California Department of Justice Record Transcripts", 15-pages; and, petitioner's "United States department of Justice (FBI File) Transcripts", 5-pages).

Petitioner does not wish to make light of his criminal and drug record, because he is both ashamed and regretful regarding those histories, however, those convictions and histories date back over two decades, and are no longer predictive of petitioner or petitioner's potential future violent behavior with the qualification (of course) he must remain drug free and sober.

### FINDING #3: INSTITUTIONAL BEHAVIOR

The 2006 panel found the following: (1) that petitioner had "programmed commendably"; (2) Basically Dr. Weber does not support your parole with a **low** to **moderate** risk factor for violence; (3) seven CDC-115's; and, (4) insufficient parole plans.

Petitioner agrees that he has "programmed commendably", but

16

1  disagree that Dr. Weber does not support his parole and that he
2  has insufficient parole plans. As for the seven (7) CDC-115's, all
3  the serious CDC-115's occurred prior to 1993, which was over four-
4  teen (14) years ago. The one Administrative CDC-115 occurred back
5  in 2001, concerned a health related issue in which the 2003 PSH
6  panel's decision stated: "An administrative 115 that probably
7  should not have been written. However, that was an administrative
8  115 back in 2001 that we're not counting heavily on."(See, Exhibit
9  G, at page 3 of decision). That is, petitioner has not had any
10 disciplinary or serious CDC-115's in over fourteen (14) years.

11     "(1) Petitioner has programmed commendably". This first
12 finding speaks for itself, however, petitioner would add a list of
13 his educational, vocational, self-help and prison job histories
14 over the past 24 hears of incarceration.

15     EDUCATION: While in CDCR's custody petitioner has attended
16 college courses and is 15-units shy of an AA-Degree. Petitioner
17 has also completed and Instructional Televised Course in Business
18 Law through the Los Angeles Comminity College Distirct, and Spanish
19 Language Video Tele-Course of 26-weeks in 2000. Petitioner college
20 grade-point average is 3.8. Petitioner obtained a Second GED 2002.
21 Petitioner attended Creative Writing classes for over three-years
22 (March 1997 through October 2000) completing the following writing
23 disciplines (1) Journalism, (2) Fiction and Non-fiction Writing,
24 (3) Novel and Short story Writing, (4) Play Writing, (5) Screen
25 Play Writing; and (6) Poetry Writing.

26     VOCATIONAL: In Petitioner was assigned to Folsom Prison's
27 Tool & Die from October of 1988 through May of 1990, and after
28 acquiring 4,200 hours of participation, received a "Certificate of

17

1  Occupationa Title and Classification, certifying him as "skilled"
2  in the following occupation catagories (1) Machinist, (2)
3  Apprentice Tool And Die Maker, and (3) Liner Mill Specialist.
4  In 1996, petitioner completed eight months of Vocational Computer
5  Programming, completing the following, (1) Computer Applications,
6  (2) Basic Math, (3) Binary Math, (4) Introduction to DOS, (5)
7  Microsoft Word 5.0, (6) Wordperfect 5.1, (7) Introduction To Basic
8  Programming, (8) Microsoft Excel 4.0.
9  In 1992, petitioner completed the Fall quarter of the Business
10 Training Institute Course of "Small Business Operation", completing
11 the courses in (1) Small Business Management, (2) Business Law,
12 (3) Business Ethics, (4) Accounting I, and (5) Business Case
13 Studies, receiving A's in all courses and a 4.0 gradeaverage. From
14 1991-1992, petitioner obtained a two-year Para Legal Degree from
15 the Southern Career Institute as part of its independent studies
16 Paralegal Specialized Practice Program , along with both Certifi-
17 cates of Completion and Achievement for maintain GPA of 98.
18 In 2001, petitioner completed a six-month Vocation in "Computer
19 Repair at California State Prison Solano.
20 In 2003, petitioner completed Vocational Office Services, complet-
21 ing the following, (1) Orientation, (2) Shop and/or Site Safety,
22 (3) Begining Typing, (4) Alphabetical Filing, (5) Proofreading,
23 Punctuation, and Spelling, (6) Electronic Calculations, (7)
24 Intermediate Typing, (8) Business English, (9) Business Math, (10)
25 Job Prep. & Problem Solving Skills; (11) Electronic Typing Review,
26 (12) Data Base, (13) Word Processing Using Microsoft Word, (14)
27 Microsoft Spread Sheet Software, (15) Microsoft Desktop Publishing,
28 (16) New Technology / Miscrosoft Powerpoint, (17) Job Prep. II /

18

1  Anger & Stress Management, (18) Advanced Typing (60 or more words
2  per minute),(19) Bookkeeping / Recordkeeping / Accounting, (20)
3  Business Law, (21) Small Business / Light Industry Education, and
4  (22) Final Job Prep. III / Career Exploration.

5      SELF-HELP: While in CDCR's custody, petitioner has engaged in
6  the following self-help progams: Petitioner has participated in
7  both the Alcoholics Anonymous and Narcotics Anonymous programs
8  from 1993 through 2004, i.e., over 11 years.

9      In 1993, petitioner completed the "Breaking Barriers Program"
10 which included workshops, teamwork and homework.

11     From 1994 through 1996, petitioner participated in the
12 "Literacy Thinking Lifeskills Program, which is based on the
13 concept that criminals have poor decision-making skills and taught
14 in-depth thinking skills for decision-making. During petitioner's
15 over three-years participation, he completed the program, became
16 a "Associate Tutor/Instructor, a Tutor-Instructor, participated
17 in the "Production of the Literacy Lifeskills Video Series" which
18 is broadcast on prison network education stations throughout
19 California Prisons, and in 1995 received a "California Literacy
20 Certificate of Appreciation Award for being a Tutor for the Laubach
21 & Life Skills Peer Tutors Program as Corcoran State Prison.

22     In 2002, petitioner received a Completion Certificate for
23 completing a "Conflict Resolution Workshop" of non-violent conflict
24 resolution in which both inmates and prison staff participated.

25     In 2003, petitioner completed an Interactive Journal, self-
26 help program while in his Office Services Vocations, consisting of
27 (1) First-Step workbook= 5 hours, (2) Abuse & Addiction workbook=
28 5 hours, (3) My Change Plan workbook= 5 hours, (4) Self-Esteem

1 | workbook= 5 hours, (5) Life Management workbook= 5 hours, (6)
2 | Values of responsible Living workbook= 5 hours, (7) Thinking
3 | Errors workbook= 5 hours, (8) Anger workbook= 5 hours, and, (9)
4 | Relapsers workbook, 5 hours. Petitioner also completed and "Anger
5 | Management Class", "Problems Solving Class" and "Stress Mangement
6 | Class" of ten (10) hours each, as self-help while in Vocational
7 | Office Services Vocation.                                              ,

8 |     In 2000, petitioner also completed a course in "Sexually
9 | Transmitted Disease", dealing with the cause, prevention and
10 | treatment and management of sexually transmitted disease, while at
11 | California Training Facility-North, i.e., at Soledad State Prison.
12 |     Since 2006 until present, petitioner has participated in the
13 | Mule Creek State Prison, B-Facility, Lifer's Group.

14 |         JOBS: While incarcerated, petitioner has had a wide
15 | variety of jobs, including porter, kitchen worker and yard-crew
16 | jobs, however, the vast majority of his prison work experience
17 | has been clerical. From 1988 through May of 1990 petitioner worked
18 | in Folsom Prison's Tool & Die Shop as an apprentice tool & die
19 | maker and machinist as part of the Prison Industry Authority (PIA).
20 | Petitioner has worked in various types of clerical jobs, e.g.,
21 | Associate Warden's Clerk, Watch Commander's Clerk, Building Clerk,
22 | Disciplinary Clerk, and Inmate Appeals Clerk; In all these jobs
23 | petitioner received above average job evaluations and these jobs
24 | required a high degree of trust by prison officials. Petitioner
25 | worked as a teacher's aid in office service after completing that
26 | vocation, assisting other inmates in learning computer skills and
27 | teaching business law and Small Business courses. Currently,
28 | petitioner is assigned to Mule Creek State Prison's B-Facility

1  Library / Law Library, assisting inmates with legal materials,
   5/
2  ect. ‾ Accordingly, petitioner has more than adequate education
3  and skills to be suitable for parole and to be able to function
4  well in the community once released. (See also, attached Exhibit **H**,
5  copy of the 2004 PBS decison, page 3 of decision, stating:

6              "The prisoner does have what appears to
             be **realistic residential plans.** However, he
7             needs to work on his employment plans,. However,
             he does appear to have **realistic job skills**
8             **or marketable skills.**

9      ""(2) Basically Dr. Weber does not support your parole with
10 a low to moderate risk factor for violence." Petitioner denies
11 this claim and state it is inopposite to the record, which includes
12 Dr. Weber's 2005 Psychological Evaluation. Although Dr. Weber
13 express some reservations regarding petitioner's commitment to
14 AA and NA, however, Dr. Weber noted that petitioner's health
15 condition is a significant barrier to relapse, i.e., because
16 petitioner's has an advance Hepatitis-C condition and any signifi-
17 cant drug or alcohol use would lead to a liver failure and death.
18 Dr. Weber notes petitioner has successfully participated in work,
19 educational and self-help while in incarcerated, has no disciplin-
20 ary infraction since 1992, and has maintains close family bonds
21 throughout his incarceration. Nowhere, does Dr. Weber voice an
22 opinion or recommendation regarding whether petitioner should or
23 should not be paroled However, the prior PSH Psychological Evalua-
24 tion done in 1999,   by Joe Reed, Staff Psychologist Ph.D, J.D.,
25 listed petitioner's violence potential if released into the
26 community as "no more than the average citizen in the community."

27 5/ Petitioner attaches Exhibit **P** , copies of petitioner's prison
   documents of educational, vocational, self-help and jobs, in
28 support of his parole suitability arguments. Also see, Exhibit **U**,
   copies of petitioner's 2003 and 2006 parole plan support letters.

1  (Exh.**K**, p. Five "Assessment of Dangerousness"). Dr. Reed found
2  that petitioner's prognosis for successful community living "is
3  very good". (Exh.**K**, page Three "Plans If Granted Release"). [6/]

4      Accordingly, Bryson's claim that Dr. Weber does not support
5  parole is groundless, inopposite of the record and cannot support
6  the denial of parole.

7      "(3) you have seven 115's in your record": Bryson, followed
8  with, "and some involve narcotics, and one involving fighting."
9  Although, petitioner did have a disciplinary CDC-115 for narcotics
10 trafficking in 1993, that CDC-115 was dismissed and removed from
11 petitioner's prison Central-File (hereafter, C-File) pursuant
12 to a Sacramento Superior Court order in 1995, after petitioner
13 filed a petition for writ of habeas corpus. In fact, the 2006
14 Board panel discusses and acknowledges this fact. (See, attached
15 Exhibit **D**, at pages 35 through 37). Therefore, the two 1993 drug
16 related CDC-115 were dismissed, and at issue are the remaining
17 five CDC-115's. Of these, none were drug related. Petitioner did
18 receive two Serious CDC-115's for "Stimulants and Sedatives
19 (**Homebrew**), one in 1987 and 1988. However, the substance was
20 "homebrew" or prison made wine, and not narcotics as alluded to
21 by panel member Bryson. In 1992 received a Serious CDC-115 for
22 fighting in which petitioner was not the aggressor, but defending
23 however, since no staff witnessed who started the fight, it was
24 listed as mutual combat; however, it was a simple fist fight and
25 no-one was hurt. In 1993, petitioner received a Serious CDC-115

26
27  ─────────────────────────────────────────
    6/ The 1999 BPS Psychological Evaluation is a more extensive and
    more detailed evaluation than the 2005 psychological evaluation
    prepared by Dr. Weber for the 2006 PSH. Further, petitioner's
28  evaluation interview with Dr. Weber took about 30-minutes, where
    his 1999 evaluation interview with Dr. Reed took several hours.

1   for refusing to work because he was on a legal court ordered
2    deadline to file legal pleadings. The fifth and final CDC-115
3   was an Administrative 115 that occurred in 2000, which the 2003,
4   BPS found should not have been written because it was health
5   related, and which the 2004 and 2006 PSH panels found not to
6   be relevant to their determinations. (See, attached Exhibit D,
7   at pages 37 through 39.)

8       Because petitioner has not received a Serious Disciplainry
9   CDC-115 since 1993, over 14-years ago, petitioner's disciplinary
10  history does not serve as any current indicator as to petitioner
11  being a risk if release on parole, especially since he has no
12  CDCR documentation of drug possession or use.

13      "(4) insufficient parole plans." Although 2006 panel member
14  Bryson stated: "as to your parole plans, you have not presented
15  documented parole plans as you have acknowledged today." (See,
16  Exh.C. page 3, 2006 PSH decision transcripts, page 3, lines 16
17  through 18.) Petitioner did not acknowledge that fact, what he
18  acknowledged was, he had not submitted new parole plan documents
19  for the 2006 PSH, because ... his parole plans were the same as
20  they were when appeared at the 2003 and 2004 board hearings. That
21  is, because petitioners parole plans have not changed, that does
22  not mean he has no documented parole plans. In fact, petitioner
23  attempted to explain to the Board, that despite his best efforts,
24  he had been unable to secure a job prior to his PSH. He informed
25  them of his family help upon parole and the fact they set up a
26  $5,000.00 account for him. And that he had a residence to parole
27  to and a lot of family support. (See, Exh.D, pages 47 through 50).
28      Accordingly, based on "institutional behavior" factors, there

                                23

1 is no basis for parole denial.[7/]

2       V. THE PANEL'S DECISION, WHICH WAS PRIMARILY
          BASED ON HIGHLY SUSPECT AND/OR INFLATED
3         OFFENSE FACTORS, ARBOGATED DUE PROCESS BECAUSE
          THE PANEL DID NOT ESTABLISH A NEXUS TO
4         PETITIONER'S CURRENT PAROLE RISK, AND BECAUSE
          IT LACKED THE PREREQUISITE PREPONDERANCE OF
5         EVIDENCE INDICATING PETITIONER'S PAROLE WOULD
          POSE AN UNREASONABLE RISK OF DANGER TO PUBLIC
6         SAFETY; NO RATIONAL PANEL WHO REVIEWED THE
          EVIDENCE OF HIS PAROLE SUITABILITY COULD HAVE
7         FOUND A PREPONDERANCE OF UNREASONABLE RISK.

8                              (1)

9       A parole authority's bald recitation of commitment offense

10 factors without articulating a rational nexus between the factors

11 alleged and the inmate's current parole risk, denies due process

12 because it is arbitrary in the extreme. (Montoya v. U.S. Parole

13 Comm. (10th Cir. 1990) 908 F.2d 635, 639-640; Dunn v. U.S. Parole

14 Comm. (10th Cir. 1987) 818 F.2d 742, 745).

15      A nexus may exist if an inmate who committed an offense when

16 intoxicated on alcohol and continues to use alcohol while in

17 prison, or if an inmate committed for violence continues to engage

18 in violent behavior, or if an inmate under consideration had

19 committed an offense related to gang activity and still

20 participates in a gang. No such factors exist in Petitioner's case

21 or where set forth by the panel.

22      The panel's mere citation of boilerplate verbiage describing

23 petitioner's offense as the basis for finding him to be currently

24 unsuitable for parole, without articulating any nexus, abrogated

25 his right to due process and liberty interest in parole because it

26 was arbitrary in the extreme. (Scott, supra, 119 Cal.App.4th at 897

27 [unsuitability grounds, a mere "mouthing of conclusionary words"

28 without "factual underpinnings", citing McQuillion v. Duncan (9th

_____
7/ See, attached Exhibit p, copies petitioner's educational,
vocational, self-help and prison work assignment documents.

                              24

1  Cir. 2002) 306 F.3d 895, 902]; Smith, supra, 114 Cal.App.4th at 371

2  [no "chain of reasoning" between "immutable" factors of past drug

3  use and current parole risk, especially in view of a long period of

4  abstinence].

5                                (2)

6       For years PSH panels have untendably adopted the some evidence

7  standard reserved for a reviewing court's assesment, of executive

8  decisions by routinely finding prospective paroles unsuitable for

9  parole based on "some" or "any" evidence of a serious commitment

10 offense. Petitioner's case is a classic example.

11      PSH decisions must be based upon "good cause" (decisions

12 reversing, suspending, revoking, or rescinding parole grants must

13 be based upon "good cause" (In re Powell (1988) 45 Cal.3d 394, 901;

14 15 CCR §2450]). Defined as a "preponderance of the evidence" that

15 there is a factual basis and good reason for the decision made. (15

16 CCR §2000(b)(49)). Even a parole decision supported by some

17 evidence may abrogate due process if the panel did not consider and

18 weigh all parole-favorable evidence. (See, In re Scott (2005) 133

19 Cal.App.4th 573, 596 et seq.; In re Capistran (2003) 107

20 Cal.App.4th 1299, 1306).

21      Title 15 CCR §2402(c) list six "circumstances tending to show

22 unsuitability"; Section 2402(c)(1) ["The prisoner committed the

23 offense in an especially heinous, atrocious or cruel manner"] has

24 subparts (A) through (E), which apply "only" if one or more of the

25 factors in subparts (A) through (E) pertain to the commitment

26 offense. The PSH panel did not allege factors (A) or (B). The panel

27 did, however, list parts of factor (C) i.e., "The victim was abused

28 ... mutilated during ... the offense." The panel listed (D) as a

                               25

1  factor, i.e., "The offense was carried out in a manner which
2  demonstrates an exceptionally callous disregard for human
3  suffering". Also, the panel listed parts of (E) as a factor, i.e.,
4  "The motive for the crime is inexplicable ...." Panel member
5  Bryson invoked circumstance (2) [Previous Violence], however, as
6  documentary evidence demonstrates, petitioner has absolutely no
7  prior history of violence. Further, in terms of the victim in this
8  case, petitioner was convicted "only" of the beating that occurred
9  during the crime. Petitioner was not charged or convicted of any
10 prior abuse or mistreatment of the victim (nor was that ever
11 alleged), therefore circumstances (2) is inapplicable. As to
12 circumstance (3) [Unstable Social History], although panel member
13 Bryson found petitioner had an "unstable social history",
14 §2402(c)(3) requires "The prisoner has a history of unstable or
15 tumultuous **relationships with others.**" Bryson failed to state a
16 single individual in which whom petitioner had had a unstable or
17 tumultuous relationship with, thus this finding is inopposite to
18 and not supported by the record. The panel did not cite
19 circumstances (4) [Sadistic Sexual Offenses] in that petitioner
20 has no history of sexual misconduct, criminal or otherwise. The
21 panel, likewise did not list circumstance (5) [Psychological
22 Factors], because petitioner has no history of mental illness and
23 no evaluating psychologist has recommended any psychological or
24 mental treatment. Lastly, circumstance (6) [Institutional
25 Behavior] ("The prisoner has engaged in serious misconduct in
26 prison or jail."). Panel member Bryson noted petitioner had a
27 total of seven CDC-115's, however, as detailed above, one of those
28 115's was an administrative 115 that the board did not rely on in

1  its finding. Two of the serious 115's (related to the 1993 drug
2  trafficking disciplinary) the panel acknowledged had been
3  dismissed and therefore not part of the decision (Exh. D, p.37,
4  lines 1-20). The other four serious 115's occurred prior to 1993,
5  and are over fourteen years old. Therefore, only circumstance (6)
6  of §2402(c) could (arguably) apply, however it would not support
7  parole denial after petitioner has been denied parole on five
8  prior occasions and has served in excess of 24 years. Irrespective
9  of the panel's citation of these factors of unsuitability, such
10 findings are contrary to documentation and the record in this case
11 and/or inapplicable as detailed above in this petition. Regarding
12 the factor of motive in §2402(c)(1)(E), motive was not charged in
13 petitioner's offense and no jury instructions were given at trial
14 regarding the element of motive . As such, §2402(c)1(E) is
15 inapplicable to this case.

16     Title 15 CCR §2402(d) list nine "circumstances of
17 suitability". Of these nine circumstances, number (5) [Battered
18 Wives Syndrome], only applies to women. Of the remaining eight,
19 number (4) [Motive for Crime] does not apply to petitioner's case,
20 because as noted above, motive was not an element of the
21 commitment offense and no jury instructions were provided at trial
22 regarding motive. Of the remaining applicable seven circumstances,
23 five clearly favor petitioner's parole suitability; Reviewing
24 these circumstance in order, circumstance (1) [No Juvenile Record]
25 petitioner has no juvenile record, See, Exh. K, p.5, paragraph
26 A-3); (2) [Stable Social History] petitioner "has experienced
27 reasonably stable relationship with others" (i.e., petitioner's is
28 married, maintains close ties with his wife and family, children

27

1  and others in the community, and there is no documented unstable
2  relationships in his documentation, See, Exh.J, p.4 at #3 and
3  Exh.K, p.1 at "Family History" and p.2 at "Marital History"; (3)
4  [Signs of Remorse] Although petitioner plead not guilty and
5  maintains his innocence, all his PSH psychological evaluations
6  state petitioner displays empathy for the victim that appears to
7  be both genuine and appropriate (See, Exh.K). Circumstance (4)
8  [Motivation for Crime] as noted above, motive is not a factor in
9  this case. Circumstance (6) [Lack of Criminal History] pertains to
10 "any significant history of violent crime" and petitioner has no
11 history of criminal violence, See, Exh.K, p.5, paragraph A-3, and
12 Exh.O; Circumstance (7) [Age] Petitioner is 57 years old and will
13 be 58 in November of 2007, which reduces the possibility for
14 recidivism; (8) [Understanding and Plans for Future] Petitioner's
15 psychological evaluations are favorable and support him here, See,
16 Exh.Q, p.4 at "Future Plans"; And, finally (9) [Institutional
17 Behavior] Petitioner's overall institutional behavior is good and
18 his serious disciplinary infractions are all over fourteen years
19 old, thus this circumstance supports suitability. Therefore, of
20 the seven circumstances of suitability that actually apply to
21 petitioner, all seven are favorable parole suitability.

22    Because of the fourteen codified parole suitability and
23 unsuitabilty factors in the regulations that apply to petitioner,
24 twelve or eleven (arguably thirteen) favored petitioner's parole,
25 finding him unsuitable for parole based solely on the offense and
26 other unchangeable factors, while ignoring most of the compelling
27 suitability factors, satisfied neither the preponderance of the
28 evidence standard nor fundamentally fair decision making required

1 by due process.

2     Petitioner is not asking the Court to abandon the some
3 evidence standard or any review standard it selects. He asks the
4 Court to determine if the panel violated due process by rendering
5 a decision it knew to be contrary to its preponderance of the
6 evidence standard for parole decisions.

7     In Scott the Court of Appeals explained why reliance on the
8 gravity of a murder did not constitute  "some evidence" that Scott
9 was currently unsuitable for parole; it was far outweighed by
10 evidence of Scott's exemplary reform and low parole risk confirmed
11 by forensic evaluations. (See, **Scott**, 133 Cal.App.4th at 594-596).

12    Because the only factors (the commitment offense, and
13 possibly fourteen year old disciplinary actions) could arguably
14 support a finding of unsuitability, and because no rational
15 panelist could have found based on a weighing of all evidence for
16 parole that a preponderance of that evidence indicated that his
17 parole currently poses an unreasonable risk of danger to public
18 safety, the panel's denial of parole based solely on some evidence
19 of a serious commitment offense abrogated Petitioner's right to
20 due process and his liberty interest in parole.

21          A. PRESIDING BOARD COMMISSIONER SANDRA BRYSON
              DENIED PETITIONER DUE PROCESS AND HIS RIGHT
22            TO A FAIR HEARING WHEN SHE INFLATED AND/OR
              MANIPULATED PETITIONER'S OFFENSE, CRIMINAL
23            AND PERSONAL HISTORY FACTORS TO JUSTIFY THE
              DENIAL OF PAROLE.
24

25    It is alleged herein, that Presiding Commissioner Bryson at
26 petitioner's 2006 PSH, inflated and manipulated facts related to
   petitioner's (1) commitment offense, (2) criminal and personal
27 history factors, and, (3) institutional behavior, for the express
28 purpose of finding petitioner unsuitable for parole.

1    "(1) Commitment Offense": Panel member Bryson found that
2  during the commitment offense the victim was abused, mutilated
3  and killed. (Exh. C, p. 1/69). However, this finding is inopposite
4  to the documentation and the record in this case. Petitioner
5  concedes the victim was killed, thus his conviction and sentence
6  for second degree murder. Petitioner, however, denies that the
7  victim was abused and mutilated. Petitioner has already
8  sufficiently addressed the abuse factor above, therefore he
9  will not   argue so here. Petitioner does further address the
10 finding of "mutilation" during the offense. It is false. During
11 Bryson's rendering of her PSH parole denial decision, petitioner
12 objected:

13          "INMATE WILLIAMS: Can I ask you one question
             before I go? I have never heard the word
14           mutilation used in this case ever before, ever.
             This is new."
15
             "ATTORNEY GUNNING: Are you asking me the
16           question?"

17           "INMATE WILLIAMS: Yeah. Anybody. I've never
             heard that before. It was like when she was
18           talking, she talked about and the child was
             abused. I didn't understand what you -- but
19           mutilation, I don't understand where that's
             coming from. It's like it's part of this. The
20           crime is being jacked up into, you know, beyond
             what it is. ... But anyway -- mutilation,
21           that's a specific type of act and that's not --
             that's not in the trial transcript. That wasn't
22           part of the trial. That's not in the police
             reports."
23
             "PRESIDING COMMISSIONER BRYSON: Sir?
24
             "INMATE WILLIAMS: That's not in the death
25           certificate."

26           "PRESIDING COMMISSIONER BRYSON: Sir, you can
             take that up with the court. And basically --
27
             "INMATE WILLIAMS: Yes ma'am."
28

1                 "PRESIDING COMMISSIONER BRYSON: -- the panel's
             position on it is that if you beat someone to
2                 death, and this little girl in particular --
             and we have looked at the photo -- that in fact,
3                 if you beat her to death with a belt, that that
             constitutes mutilation."

4

             (See, attached Exhibit **C**, at pp. 7/75, lines
5                 9-27 and 8/76, lines 1-22).

6    Bryson chided petitioner to take his objection up with the courts;
7    Petitioner, now does so.

8        Bryson's comments, regarding the basis for why she found that
9    the victim had been mutilated, demonstrates two quintesential
10    flaws in both her reasoning and decision making process. First,
11    her words demonstrates she didn't have a good or sufficient grasp
12    of the facts surrounding petitioner's commitment offense. For
13    example, the actual facts are that the victim did not die from any
14    beating with a belt, but rather, from a blow to the head which
15    caused swelling around the brain stem, resulting in respiratory
16    failure. That is, the victim died from "blunt force trauma" to the
17    head. Second, Bryson's comments demonstrate with crystal clarity,
18    that the source Bryson relied upon for the mutilation finding was
19    an autopsy photograph. Not only does that photo show no such
20    thing, i.e., mutilation; It is clear Bryson either misunderstands
21    the legal definition of the word "mutilation" as used in a
22    criminal context or she has chosen to disregard the actual legal
23    definition for one of her own design. Bryson apparently believes
24    "beating" (her terminology) someone with a belt, in and of itself,
25    constitutes mutilation, even if it was not the cause of death.
26    Even where (as in this case) the forensic evidence is that the
27    belt did not break the victim's skin, cause any cuts or open
28    wounds to the skin, did not strip skin from the body or any other

31

1  form of actual mutilation. There was no evidence of disfigurement

2  from the belt. Nor did the forensic evidence show a great deal of

3  bruising or discoloring on the victim's skin from the belt, during

4  the offense. However, even if that had been the case, bruising and

5  discoloring alone does not meet the criminal or common English

6  definitions for the word "mutilation". Even more important, there

7  is no evidence whatsoever that Bryson has any expertise in the

8  forensic sciences or any training that would make her a creditable

9  and reliable legal expert in the forensic sciences field;

10  Especially with respect to evaluating autopsy photographs.

11      Black's legal dictionary, 2006 Edition, defines **mutilation**

12  thusly:

13              "In criminal law, the depriving a man of the
            use of any of those limbs which may be useful
14          to him in a fight, the loss of which amounts
            to **mayhem**. People v. Bullington 27 Cal.App.2d
15          396, 80 P.2d 1030, 1032 (emphasis added.)

16  California P.C. §203, defines "mayhem" as follows:

17              "Every person who unlawfully and **maliciously**
            deprives a human being of a member of his body,
18          disables, disfigures, or renders it useless,
            or cuts or disables the tongue, or puts out
19          an eye, or slits the nose, ear, or lip, is
            guilty of mayhem." (P.C. §203, emphasis added.)
20
    The elements of "mutilation" do not exist in this case, and
21
    Bryson's attempt to manipulate or inflate petitioner's offense
22                                                          7/
    deprived him of due process and a fair PSH process.
23
        (2) "Criminal and Personal History":
24
        First, regarding petitioner's "criminal history", panel
25
    member Bryson found that petitioner has a "long history of
26

27  7/ It is not the petitioner's intent herein, to minimize the
    commitment offense, nor any pain and suffering inflicted on the
    victim in this case, however, he insist he has a right to have
    his parole suitability determination based on the actual facts,
    evidence and record in this case.

1  violence, of assaults ...." (See, Exh.C, p. 2/70, lines 1-4).
2  Petitioner does not deny he has an extensive criminal history, but
3  denies he has any history of violence and assaults, criminal or
4  otherwise. Nor did Bryson cite a single specific example of
5  petitioner being involved in violence or assaults. Nor did Bryson
6  point to any evidence in the record of either. This was another
7  example of a deliberate falsification of petitioner's record by
8  Bryson in order to justify the unsuitability finding. There is,
9  however, undisputable evidence in this case, that petitioner has **no**
10 prior history of violence or assaults. (See, Exh.O, copies of
11 petitioner's criminal history from the Cal. Dept. of Justice and
12 from the U.S. Dept. of Justice [FBI]; and Exh.K, petitioner's 1999
13 Psychological Evaluation, p.5, stating "However, on the other hand
14 he [petitioner] has **no** juvenile record. None of his adult
15 convictions involved crimes of violence."). Nor is there any
16 evidence or record showing that petitioner committed any acts of
17 violence against anyone, or that he was ever arrested or charged
18 for such crimes.

19    ,  Since Bryson's finding of a "long history of violence and
20 assaults" is **untrue**, the question then arises, where did she
21 acquire this false information? The answer is simple, she created
22 it herself. As proof of this claim, the court need only examine the
23 2006 PSH transcripts at pages 15 through 19 (See, Exh.D). During
24 Bryson's discussions with petitioner regarding his criminal record,
25 she asks petitioner whether he committed a number of crimes, to
26 which he answers "Yes. Non-violent crimes." Petitioner went on to
27 explain his crimes were mostly forgery and forgery related crimes.
28 At this point Bryson begins an inquiring into how petitioner

1  obtained the checks he forged. This also the point where Bryson

2  begins to manipulate facts in an attempt to create a violent

3  criminal history; For example:

4       "PRESIDING COMMISSIONER BRYSON: So that -- does that
        not implicate you in violence because how do you know

5       know how these checks were obtained?" (emphasis added)

6       "INMATE WILLIAMS: Well, I never asked how the checks
        were obtained."

7
        "PRESIDING COMMISSIONER BRYSON: So that --

8
        "INMATE WILLIAMS: I was just giving you an example of

9       how a lot of those things were obtained."

10      "PRESIDING COMMISSIONER BRYSON: I'm trying to
        understand your mind even now. And you're looking

11      back on that and you're saying, well, there was no
        force and violence because you rolled off that part

12      of the fact that these were obtained by --"

13      "INMATE WILLIAMS: Yeah."

14      "-- force and violence. So you don't consider
        yourself having been implicated in that process at

15      all because you didn't -- you weren't part of that?
        You just bought the -- you weren't part of that?

16      You just bought the --"

17      "INMATE WILLIAMS: Yeah."

18      "PRESIDING COMMISSIONER BRYSON: -- stolen checks? Is
        that right?

19
        "INMATE WILLIAMS: Well, no, no.

20      That's not the point I'm making at all. The point I'm
        making is just to answer your question straight up

21      and down front. And this may sound strange to you,
        but see, when you're in that lifestyle and you're into

22      a drug and you take stuff, your way of thought is not
        the way we think now. And you never even think about

23      collateral consequences and all that stuff like that.
        You never even go through that thought, well, let me

24      not buy these checks because they may have come from
        a robbery. You don't even ask people. The only thing

25      you ask them about is this in the paper [SEC]? How
        long have you had it, because you want to have some

26      sense of how long this has been out. Do you want to
        run and cash checks that's been floating around a

27      while because your chances of getting arrested are
        (indiscernible). And that's the kind of process that

28      your mind go through. You never really go through

34

1    that kind of critical thinking, like, you know, like
2    you're kind of getting into now. So, you know."

3    "PRESIDING COMMISSIONER BRYSON: So how do you look
      at them now?"

4    "INMATE WILLIAMS: Oh, all different. Sometimes I,
5    you know, think about some of the things, I've done.
      Not just the criminal things. At my age and the
6    mindset I'm in now, I look at a lot of things and you
      have --"

7    "PRESIDING COMMISSIONER BRYSON: Specifically the
8    stolen checks, credit card. I'd really be interested
      in how you view that now."

9    "INMATE WILLIAMS: It was wrong."

10   "PRESIDING COMMISSIONER BRYSON: I know, but beyond
11   that I mean what -- do you consider that you were
      a part of the whole system that involved force and
12   violence, or do you still repeat -- do you deny that?"

13   "INMATE WILLIAMS: **Yeah**. And from that perspective, **yes**
      You know, just like a person, even if you're a doctor
14   in a war, you're part of a war, right? So yeah. From
      that perspective, yes. I was part of all that. And,
15   I'm not trying to minimize anything. That wasn't my
      purpose to try and minimize  and say, "'I'm not as
16   bad as other people," or any kind of thing. I'm just
      trying to kind of answer the question. But, no. No..."
17   (emphasis added).

18   To Bryson's question "... do you consider that you were part of a

19   whole system that involved force and violence, or do you still

20   repeat -- **deny that**?", petitioner answered with a unequivocal **Yeah**,

21   followed by **yes**, i.e., petitioner responded in the affirmative

22   denying he was part of any violence. Petitioner, however did

23   attempt to support his position with a war analogy about a doctor

24   in a war, but the point does not come across well in the PSH

25   transcripts.[8/] The point petitioner attempted to make, was that

26   although an army doctor, in a war, may be participating in a war

27   8/ Petitioner alleges herein, that the 2006 PSH transcripts do not
     accurately reflect, in many key areas at issue in this petition,
28   the substance of what was said by the parties at the PSH. In fact,
     some errors seem to be have created purposefully. Issues regarding
     the transcripts accuracy will be addressed below in the petition
     at·Ground VIII.

1 and the army may be engaged in violent warfare, that doesn't mean
2 the doctor is part of the violence. In hindsight, petitioner
3 recognizes the analogy of a lifesaving doctor and that of a non-
4 violent criminal may be a bad analogy, however, the point is no
5 less valid. There is no record and no evidence that petitioner has
6 any prior history of being involved in violence, none. Basically,
7 under Bryson's theory of "force and violence" any criminal, no
8 matter what the crime, are involved in "force and violence"
9 simply because they are criminals and therefore "a part of the
10 whole system that involved force and violence".

11      At any rate, this whole line of questioning revolved around
12 Bryson's bald and unsubstantiated "assumption" that the checks
13 petitioner purchased from others came from crimes of force and
14 violence. However, there is not one shred of evidence in the record
15 to support that belief. Petitioner's statements contain no such
16 evidence nor did any documentary evidence. Even though there was no
17 such evidence, had there been, under the American and California
18 system of criminal justice, other persons crimes are not
19 transferable to those who had no part in the planning or
20 perpetration of those crimes.

21      The evidence, facts and record are inopposite of Bryson's
22 findings that petitioner has a long prior history of violence and
23 assaults. Only in Bryson's fertile imagination does those claims
24 have substance, thus petitioner was denied due process and a fair
25 PSH.

26      Second, regarding petitioner's "personal history", Bryson
27 found petitioner had an "unstable social history". (Exh.C, p. 2/70,
28 line 1.). Regarding Bryson's comments that petitioner used

36

1  drugs for two decades prior to the commitment offense (Exh.C, p.
2  2/70, lines 5-8.), these are unchanging factors that petitioner has
3  addressed above.

4       Most important, Bryson's finding of an "unstable social
5  history" is inapplicable to petitioner as a matter of fact and law.
6  Pursuant to the Board's regulatory provisions involving
7  "Circumstances Tending to Show Unsuitability", the Unstable Social
8  History factors provides  as follows:"The prisoner has a **history** of
9  **unstable or tumultuous relationship with other.**" (See, CCR
10 §2402(c)(3)). Therefore, the Board's regulatory provisions require
11 that petitioner have a "history" of "unstable relationships with
12 others" to be denied parole based this factor. Because Bryson cited
13 no examples of any "history" of unstable or tumultuous
14 relationships or named any such individuals, this
15 factor/circumstance cannot support an unsuitability finding.
16 Bryson's findings were inopposite of the evidence and record. (See,
17 Exh.J, p.4, at #3, and Exh.A, **p.2 of the October 1986 Probation**
18 **Report Letter.**).

19      Because Bryson's finding does not conform with regulatory
20 provisions and is inopposite of the record, it cannot support a
21 finding of unsuitability.

22      (3) "Institutional Behavior": Panel member Bryson found, "...
23 you have seven 115's on your record, and some involving narcotics"
24 (See, Exh.C, p. 3/71, lines 7-8). The issue of petitioner's
25 disciplinary history concerning "Serous CDC-115's" and drug related
26 115's was addressed above (at Ground **IV** pages 22 - 23) of this
27 petition. Petitioner only adds, whatever his serious disciplinary
28 history, it's over fourteen (14) years old. Further, Bryson's

1 negative comments here, contradicts her decision finding that: "As
2 to your institutional behavior, you have programmed commendably."
3 (See, Exh."C, p. 2/70, lines 14-15).

4    Accordingly, petitioner has established through clear and
5 convincing evidence that panel member Bryson violated petitioner's
6 due process when she manipulated paroling factors.

7           B. THE PANEL ESTABLISHED NO LINK BETWEEN
8              COMMITMENT OFFENSE (NO NEXUS), AND
               DENIAL OF PAROLE BASED UPON PETITIONER
9              CURRENTLY BEING AN UNREASONABLE RISK OF
               DANGER TO PUBLIC SAFETY IF PAROLED.

10    Although, as argued above, Bryson found Dr. Weber did not
11 support petitioner's parole in his 2006 psychological evaluation
12 because of the **low** to **moderate** risk for violence assessment and
13 a Global Assessment Function (hereafter, GAF) of 75, Dr. Weber
14 never actually stated any opposition to parole. However, Dr. Reed's
15 more comprehensive and exhaustive 1999 psychological evaluation
16 found that "if released to the community, his violence potential
17 is considered no more than the average citizen in the community",
18 and he gave petitioner a GAF of 90. If the 2006 and 1999 evaluations
19 are averaged out, we still have a **low** risk of violence threat
20 assessment, and a GAF of **83**. Averaged out, both evaluations support
21 parole, although arguable they both do individually as well.

22    Because the gravity of the offense can no longer constitute
23 "some-evidence" after petitioner's 24-years of incarceration and
24 half-dozen suitability hearings, the offense cannot provide the
25 necessary nexus that petitioner is "currently" a risk if paroled.
26 (See, In re Sandra Davis Lawrence 2007 DJDAR 7363, 7374; In re
27 Richard Gray, 2007 DJDAR 7515, 7524; In re John Bernard Weider,

28

1  2006 DJDAR 15795, 15798; In re Wen Lee, DJDAR 13961, 13963-64;

2  Irons (2007) (9th Cir. Case No. 05-15725, at pages 2480-2482). And

3  petitioner's commitment offense is certainly no more aggravated

4  than the following cases where prisoners were granted parole: In re

5  Rosenkrantz (2002) 29 Cal.4th 616; In re Dannenberg (2005) 34

6  Cal.4th 1061; In re McClendon (2003) 113 Cal.App.4th 315; In re

7  Burns (2006) 136 Cal.App.4th 1318; In re Van Houten (2004) 116

8  Cal.App.4th 339; In re DeLuna (2005) 126 Cal.App.4th 585; In re

9  Lowe (2005) 130 Cal.App.4th 1405; In re Morrall (2002) 102

10  Cal.App.4th 280, or any of the above cited cases.

11
            VI.  THE INTERMINABLE PRECLUSION OF PETITIONER'S
12               PAROLE BASED SOLELY ON HIS COMMITMENT OFFENSE
                 OF SECOND DEGREE MURDER ABROGATES DUE PROCESS:
13               BECAUSE NEITHER HIS OFFENSE FACTS NOR PAROLE
                 SUITABILITY OTHERWISE CAN IMPROVE, AND BECAUSE
14               HE HAS SERVED MORE THAN THE MAXIMUM PRISON TERM
                 PRESCRIBED FOR THE PARTICULAR FACTS OF HIS
15               OFFENSE: DENIAL OF PAROLE BASED ON UNCHANGING
                 FACTS COVERTS PRISON TERM TO LIFE WITHOUT THE
16               POSSIBILITY OF PAROLE.

17      The authorities cited above which permit parole denial to an

18  otherwise qualified inmate whose commitment offense was particular-

19  ly egregious when compared to other examples of that offense,

20  place reasonable limits on such discretion to preclude repeated

21  or interminable denial of parole on that basis. Because the facts

22  circumstances of commitment and prior offenses can never change, a

23  contrary policy would convert sentences like petitioner's 15-year

24  to life with possibility of parole, to life without the possibility

25  of parole. (See, Biggs v. Terhune (9th Cir. 2003) 334 F.3d 910, 917

26  ). California Courts warn:

27                    "[T]he Legislature has clearly expressed its
                      intent that when murderers -- who are a great
28                    majority of indeterminate sentences -- approach
                      their minimum eligible parole date, the Board

                                    39

1

    '"**shall normally set a parole release date.**"'(P.C.
§3041(a)). the Board's authority to make an exception
2    based on gravity of a life term inmate's current or
past offenses should not operate to swallow the rule
3    that a parole is normally to be granted ...." (See,
In re Rosenkrantz, supra, 29 Cal.4th at 683, citing,
4    In re Ramirez, supra, 94 Cal.App.4th 549, 570.)

5      The Ninth Circuit recently reviewed the constitutional

6 propriety of the BSH panel's use of a first-degree murder commit-

7 ment offense to find a prisoner unsuitable for parole at his **first**

8 hearing. The court found no evidence to support most of the panel's

9 grounds for unsuitability, but held that a particularly egregious

10 commitment offense could be an appropriate basis for finding such

11 a prisoner unsuitable for parole at **an initial parole hearing**. The

12 Ninth Circuit, however, cautioned:

13    "As in the present instance, the parole board's sole
supportable reliance on the gravity of the offense and
14    conduct prior to imprisonment to justify denial of
parole can be initially justified as fulfilling the
15    the requirements set forth by state law. Over time,
however, should Biggs continue to demonstrate
16    exemplary behavior and evidence of rehabilitation,
denying him a parole date simply because of the nature
17    of Biggs' offense and prior conduct would raise
serious questions involving his liberty interest in
18    parole ...."

19    "A continued reliance in the future on an unchanging
factor, the circumstances of the offense and conduct
20    prior to imprisonment, runs contrary to the rehabilita-
tive goals espoused by the prison system and could
21    result in a due process violation. (Biggs, supra,
334 F.3d at pp. 961-917).
22

23      Biggs's holding has been relied on in addressing the issue

24 here raised by petitioner. More recently, the Ninth Circuit Court

25 of Appeals, in Irons v. Carey (9th Cir. 2007) 479 F.3d 658, in

26 reversing their prior decision in Irons v. Warden (E.D. Cal. 2005)

27 358 F.Supp.2d 936, in light of the California Supreme Court's

28 decision in In re Dannenberg (2005) 24 Cal.4th 1061, and the

1  Ninth Circuit's decision in Sass v. California Board of Prison

2  Terms (9th Cir. 2006) 461 F.3d 1123, however, upheld the legal

3  principle:

4              "We note that in all cases which we have held
5     that a parole board's decision to deem a prisoner
       unsuitable for parole solely on the basis of his
6     commitment offense comports with due process,
       the decision was made before the inmate had served
7     the **minimum number of years required by his
       sentence.** Specifically, in Biggs, Sass and here,
8     the petitioners had not served the minimum number
       of years to which they had been sentenced at the
9     time of the challenged parole denial by the Board.
       [Citations.] All we held in those cases and all
10    we had today, therefore, is that, given the
       particular circumstances of the offenses in these
11    cases, due process was not violated when these
       prisoners were deemed unsuitable for parole **prior
12    to the expiration of their minimum terms.**"
       (Irons v Carey, supra, 479 F.3d at 665, emphasis
13    added.)

14 Echoing this legal principle, in an even more recent California

15 case, the State Appellate Court stated:

16            "The even more recent Ninth Circuit opinion, Irons
       v. Carey, was authored by the dissenting judge in
17    Sass, yet also denied relief for the prisoner
       challenging the Board's denial of parole. The court
18    reversed the district court decision which had
       found a lack of "some evidence" the prisoner's
19    release would present a present danger to the
       community. But this Ninth Circuit opinion, unlike
20    Sass, expressly embraced the Biggs rational and
       indeed emphasized its denial of relief was only for
21    the time being—indeed predicated only on the fact
       the prisoner had not yet served the minimum time
22    required for the offense he committed."
       (In re Sandra Davis Lawrence 2007 DJDAR 7363, at
23    7373).

24 Petioner has now served over eleven (11) years past his minimum

25 parole date, and has served over six (6) years past the expiration

26 of his 15-year minimum term.

27      Petitioner, is an aging, fully reformed, rehabilitated parole

28 qualified inmate, having achieved and maintained for two decades

41

one of the highest standards of parole suitability possible under
Board regulations and the suitability factors listed therein, was
eligible to parole more than a decade ago, 1996, and has been
confined over the maximum term prescribed by the regulations for
the factors of his commitment offense. (15 CCR §2403(c), II-(c),
II-Prior Relationship and C-Severe Trauma, which indicates a base
term of 18-19-20 years. The guidelines set forth in 15 CCR §2403(c)
do not take into consideration any post-conviction credits as
mandated by petitioner's statutory sentencing provisions set forth
in P.C. §190, which amount to four months of year up to the
expiration of the minimum-term, i.e., pursuant to P.C. §2931. This
also includes any pre-sentence and vested credits. Additionally,
petitioner can receive regulatory credits pursuant to 15 CCR §2410
, against any post expiration of minimum-term time served, which
can amount to up to four (4) months per year. If petitioner were
to receive both statutory and regulatory credits it would amount
to over 84 months. The Board has denied petitioner parole on less
than six (6) times based on unchanging facts of petitioner's
commitment offense and criminal and social histories. And, although
Presiding Commissioner Bryson, at the 2006 PSH attempted to load
negatives factors never before raised by any other PSH, nonetheless
, her objections to parole still almost entirely concern the same
 unchanging factors.

However viewed, the evidence is that petitioner has a **low**
parole risk, and by all fair measures of regulatory provisions
for suitability, petitioner qualifies for parole release. To deny
parole on the basis given by the 2006 PSH panel, is to concede

1  the Board has the power to turn statutory life with the possibility

2  into, life without the possibility of parole. Accordingly, the

3  Court should grant parole release.

4          VII.  PETITIONER'S DUE PROCESS AND LIBERTY INTEREST
5                WERE VIOLATED WHEN THE BOARD DID NOT PROPERLY
                 EVALUATE   HIS CIRCUMSTANCES OF SUITABILITY
6                PURSUANT TO 15 CCR §2402(d)(1)-(9).

7      Because this issue has been already thoroughly discussed above

8  in some detail, petitioner will primarily address the legal aspect

9  rather than the factual basis for this claim.[9/] The Board did not

10 undertake any individualized consideration of petitioner's **factors**

11 of suitability as provided for in regulatory provisions 15 CCR

12 §2402(d)(1)-(9); For example, the Board did not comment on (1) the

13 fact petitioner had no juvenile record, (2) that petitioner had

14 reasonable stable social history with others as documented in the

15 2006 and 1999 psychological evaluations, (3) that petitioner

16 had the appropriate compassion for the victim and understands

17 the nature and magnitude of the offense as documented in the 2006

18 and 1999 psychological evaluations, (6) petitioner lacked any

19 violent crime history, (7) petitioner's age of 57 reduces the

20 probability of recidivism, (8) prisoner has realistic plans for

21 for release and has developed marketable skills that can be used

22 upon release as documented in the 2006 and 1999 psychological

23 evaluations, and (9) that institutional activities indicate an

24 enhanced ability to function within the law upon release, i.e.,

25 the past fourteen (14) years as documented in the 2006 and 1999

26 psychological evaluations (See, Exhibits **J** and **K**.).

27          "The Board's failure to undertake the
            individualized consideration of all relevant
28          factors required by Rosenkrantz, supra, 29 Cal.4th

43

1

2              at page 655, also offends the Board's own
               regulations, which require that '[a]ll relevant
3              reliable information available to the panel
               **shall be considered** in determining suitability
               for parole."

4

5              (In re David Baker 2007 DJDAR 7548, 7557 at fn.21,
               citing, ([§2281], subd.(b); Scott I., supra, 119
               Cal.App.4th at 898.).

6

7         For this and other reasons cited above, petitioner was denied

   due process and a fair 2006 PSH.

8

9              VIII.  PETITIONER'S DUE PROCESS IS VIOLATED BY BOARD
                      PAROLE DENIAL TRANSCRIPTS WHICH DO NOT ACCURATELY
                      REFLECT CRUCIAL AND CRITICAL DISCUSSIONS DEALING
10                    WITH THE COMMITMENT OFFENSE, CRIMINAL, DRUG AND
                      SOCIAL HISTORIES, AND WHICH TRANSCRIPTS APPEARS
11                    TO BE PURPOSELY EDITED; THUS PETITIONER REQUEST
                      THE COURT GRANT HIM **DISCOVERY** IN ORDER TO OBTAIN
12                    THE ORIGINAL TAPE RECORDING AND NEW TRANSCRIPTION
                      IF REQUIRED, OF THE 2006 PAROLE SUITABILITY
13                    HEARING.

14        Petitioner asserts, that the 2006 PSH transcripts contain

15   substantial errors and missing portions of discussion between

16   petitioner and Board panel members on critical topics involving

17   the commitment offense, petitioner's prior drug, criminal and

18   social histories, and, his institutional behavior and program, i.e.

19   , regarding the regulatory provision issues of suitability vs.

20   unsuitability. Some of the errors appear to nothing more than

21   unintentional errors in translating which are nonetheless serious

22   enough to alter the meaning of crucial discussions in the above

23   noted areas so as to be prejudicial in nature violating due process

24   . Other areas, where whole sections of dialogue are missing during

25   critical discussions on the topics cited above, which missing

26    portions are favorable to and support petitioner's version and

27    suitability, seem to have been deliberately edited out.

28         Petitioner has sent the Board of Parole Hearings, numerous

44

letters in memorandum form detailing his concerns regarding the
transcripts, and requesting either a new transcription or a copy
of the actual tape recording of the November 29, 2006 PSH. Despite
petitioner's efforts, he has yet to obtain a single response from
that agency. As proof of these efforts petitioner attaches Exhibit
R, copies of petitioner's 3-page memorandum to the Board, along
with a Board 1084-Form requesting a copy of his PSH tape recording,
and a copy of the returned envelope of petitioner's first attempt
to obtain the tape recording. Petitioner's 3-page memorandum/letter
describes in detail, serious problems petitioner found with the
hearing transcripts. Since petitioner's original letter to the
Board was returned. He has sent three more with the same material
and they have not been returned, and have went unanswered.

Accordingly, since petitioner is entitled to accurate records
upon which to litigate his parole denial, petitioner seek this
court grant him an **order** granting discovery and copy of that tape
recording. And, upon examination and proof of petitioner's claims
to order a new transcription be made.[10]

> IX. PETITIONER CANNOT BE FORCED TO ATTEND ALCOHOLIC'S
> OR NARCOTIC'S ANONYMOUS (AA/NA) BECAUSE THEY ARE
> RELIGIOUS BASED PROGRAMS AND PETITIONER NO LONGER
> MAINTAINS SUCH RELIGIOUS BELIEFS, AND WHOSE FORCED
> PARTICIPATION WOULD VIOLATE THE FIRST AMENDEMENT
> OF THE FEDERAL CONSTITUTION: AND WHERE THERE IS NO
> EVIDENCE THAT PETITIONER HAS USED ANY ILLEGAL DRUG
> SINCE HIS COMMITMENT OFFENSE ARREST IN 1984.

Petitioner maintains that he is opposed to attending AA or NA

[10] Discovery is available in a habeas corpus proceeding after an
order to show cause has been issued. In re Scott (2003) 29 C4th
783, 814, 129 CR2d 602; In re Avena (1996) 12 C4th 694, 730, 49
CR2d 413. Both petitioner and respondent are entitled to discovery.
In re Scott, supra. It is reasonable for a court to look at the
reciprocal discovery law to determine the scope of discovery on
habeas corpus. In re Scott, supra. Also, Board regulatory provision
15 CCR §2254 provides that a prisoner has the right to a copy of a
record of his parole hearing, transcripts and/or tape recording.

1   because the are religious based programs. Petitioner, however

2   however would not be opposed to attending any non-religous based

3   AA or NA program, however, currently MCSP offers no such programs

4   on B-Facility where he is currently being housed. Petitioner does

5   attach Exhibit S, petitioner's declaration addressing his beliefs

6   and the AA / NA programs.

7       For the reasons stated above and in Exh.S, petitioner request

8   the court hold that the Board requirement that petitioner must

9   attend AA or NA, and the Board's reliance on this factor at the

10  2006 PSH in denying petitioner parole, is unconstitutional. (See,

11  e.g., Turner v. Hickman, (E.D. Cal. 2004) 342 F.Supp.2d 887, 899,

12  [ ... requiring participation in the drug treatment program was

13  an establishment of religion prohibited by the First Amendment.]).

14          X. PETITIONER'S PAROLE DENIAL IS UNLAWFUL, BECAUSE
               PURSUANT TO THE INHERENT STATUTORY PROVISIONS OF
15             CALIFORNIA'S CONTROLLING PAROLE STATUTE (P.C, §
               3000 WHOSE PROVISIONS ARE CONTROLLING OVER AND
16             SUPERCEDE THE PAROLING POWERS AND PROCEDURES
               GRANTED TO THE BOARD PURSUANT TO P.C. §3040 ET.
17             SEQ.), THE BOARD'S POWER TO GRANT AN "INITIAL
               PAROLE RELEASE" TO P.C. §190 PRISONERS, EXTENDS
18             ONLY TO THE "EXPIRATION" OF THE MINIMUM-TERM,
               BASED UPON §190'S CREDIT REDUCTION PROVISIONS.
19

20      Under California law, there are two distinct type of prison

21  sentences, i.e., determinate and indeterminate. Determinate

22  sentences fall under the provisions of P.C. §1170, and

23  indeterminate sentences fall under P.C. §1168. However,

24  irrespective of whether a state prisoner is serving a determinate

25  or indeterminate sentence, in California, their sentences "must"

26  adhere to the statutory provisions of P.C. §3000. That is, both

27  determinate and indeterminate sentences fall under the paroling

28  provisions of P.C. §3000. That's because P.C. §3000's is the

1
2  controlling paroling statute of California. While **P.C. §3000** is

3  the statutory law which provides for parole in California, P.C.

4  §3040 et seq., are the penal code provisions which gives the Board

5  of Prison terms (currently, Board of Parole Hearings) powers to

6  parole, and P.C. §3041's provisions contain the paroling

7  procedures the Board must utilize in their discretionary paroling

8  determinations; That is, **§3000** is the state law allowing parole,

9  and §3040 et seq., are the laws giving power to the Board to grant

10 parole and the procedures that must be utilized in determining

11 whether to grant or deny parole. The above distinctions are vital

12 to the understanding of State law, as will be shown below.

13      P.C. §3000, at pertinent parts, provide as follows:$\underline{11}$/

14           "The Legislature finds and declares that the period
            immediately following incarceration is critical to
15          successful reintergration of the offender into society
            and to positive citizenship. It is in the interest
16          of public safety for the state to provide for the
            supervision of and surveillance of prolees and to
17          provide educational, vocational, family and personal
            counseling necessary to assist parolees in the
18          transition between imprisonment and discharge. <u>A
            sentence pursuant to Section 1168 or 1170</u> **shall** include
19          <u>a period of parole</u>, unless waived, as provided in this
            section. **Notwithstanding** "any" provision to the
20          contrary in Article 3 (**commencing with Section 3040**)
            <u>of this chapter:</u>"

21           "(a) At the expiration of a term of imprisonment of
            one year and a day, or a term of imprisonment imposed
22          pursuant to Section 1170, <u>or at the expiration of such
            term as reduced pursuant to Section</u> **2931**, if applicable,
23          <u>the inmate</u> **shall** <u>be released on parole</u> not exceeding
            three years...."

24
25 Thus, although P.C. §3040 et seq., grants the Board the power to

26 grant paroles, California's controlling parole statute **P.C. §3000**

27 $\underline{11}$/ Petitioner was arrested and charged with his commitment offense
   in June of 1984, therefore all Penal Code provisions cited in this
28 Ground for Relief, will appear as enacted in 1984, otherwise there
   would be a problem with ex post facto application.

1    , limits the Board's discretionary parole powers over any sentences

2    which receive mandatory P.C. §2931 credits. **P.C. §3000** does so

3    with the phrase$ **notwithstanding**. That is, **P.C. §3000**, mandates

4    that as a matter of state law, its provisions pursuant to its

5    subpart (a), is "controlling" over any provisions found in P.C.

6    §3040 et seq., i.e., over the discretionary paroling powers and

7    paroling procedures of Board.<u>12/</u>

8        This brings us to P.C. §190, the second degree murder Penal

9    Code provisions under which petitioner was sentenced. P.C. §190

10   at pertinent part provides as follows:

11           "§ 190. [Punishment for murder.] ... Every person
12           guilty of murder in the second degree shall suffer
             confinement in the state prison for a term of 15
13           years to life."

14           "The provisions of Article 2.5 (commencing with
             Section 2930) of Chapter 7 of Title 1 of Part 3
15           of the Penal Code **shall** apply to reduce any
             any minimum term of 25 or 15 years in a state
16

17   12/ Under both California and federal law, the statutory phrase
     **notwithstanding** is a very comprehensive phrase signalling its
     broad application overriding **all** other code sections unless it is
18   specifically modified by use of a term applying it only to a
     particular code section or sections. (See, West Cal. Digest 2nd,
19   55A Words and Phrases (H-N); People v. Tillman (1999) 73 C.A.4th
     771; People v. Franklin 66 CR 742; People v. Superior Court
20   (Hubbard) (1991) 230 C.A.3d 287, 296; In re Marriage Dover (1971)
     15 C.A.3d 675, 678 fn.3; State of California v. Superior Court
21   (1967) 252 C.A.2d 637, 639-640; In re Marriage of Cutler, 94 CR2d
     156, 79 C.A.4th 460, as modified, rehearing denied, review denied;
22   In re Pacific Gas and Elec. Co. (N.D. Cal. 2000) 283 B.R. 41 (Term
     "notwithstanding" is well recognized as a term used to express
23   broad preemptive intent.); In Hubbard, supra 230 C.A.3d 287, 296,
     citing Marriage of Dover, supra, held "This statutory phrase in a
24   statute indicates legislative intent that the statute be exclusive
     or **sui generis**, and thus controlling over other statutes on the
25   same subject." Dover, supra, 15 C.A.3d 675, 678 fn.3; Along with
     the California Courts, the State Attorney General's Office has
26   repeatedly weighed in supporting this definition and application of
     the phrase "notwithstanding" (See, 73 Ops. Cal.Atty.Gen. 296, 299
27   (1990); 64 Ops.Cal.Atty.Gen. 660, 662 (1981); 94 Ops.Cal.Atty.Gen.
     1906, 1908 (1995).

28

1

2                    prison imposed pursuant to this section, but such
                     person **shall** not otherwise be released on parole
3                    prior to such time."

4               (P.C. §190, emphasis added.)

5       Pursuant to the provisions of P.C. §190, prisoners  sentenced

6       under its provisions **"shall"** (i.e., are mandated) credits pursuant

        to the "Determinate Sentence Law's" credit reduction provisions
7
        found at P.C. §2940 et seq.. California courts have long concluded
8
        that the mandatory statutory credit reductions of **P.C. §2931**
9
        apply to second degree murderers sentenced pursuant to P.C. §190
10
        between the years of §190's 1978 and 1998 amendments. That is,
11
        from the passage of Proposition 7 in 1978, until the passage of
12
        Proposition 222 in 1998. (Former P.C. §190 and later P.C. §2933(e)
13
        provided that terms for second degree murder are reduced only by
14
        the "one-for-two" scheme of P.C. §2931(a)-(c). In re Monigold,
15
        (1988) 205 CA3d 1244, 1227. Those convicted of such murders after
16
        June 3, 1998, accures no credits. People v. McNamee, (2002) 96
17
        C.A.4th 66, 116 CR2d 625. The California Supreme Court in People
18
        v. Cooper, 27 Cal.4th 38, 45-46, 115 Cal.Rptr.2d 219, 226, held
19
        prisoners sentenced under Prop. 7's amendment of P.C. §190 are
20
        entitled to mandatory credits. The State Supreme Court further
21
        held in People v. Jefferson (1999) Cal.Rptr.2d 893, 899, 21 Cal.4th
22
        86, 95-96, that a indeterminate prisoner under the new law must
23
        be released upon **expiration** of his 'term' less good-time credits.
24
            Having conclusively established that petitioner is a P.C. §190
25
        prisoner who is entitled to P.C. §2931 credits. Additionally,
26
        petitioner notes that P.C. §2932(e) which is mandated by §190
27
        to apply to its prisoners, provides as follows:
28

                                    49

1

2             "(e) <u>each prisoner subject to Section 2931
              shall be notified of</u> the total amount of good
3             behavior and participation credit which may
              be credited pursuant to 2931, <u>and his</u>
              <u>anticipated time-credit release date></u>."

4

5             (P.C. §2932(e), emphasis added.)

6    Therefore, pursuant to §2932(e), as a matter of law, petitioner

7    must be provided with an "anticipated time-credit release date"
     based on his mandatory §2931 credits.

8

9         Pursuant to California law (§2932(e)) petitioner must be
     informed of anticipated §2931 time-credit release date. And, pursuant
10
     to P.C. §3000, notwithstanding any powers granted to the Board
11
     pursuant to P.C. §3040 et seq., petitioner must be paroled "...
12
     at the expiration of such term as reduced pursuant to Section
13
     2931 ...." (§3000(a)).
14
          Despite these clear and easily understood provisions and
15
     despite the mandatory provisions cited above, petitioner has now
16
     served more than six-years over the expiration of his 15-year
17
     minimum term, which §190 mandates be reduced by P.C. §2931 credits
18
     . That is, although petitioner has no time credit losses, he
19
     exceeded his 15-year minimum term on April 18, 2001. (See,
20
     attached Exhibit T, copies of five CDCR Term Computation Forms,
21
     also known as Legal Status Sheets).
22
          Because, the Board failed to comply with the above mandatory
23
     statutory provisions by failing to grant an "initial parole
24
     release" prior to expiration of term provided by §3000, and
25
     has usurped its authority under state law by not granting parole
26
     release, it has lost jurisdiction over petitioner's "initial
27
     parole release" and the court must now grant parole.
28

State prisoners do have a constitutionally protected interest in receiving parole if a state statute contains mandatory language that requires a parole board to grant parole in certain situations. (<u>Greenholtz v. Inmates of Neb. Penal & Corr. Complex</u>, (1979) 442 U.S. 1, 12; <u>Board of Pardons v. Allen</u>, (1987) 482 U.S. 396, 376-378). When such mandatory language exists, a prisoner has a legitimate expectation of parole or "liberty interest" that cannot be denied without due process. (<u>Greenholtz</u>, supra, 442, U.S. 11-12; <u>Biggs v. Terhune</u>, 334 F.3d 910, 914-15 (9th Cir. 2003) [state statute mandating parole board set release date unless board determines that certain factors undermine its ability to set date created generally protected liberty interest upon incarceration of inmate]). The Supreme Court has held that when a statute provides that the parole board "shall" release and inmate "unless" other criteria holds otherwise, the "shall" / "unless" formula creates a protected liberty interest. (<u>Greenholtz</u>, supra.) The same liberty interest is created when the statute (or regulation) requires the parole board "shall" release an inmate "when" the specified criteria are met. (<u>Board of Pardons v. Allen</u>, supra, 482 U.S. at 376-78.)

The federal courts have long held that California's P.C. §2931 credit reduction scheme creates a federally protected liberty interest in those credits. (See, <u>Toussaint v. McCarthy</u>, 801 F.2d 1080, 1094-1098 (9th Cir. 1986).

Petitioner, herein, however, submits that California's P.C. §3000 contains both of United States Supreme Court's criteria for creating a federally protected liberty interest in parole. That

is, §3000 contains the "shall" / "unless" language formula, and it contains the formula that the parole "shall" release "when" specified criteria is met. For example, **§3000(a)** requires that:

> "... at the expiration of such term as
> reduced pursuant to **Section 2931** ...
> the inmate **shall** be released on parole
> ... **unless** the board for good cause
> waives parole and discharges the inmate
> from custody of department."    ,
> (P.C. §3000, emphasis added.)

Thus, **§3000(a)** also creates a protected liberty interest in that it requires the inmate **shall** be paroled when the specified criteria is met, i.e., the criteria that must be met is that the inmate has reached the expiration of his term as is reduced by Section 2931.

Petitioner reached and exceeded the expiration date of his term reduced by §2931 credits (which is his 15-year minimum term) by over six (6) years.

Accordingly, petitioner is entitled to a mandatory "initial parole release" when he reached the expiration of his term reduced by §2931 credits. In effect, petitioner's incarceration since April 18, 2001, is analogous to false imprisonment. Petitioner's Federal Constitutional rights have been violated under the Eighth Amendment and Fourteenth Amendment's Due Process and Equal Protection Clauses.

### XI. BASED ON THE ARGUMENT AND AUTHORITIES HEREIN, PETITIONER REQUEST THE COURT GRANT **EVIDENTIARY HEARING.**

After pleadings have been filed, if factual issues are in dispute, the court may order an evidentiary hearing. (See, In re Lawler (1979) 23 C.3d 190, 194, 151 CR 833). A superior court entertaining a habeas petition is **required** to conduct an

evidentiary hearing if a reasonable likelihood exists that the petitioner is entitled to relief and the entitlement depends on resolving factual issues. (Cal. Rules of Ct. 4.551(f)).

Petitioner seeks an evidentiary hearing to resolve the following factual disputes:

1) Factual disputes regarding the 2006 PSH, as detailed in this petition.

2) Factual disputes regarding the accuracy of the 2006 PSH transcripts and tape recording of those proceedings.

3) Factual dispute regarding the lack of fundamental fairness and due process at 2006 PSH, related to Presiding Commissioner Sandra Bryson.

4) Factual disputes regarding petitioner's claims against being forced to participate in AA or NA.

For the above stated reasons, petitioner request the court grant him an evidentiary hearing.

## CONCLUSION

Petitioner seek the Court grant his petition for writ of habeas corpus and grant the following relief; (1) grant his immediate parole release; (2) in the alternative to order the Board to order his parole release within thirty-days of any favorable order; or in the alternative order the Board to hold another PSH within thirty-days and release petitioner on parole within ten-days of such action; and (3) issue order blocking the Governor from preventing any one of the parole releases scenarios as cited.

Dated: July 29 , 2007

Abe Williams, Jr
In Pro Per

53

# EXHIBIT 3

1

2

SUPERIOR COURT OF THE STATE OF CALIFORNIA

3

COUNTY OF ALAMEDA

4

5

6  IN RE                    )           CASE NO. _____
                            )
7  ABE WILLIAMS, JR.        )           PETITION FOR WRIT OF HABEAS
                            )           CORPUS AND MEMORANDUM OF
8  ON HABEAS CORPUS         )           POINTS AND AUTHORITIES
   _____ )

9

10

11

12

13

14

15              PETITIONER'S SEPARATELY BOUND

16                 "SUPPORTING DOCUMENTS"

17

18        (ATTACHED HABEAS EXHIBITS **A** THROUGH **U**)

19

20

21

22

23

24

25                          ABE WILLIAMS, JR.
                            D-48163  B-9-127L
26                          M.C.S.P.
                            IONE, CA 95640-9000
27                          IN PRO PER

## SUPERIOR COURT OF THE STATE OF CALIFORNIA
## COUNTY OF ALAMEDA

| | |
|---|---|
| IN RE ) | CASE NO. _____ |
| ) | |
| ABE WILLIAMS, JR. ) | PETITION FOR WRIT OF HABEAS |
| ) | CORPUS AND MEMORANDUM OF |
| On Habeas Corpus ) | POINTS AND AUTHORITIES |
| _____ ) | |

### PETITIONER'S SEPARATELY BOUND
### "SUPPORTING DOCUMENTS"

(ATTACHED HABEAS EXHIBITS **A** THROUGH **U**)

ABE WILLIAMS, JR.
D-48163  B-9-127L
M.C.S.P.
IONE, CA 95640-9000
IN PRO PER

# TABLE OF EXHIBITS

## EXHIBITS

**A**  COVER SHEET OF "PROBATION REPORT" AND 3-PAGE "LETTER" ATTACHED TO PROBATION REPORT.

**B**  2006 PAROLE SUITABILITY HEARING "LIFER DECISION", 1-PAGE

**C**  2006 PAROLE SUITABILITY HEARING "DECISION TRANSCRIPTS", 9-PAGES

**D**  2006 PAROLE SUITABILITY HEARING "TRANSCRIPTS", 70-PAGES

**E**  1996 PAROLE SUITABILITY HEARING "DECISION TRANSCRIPTS", 4-PAGES

**F**  1999 PAROLE SUITABILITY HEARING "DECISION TRANSCRIPTS", 5-PAGES

**G**  2003 PAROLE SUITABILITY HEARING "DECISION TRANSCRIPTS", 7-PAGES

**H**  2004 PAROLE SUITABILITY HEARING "DECISION TRANSCRIPTS", 7-PAGES

**I**  2005 PAROLE SUITABILITY HEARING "DENIAL DOCUMENTS", 3-PAGES

**J**  2005 PAROLE "PSYCHOLOGICAL EVALUATION", 5-PAGES

**K**  1999 PAROLE "PSYCHOLOGICAL EVALUATION", 6-PAGES

**L**  "TRIAL TRANSCRIPT", PAGE 1835 (1-PAGE)

**M**  COPIES OF THREE (3) TRIAL "JUROR AFFIDAVITS", TOAL OF 11-PAGES

**M(1)**  AFFIDAVIT OF JURY FOREMAN WILLIAMS H. HARA, 3-PAGES, AND INVESTIGATOR MICHAEL G. MCCARTHY

**M(2)**  AFFIDAVIT OF JUROR GAIL ELISE HALL, 5-PAGES, AND INVESTIGATOR MICHAEL G. MCCARTHY

**M(3)**  AFFIDAVIT OF JUROR LAWRENCE J. CRUZ, 3-PAGES, AND INVESTIGATOR MICHAEL G. MCCARTHY

**N**  "TRIAL TRANSCRIPTS", PAGES 1137, 1629, 1633-1634 (4-PAGES)

**O**  COPIES OF PETITIONER'S CRIMINAL HISTORIES FROM "CALIFORNIA'S DEPARTMENT OF JUSTICE", 15-PAGES, AND "UNITED STATES' DEPARTMENT OF JUSTICE", 5-PAGES

**P**  COPIES OF PETITIONER'S PRISON "ACADEMIC", VOCATIONAL", "WORK" AND "SELF-HELP" DOCUMENTATION, 58-PAGES

**Q**  2006 PETITIONER'S "2006 LIFE PRISONER EVALUATION", 6-PAGES

**R**  COPY OF PETITIONER'S NOTIFICATION TO BOARD OF PAROLE HEARINGS, OF SERIOUS ERRORS IN THE 2006 PAROLE HEARING TRANSCRIPTS, AND REQUEST FOR COPY ACTUAL TAPE RECORDING OF THOSE PROCEEDINGS

# TABLE OF EXHIBITS

## EXHIBITS

**S**  COPY OF "PETITIONER'S DECLARATION", REGARDING AA AND NA, 3-PAGES

**T**  COPIES OF FIVE (5) "TIME COMPUTATION FORMS" (ALSO KNOWN AS "LEGAL STATUS SHEETS [LSS]", 5-PAGES

**U**  COPY OF PETITIONER'S 2003, 2006-2007 PAROLE SUPPORT LETTERS, ALONG WITH A COPY OF PETITIONER'S "POST-INCARCERATION PAROLE PLAN MATRIX", TOTALING __6__ PAGES

# EXHIBIT "A"

## SUPERIOR COURT OF CALIFORNIA
## COUNTY OF ALAMEDA, STATE OF CALIFORNIA

THE PEOPLE OF THE STATE OF CALIFORNIA

VS

WILLIAMS, ABE JR

DEFENDANT

### PROBATION OFFICER'S REPORT AND RECOMMENDATION

| | | | |
|---|---|---|---|
| EVENT NAME | WILLIAMS, ABE JR | | |
| C.I.I. NAME | WILLIAMS, ABE UNKNOWN JR | JUDGE | TABER |
| ADDRESS | 2014 5th Avenue, #207, Oakland, CA. | DEPARTMENT NO. | 07 |
| D.O.B. | 11/11/49    (AGE:   36  ) | DOCKET NO. | 80451 |
| SEX | MALE    ETHNIC BLACK | REFERRAL DATE | 10/15/86 |
| HT. 5FT 11IN WT. 175 HAIR BLACK | | | |
| C.I.I. NO. | 07695470 | COURT DATE | 11/12/86 |
| | | CONTINUED: | 01/09/87 |
| CEN. | 4052144 | DEFENSE ATTORNEY | P D-SPEAR /PRO PER |
| PFN. | AGG441 | REPORT BY | JACQUELINE TOWNSEND |
| | | | DEPUTY PROBATION OFFICER |

CHARGES FILED    PC 187 2N U/G 4/PR F

CURRENT CHARGES    PC 187 2N U/G 4 /PR F

CHARGE STATUS    JURY VERDICT

DATE AND PLACE OF    **ARREST**    ARREST AGENCY **SHERIFFS OFFICE**

06/19/84 OMC 06    OA

CURRENT CUSTODY STATUS    **IN CUSTODY**    DAYS IN JAIL THIS CHARGE    886 days

CUSTODY STATUS THIS CHARGE    **IN CUSTODY**
O.R. ON    BAILED ON    AMOUNT $

MARRIED:  Yes _____  No  x  LIVES WITH  girlfriend    INCOME SOURCE  self-employed

FORM 240.58 (REV 9-78)

INSTITUTION STAFF RECOMMENDATION SUMMARY

SOURCES OF REPORT:

Probaiton Officer's Report, Inmate Interview, and File No. B-99692.

CONFIDENTIAL INFORMATION:

NONE

HOLDS/DETAINERS:

NONE

MEDICAL/DENTAL:

Full Duty/Camp Qualified.

PSYCHIATRIC/PSCYCHOLOGICAL:

No referral indicated.

WORK SKILLS:

Subject claims experience as a metal polisher, retail clerk and laborer.

NARCOTICS/DRUGS/ALCOHOL:

Subject relates that he is a heavy drinker of alcoholic beverages, user of marijuana and addicted to cocaine and heroin.

ESCAPE HISTORY:

NONE

ARSON HISTORY:

NONE

SEX RELATED OFFENSES:

NONE

ACADEMIC/VOCATIONAL: I.Q.:____AVERAGE____TOTAL READING:__12.8_____

TOTAL ARITHMETIC:__8.2____TOTAL GPL:_10.5_____

WILLIAMS          D-48163          NRC-CMF          2-4-87          ril          1

## CRIMINAL HISTORY

<u>Juvenile</u>:  The defendant's formal juvenile probation record is not available for review.

<u>Adult</u>:  In view of the disposition of the case, the defendant's adult record is contained in the attached CII record.  FBI record received.  CORPUS and NCIC received indicating no outstanding warrants.

## PRESENT OFFENSE

<u>Offense Summary</u>:  The District Attorney's holding order summary indicates as follows:

"On May 27, 1984, between the hours of 6:00 a.m. and 11:55 p.m., the defendant was in the 922 E Street apartment with the victim (age 3) and the victim's mother, Deborah Harris. The defendant tied the victim's hands to one door and her feet to another and beat her until she lost consciousness.  The child was taken to Merritt Hospital Emergency Room by Deborah Harris and was pronounced dead on arrival.  The cause of death was blunt trauma to the head."

<u>Negotiated Plea</u>:  There was no negotiated plea as the defendant was convicted by jury October 15, 1986 of 187 PC, second degree, with use of dangerous weapon and great bodily injury, and four prior felonies, according to the attached District Attorney's Conviction Activity sheet.

<u>District Attorney's Statement</u>:  The District Attorney's letter has not been received as of January 7, 1987.

<u>Victim Notification</u>:  The District Attorney's holding order summary did not include a current address.  In the undersigned's letter to the Court November 12, 1986, the undersigned requested the District Attorney's Office or the Public Defender's Office provide a current copy of the police report and current address of the victim.  The Victim/Witness Program was contacted several times and did not respond.  The police report was not received until January 7, 1987, courtesy of the Public Defender's Office.  Only initial homicide report received indicating victim's mother last resided at the address on the police report at 922 E Street, Oakland.  The police report was received too late to contact or trace the victim's mother.  Presumably she has been in contact with the District Attorney Office.

<u>Defendant's Statement</u>:  The defendant declined to be interviewed regarding the offense. He stated when contacted at the North County Jail, Oakland, November 6, 1986, that he did not wish to be interviewed regarding the facts of the case or his relationship with the victim's mother or any related materials since he planned to appeal.

<u>Defense Attorney's Statement</u>:  The defendant is representing himself in the instant matter. However, previously he used the services of the Public Defender's Office.  The Public Defender who is providing consultation with the defendant submitted the attached three-page letter.

<u>Time in Custody</u>:  The defendant was arrested June 19, 1984 and has been in custody to date, for a total of 886 days credit for time served in Docket No. 80451 as of January 9, 1987.

-3-

SOCIAL FACTORS

(Part of the following information is extracted from earlier court reports.)

Family Background:  The defendant is the third of seven children born of the marriage of Abe Williams and the former Josie Byrd.  He has spent most of his life in California, most of it in the Oakland area.  His parents were separated in 1957, he states that the cause was "because my father was a very cool man."  The father retired in 1964 after a career in the Army.  He is currently a hospital administrator in Chicago, Illinois. The mother has had a history of mental illness and has spent seven years in Napa State Hospital and was discharged in 1964.  She now lives in Kansas and the defendant has had no recent contact with her.  The defendant joined the Job Corps studying electronics for a period of six months, after which he came to live with an aunt in the Oakland area. The defendant explained that after an arrest for armed robbery as a juvenile, he was sent to live with his stepbrother in Washington, D.C., after which time he came back to the Oakland area and has lived around here ever since.

He states that after his recent release from CRC, he lived at the halfway house operated by Allied Fellowship at East 19th and 10th Avenue in Oakland.  He had been there approximately three weeks when he was arrested in the present offense.  He states that he urged the authorities in charge of his parole to allow him to live in some other community other than Oakland because he has so many drug-oriented associates in this area that he cannot seem to keep away from them.  However, because he apparently had no resources in any other area, he was paroled to the halfway house in Oakland.

Educational History:  School documents indicate that the defendant entered Berkeley High School in September of 1966 and left in January of 1967.  He earned ten credits although he was enrolled in five different courses.  He failed three out of the five.  His grade point average was 2.0.  He left Berkeley High School when he was committed to the California Youth Authority.  The Defense Attorney's letter attached indicates the defendant received a GED while serving prison time and completed approximately one year of college credits while incarcerated in the state prison system.

Employment History:  The defendant states that since his release on parole he had been involved in setting up a consulting business and had documents in his possession at the jail, not available to the undersigned, indicating that he had been involved in a company, Trans International Credit Corporation for a year and one-half with a Berkeley address at 1644 San Pablo Avenue, Suite 8.  He had also been involved in a franchise operation from Delaware, called H&W Credit Consultants.   The defendant states that he was assisting persons with criminal records or other financial difficulties in securing credit, had taken a home study course and received a mail order franchise.  The defendant indicated that it was providing him with sufficient funds to support himself and occasionally he hired temporary workers to assist him.  He apparently has continued some of his business activities while incarcerated.  Previous probation reports indicated his employment history prior to his last prison sentence as follows: "The defendant's last reported employment was with the Beverly Metal Polishing Shop on Market Street in Oakland where he worked as a metal polisher earning $150 per week for a period of five months ending in 1975 when that company went out of business.  He has worked for short periods of time for various employers in the Bay Area, none for more than one or two weeks.  The previous reports state: 'He indicates that he last worked for a business named U.S.S. Acting Company and Cultural Organization on East 14th Street in Oakland for two months during April and May of 1975 as a business manager.  This employment could not be verified due to the fact that the business is no longer in existence.'"

Marital History:  The defendant married Patricia Shipman in 1970 and separated in 1973. They have no children, although she had an adopted son by a previous marriage.  The defendant fathered a child 12 years ago by Linda Brown, who now resides in Fairfield, is married and has the child in her custody.  The defendant states he never provided child support since she married and has several other children.  He believes his daughter is age 12 and does not maintain contact.  The defendant was residing after his release on parole with a Shirley Rivera, a 43-year-old previous supervisor at the Carnation Milk Company who reportedly now resides in Atlanta with her three children.

Finances:  The defendant states that he has several hundred dollars in savings, but otherwise has no property or equity.  He lists no outstanding liabilities.  He does have a business name and apparently is transacting some business from the North County Jail at least through his last known or admitted business address at 1466 San Pablo Avenue, Suite 8, Berkeley, under the name of Trans International Credit Corporation which he reportedly closed as a business entity a year after his incarceration.  He also was involved in another partnership, but is unwilling to be specific regarding his business affairs. He does not own an automobile.  He lists no outstanding liabilities.

Mental Health, Alcohol and Drug History:  The defendant has a long history of heroin use and was committed to CRC.  At one time he admitted in 1978 that he had a $100 a day habit and had been unable to control his addiction.  However, currently the defendant states that he has tapered off on his use of heroin but had used cocaine upon his release from prison.

Medical History:  The defendant states he was using Valium fairly regularly, after being treated at Highland Hospital and up to the date of his trial.  He claims that he had not eaten for two months, had been seen by physicians at Highland and returned to the North County Jail.

The defendant previously had been treated by George Barrett at the Criminal Justice Mental Health Clinic on a regular basis during previous incarcerations due to depression.  He has not sought treatment during his current incarceration.

Prior Probation History:  The defendant has an extensive record of prior probation failures, having first been referred in November of 1974 for burglary and receiving stolen property. He was sentenced to the County Jail which was later modified and he was given credit for time served and released in April of 1975.  He was again referred in 1975 for burglary and placed on three years probation with six months in the county jail.  He was violated for a 470 PC forgery violation and served additional jail time after a denial of probation. In 1976 the defendant was arrested and charged with receiving stolen property and for forgery.  The defendant was placed on three years felony probation in Superior Court, July 2, 1976 and ordered to spend one year in the county jail.  He consistently failed to cooperate with the Probation Office.  He was sentenced to CRC November 17, 1977.  After his commitment to prison and release, the defendant was arrested in 1982 on a 476A PC charge, and appeared in Fremont Court April 2, 1982 and was sentenced to one year in jail and probation apparently terminated when he was released from custody.

Institutional and Parole History:  On November 17, 1977, the defendant was committed to CRC from Alameda County following his plea to a 470 PC forgery case, with several subsequent returns for court action.  He was committed from Alameda County to state prison December 7, 1978 following his conviction of a 470 PC forgery matter.  He received a sentence of one year, four months.  He was paroled July 6, 1979 to Contra Costa County. He was violated October 24, 1979 and returned to custody, and subsequently released

January 3, 1981 to Alameda County. He was violated December 1, 1982 and returned to custody to finish his term of December 13, 1978 and paroled March 11, 1983. He was returned on a parole violation for an additional 11550 H&S arrest, October 12, 1983 and was paroled January 21, 1984.  His last parole agent, Spencer Snow, provided information that the defendant had been paroled after his last violation and was discharged May 1, 1986. He did a year additional time in custody on the last violation, and had been violated due to being a parolee-at-large namely moving without giving a forwarding address or reporting to the parole agent. After his last parole, the defendant apparently moved several times according to the parole agent, and was living with at least two other female companions. His tests were clean although he had a history of heroin use, apparently the tests indicated he was no longer dependent on heroin. The parole agent was unaware of whether the defendant was using cocaine. He recalled the defendant had placed some art works in an East Oakladn shop for re-sale, but did not recall the defendant discussing any business ventures.

<u>Character References</u>: The defendant states he has had an aunt and uncle visit on a regular basis but did not provide any specific character references for the undersigned to contact.

<u>Restitution and Fines</u>: The defendant is subject to the $100 minimum restitution fine requirement. Since The Victim/Witness Program did not respond regarding any restitution request, and since the undersigned does not have the victim's mother's current address, it is unclear whether or not the victim's mother submitted a restitution request either to the District Attorney's Office or through the State Victim Compensation Fund.

<div align="center">SENTENCING FACTORS</div>

<u>Rule 414:  Criteria Affecting Probation</u>:

(a)        The defendant does not appear eligible for probation.

(b)        The likelihood that if not incarcerated, the defendant would be a danger to others.

(c)(1)     The nature and circumstances of the offense.

(c)(2)     The vulnerability of the victim and degree of harm to the victim, causing death.

(c)(3)     The defendant used a weapon.

(c)(4)     The defendant inflicted bodily injury.

(d)(1)     The defendant has an extensive record of prior criminal conduct resulting in prison commitments and parole violations.

(d)(6)     The defendant is in danger of addiction to or abuse of narcotics or dangerous drugs.

(d)(9)     The defendant expresses no remorse.

<u>Rule 416:  Criteria Affecting Probation In Unusual Cases</u>:  Not applicable.

**Rule 421:   Circumstances In Aggravation:**

(a)(1).    The offense involved great bodily harm resulting in death.

(b)(2)    The defendant's prior convictions as an adult are numerous and of increasing
          seriousness.

(b)(3)    The defendant has served prior prison terms.

(b)(5)    The defendant's prior performance on parole was unsatisfactory resulting in
          numerous violations.

**Rule 423:   Circumstances In Mitigation:**   The undersigned finds no circumstances in mitigatio

**Rule 425:   Criteria Affecting Concurrent or Consecutive Sentencing:**   Not applicable.

## EVALUATION

The defendant, now age 36, was convicted by jury trial of violation of 187 PC, second
degree, with the use of a weapon and great bodily injury, with four prior felonies.
The District Attorney submitted a Conviction Activity Sheet and a holding order summary,
but no additional letters or materials were received.  The Defense Attorney in the first
jury trial and acting as a consultant to the defendant in the second trial, has submitted
the attached letter.  The initial police report was received by the undersigned deputy
on January 7, 1987 courtesy of the Public Defender's Office.

The defendant was interviewed in November, 1986 and declined to discuss details relating
to the offense or surrounding circumstances.  He was willing to discuss only some business
ventures that he had engaged in after his release from prison and was primarily focusing
on his own preparation of legal motions, anticipating a new trial.

In the absense of other relevant documents, the undersigned would recommend only that
the defendant be sentenced to the term deemed appropriate by the Court.  The defendant's
long criminal career and conviction on the instant offense is sufficient to preclude
probation.  He has a history of mental instability, has engaged in a criminal career
preceded by juvenile offenses, and has had a serious narcotic problem in the past prior
to his last commitment to prison.  However, his parole supervision record following his
least release was punctuated by several violations or return to prison.  He did have
difficulties communicating with the parole agent and there was some conflict regarding
a girlfriend with whom he had been living where he was asked to leave, and failed to
notify the parole agent as to his exact whereabouts.  The defendant apparently lives
by his own self-serving standards of conduct and the prognosis for any eventual rehabili-
tation is dubious.

## RECOMMENDATION

It is respectfully recommended that probation be denied.

Dated: January 8, 1987                    Respectfully submitted,
tae

                                          PAUL GREEN
                                          CHIEF PROBATION OFFICER
Reviewed by:


                                          By
Nathaniel Bates                              Jacqueline Townsend
Unit Supervisor                              Deputy Probation Officer III

I have read and considered
the foregoing report.


_____

JUDGE, SUPERIOR   COURT

— *230*

Ms. Jacqueline Townsend
Page 2
October 28, 1986

I recommend that the punishment for those three enhance-
ments be stricken pursuant to Penal Code section 1385 and
California Rule of Court 445.

There are several reasons for this. The district attorney
conceded that in this case there was no intent to kill and no
express malice. Moreover, the evidence at trial showed that
Mr. Williams gave first aid to the victim and took her to the
hospital. The courts have expressly held that this is a
circumstance in mitigation.

Moreover, although technically a belt or stick can qualify
as a deadly or dangerous weapon, neither is normally considered
to be such; they are not in the category of a dagger, for
example. (Incidentally, the finding of the jury, that Mr.
Williams used a belt or stick, is ambiguous and may violate the
doctrine of election.)

Further: the evidence suggests, and I believe, that the
mother of the victim, Debra Harris, was primarily or solely
responsible for the death of her child. The probation records
of your office show Debra Harris to have a reputation for
violent, severe, unprovoked attacks upon people, both upon her
fellow inmates and upon counselling and probation personnel,
while evidence in this case suggests that she battered the
victim over the last year of the child's life. I believe she
dealt all or most of the blows that caused her child's death.
I believe that the events in this case are part of the reason
her other child was taken from her and placed in a foster home.

Until the events of this case, there was never any indi-
cation of violence in Mr. Williams' behavior or disposition.
He helped one of his aunts in child daycare, and I'm told he
was always caring and gentle with those children. The mother
of his own child told the police he never abused children.

It cannot be denied that the victim in this case was a
child, thus vulnerable and placed in a vulnerable position.
This is not, however, a factor in aggravation in this case,
because it was exactly that fact which the prosecution success-
fully used in preventing an instruction on, and a possible
verdict for, involuntary manslaughter.

Mr. Williams has a past history of theft and heroin use, as
your records will show and as was brought out pretty thoroughly
in court. His parole officer, Mr. Spencer Snow, and Officer
Ian Haney, Oakland Police Department, told me they believe

Ms. Jacqueline Townsend
Page 3                                                    —    231
October 28, 1986

heroin addiction is what ruined Mr. Williams' life up till
now. I think so, too. Mr. Williams' uncle, Mr. Baird, told me
the family always thought Mr. Williams had a good mind and
could have made something of himself -- and done something
useful -- if it were not for heroin. I think so, too.

And I think it is still a strong possibility that Mr.
Williams can be useful to himself and to society. He is going
to have to serve a long prison sentence. But I believe
strongly that he can turn his life around. He wants to. In
prison before, he got his GED and about a year of college,
through correspondence courses. So he doesn't just twiddle his
thumbs there. Although there is some sort of policy decision
that punishment rather than rehabilitation is the primary pur-
pose of sentencing these days, that policy decision is as
ephemeral as many other such decisions made over the years, and
it should not in individual cases blind us to the possibilities
in a human life.

In sum: I am asking that sentence be stricken or stayed on
the three enhancements. There are good solid reasons for doing
so. For second degree murder, there is already only an aggra-
vated sentence possible: 15 years to life. In other juris-
dictions, and in California in the past, mitigated sentences on
second degree murder are and were possible. Not now in Cali-
fornia. Thus, in asking that the enhancements be stricken or
stayed, I do not believe I am asking for mitigation; I am
merely asking for no further aggravation than is already
present.

                              Yours truly,

                              JAMES R. JENNER
                              PUBLIC DEFENDER

                              Scott Spear
                              Scott Spear
                              Assistant Public Defender

SS:mtp

# EXHIBIT "B"

# EXHIBIT "C"

69

1              **CALIFORNIA BOARD OF PAROLE HEARINGS**

2                   **D E C I S I O N**

3      **DEPUTY COMMISSIONER WOLF:**  We're on the record.

4      **PRESIDING COMMISSIONER BRYSON:**  And we've

5 reconvened for a decision in the matter of Abe

6 Williams.  All parties have returned to the room.  The

7 time is 10:45.  Sir, the panel reviewed all

8 information received from the public and from you and

9 relied on the following circumstances in concluding

10 that you are not yet suitable for parole and would

11 pose an unreasonable risk of danger to society or a

12 threat to public safety if released from prison.  This

13 offense was carried out in an especially cruel and

14 callous manner.  The victim, Tequila Hawkins, a three-

15 year old female was particularly vulnerable in that

16 she was a very young child, totally dependent upon

17 adults for her livelihood, and you enjoyed a special

18 relationship of trust with her as you lived with her

19 mother and her.  This offense was carried out in a

20 dispassionate manner.  On May 24th of 1984 between 0600

21 and 2355, you were in the 922 East Street apartment

22 with the victim and her mother, Deborah Harris.  You

23 tied the victim's hands to one door, her feet to

24 another door, and beat her until she lost

25 consciousness, evidently with a belt.  This victim was

26 abused, mutilated during this offense, and she was

27 **ABE WILLIAMS    D-48163   DECISION PAGE 1    11/29/06**

70

1    killed.  You do have an unstable social history.  You
2    also have a long history of violence, of assaults,
3    prior criminality, and an escalating pattern of
4    criminal conduct.  You've failed society's previous
5    attempts to correct your criminality.  And you were
6    involved, by your own account, excessively with drugs
7    for approximately a decade prior to the commitment
8    offense.  You were heavily involved with cocaine.
9    Most especially, you had an admitted $100 a day drug
10   habit, which you were maintaining by committing
11   crimes; that you failed society's attempts to correct
12   your criminality in terms of adult probation, adult
13   parole, and commitments to prison, as well as county
14   jail.  As to your institutional behavior, you have
15   programmed commendably.  Currently, a Law Library
16   clerk, you have served in numerous other positions
17   within the institution, many clerking positions,
18   porter, yard crew.  You have performed in college
19   studies, are a paralegal, have even done some
20   rudimentary studies which you are to be commended for,
21   been an educational clerk, and you have completed
22   office services technician vocation in 2002, also
23   becoming a teacher's assistant, computer applications.
24   You also were a (indiscernible) formerly, and
25   completed certification in that.  You are a machinist
26   and you've also served in computer repair.  You have
27   **ABE WILLIAMS    D-48163  DECISION PAGE 2    11/29/06**

1   many laudatory chronos in your file.  And up until and
2   including in parts of 2004, you have been engaged in
3   self-help programs, including A.A., N.A., arts in
4   corrections, literacy program, journaling, interactive
5   journaling, and non-violent conflict resolution and
6   anger management and many other self-help courses.  As
7   to your misconduct, you have seven 115s on your
8   record, and some involving narcotics, and one
9   involving fighting.  Your most recent 128(a) was in
10  2006, refusal to stand for count, but you've explained
11  that to this Board.  As to the psychological report
12  dated February 18 of 2005 by Dr. Frankie Weber,
13  basically Dr. Weber does not support your parole.  He
14  assigns you or assesses you with low to moderate risk
15  for violence, and a global assessment of functioning
16  of 75.  As to your parole plans, you have not
17  presented documented parole plans as you have
18  acknowledged to this panel today.  And, in fact, in
19  referencing the 2004 transcript, the panel at that
20  time did make recommendations for you, and perhaps,
21  Commissioner, I would like to address that.

22      **DEPUTY COMMISSIONER WOLF:**  We recommend that you
23  continue your self-help, educational and vocational
24  programs.  And my final comment to you at the last
25  hearing was that you have a solid job offer the next
26  time you come to the hearing.

27  **ABE WILLIAMS   D-48163  DECISION PAGE 3   11/29/06**

72

1           **INMATE WILLIAMS:**  Yes.

2           **PRESIDING COMMISSIONER BRYSON:**  And as to the

3     2005 -- the 2005 document, there was no hearing in

4     2005.  That was a stipulation in 2005, which is on

5     your motion to request time.  And, in fact, the

6     stipulation itself in which you were granted a one-

7     year denial, it was to obtain support letters, a job

8     offer letter, support letter from the victim's

9     relatives, and to resolve legal issues.  So you were

10    granted a one-year postponement on your own motion.

11    The only reason in the form, as your attorney

12    referenced, doesn't make any recommendations is that,

13    quite often, when there is stipulations are requested,

14    there is no complete review and hearing, as there

15    certainly was not in this case.  And therefore, the

16    signatures -- signators in this case -- I can read

17    Garner Easter.  I don't know who the chair -- the

18    panel chair was that actually made the other

19    signature, but there was a panel signature.  They

20    would not have reviewed your file, and it would not be

21    appropriate for them to therefore make recommendations

22    at the time of that grant of stipulation.  So

23    basically you know I'm sure, because this is your

24    sixth subsequent hearing, you know what is required

25    and what the Boards are looking for, what the panels

26    are looking for in determining your suitability.  As

27    **ABE WILLIAMS    D-48163  DECISION PAGE 4    11/29/06**

73

1  to Penal Code 3042 responses, responses indicate

2  opposition to a finding of parole suitability,

3  specifically by the District Attorney of Alameda

4  County.  In a separate decision, the hearing panel

5  finds it is not reasonable to grant the parole date --

6  or to expect parole to be granted at a hearing for the

7  next two years, and the reasons for this are as

8  follows:  This panel believes that this crime far

9  exceeded the minimum necessary to sustain the

10 conviction.  This offense was the offense was carried

11 out in an especially cruel and callous manner.  It's

12 hard to imagine the pain and fear that that little

13 girl went through.  She was so vulnerable.  She was

14 very young, a three-year old child.  This is Tequila

15 Hawkins.  She was totally dependent upon you and her

16 mother for her livelihood and for her life.  And she

17 enjoyed a special relationship of trust with you as

18 she lived -- as you were living with her and her

19 mother at the time.  This offense was carried out in a

20 The offense was carried out in a dispassionate and

21 calculated -- or dispassionate.  Strike the calculated

22 manner in that on May 24th of 1984, between six a.m.

23 and 2355, you were in the 922 East Street apartment

24 with the victim and her mother, Deborah Harris.  You

25 tied the victim's hands to one door, her feet to

26 another door, and beat her until she lost

27 **ABE WILLIAMS   D-48163 DECISION PAGE 5   11/29/06**

74

1    consciousness, evidently with a belt.   That was

2    declared to be the weapon.   This victim was abused.

3    She was mutilated during this offense.   The offense

4    was carried out in a manner demonstrating

5    exceptionally callous disregard for human suffering.

6    You had a clear opportunity to cease, but you

7    continued.   This child was taken to Merritt Hospital

8    Emergency Room in Oakland by Deborah Harris and

9    pronounced dead on arrival.   The cause of death was

10    blunt trauma to the head.   The motive for this crime

11    was simply inexplicable, and in fact, you were

12    absconding from the law.   You were under the influence

13    at the time of the criminal offense.   So for that

14    reason, for the extreme gravity of this crime and for

15    basically the need to improve your insight into this

16    crime, which is important for you to understand the

17    magnitude and nature of the criminal offense, and for

18    you to firm up your residential and transitional

19    parole plans, and reengage in self-help, which has

20    been minimal to none since 2004, we're denying you

21    parole for two years and placing you on the 2008

22    calendar for your next subsequent hearing.   The Board

23    recommends no more 115s or 128(a)s, get self-help.

24    That would also include A.A., N.A. as available.

25    Advance your trades or perishable skills.   Correct

26    positive chronos, and advance your education as it is

27    **ABE WILLIAMS    D-48163   DECISION PAGE 6    11/29/06**

75

 1    available for you to do so, perhaps by distance

 2    learning.  Also, we are requesting a new psychological

 3    evaluation per BPT Form 1000(a) prior to your next

 4    hearing.  And, sir, I wish you good luck.  And,

 5    Commissioner, do you have anything further?

 6        **DEPUTY COMMISSIONER WOLF:**  Nothing further.

 7        **PRESIDING COMMISSIONER BRYSON:**  All right.  That

 8    concludes this hearing.  The time is --

 9        **ATTORNEY GUNING:**  Can I ask something?  Are you

10    asking him to admit to the drugs?  You raised the

11    issue of insight when asked to admit (indiscernible)

12    have insights.  I guess my question is are you asking

13    him to admit to it?

14        **PRESIDING COMMISSIONER BRYSON:**  I'm asking him

15    to gain insight into his entire criminal history.

16        **ATTORNEY GUNING:**  Okay.

17        **INMATE WILLIAMS:**  Can I ask you one question

18    before I go?  I have never heard the word mutilation

19    used in this case ever before, ever.  This is brand

20    new.

21        **ATTORNEY GUNING:**  Are you asking me the

22    question?

23        **INMATE WILLIAMS:**  Yeah.  Anybody.  I've never

24    heard that before.  It was like when she was talking,

25    she talked about and the child was abused.  I didn't

26    understand what you -- but mutilation, I don't

27    **ABE WILLIAMS    D-48163   DECISION PAGE 7   11/29/06**

76

1    understand where that's coming from.  It's like it's
2    part of this.  The crime is being jacked up into, you
3    know, beyond what it is.  Believe me, I understand.
4    I'm not trying to minimize anything and I understand
5    it must have been in the record and all that stuff.
6    But I'm telling you, I didn't do that.  But anyway --
7    but mutilation, that's a specific type of act and
8    that's not -- that's not in the trial transcript.
9    That wasn't part of the trial.  That's not in the
10   police reports.
11        **PRESIDING COMMISSIONER BRYSON:**  Sir?
12        **INMATE WILLIAMS:**  That's not in the death
13   certificate.
14        **PRESIDING COMMISSIONER BRYSON:**  Sir, you can
15   take that up with the court.  And basically --
16        **INMATE WILLIAMS:**  Yes, ma'am.
17        **PRESIDING COMMISSIONER BRYSON:**  -- the panel's
18   position on it is that if you beat someone to death,
19   and this little girl in particular -- and we have
20   looked at the photo -- that in fact, if you beat her
21   to death with a belt, that that constitutes
22   mutilation.
23        **INMATE WILLIAMS:**  Okay.
24        **PRESIDING COMMISSIONER BRYSON:**  And that's the
25   premise on which that was stated.
26        **INMATE WILLIAMS:**  Okay.
27   **ABE WILLIAMS   D-48163  DECISION PAGE 8   11/29/06**

77

1          **PRESIDING COMMISSIONER BRYSON:**  And that

2    concludes the hearing.   The time is now 10:56.

3                            --o0o--

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23    **PAROLE DENIED TWO YEARS**

24    **THIS DATE WILL BE FINAL ON:** _____ **MAR 2 9 2007** _____

25    **YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT**

26    **DATE, THE DECISION IS MODIFIED.**

27    **ABE WILLIAMS   D-48163   DECISION PAGE 9   11/29/06**

78

## CERTIFICATE AND DECLARATION

## OF TRANSCRIBER

I, TAMA BRISBANE, the owner of House of
Scribes, have designated ROBERTINE DONALDSON, a duly
designated transcriber with House of Scribes residing
in the State of Florida, to prepare the foregoing
transcript. With my signature I do hereby declare and
certify, under penalty of perjury, that I have
directed her to transcribe tape(s) that total one in
number and cover a total of 80 pages. The recording
was duly recorded at CALIFORNIA DEPARTMENT OF
CORRECTIONS, MILL CREEK STATE PRISON, and the
foregoing pages constitute a true, complete and
accurate transcription of the aforementioned tape to
the best of her ability.

I hereby certify that House of Scribes and
its designated transcribers are disinterested parties
in the above-captioned matter and have no interest in
the outcome of the proceeding.

Dated February 1, 2007 in Stockton,
California.

Tama Brisbane

Owner, House of Scribes

# EXHIBIT "D

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS


In the matter of the Sixth)
Subsequent Parole         )
Consideration Hearing of: )    CDC Number D-48163
                          )
ABE WILLIAMS              )
                          )
_____)


# COPY
# INMATE

MULE CREEK STATE PRISON

IONE, CALIFORNIA

November 29, 2006

8:44 A.M.


PANEL PRESENT:

SANDRA BRYSON, Presiding Commissioner
CHUCK WOLF, Deputy Commissioner


OTHERS PRESENT:

ABE WILLIAMS, Inmate
MIKE GUNING, Attorney for Inmate
JILL KLINGE, Deputy District Attorney
CORRECTION OFFICERS UNIDENTIFIED


CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____  No     See Review of Hearing
_____  Yes    Transcript Memorandum


**Robertine Donaldson**          **House of Scribes**

ii

INDEX

|  | PAGE |
|---|---|
| Proceedings | 1 |
| Case Factors | 13 |
| Pre-Commitment Factors | 15 |
| Post-Commitment Factors | 24 |
| Parole Plans | 47 |
| Closing Statements | 54 |
| Decision | 69 |
| Adjournment | 77 |
| Transcriber Certification | 78 |

1

1          P R O C E E D I N G S

2          **DEPUTY COMMISSIONER WOLF:**  Okay.  We're on the

3     record.

4          **PRESIDING COMMISSIONER BRYSON:**  This is the

5     Sixth Subsequent Parole Consideration Hearing for Abe

6     Williams, CDC Number D, David, 48163.  Today's date is

7     November 29th, 2006 and the time is 8:44. We're located

8     at Mill Creek State Prison.  The inmate was received

9     January 21st 1987 from Alameda County.  The life term

10    began January 21st, 1987 with a minimum eligible parole

11    date of September 19, 1996 in Case No. Alameda 80451,

12    charging in Count 1, controlling offense, Penal Code

13    187 murder in the second, with Penal Code 12022(b) use

14    of a deadly weapon, to wit, a belt.   Count 2, Penal

15    Code 667.5(b) enhancement for prior serious felonies

16    for which the inmate received a life term of 15 to

17    life, plus three years, or 18 years to life.  This

18    hearing is being recorded.  For the purpose of voice

19    identification, each of us will state our first and

20    last name, spelling the last name.  When it is your

21    turn, sir, after you spell your last name, please

22    state your CDC number.  I will start and then go to my

23    left.  Sandra Bryson, B-R-Y-S-O-N, Commissioner, Board

24    of Parole Hearings.

25         **DEPUTY COMMISSIONER WOLF:**  Chuck Wolf, W-O-L-F,

26    Deputy Commissioner.

27         **DEPUTY DISTRICT ATTORNEY KLINGE:**  Jill Klinge,

2

1    K-L-I-N-G-E, Deputy District Attorney, Alameda County.

2         **ATTORNEY GUNING:**  Excuse me.  Mike Guning, G-U-

3    N-I-N-G.  I'm the attorney for Mr. Williams.

4         **INMATE WILLIAMS:**  Abe Williams, Williams, W-I-L-

5    L-I-A-M-S.

6         **PRESIDING COMMISSIONER BRYSON:**  And your CDC

7    number, please.

8         **INMATE WILLIAMS:**  D-48163.

9         **PRESIDING COMMISSIONER BRYSON:**  Thank you.  We

10   have two Correctional Peace Officers in the room who

11   are here for security purposes.  Commissioner Wolf, is

12   there any confidential material in the file, and if

13   so, will it be used today?

14        **DEPUTY COMMISSIONER WOLF:**  None that we will be

15   using today.

16        **PRESIDING COMMISSIONER BRYSON:**  All right.  And

17   I'm passing the hearing checklist marked Exhibit 1 to

18   your attorney to ensure we're all proceeding with the

19   same set of documents.  And when you're ready,

20   counselor, do you have the documents?

21        **ATTORNEY GUNING:**  I have the documents.  Thank

22   you.

23        **PRESIDING COMMISSIONER BRYSON:**  And when you're

24   ready, Mrs. District Attorney, do you have the

25   documents?

26        **DEPUTY DISTRICT ATTORNEY KLINGE:**  I have the

27   documents, thank you.

3

1      **PRESIDING COMMISSIONER BRYSON:**  Thank you.  Are

2  there any additional documents to be submitted beyond

3  those you gave us at the start of the hearing?

4      **ATTORNEY GUNING:**  Not at this time.

5      **PRESIDING COMMISSIONER BRYSON:**  All right.

6      **DEPUTY COMMISSIONER WOLF:**  Do you have any self-

7  help documents you want us to see?

8      **ATTORNEY GUNING:**  New ones?

9      **DEPUTY COMMISSIONER WOLF:**  Yeah.

10      **ATTORNEY GUNING:**  No.

11      **DEPUTY COMMISSIONER WOLF:**  None since the last

12  hearing?

13      **ATTORNEY GUNING:**  No.

14      **PRESIDING COMMISSIONER BRYSON:**  Okay.  All

15  right.  Sir, I'd appreciate it if you would read the

16  documents at the table there in front of you.

17      **INMATE WILLIAMS:**  Read it aloud?

18      **PRESIDING COMMISSIONER BRYSON:**  Please.

19      **INMATE WILLIAMS:**  The Americans With

20  Disabilities Act, ADA, is a law to help people with

21  disabilities.  Disabilities are problems that make it

22  harder for some people to see, hear, breathe, talk,

23  walk, learn, think, work or take care of themselves

24  than it is for others.  Nobody is kept out of public

25  places or activities because of a disability.  If you

26  have a disability, you have the right to ask for help

27  to get ready for the BPT hearing, get to the hearing,

4

1    talk, read forms and papers and understand the hearing
2    process.  The BPT will look at what you asked for to
3    make sure that you have a disability that is covered
4    by the ADA, and that you have asked for the right kind
5    of help.  If you do not get help or if you don't think
6    you got the kind of help you need, ask for the BPT1074
7    grievance form.  You can also get help to fill it out.
8         **PRESIDING COMMISSIONER BRYSON:**  Thank you.  All
9    right, sir, the record reflects that on June 7th of
10   2006, you signed BPT Form 1073, the Reasonable
11   Accommodation Notice and Request in accordance with
12   the provisions of the Americans with Disabilities Act,
13   disability as defined under the ADA.  And you have a
14   reading level I see of -- it says -- I think it says
15   VA.  I'm not sure what that means.  But a total GPO of
16   12.9, which is quite high.  I notice you're wearing
17   glasses.
18        **INMATE WILLIAMS:**  Yes.
19        **PRESIDING COMMISSIONER BRYSON:**  Do they
20   accommodate you for reading and to help seeing?
21        **INMATE WILLIAMS:**  Yes, but I don't -- the
22   bifocal part is not very good.  They missed the
23   prescription on it, so it's a little hard straining.
24   Like even though these letters was big, it's hard for
25   me to see.
26        **PRESIDING COMMISSIONER BRYSON:**  Have you written
27   something up on this to try to get more -- better

5

1   glasses?

2       **INMATE WILLIAMS:**  Yeah.  I'm waiting for another

3   optometrist visit.  It takes a while.

4       **PRESIDING COMMISSIONER BRYSON:**  Oh, okay.  All

5   right.  Just so that's being handled.  And it doesn't

6   appear that you have any problem walking to this

7   hearing.

8       **INMATE WILLIAMS:**  No, ma'am.

9       **PRESIDING COMMISSIONER BRYSON:**  Is that correct?

10      **INMATE WILLIAMS:**  No, ma'am.

11      **PRESIDING COMMISSIONER BRYSON:**  And it doesn't

12  appear that you have any hearing difficulties.  Is

13  that correct?

14      **INMATE WILLIAMS:**  No, I don't.

15      **PRESIDING COMMISSIONER BRYSON:**  All right.  And

16  so is everything else on this form that you signed in

17  June, is that still correct?

18      **INMATE WILLIAMS:**  Yes, it is.

19      **PRESIDING COMMISSIONER BRYSON:**  All right.  Have

20  you ever included in the Triple CMS or OEP programs?

21      **INMATE WILLIAMS:**  No.

22      **PRESIDING COMMISSIONER BRYSON:**  All right.  Are

23  you now on any drugs or do you suffer from any

24  disability that you believe might prevent you from

25  participating in today's hearing?

26      **INMATE WILLIAMS:**  No.

27      **PRESIDING COMMISSIONER BRYSON:**  All right.

6

1    Counsel, do you concur?

2            **ATTORNEY GUNING:**  Yes, I do.

3            **PRESIDING COMMISSIONER BRYSON:**  All right.  This

4    hearing is being conducted pursuant to Penal Code

5    Sections 3041 and 3042, and the Rules and Regulations

6    of the Board of Parole Hearings governing Parole

7    Consideration Hearings for life inmates.  The purpose

8    of today's hearing is to consider your suitability for

9    parole.  In doing so, the panel will consider the

10   number and nature of the crimes for which you were

11   committed for, your prior criminal and social history,

12   and your behavior in programs since your commitment.

13   The panel has had the opportunity to review your

14   Central File.  You will be given the opportunity to

15   correct or clarify the record.  The panel will

16   consider your progress since your commitment, your

17   counselor's report, Psychological Report and any other

18   relevant information.  Any change in parole plans

19   should be brought to the panel's attention.  The panel

20   will reach a decision today and inform you whether or

21   not it finds you suitable for parole and the reasons

22   for its decision.  If you are found suitable for

23   parole, the length of your confinement will be

24   explained to you.  Nothing that happens here today

25   will change the findings of the court.  The panel is

26   not here to retry your case.  The panel is here for

27   the sole purpose of determining your suitability for

7

1    parole.  Do you understand?

2         **INMATE WILLIAMS:**  Yes.

3         **PRESIDING COMMISSIONER BRYSON:**  This hearing

4    will be conducted in three phases.  I will discuss

5    with you the crime for which you were committed, your

6    prior criminal and social history.  Commissioner Wolf

7    will discuss with you your progress since your

8    commitment, your counselor's report and your

9    psychological evaluation.  I will then discuss with

10   you your parole plans and any letters of support or

11   opposition that may be in the file.  Once that is

12   concluded, the panel and then the District Attorney

13   and then your attorney will be given the opportunity

14   to ask you questions.  Wuestions from the District

15   Attorney shall be asked through the chair, and you

16   will respond your answers to the panel.  Next the

17   District Attorney and then your attorney, and then you

18   will be given an opportunity to make a final statement

19   regarding your suitability for parole.  Your statement

20   should address why you feel you are suitable for

21   parole.  The panel will then recess, clear the room

22   and deliberate.  Once the deliberations are complete,

23   the panel will resume the hearing and announce its

24   decision.  The California Code of Regulations states

25   that regardless of time served, a life inmate shall be

26   found unsuitable for and denied parole if, in the

27   judgment of the panel, the inmate would pose an

8

1    unreasonable risk of danger to society if released

2    from prison.  You have certain rights.  Those rights

3    include the right to a timely notice of hearing.  Did

4    you receive timely notice of this hearing?

5         INMATE WILLIAMS:  Yes, I did.

6         PRESIDING COMMISSIONER BRYSON:  Okay.  The right

7    to review your Central File, and I notice that in July

8    19th of 2006 and then again in October of this year,

9    you were given an opportunity to review your Central

10   File and you declined.  Is that true?

11        INMATE WILLIAMS:  Yes, it is.

12        PRESIDING COMMISSIONER BRYSON:  Why is that?

13        INMATE WILLIAMS:  Well, I felt it wasn't any

14   really good reason to review it because pretty much

15   everything was the same as it had been the last time,

16   so --

17        PRESIDING COMMISSIONER BRYSON:  All right.  I'll

18   just give you the little speech I give all the inmates

19   and that is it's always a good idea.  It's all about

20   you.  It's really a good idea to review your Central

21   File, even if you think you know what's in there,

22   because it's paperwork and it gets moved around.  And

23   so you want to make sure that things are in there that

24   are supposed to be.  And if there's something that

25   needs to be removed, some status has changed and

26   something needs to be taken out, or something needs to

27   be added, you have an original copy.  You think

9

1   there's a copy in there but maybe it got lost.  You

2   need to kind of right that.  That's your

3   responsibility.  And we can't make any changes to

4   errors that you can from your perspective, so all

5   right.  Just a recommendation in that regard.  You

6   also have the right to be heard by an impartial panel.

7   Do you have any evidence that this panel before you

8   today cannot be impartial on your behalf?

9         **INMATE WILLIAMS:**  I have no information either

10  way to make that kind of judgment.  I'll just assume

11  and take you at your word.

12        **PRESIDING COMMISSIONER BRYSON:**  You will receive

13  a copy of the panel's written tentative decision

14  today.  That decision will become effective within 120

15  days.  It is also subject to review by the Governor.

16  A copy of the tentative decision and a copy of the

17  transcript will be sent to you.  The Board has

18  eliminated its appeal process.  If you have -- if you

19  disagree with anything in today's hearing, you have a

20  right to go directly to the court.  You are not

21  required to admit your offense or to discuss your

22  offense if you do not wish to do so.  However, this

23  panel does accept as true the findings of the court,

24  and you are invited to discuss the facts and

25  circumstances of the offense if you desire.  The Board

26  will review and consider any prior statements you have

27  made regarding the offense in determining your

10

1    suitability for parole.  So basically it's pretty

2    simple.  Just tell the truth.

3         **INMATE WILLIAMS:**  Yeah.  Okay.

4         **PRESIDING COMMISSIONER BRYSON:**  All right.

5    Counsel, are there any preliminary objections?

6         **ATTORNEY GUNING:**  Excuse me.  Mr. Williams just

7    has one objection.  The objection is to the

8    jurisdiction of this panel pursuant to Penal Code

9    Section 190.  If you would like to discuss that issue

10   with Mr. Williams, he's willing to do so at this time.

11        **PRESIDING COMMISSIONER BRYSON:**  And what is

12   that, sir?

13        **INMATE WILLIAMS:**  It's simply about Penal Code -

14   - pursuant to Penal Code 190.  Penal Code 190 requires

15   that all (indiscernible) apply the alternative

16   sentencing law or credit reduction scheme to reduce

17   the minimum terms, the one (indiscernible) not the

18   life terms.  And all sentences reduced by that scheme

19   requires that you parole the person at the expiration

20   of the term being reduced by those credits, which is

21   the 15 year minimum term.  And if you look at Section

22   2932, which is part of that DSL scheme, it says we

23   all, everybody receiving 2931 credits, which we did,

24   have to be told of their anticipated time credit

25   release date.  Penal Code 3000, which is called the

26   Controlling Parole Statute, in California, requires

27   and mandates, and it says it applies to both DSL and

11

1    determinate -- determinate and indeterminate

2    prisoners.  I'm an indeterminate prisoner.  It applies

3    to all of us.  And it says specifically under there,

4    notwithstanding any provisions of 2940, a sequence

5    which is Penal Code statutes, that the power of the

6    Board to grant paroles, it says notwithstanding, which

7    means it's controlling over that.  It applies -- it

8    says anyone receiving 30 -- 2931 credits must be

9    paroled at the expiration of the term in which they

10   receive those credits.  That's 3000, Section A,

11   subsection A.  And it says specifically

12   notwithstanding any provisions or powers of the Board,

13   this must apply.  And California has not been applying

14   that law.  I have a paralegal degree.  But I'm not

15   saying I know everything, but this is the consensus

16   that I have come to.  After years of a lot of studying

17   on that law, I have that in the courts now.  And I was

18   trying to get this resolved before I came here this

19   time.  That's why I waived my hearing the last time.

20   It has not been resolved yet.  So I want that.  It

21   just, you know, doesn't have nothing to do with you

22   all, but if I -- I'll probably, you know, file a

23   petition in the court.  And so I wanted that objection

24   on the record.

25        **PRESIDING COMMISSIONER BRYSON:**  And so we

26   permitted you to make that position on the record.  We

27   respect your position.

12

1        **INMATE WILLIAMS:**  Thank you.

2        **PRESIDING COMMISSIONER BRYSON:**  But you're

3    right.  It doesn't apply to what we're doing here

4    today.  And in fact, you're taking it up in the proper

5    venue, which is the courts.

6        **ATTORNEY GUNING:**  Do you know where it is in the

7    court?

8        **INMATE WILLIAMS:**  Right now, in the federal

9    courts, and (indiscernible).

10        **PRESIDING COMMISSIONER BRYSON:**  Is this with the

11    Ninth?

12        **INMATE WILLIAMS:**  Yes.

13        **PRESIDING COMMISSIONER BRYSON:**  Okay.  Will the

14    inmate be speaking with the panel today?

15        **ATTORNEY GUNING:**  As you know, every year in his

16    file, he's always denied his involvement in this

17    offense, so he's not talking about the facts of the

18    offense.  But everything else you want to talk about,

19    he's more than happy to discuss with you.

20        **PRESIDING COMMISSIONER BRYSON:**  All right.  Sir,

21    well, then I need to swear you in if you're going to

22    speak at all.

23        **INMATE WILLIAMS:**  Yes.

24        **PRESIDING COMMISSIONER BRYSON:**  Okay.  Would you

25    raise your right hand, please.  Do you solemnly swear

26    that the testimony you give at this hearing will be

27    the truth, the whole truth, and nothing but the truth?

13

1       **INMATE WILLIAMS:**  Yes.

2       **PRESIDING COMMISSIONER BRYSON:**  Thank you.

3    Okay.  I will read the facts of the crime then into

4    the record.  Of course, in the Probation Officer's

5    Report, it's presented in the summary of the crime and

6    the correct Board Report of October of 2006 by N.

7    Bennett, B-E-N-N-E-T-T, Correctional Counselor I.  Per

8    the POR:

9              "On May 24, 1984, between the hours of six

10             a.m. and 11:55 p.m., Williams was in the 922 E

11             Street apartment with the victim, Tequila

12             Hawkins, H-A-W-I-K -- let's try again -- H-A-W-

13             K-I-N-S, age three, and the victim's mother,

14             Deborah Harris, common spelling.  Williams tied

15             the victim's hands to one door and feet to

16             another door and beat her until she lost

17             consciousness.  The child was taken to Merritt

18             Hospital Emergency Room by Deborah Harris, and

19             was pronounced dead on arrival.  The cause of

20             death was blunt trauma to the head."

21       And as to the prisoner's version, same report,

22    number two.  Williams read his version as documented

23    in a September 2001 Subsequent Parole Consideration

24    Report.  He indicated it was still valid and did not

25    wish to change his statement.  That report reflects

26    the following:

27             "Williams maintains his innocence.  He

14

1       feels bad and remorseful in that he could have
2       prevented the death of Tequila.  Williams feels
3       that if he had reported the abuse to the
4       authorities, the victim would still be alive.
5       At the time, Williams states that he was selfish
6       by only thinking of himself and his drug habit.
7       Williams states that he had lived with the
8       victim and her mother, Deborah Harris, for about
9       two months, during which time he had noticed the
10      victim with bruises and signs of abuse by
11      Harris.  Twice he intervened, but for the most
12      part, stayed out of it.  Williams' main concern
13      was to have a place to stay, female
14      companionship, and maintaining his drug habit.
15      Looking back at what took place on May 27th,
16      1984, Williams feels that he should have reacted
17      differently when he walked into the apartment,
18      saw Harris crying and Tequila lying on the bed
19      motionless.  Williams claimed even though he
20      administered CPR and drove Harris and the victim
21      to the hospital, things would have turned out
22      differently had he not been absconding from the
23      law and under the influence of heroin."
24          And as to this inmate's prior criminal history,
25      I will incorporate by reference his criminal history
26      from the California Identification Investigation
27      Bureau, called the CLMI rap sheet, of his criminal

1   history.  The juvenile records are apparently sealed.

2   And we note that as reflected in the sentencing on the

3   commitment offense, this inmate has a significant

4   history of adult arrests and convictions.  Noting that

5   -- sir, I believe you are -- is it correct you're a

6   third term in prison.  Is that correct?

7        **INMATE WILLIAMS:**  Yes.

8        **PRESIDING COMMISSIONER BRYSON:**  Okay.  Basically

9   since November of 2004 to the commitment offense, ten

10  years later, so basically from the age of

11  approximately 24 to approximately 34, you were doing a

12  number of crimes.  Is that correct?

13       **INMATE WILLIAMS:**  Yes.  Non-violent crimes.

14       **PRESIDING COMMISSIONER BRYSON:**  Nonetheless,

15  they were felonies.  They were burglaries.  You

16  violated probation, violated parole.  Passing bad

17  checks, several parole violations, health and safety

18  code violations, drugs.  Were you -- what's your drug

19  history?

20       **INMATE WILLIAMS:**  I've got an extensive drug

21  history, and most of those crimes are related to drug

22  history.  Those burglaries are not physical

23  burglaries.  Those are burglaries with checks.  That's

24  what I primarily did all those years was involved in

25  check frauds and stuff like that.  And they was --

26  back in those days, in the mid-seventies, if you got

27  checks that was stolen from somewhere and they would

16

1    charge you with the burglary.  If they were taken in a
2    house burglary -- I used to buy checks off people and
3    then I would cash them and I would use them, you know,
4    running checks.  And that's mostly what the extent of
5    my crimes were.  I never had any violent crime.  And
6    that was all behind drugs.  I started using drugs in
7    1970 after a car accident.  I was in a car accident
8    and I got hooked on morphine in the hospital.  I was
9    in there two and a half months.  And I had some
10   serious injuries.  And I just came out and started
11   using drugs and heroin.  You know, I was in -- that
12   was it.

13        PRESIDING COMMISSIONER BRYSON:  Did you sell
14   drugs as well to keep your habit going?

15        INMATE WILLIAMS:  No.  That was one of the
16   reasons because I was selling drugs after there was
17   violence.  You can't sell drugs and not be violent.  I
18   wasn't about violence.  And before it was a good way
19   to get money.  I had my drug habit but stayed away
20   from that part of it.  So I stayed away from all that
21   stuff.

22        PRESIDING COMMISSIONER BRYSON:  Would you
23   explain how you did your forgeries?  You just said you
24   bought checks off people and then you sold them.  What
25   was that about?

26        INMATE WILLIAMS:  Well, I used to like -- what I
27   would do is I'd go down the street.  I know a lot of

17

 1    people, pimps and prostitutes.  And prostitutes rob

 2    people.  And I know a lot of guys.  And kind of when

 3    you're in that drug lifestyle, you get a name and

 4    people know what you do.  You know these people rob.

 5    These people do this.  These people prostitute and all

 6    this.  These people shoplift.  And you kind of float

 7    around.  And once you get into all this, people get

 8    checks and credit cards and stuff.  They come and they

 9    try to sell them all to the people.  Like when they

10    get all that, they take the cash and they --

11         **PRESIDING COMMISSIONER BRYSON:**  So basically

12    that person has done a robbery.

13         **INMATE WILLIAMS:**  Right.

14         **PRESIDING COMMISSIONER BRYSON:**  And then they --

15         **INMATE WILLIAMS:**  Right.

16         **PRESIDING COMMISSIONER BRYSON:**  -- pass the

17    check on to you?

18         **INMATE WILLIAMS:**  Right.

19         **PRESIDING COMMISSIONER BRYSON:**  So that -- does

20    that not implicate you in force and violence because

21    how do you know how these checks were obtained?

22         **INMATE WILLIAMS:**  Well, I never asked how the

23    checks was obtained.

24         **PRESIDING COMMISSIONER BRYSON:**  So that --

25         **INMATE WILLIAMS:**  I was just giving you an

26    example of how a lot of those things were obtained.

27         **PRESIDING COMMISSIONER BRYSON:**  I'm trying to

18

1    understand what goes on in your mind even now.  And

2    you're looking back on that and you're saying, well,

3    there was no force and violence because you rolled off

4    that part of the fact that these were obtained by --

5         **INMATE WILLIAMS:**  Yeah.

6         **PRESIDING COMMISSIONER BRYSON:**  -- force and

7    violence.  So you don't consider yourself having been

8    implicated in that process at all because you didn't -

9    - you weren't part of that?  You just bought the --

10        **INMATE WILLIAMS:**  Yeah.

11        **PRESIDING COMMISSIONER BRYSON:**  -- stolen

12   checks?  Is that right?

13        **INMATE WILLIAMS:**  Well, no, no.  That's not the

14   point I'm making at all.  The point I'm making is just

15   to answer your question straight up and down front.

16   And this may sound strange to you, but see, when

17   you're in that lifestyle and you're into a drug and

18   you take stuff, your way of thought is not the way we

19   think now.  And you never even think about collateral

20   consequences and all that stuff like that.  You never

21   even go through that thought, well, let me not buy

22   these checks because they may have come from a

23   robbery.  You don't even ask people.  The only thing

24   you ask them about is this in the paper?  How long

25   have you had it, because you want to have some sense

26   of how long this has been out.  Do you want to run and

27   cash checks that's been floating around a while

19

1   because your chances of getting arrested are

2   (indiscernible).  And that's the kind of process that

3   your mind go through.  You never really go through

4   that kind of critical thinking, like, you know, like

5   you're kind of getting into now.  So, you know.

6       **PRESIDING COMMISSIONER BRYSON:**  So how do you

7   look at them now?

8       **INMATE WILLIAMS:**  Oh, all different.  Sometimes

9   I, you know, think about some of the things I've done.

10   Not just the criminal things.  At my age and the

11   mindset I'm in now, I look at a lot of things and you

12   have --

13      **PRESIDING COMMISSIONER BRYSON:**  Specifically the

14   stolen check, credit card.  I'd really be interested

15   in how you view it now.

16      **INMATE WILLIAMS:**  It was wrong.

17      **PRESIDING COMMISSIONER BRYSON:**  I know, but

18   beyond that I mean what -- do you consider that you

19   were a part of the whole system that involved force

20   and violence, or do you still repeat -- do you deny

21   that?

22      **INMATE WILLIAMS:**  Yeah.  And from that

23   perspective, yes.  You know, just like a person, even

24   if you're a doctor in a war, you're part of a war,

25   right?  So, yeah.  From that perspective, yes.  I was

26   part of all that.  And I'm not trying to minimize

27   anything.  That wasn't my purpose to try and minimize

20

1    and say, "I'm not as bad as other people," or any kind

2    of thing.  I'm just trying to kind of answer the

3    question.  But, no.  No.  I take full responsibility

4    for all that stuff.  It was wrong.  I shouldn't have

5    been doing it.  I shouldn't have been involved in it

6    because one thing breeds another and it's all a part

7    of a big cesspool of stuff, you know.  And it's just

8    at the time, I was so deep in that lifestyle, so

9    involved in that, you don't have the type of thinking

10   that you have now -- that I have now.  So --

11       PRESIDING COMMISSIONER BRYSON:  Okay.  Going

12   back over your personal history, how would you

13   characterize your childhood?  We have what we have in

14   the Board packet which I'm sure you've read.  You've

15   got a copy of the Board packet.  Is that correct?

16       INMATE WILLIAMS:  Hm-mmm.  Yes.

17       PRESIDING COMMISSIONER BRYSON:  Okay.  And how

18   would you characterize your upbringing?  Was it a good

19   childhood, difficult?  What -- how would you -- or

20   talk about a specific --

21       INMATE WILLIAMS:  I believe it was fairly

22   normal.  I was raised in a military family so strict.

23   A lot of the things I thought as a child was on

24   account of fear.  Now I look back and see that I was

25   probably better off than most of my friends.  We lived

26   all over the country.  We saw a lot of different

27   things.  Almost everybody in my family were A

21

1    students.  All of my brothers and sisters mostly are

2    professionals now.  And, you know, so I had a pretty

3    good upbringing.  You know, I just, you know,

4    somewhere along the line got caught up in, you know,

5    to the wrong way.  You know, I got involved with the

6    drug lifestyle and I just, you know, spun -- spun out

7    of control.  I think if you look at some of the things

8    I've done since the prison -- I get lots of

9    certificates.  I love education.  I love learning.  I

10   love studying.  I love -- every time I've been in

11   prison, I study.  I go to college.  I do all of the

12   things I do.  But somehow, every time I got back out,

13   I would just fall back into the drugs.  And it would

14   kind of draw everything out of perspective again.  But

15   I mean I think that my parents did pretty good.  They

16   -- you know, they weren't perfect, you know.  I can't

17   blame anything on my childhood.

18           PRESIDING COMMISSIONER BRYSON:  Okay.  All

19   right.  Were you working just prior to the commitment

20   offense?

21           INMATE WILLIAMS:  No.

22           PRESIDING COMMISSIONER BRYSON:  Was -- what was

23   -- the span of not having a job a long time, because

24   you were 34 at the time?

25           INMATE WILLIAMS:  One of the reasons, and I

26   think in my statement that I made regarding my version

27   is, one of the reasons that I think that I probably

22

1    didn't do the things that I needed to do I felt

2    because I was running on parole at the time.  And

3    having absconded from parole, you are -- you are

4    growing from already -- so you're in a different

5    mindset.  And this -- because I was living that type

6    of lifestyle, always afraid of getting arrested, being

7    put back in prison, and all that kind of stuff.  It

8    made me kind of react.  And then with the drugs -- and

9    this is why I said in the letter that I take a lot of

10   responsibility for what happened, because even, you

11   know, I took the cues at the hospital.  I gave the

12   CPR.  But I left.

13            PRESIDING COMMISSIONER BRYSON:  If he's going to

14   speak about the life crime, then he's going to speak

15   about it.  If he's not, he's not because I --

16            DEPUTY DISTRICT ATTORNEY KLINGE:  That's true,

17   sir.

18            INMATE WILLIAMS:  Okay.

19            PRESIDING COMMISSIONER BRYSON:  You're going

20   there.  So you're welcome to talk about it if you

21   want.  It's just that it's one or the other.  That's

22   the law.

23            INMATE WILLIAMS:  Okay.  I kind of faded into

24   that so --

25            PRESIDING COMMISSIONER BRYSON:  I understand.

26            INMATE WILLIAMS:  Okay.  So I guess --

27            PRESIDING COMMISSIONER BRYSON:  Okay.  Is there

23

1    anything else about your history that you'd like to
2    tell us.  We may have further questions or you may
3    have further remarks, but just anything that occurs to
4    you now.

5         **INMATE WILLIAMS:**  About my history?

6         **PRESIDING COMMISSIONER BRYSON:**  Your personal
7    history prior to the crime that you want to let us
8    know or discuss?

9         **INMATE WILLIAMS:**  Well, all I can say is that I
10   was in a whole different world.  And I regret
11   everything that happened, you know.  And I regret
12   having lived the lifestyle.  I know I have more
13   potential.  I know a lot of guys that I've talked out
14   there and I'm around, and I know they probably didn't
15   have the potential.  I know I had the potential to do
16   anything, and I really mean that.  I'm not being
17   egotistical.  I'm not being arrogant.  I'm smart
18   enough and I could have been anything.  And I
19   basically destroyed my life and I know that.  And I
20   have a lot of regrets about the things I've done to
21   people, things that I've not been there for my
22   children, the whole gamut, you know.  And it's poor,
23   you know.  I think the age, when you reach a certain
24   age, you just, you know, you just see things
25   differently.  And so I mean I can't change anything.
26   The only thing I can do is come and tell you where it
27   is now.

24

1          **PRESIDING COMMISSIONER BRYSON:**  Okay.  You have

2     a child, Alinda Brown?

3          **INMATE WILLIAMS:**  I have two daughters.

4          **PRESIDING COMMISSIONER BRYSON:**  Two daughters.

5     Okay.  Are you in touch with them?

6          **INMATE WILLIAMS:**  My daughter, Alinda Brown, I'm

7     in touch with her.  Dominique, my youngest child, I've

8     never been in touch with her since I've been in prison

9     because her mother moved after this crime, moved back

10    to Atlanta, which was her home.  And we haven't had

11    contact.  So it's that kind of situation.

12         **PRESIDING COMMISSIONER BRYSON:**  Okay.  All

13    right.  What's your relationship with your other

14    daughter?

15         **INMATE WILLIAMS:**  Very good, but again, it's

16    part of my regrets is that her life is going straight.

17    She's now got involved and been in trouble a couple of

18    times too.  And I bear responsibility for that because

19    I wasn't out there and she's been in trouble, you

20    know.  So -- and she's had drug problems so it's like

21    the sins of the father on to the daughter, you know,

22    so, you know.

23         **PRESIDING COMMISSIONER BRYSON:**  Well, if you'll

24    turn your attention to Commissioner Wolf, we'll go to

25    your post-conviction factors.

26         **DEPUTY COMMISSIONER WOLF:**  Okay.  We've done

27    this before, you and I.

25

1        **INMATE WILLIAMS:**  Yes, sir.

2        **DEPUTY COMMISSIONER WOLF:**  And I'm going to go

3   back to the last transcript.  I'm going to start by --

4   again, I'm going to go over some of the comments that

5   you and I made back and forth regarding your

6   programming.  You're still -- you're still a medium A

7   with 28 points, and you're now a relief clerk, I

8   understand?  That's your --

9        **INMATE WILLIAMS:**  Yeah.  I'm a Law Library clerk

10  now.  I have been for about four months.

11       **DEPUTY COMMISSIONER WOLF:**  Okay.  We'll go into

12  vocation.  The last time we met, you were in the

13  Vocational Office Services Program.  You had completed

14  that program.  You were working as a teacher's aide

15  and you were teaching people on computer applications.

16       **INMATE WILLIAMS:**  Yes, sir.

17       **DEPUTY COMMISSIONER WOLF:**  And that was like all

18  the main applications like word processing,

19  spreadsheets, desktop publishing and things of that

20  nature?

21       **INMATE WILLIAMS:**  Yes, sir.

22       **DEPUTY COMMISSIONER WOLF:**  Did you get tired of

23  doing that or why did you get out of that?

24       **INMATE WILLIAMS:**  Well, because I transferred

25  over to BER and they don't have office services over

26  there.

27       **DEPUTY COMMISSIONER WOLF:**  Is BER a less -- what

26

1    do you call it?

2         **INMATE WILLIAMS:**  It's --

3         **DEPUTY COMMISSIONER WOLF:**  A more secure

4    facility?

5         **INMATE WILLIAMS:**  Yes.  It's more secure.

6         **DEPUTY COMMISSIONER WOLF:**  It's more secure?

7         **INMATE WILLIAMS:**  Yes.  It's more.  It's a

8    safety needs job.

9         **DEPUTY COMMISSIONER WOLF:**  Oh, okay.  So why did

10   you go over there?

11        **INMATE WILLIAMS:**  Well, because some people came

12   on the yard that knew the victim's family.  And so a

13   lot of words started going around.

14        **DEPUTY COMMISSIONER WOLF:**  Oh.

15        **INMATE WILLIAMS:**  And to avoid again conflict,

16   it was easier to go over there.

17        **DEPUTY COMMISSIONER WOLF:**  So after all these

18   years, there's people that knew the victim's family?

19        **INMATE WILLIAMS:**  Occasionally you run into

20   those things.

21        **DEPUTY COMMISSIONER WOLF:**  Oh.  You also worked

22   as a clerk in the Education Department, on the yard

23   crew.  You were a vocational, auto painting.  You were

24   a machinist.  And you, at the time, had 4200 hours'

25   experience as an apprentice tool and diemaker?

26        **INMATE WILLIAMS:**  Yes.

27        **DEPUTY COMMISSIONER WOLF:**  And you have a

27

1    certificate of completion in that, right?

2         INMATE WILLIAMS:  Yes, I do.

3         DEPUTY COMMISSIONER WOLF:  You also worked in

4    vocational computer repair.  You were a porter.  You

5    were the Third Watch Commander's clerk.  And you did a

6    lot of -- you've done a lot of work over the years.

7    And you received numerous laudatory chronos from

8    staff, as well as teachers, as well as aides, as well

9    as just everyone that you've been working with.  You

10   have taken numerous computer repair courses and

11   computer skill courses.  You have a certificate of

12   high school proficiency which you received in October

13   of 2002.

14        INMATE WILLIAMS:  True.

15        DEPUTY COMMISSIONER WOLF:  And at the time I

16   talked to you last, you were 15 units shy of getting

17   your A.A.

18        INMATE WILLIAMS:  Yes, sir.

19        DEPUTY COMMISSIONER WOLF:  Do you have your A.A.

20   now?

21        INMATE WILLIAMS:  No.  Unfortunately, I don't

22   have the funds.  None of these prisons no longer offer

23   the college programs.  And because they don't have the

24   ability to give you the grants -- and I've tried.  In

25   Corcoran, I managed to get enough money to take one

26   course, a law -- business law course and that's it.  I

27   haven't been able to find anyone that would give

28

1    grants to prisoners.

2           **DEPUTY COMMISSIONER WOLF:**  Okay.  Well,

3    ultimately, what would you -- what would you like to

4    get your B.A. in?

5           **INMATE WILLIAMS:**  Either computer sciences.  I'd

6    like to get a combination of computer sciences and

7    law.

8           **DEPUTY COMMISSIONER WOLF:**  Okay.

9           **INMATE WILLIAMS:**  Law intrigues me.

10          **DEPUTY COMMISSIONER WOLF:**  And you are a

11   paralegal?

12          **INMATE WILLIAMS:**  Yes, I am.  I have a paralegal

13   certificate.

14          **DEPUTY COMMISSIONER WOLF:**  Which you received

15   before you came to prison?  Is that right?

16          **INMATE WILLIAMS:**  No.  Actually I got it before

17   they cut off the grants.  I've taken advantage of

18   several -- when they had the Pell Grants, before they

19   cut them off in '91, I used them to get a business

20   training degree.  And also the paralegal degree from

21   Southern Career Institute.  That was a two-year

22   degree, paralegal degree.

23          **DEPUTY COMMISSIONER WOLF:**  Okay.  You have

24   extensive participation in A.A. and N.A.  You're -- it

25   actually goes back to the early to mid-nineties.

26          **INMATE WILLIAMS:**  Yes, sir.

27          **DEPUTY COMMISSIONER WOLF:**  And then you were the

1    Chairman of the A.A. group in '97.  As far as your

2    self-help and therapy groups, you were a tutor and

3    instructor in the literacy program?

4         **INMATE WILLIAMS:**  Yes.

5         **DEPUTY COMMISSIONER WOLF:**  Was that the law back

6    literacy program?

7         **INMATE WILLIAMS:**  You know, yeah.  It had

8    something to do with law back, but it was called

9    Thinking Life Skills.  And I was in that for four

10   years.  It actually taught -- it's probably the best

11   law self-help groups I've been involved in.  It

12   actually teaches you how to change your thinking, how

13   to actually start thinking differently.  How to start,

14   you know, analyzing how you make decisions.  It's a

15   whole concept it's built on.  One of the reasons that

16   criminals do the things, they are poor decision

17   makers, because if they really thought about what they

18   were doing, they wouldn't go rob the store.  They

19   wouldn't cash the check.  They wouldn't use dope

20   because they would see the circumstances, the

21   disadvantages outweigh, you know, the benefits.

22        **DEPUTY COMMISSIONER WOLF:**  Is this a book that

23   you worked out of?

24        **INMATE WILLIAMS:**  Well, it was a whole program.

25   It was set up by a psychologist out of Canada named --

26   a psychologist out of England named Edwards.  And they

27   set it up.  And we got the program down in Corcoran in

30

1    '94.  And we started teaching it.  We did a video

2    series on it.  They show it at some of these prisons

3    around.  But it's probably by far the best program

4    that I was in.

5        **DEPUTY COMMISSIONER WOLF:**  Okay.  Thank you for

6    that information.  You also learned Spanish through a

7    TV video program?

8        **INMATE WILLIAMS:**  Vaguely.

9        **DEPUTY COMMISSIONER WOLF:**  Vaguely?

10        **INMATE WILLIAMS:**  Espinos.  Because it was

11    designed for people who already knew Spanish, and it

12    didn't really start with like the verbs and all the

13    stuff, you know, like you do in English.  You know,

14    the basics of the English language.  And you watched

15    it.  What you did was watch the video series, all the

16    story.  It unfolded over like 21 weeks.  And as they

17    spoke, you learned the language.  So it was very

18    minimal to learn the language.  I understand Spanish

19    so I watch the stations.  And I understand a lot of it

20    and I'm able to speak it.

21        **DEPUTY COMMISSIONER WOLF:**  But did this help you

22    learn to understand Spanish?

23        **INMATE WILLIAMS:**  Yes.  Yes.  I understand it

24    fairly well.

25        **DEPUTY COMMISSIONER WOLF:**  You also -- you've

26    also taken classes in the management of sexually

27    transmitted diseases.  You were in the Arts in

31

1    Corrections Program, as you mentioned before.   There's

2    numerous chronos in your file documenting your

3    attendance and your participation in N.A. and A.A.

4    And you received exceptional grades in your office

5    services assignments.   You participated in vocational

6    education, interactive journaling, anger workbook,

7    interactive journaling in the use -- of the use, an

8    addiction workbook, the relapse workbook, thinking

9    errors workbook, self-esteem workbook, life management

10   values for responsible living, the con game, change

11   plan, and stress management and anger management,

12   problem solving and others.   You have a certificate of

13   attendance indicating one complete year in N.A., which

14   you received in 2003.   Your high school equivalency

15   certificate.   You have a certificate in non-violent

16   conflict resolution, which you received back in 2002.

17   And you also -- didn't you design some computer

18   programs as well while you were --

19       **INMATE WILLIAMS:**   Yes, I did.

20       **DEPUTY COMMISSIONER WOLF:**   -- were in the unit?

21       **INMATE WILLIAMS:**   I did some -- a bunch of

22   programs for application around prisons.   As a matter

23   of fact, that's a certificate of completion that we

24   got from there.   I designed that to cover the whole

25   thing, watermark and all.

26       **DEPUTY COMMISSIONER WOLF:**   That one?

27       **INMATE WILLIAMS:**   Yes.

32

1           **DEPUTY COMMISSIONER WOLF:**  Very nice.  You've
2    been busy.  Okay.  Let me talk about your -- I'm going
3    to give you the opportunity to add anything that I may
4    have left out, too.  So let me talk about your
5    disciplinary history, and then we will go into your
6    psych report.  The disciplinary history kind of
7    surprises me because you went so long without getting
8    in trouble.  And then just recently, you got a 128 for
9    refusing to stand for count.  And that was in February
10   of this year.  And the officer Betinas stated that he
11   announced standing to count.  Prior to counting each
12   section of the tier, he ordered you to stand up and
13   you refused.  Can you tell us about that?

14          **INMATE WILLIAMS:**  Okay.  That's one that's being
15   appealed right now.  I actually filed a 602 on that.
16   I got here copies of 30 inmate 128s.  They all say the
17   same identical thing.  Thirty people on the bottom
18   tier.  It's only 50 people on the bottom -- no, 100
19   people on the bottom tier.  And what happened was that
20   day, if you recognize the date of that, that's Super
21   Bowl Sunday.  Count is at 4:00.  The game was on.  We
22   got two big TVs.  The officers was watching TV.  They
23   had -- had the TV because everybody was cheering and
24   stuff like that.  Now what happens is, when the count
25   times come, they turn the lights on.  And then at
26   4:00, they announce the count.  Betinas actually
27   started count five minutes before they -- it was ever

33

1    announced.  And he came around and anybody that wasn't
2    standing up, he wrote them up.  We never heard any
3    announcement.  We never heard anything.  I was sitting
4    in there like I'm usually doing.  I'm doing law work
5    because I'm not a sports nut.  I don't watch sports.
6    And I was doing -- so my light was already on.  If the
7    announcement had come on, after all these years, I've
8    never not stood up for count.  I not only stand up for
9    count, I go to the front of the door to stand up for
10   count.  All these guys that had never ever been
11   written up for count, missing a count.  I've never
12   been written up for missing a count.  Betinas never
13   counseled us.  He wrote a generic 128.  All of them
14   say the same thing.  You're welcome to look at this.
15   I filed a 602 on this.  The appeal officer then
16   returned my appeal and told me to take off all this --
17   all this information I had supporting my argument.
18   Not only that, but 128s, and the inmates have
19   statements saying exactly what I'm telling you now.
20   They never heard of this and he never counseled us.
21   And when I sent this, they told me to take off all the
22   documentation I had except for Betinas' 128 with his
23   version.  It was no use appealing it if I'm going to
24   go that.  Just send his version in.  So I filed a --
25   not filed it, I filed a misconduct complaint against
26   Betinas for making that statement, this incorrect
27   statement.  Well, when they wouldn't file my 602, I

34

 1    filed a misconduct complaint on the Appeal

 2    Coordinator. She -- they refused to file that. So I

 3    contact Internal Affairs. This is a letter from

 4    Internal Affairs. And they asked them to investigate

 5    whether they need to investigate. So, of course, they

 6    didn't see any need to investigate. So right now,

 7    this is at the third level. I don't know how I can

 8    convince you, but bottom line, I did not -- I would

 9    not make a stand like that. It's stupid. We only

10    count once a day. It's a simple thing to get up and

11    stand up for count. I certainly would not do nothing

12    like that. It's just a idiot. It would be idiotic.

13         **DEPUTY COMMISSIONER WOLF:** Okay. Thank you.

14    Any questions about that?

15         **DEPUTY DISTRICT ATTORNEY KLINGE:** No.

16         **DEPUTY COMMISSIONER WOLF:** Okay. Then you have

17    another one in '05.

18         **INMATE WILLIAMS:** Yeah.

19         **DEPUTY COMMISSIONER WOLF:** And that was for

20    using indigent envelopes to mail out personal mail.

21         **INMATE WILLIAMS:** Yeah.

22         **DEPUTY COMMISSIONER WOLF:** And it says, checking

23    in your trust account, you had a balance of $11.81.

24         **INMATE WILLIAMS:** Yeah.

25         **DEPUTY COMMISSIONER WOLF:** Anyway, that's

26    against the rules.

27         **INMATE WILLIAMS:** What's happening with that is,

1   whenever we don't have any money, and all of us
2   occasionally don't, you can apply for indigent
3   envelope.  They give you the manila envelopes.  They
4   give you one of those, and they give you five
5   envelopes.  And you just write on it, write your
6   letters on it.  They never had a rule that you had to
7   use them all within the week.  So sometimes you may
8   have some piled up.  They changed the mailroom
9   officer.  The mailroom officer came on and decided --
10  and again, I wasn't the only one that I got that.  I
11  didn't even know I had this until I was doing my Board
12  Report.  And I didn't even bother to even challenge
13  this.  I just left it there.  But we all use them.
14  They give them to you.  And there's no rule --
15  absolutely no rule that said that you had to use them
16  at any given time.  They're giving them because you
17  don't have any money.  You may have three people to
18  write that week, want people to write like that.  So
19  apparently, when I used that, at the time, I had $11
20  on the books.  So I -- you know, I was surprised about
21  it.  I didn't challenge it, so --

22       **DEPUTY COMMISSIONER WOLF:**  Okay.  Thank you.
23  Then the only other 128 you had was back in '95, and
24  that was you were late to your job assignment.

25       **INMATE WILLIAMS:**  Yeah.

26       **DEPUTY COMMISSIONER WOLF:**  And then you got one,
27  two, three, four, five, six, seven 115s.  All of them

36

1    occurred in the late eighties and early nineties.  And
2    they were all about -- well, four -- five of them were
3    -- no four of them were about drugs.
4        **INMATE WILLIAMS:**  About what?
5        **DEPUTY COMMISSIONER WOLF:**  Possession of a
6    hypodermic syringe, trafficking narcotics, stimulants
7    and sedatives twice.  One was -- both of those were
8    home brewed.
9        **INMATE WILLIAMS:**  Yeah.
10       **DEPUTY COMMISSIONER WOLF:**  Two chronos.
11       **INMATE WILLIAMS:**  Yeah.
12       **DEPUTY COMMISSIONER WOLF:**  And then one for
13   fighting.  And then the most recently -- recent one
14   which we discussed at your last hearing was the one
15   where you were creating an unsafe and unsanitary
16   environment.
17       **INMATE WILLIAMS:**  Yeah.
18       **DEPUTY COMMISSIONER WOLF:**  Now the last time we
19   talked about this, you had an explanation that was
20   quite like the --
21       **INMATE WILLIAMS:**  Yeah.
22       **DEPUTY COMMISSIONER WOLF:**  But I would like you
23   to, if you could in a nutshell, let Commissioner
24   Bryson know about that one.
25       **INMATE WILLIAMS:**  The last one, the drug --
26       **DEPUTY COMMISSIONER WOLF:**  The 2001.
27       **INMATE WILLIAMS:**  You know, the drug trafficking

37

1  one, I got -- I took up into the courts and got that
2  overturned.  That drug traffick was overturned by the
3  courts.
4      **PRESIDING COMMISSIONER BRYSON:**  Are we talking
5  about the 11/29/93 one?
6      **INMATE WILLIAMS:**  Yes.  The Sacramento Superior
7  Court.
8      **DEPUTY COMMISSIONER WOLF:**  Well, it's not in his
9  C File.
10     **PRESIDING COMMISSIONER BRYSON:**  It disappeared
11 from the C File.  Therefore, that would be the signal
12 that --
13     **DEPUTY COMMISSIONER WOLF:**  That would indicate
14 to me that it had gone away.
15     **PRESIDING COMMISSIONER BRYSON:**  Okay.
16     **INMATE WILLIAMS:**  That was supposed to be
17 dismissed.  Eleven guys that was -- see, a lot of
18 stuff that happens, it is behind --
19     **DEPUTY COMMISSIONER WOLF:**  That was dismissed.
20     **INMATE WILLIAMS:**  Okay.
21     **DEPUTY COMMISSIONER WOLF:**  But I would like you
22 to explain the one --
23     **PRESIDING COMMISSIONER BRYSON:**  Yes.
24     **DEPUTY COMMISSIONER WOLF:**  -- environment,
25 unsanitary environment.
26     **INMATE WILLIAMS:**  I was the Commander's clerk in
27 Soledad on the patio.  On the patio, we have his

38

1    office, the Captain's office, and all the clerks were

2    in here.  They did have --

3         **DEPUTY COMMISSIONER WOLF:**  Explain it to

4    Commissioner Bryson.  I've already heard the story.

5         **INMATE WILLIAMS:**  They didn't have any bathroom

6    facilities.  At the time I was taking medication for

7    FC, which would be interferon, the pill, and it's

8    highly toxic and you have to flush with a lot of water

9    all the time.  You got to drink a lot of water.  And

10   they have no bathroom.  Well, they had a riot that

11   day.  And we were locked up in the office for almost

12   four hours without anything.  The inmates kept a

13   gallon jug in which we would go back in the back

14   office behind the cabinet, and you would urinate in

15   there and you would just use it.  And then whenever

16   you got a chance, you'd empty it.  And that had been

17   satisfactory for years up there.  This particular day,

18   I was locked up in there.  It took me four hours

19   before they got things down here, and I was the watch.

20   I took the watch report on all the information.  And

21   they had an officer up on patio that hadn't worked

22   there before.  So after everything was cleared up and

23   it was running shop, I left out of there.  And the

24   officer came in and found the jug up there with the

25   urine in it.  And he put it out there and I explained

26   it to him.  He asked me what that was and he didn't --

27   because he didn't know what stuff this was.  And I

39

1    said I was locked up there and I hadn't had a chance
2    (indiscernible).  So what happened was he wrote me up
3    for it.  Now I went to the -- this is from my Board
4    hearing in 2003.  I actually filed a 602 on that and I
5    lost the 602.  But then I filed an accommodation thing
6    up there and they granted it saying that we had no
7    bathroom facility.  They changed the whole policy up
8    there.  (indiscernible) they changed the whole policy
9    and said that any time they had a situation, they have
10   to come at least every 30 minutes and let the inmates
11   use the bathroom up there because they recognized it
12   wasn't -- it wasn't fair.  And the Board hearing of
13   2003, this is what they said in terms of that.  They
14   said an administrative 115 that probably should not
15   have been written.  However, it was an administrative
16   115 in 2001 and it was not relied heavily on.  So they
17   recognized the circumstances of that.

18        **DEPUTY COMMISSIONER WOLF:**  That was Commissioner
19   -- oh, that was 2003.

20        **INMATE WILLIAMS:**  Yeah.

21        **PRESIDING COMMISSIONER BRYSON:**  Okay.  Thank
22   you.

23        **DEPUTY COMMISSIONER WOLF:**  Okay.  Then that's
24   it.  That's your disciplinary history.

25        **INMATE WILLIAMS:**  Yeah.

26        **DEPUTY COMMISSIONER WOLF:**  Then we'll go to your
27   most recent psych report, which was done in 2005

40

1    February.  And this is a clinical evaluation which was
2    conducted by Frank D. Weber, Ph.D., clinical
3    psychologist.  And he -- let me just paraphrase some
4    of the things he says in this report.  Updated History
5    and Personal Growth, which is on page two.

6              "Since his last psychological evaluation
7         in May 1999, Mr. Williams has attended several
8         different self-help programs.  He's attended
9         classes of thinking errors, problem solving,
10        abuse and addiction, anger management, self-
11        esteem, first step, relapse prevention, life
12        management and values for responsible living.
13        He's also participated in the office services
14        vocational program, which again he completed.
15        Then he was hired as an aide.  Got his GED in
16        2003.  He goes on to say Mr. Williams has
17        participated in N.A. and A.A. for the past ten
18        or 11 years and continues to attend N.A. and
19        A.A. meetings.  He states the last time he had a
20        drink was in 1988.  He was able to describe what
21        it was like for him to work through the 12 Steps
22        in adequate detail.  However, he was not able to
23        recite the 12 Steps, and he did not know the 12
24        Traditions of N.A., A.A. or the history of the
25        movement.  He stated he's never had a sponsor
26        and has never been a sponsor to anyone else.  He
27        said that he does not have any temptation to

```
1      drink because the consequences of doing so are
2      so dire.  He has FC.  He has numerous
3      (indiscernible).  He also stated he thinks about
4      what it would do to his family.  His wife of
5      many years is still supportive of him.  When he
6      paroles, he said he will be -- he will continue
7      to go to meetings and will only hang around with
8      people who are sober.  In regards to the crime
9      and the underlying causes, he states he was
10     living the drug lifestyle and this led to his
11     apathy.  He stated he knew that the victim's
12     mother was beating her but did nothing about it.
13     He denied any other responsibility for the crime
14     itself.  The following are the factors that
15     increase Mr. Williams' risk for violence.  It is
16     unclear what role Mr. Williams played in the
17     commitment offense.  At the least, he was
18     negligent.  At the most, he was extremely
19     callous and cruel in his treatment of the
20     victim.  If the inmate's version of the offense
21     is true, he seems to have accepted appropriate
22     responsibility for his actions.  Number two,
23     substance abuse played a large role in the
24     commitment offense.  Mr. Williams' health
25     condition is a significant barrier to relapse.
26     However, he does not seem to have done the work
27     necessary to remain sober.  His participation in
```

42

```
1        A.A., N.A. seems minimal.  He does not know the
2        12 Steps and has never had a sponsor.  Also his
3        description of his participation in A.A., N.A.
4        seems to be at a superficial level.  The
5        following are the factors that decrease Mr.
6        Williams' risk for violence.  He's successfully
7        participated in work, vocational, educational
8        and self-help programs.  He has no disciplinary
9        infractions for fighting since 1992.  He has no
10       history of convictions for violent crimes other
11       than the commitment offense.  He has maintained
12       strong family bonds throughout his years of
13       incarceration.  Given the factors mentioned
14       above, this examiner concludes that Mr. Williams
15       is in the low to moderate risk category for
16       violence should he parole.  What is the extent
17       to which the prisoner has explored the
18       commitment offense and come to terms with the
19       underlying causes?  Mr. Williams states that he
20       accepts responsibility for his behavior.  He
21       reports he was not involved in the murder of his
22       victim, did nothing to prevent the abuse that he
23       knew was taking place.  He accepts full
24       responsibility for not intervening.  Mr.
25       Williams has come to understand that his
26       involvement in the drug lifestyle led to his
27       apathy towards his victim.  He states he is
```

43

1        completely commenced sobriety and has no desire

2        to return to this lifestyle.  As far as

3        recommendations, what is the need -- what is the

4        need for further therapy programs while

5        incarcerated?  I recommend Mr. Williams continue

6        to participate in programs designed to help him

7        understand and deal with his addictions.  And

8        number two, he needs to work harder on the 12

9        Steps of A.A., N.A., and work to put together a

10       strong relapse prevention plan.  I do not

11       recommend treatment for any psychiatric

12       conditions at this time."

13    Now he says a lot of -- well, kind of negative

14  comments regarding your superficial grasp of A.A. and

15  N.A., your not knowing the 12 Steps.  He doesn't feel

16  like you're totally committed to this prevention

17  program for your -- to help you from -- keep you from

18  relapsing should you be released to the community.

19  Could you address that, please?

20     **INMATE WILLIAMS:**  I think one of the problems

21  that he may have misunderstood is that I have a bad

22  memory.  I can't -- my memory is really bad and it's

23  largely due to the FC.  And if you read up on the

24  symptoms, FC -- I'm long term.  They just took me out

25  for a MRI about two weeks ago because they said I'm

26  all levels spun up and stayed up, which means that I

27  probably have tumor, cirrhosis or something.  They're

44

```
 1   waiting for that to come back.  And I've had this
 2   stuff so long.  So this is about on target.  One of
 3   the parts of it is you are tired all the time.  Like I
 4   would probably go all right now, but when I get off
 5   work, I'm so tired and so beat it's like, you know,
 6   I've been working in a farm or something.  My memory
 7   is just shot to hell.  You know, they tease me about
 8   it even on the job and places around there.  And I do
 9   keep this with me.  And I should have showed it that
10   day.  This is an old card.  You can see I got two of
11   these.  I've had this since the early nineties.  I
12   keep this in my pocket.  And I really can't -- if you
13   try and ask me like -- not only on this.  A lot of
14   things -- I can't come up.  I can give you that.  Like
15   in the old days, I could memorize anything, you know.
16   I used to work in the Post Office.  I got good jobs
17   because of memory.  But I can't do that anymore.  So
18   if not -- what he thinks that is my lack of
19   involvement, it's not that because every A.A. that
20   I've been involved in, I've been, you know, every part
21   of -- I make all these sessions.  I'm fully involved.
22   They just -- I've never been in one where we had
23   outside sponsors.  Never.  We had outside -- yes.  We
24   never had sponsors in none of the A.A.s I've ever been
25   in.  So I don't know about that part of it.  But it's
26   not because I don't take it serious.  Now that I'm
27   involved in this lifer -- we just started a lifer's
```

45

1   group out here.  And I'm involved in that.  I just
2   started with that on our yard.  So I mean it's not
3   that I'm not involved.  It's just that maybe, you
4   know, when it comes to recalling like -- just I can
5   tell them what A.A. is all about.  I can tell you what
6   all the steps are.

7          **DEPUTY COMMISSIONER WOLF:**  Do you have a sponsor
8   in the institution?

9          **INMATE WILLIAMS:**  Where we're at, we have an
10  outside person that comes in.  We have our personal
11  sponsors to the group, I guess.

12         **DEPUTY COMMISSIONER WOLF:**  No, I mean some of
13  the sponsors, a mentor, a teacher, someone you look up
14  to in the event that you lose your strength.  Someone
15  that gives you assistance and help when you need it.
16  That's what a sponsor is.

17         **INMATE WILLIAMS:**  In terms of the A.A. group?
18         **DEPUTY COMMISSIONER WOLF:**  In terms of your
19  sobriety.  In terms of your path to becoming a better
20  person.  Do you have someone in your life like that?

21         **INMATE WILLIAMS:**  No.  Are you talking about on
22  the outside?

23         **DEPUTY COMMISSIONER WOLF:**  Outside or inside.
24         **INMATE WILLIAMS:**  Well, mostly my family because
25  no one in my family -- I'm the only one that ever --
26  you know, I was like the black sheep of the family.
27  I'm the only one addicted.  So my family is all -- I

46

1    mean they don't do drugs.  Like I said, all my family
2    are professionals.  And so that's kind of my mentors.
3    I'm real close to my family now.

4        **DEPUTY COMMISSIONER WOLF:**  Okay.  We're talking
5    about sponsors now.  Do you know what a sponsor is?

6        **INMATE WILLIAMS:**  Yeah.  Someone who like -- in
7    terms of A.A. and N.A., a sponsor is a person who is
8    almost like a brother to you.  Any time you feel any
9    type of problems or anything, if you're feeling weak
10    like, you know, like you want a drink or you're having
11    problems, just delete drinking, you know.  Your life
12    out of whack, you go to them and they kind of help you
13    almost like, you know, like going to a psychiatrist or
14    something like that.  And they help you with all your
15    stuff like that.

16        **DEPUTY COMMISSIONER WOLF:**  Then you don't have
17    someone like that?

18        **INMATE WILLIAMS:**  No, sir.  We just don't have
19    that in here.  I mean we talk among each other.  We
20    talk and a lot of us hang out together because when
21    you're trying to -- you know, these yards, they have
22    drugs, alcohol on there if you really want them.  You
23    know, they're out there.  So you can like the same
24    thing on the streets.  You hang around the type of
25    people that you want to be around.  So you can not to
26    hang around with the people that's doing the drugs and
27    the alcohol.  So you hang around the A.A. people and

47

1   stuff like that.  But that's how it goes, you know,
2   that --
3        DEPUTY COMMISSIONER WOLF:  Right.  All right.  I
4   think I'm going to turn it back over to you then.
5        PRESIDING COMMISSIONER BRYSON:  Thank you,
6   Commissioner.  And what are your parole plans?  We
7   notice that in the Board packet here, you've given us
8   some plans.  I have no letters -- current letters of
9   support or employment plans or any kind of support for
10  the outside plans.
11       INMATE WILLIAMS:  I tried as best as I can, but
12  I haven't been able to get a job -- secure a job.  I
13  tried.  My sister put up -- she put up a $5,000
14  account for me and said, "Well, you know, you don't
15  have to worry about money."  My sister is a bank
16  manager, the one that's retired.  Her husband makes
17  $183,000 a year.  And so, you know, they have set up
18  for me, if I get out.  I don't have to worry about
19  that.
20       PRESIDING COMMISSIONER BRYSON:  Okay.  Now your
21  telling us that is admirable.  Do we have any
22  documentation to that effect?
23       INMATE WILLIAMS:  Well, yes.  One of my Board
24  things was given -- not for this time, but in '84 --
25  my '84 Board memorandum had it with the letters on it
26  from my brother-in-law and from my sister.
27       PRESIDING COMMISSIONER BRYSON:  1984?

48

1          **INMATE WILLIAMS:**  Yeah.  You have the 2004
2    suitability?  I had the letter on it.  I think I took
3    that one and gave it to you.

4          **PRESIDING COMMISSIONER BRYSON:**  But we have a
5    copy of that in the C File, Mr. Wolf?  You understand
6    that it's a matter of if it's not on paper, it doesn't
7    exist, that whole legal philosophy.  And that's why
8    I'm asking for documentation.  Were they -- were your
9    relatives planning to send you some letters of
10   support, or what was the situation?

11         **INMATE WILLIAMS:**  Well, because it was the same
12   thing.  You know, the reason I didn't ask them to send
13   the letters this time because it was the same
14   identical thing the last time I went.  And I had -- I
15   brought those letters in, you know, where they stated,
16   you know, that they had set up an account for me, and
17   that I wouldn't have to worry about money; that I had
18   a place to live and everything would be met for me.
19   And it was part of these because I always turn these
20   in.  This is the first year I haven't done it.  I make
21   these Board Report with all my progress stuff in it.
22   Anything in it for 2000.  I prepared one for every
23   Board except for this one that I been at.  And it was
24   attached to the one that I turned in at my last
25   hearing that I came to.  I think it was the 2004
26   hearing because I didn't come to the 2005 hearing.

27         **PRESIDING COMMISSIONER BRYSON:**  Your 2005 one

49

1   was actually -- wasn't that actually a postponement?

2       **INMATE WILLIAMS:**  Yeah.   That was the

3   postponement, so it --

4       **PRESIDING COMMISSIONER BRYSON:**  And it said --

5   and it said the reason for the postponement was to

6   obtain support letters, a job offer letter, support

7   letter from the victim's relatives, and to resolve

8   legal issues.

9       **INMATE WILLIAMS:**  Yeah.

10      **PRESIDING COMMISSIONER BRYSON:**  So you were

11  intending in 2005, in October actually, to get support

12  letters.

13      **INMATE WILLIAMS:**  Yeah.

14      **PRESIDING COMMISSIONER BRYSON:**  So did they come

15  forward?

16      **INMATE WILLIAMS:**  I don't know.   I didn't -- I

17  was trying to get --

18      **PRESIDING COMMISSIONER BRYSON:**  Okay.   Well,

19  then --

20      **DEPUTY COMMISSIONER WOLF:**  I have one letter in

21  here from Inez Williams.

22      **INMATE WILLIAMS:**  Yes.   That's my sister.

23      **DEPUTY COMMISSIONER WOLF:**  This was dated 2003,

24  though so that's an awfully old letter.  I mean to

25  rely on something three years old for today is really

26  not practical because things change.  But she supports

27  you and she's aware you made a lot of progress over

50

1   the years.  And because she knows you don't have a job

2   upon release, she set up a bank account in the sum of

3   $5,000 to assist you.

4          **INMATE WILLIAMS:**  Yes.

5          **DEPUTY COMMISSIONER WOLF:**  And that she supports

6   you and she hopes that the Board will grant you

7   parole.  So she had set up a $5,000 savings account in

8   2003.  That's the latest letter we have from her.

9          **INMATE WILLIAMS:**  Actually we was trying to get

10  some things together, but I guess they didn't arrive

11  in time.

12         **PRESIDING COMMISSIONER BRYSON:**  What would be

13  your plan for transition?  Were you planning to do

14  A.A. or N.A. on the outside?

15         **INMATE WILLIAMS:**  Both N.A., A.A. active.

16         **PRESIDING COMMISSIONER BRYSON:**  And where would

17  that be, in the Hayward area?

18         **INMATE WILLIAMS:**  Yes, in the Hayward area.

19         **PRESIDING COMMISSIONER BRYSON:**  Have you looked

20  into any programs in that county?

21         **INMATE WILLIAMS:**  In fact, I was supposed to be

22  part of what was found in the letter from the A.A. and

23  N.A.  That's what I was, you know --

24         **PRESIDING COMMISSIONER BRYSON:**  Hm-mmm.

25         **INMATE WILLIAMS:**  I was trying to get together

26  in time for the Board.

27         **DEPUTY COMMISSIONER WOLF:**  Can I make a

51

1    suggestion to you?

2        **INMATE WILLIAMS:**  Yes, sir.

3        **DEPUTY COMMISSIONER WOLF:**  That you get a

4    sponsor now out there.  You start writing,

5    communicating.  And the way you do that is you write

6    the local chapter of A.A. and N.A. in Hayward or

7    wherever you're going to be living, and ask them to

8    assign you a sponsor.

9        **INMATE WILLIAMS:**  Okay.

10       **ATTORNEY GUNING:**  Can I interject on that one?

11       **DEPUTY COMMISSIONER WOLF:**  Hm-mmm.

12       **ATTORNEY GUNING:**  I've been to a lot of hearings

13   where that issue has been brought up, and what I've

14   found out over time is that they will not give you a

15   sponsor until you're released.  That's --

16       **DEPUTY DISTRICT ATTORNEY KLINGE:**  I've actually

17   seen people with outside sponsors though.

18       **DEPUTY COMMISSIONER WOLF:**  I have too.  I've

19   seen numerous outside sponsors.  And there is an A.A.

20   group at the church that I go to that specializes in

21   outside sponsors.

22       **ATTORNEY GUNING:**  For people who are

23   incarcerated?

24       **DEPUTY COMMISSIONER WOLF:**  For people who are

25   incarcerated.

26       **ATTORNEY GUNING:**  Okay.  All right.  I'm talking

27   specifically about A.A. and N.A.

52

1        **DEPUTY COMMISSIONER WOLF:**  A.A. and N.A.

2        **ATTORNEY GUNING:**  Okay.  All right.  Can you

3    tell me where is it that you're talking about?

4        **DEPUTY DISTRICT ATTORNEY KLINGE:**  I've been in

5    San Quentin where they have outside sponsors.  I've

6    been in here (indiscernible) outside sponsors.

7        **ATTORNEY GUNING:**  Did they tell you where they

8    were at?

9        **DEPUTY DISTRICT ATTORNEY KLINGE:**  At the local

10    places that they were going to be paroled to.

11        **ATTORNEY GUNING:**  Okay.  All right.  Good.

12    Thanks.

13        **PRESIDING COMMISSIONER BRYSON:**  All right.  We

14    sent out 3042 notices.  Those notices go to agencies

15    having a direct interest in your case.  We have a

16    representative of the Alameda County District

17    Attorney's office present who will have the

18    opportunity to make a statement regarding parole

19    suitability prior to the conclusion of this hearing.

20    Commissioner, do you have any further questions of

21    this inmate at this time?

22        **DEPUTY COMMISSIONER WOLF:**  No.

23        **PRESIDING COMMISSIONER BRYSON:**  All right.  Ms.

24    Klinge, do you have any questions of the inmate at

25    this time?

26        **DEPUTY DISTRICT ATTORNEY KLINGE:**  Just a couple.

27    During the social history, I noted that it stated your

53

1   mom, but could you ask the inmate, it stated his

2   mother suffered from mental illness and was

3   institutionalized for period of time.  At what age was

4   the inmate when his mother was institutionalized?

5       **PRESIDING COMMISSIONER BRYSON:**  How old were

6   you?

7       **INMATE WILLIAMS:**  About seven years old.

8       **DEPUTY DISTRICT ATTORNEY KLINGE:**  And how long

9   was the mother absent from the home?

10      **INMATE WILLIAMS:**  She was in (indiscernible) for

11  approximately 11 years.  But my father remarried.  I

12  always had some mother, you know, some other person

13  there.

14      **DEPUTY DISTRICT ATTORNEY KLINGE:**  What was the

15  nature of the mother's mental illness?

16      **INMATE WILLIAMS:**  I -- you know what, I never

17  knew any of that stuff.  It was never discussed with

18  us.

19      **DEPUTY DISTRICT ATTORNEY KLINGE:**  In the

20  inmate's parole plans, has the inmate looked into any

21  type of residential drug or alcohol treatment living

22  facilities as a transition into the community?

23      **INMATE WILLIAMS:**  In fact, yes, I did.  And I

24  kind of thought that would be a good thing to try and

25  achieve.  But no one writes me back.  I wrote Delancey

26  Street.  I wrote several others over the years, and I

27  just kind of stopped writing them.  They don't even

54

1   write a response and say, "We can't do it."  You know,

2   I haven't got any response from them at all.  Right.

3   Delancey Street, I wrote at least six or seven times.

4   And the other ones -- I figured because that's the

5   most structured and, you know, well known.  And I

6   think they don't even respond.

7        **DEPUTY DISTRICT ATTORNEY KLINGE:**  No other

8   questions.

9        **PRESIDING COMMISSIONER BRYSON:**  All right.  Any

10  questions, counsel?

11       **ATTORNEY GUNING:**  I have no questions.

12       **PRESIDING COMMISSIONER BRYSON:**  All right.  Then

13  I'd like to invite the District Attorney to make a

14  closing statement.

15       **DEPUTY DISTRICT ATTORNEY KLINGE:**  Thank you.

16  The District Attorney's office of Alameda County is

17  opposed to parole at this time and feels that the

18  inmate is unsuitable for parole and does still pose a

19  risk to the community.  This is based on several

20  factors.  Initially I would like to reference the

21  panel to the September 16, 2005 letter our office

22  submitted and incorporate those arguments and

23  photographs into my closing statement.  That was

24  authored by Deputy District Attorney Sam Wellman.

25  First of all, looking to the commitment offense, I

26  know that the inmate now is claiming his innocence.

27  But the panel must assume that the conviction is true

55

1    for these purposes.  And it is clear that this offense

2    was especially heinous, cruel and callous.  In this

3    offense to which the inmate did confess to the police,

4    the victim who was three years old was tied with her

5    hands to the door above her head, and at one point,

6    was tied with her feet to another door inside the

7    residence, so she was actually suspended in air.  She

8    was lifted and beaten by the inmate for approximately

9    two to three hours.  The victim's skull fracture and

10   numerous marks and injuries were on her body.  She was

11   completely defenseless during this time and three

12   years old.  It's hard to imagine what that little girl

13   went through during this.  There was no mercy shown to

14   this victim.  And the cause of death was blunt trauma

15   to the victim's head.  During his statements to the

16   police, the inmate admitted to beating the victim and

17   I believe it was because she had soiled herself or had

18   an accident regarding using the restroom.  This was

19   certainly a callous disregard for the life and

20   suffering of another, and was carried out in a

21   dispassionate manner.  This is a torture type murder.

22   The victim was abused during the attack and the motive

23   for the crime is inexplicable.  The inmate's previous

24   record is extensive and criminal behavior began at an

25   early age and was continuous throughout this inmate's

26   life.  This crime was committed I believe when the

27   inmate was approximately 36 years old.  It's his third

56

1    prison commitment.  It was committed when he was on
2    parole at the time.  Clearly past attempts to
3    rehabilitate the inmate failed miserably.  He did have
4    an unstable social history to some extent.  His mother
5    being institutionalized within the home.  He did start
6    acting out at an early age.  Obviously he's failed
7    previous grants of probation and parole.  I'm a little
8    perplexed.  The panel went through an extensive list
9    of programming the inmate's done in the past.  But I
10   don't see any evidence of A.A. or N.A. since the last
11   Board -- since 2004.
12        **DEPUTY COMMISSIONER WOLF:**  Is there any chronos
13   in the file indicating any participation since then?
14        **DEPUTY DISTRICT ATTORNEY KLINGE:**  So I see no
15   programming in the last couple of years.  So that is
16   of great concern.  If you look at the 2005
17   Psychological Report, which was read into the record,
18   that psychologist has great concerns about the
19   inmate's recovery process.  In the middle of
20   questioning done by the panel today, it became clear
21   that he was not clear in the concept of sponsors,
22   outside sponsors, inside sponsors, things that are
23   fairly basic to the N.A., A.A. process.  If you look
24   to the inmate's past reports, he had at least a
25   hundred dollar a day habit for many, many years, and
26   was also using other drugs and alcohol.  As quoted in
27   the 1996 Psychological Report, people that are into

57

1    heroin have a particular poor record of being able to

2    go straight on the outside.  He has used

3    methamphetamine and cocaine.  Even after you are clean

4    and sober, it stays in your system four to seven

5    years, heroin 100 years.  Heroin is one of the hardest

6    things to kick.  And also to share, when you go back

7    to that environment, with the environmental cues, it's

8    highly likely you'll use again.  He mentioned it

9    himself that he would come into prison, he would do

10   well, and the minute he got back out he'd be back on.

11   He's planning to parole back to the same community.

12   It's extremely likely dealing with the stress of the

13   outside world, and heroin is extremely prevalent still

14   in that community, that he's at great risk to start

15   using again, which could lead him down the same path

16   that he's been down before, that culminated in this

17   brutal killing.  The parole plans are nonexistent at

18   this point, unfortunately, because there's no letters

19   of support.  This isn't the type of person that would

20   clearly benefit if granted today, come up, live in,

21   start a residential program.  A lot of the inmate's

22   answers, mainly it's true, but he's clearly apparently

23   not responsible for anything that's happened.  His

24   recent, you know, 128s, his 115 in 2001.  Delancey

25   Street doesn't bring him back.  Maybe it's not in

26   those letters, but I've seen hundreds of inmates where

27   Delancey Street answers them.  I've seen lots of

58

1    inmates that get the list from Alameda County of all
2    the residential treatment programs, and there are tons
3    that they've contacted. And some of them will give
4    you acceptance information prior to release date.
5    Delancey Street won't, but they will write you and
6    tell you that they won't. I find that somewhat
7    incredulous. For someone at the inmate's intelligence
8    level and training, I don't see a resume, copies of
9    letters used -- submitted for jobs. If he doesn't get
10   answers, he could submit the copies he sent out. Even
11   a copy of a bank statement for this account of $5,000
12   that's set up for him is not here. There's a lot of
13   things he could do to shore up his parole plan.
14   Looking back to the 1996 Psychological Report, at that
15   time, on Axis 1, he had alcohol, an opiate and cocaine
16   abuse. And on Axis 2, an antisocial personality
17   disorder with (indiscernible) features. And that
18   psychologist spoke about wanting to talk the talk, and
19   how sociopaths present well on the inside, but that
20   doesn't necessarily mean they'll perform well on the
21   outside. In his later Psychological Reports, they
22   don't have enough to diagnose this. If you have a
23   antisocial personality disorder and are in the
24   sociopath category, you don't -- you're not cured. It
25   doesn't disappear. Hopefully, a lot of what the
26   inmate said is true, but I'm very wary of someone with
27   this type of personality learning the jargon, the

59

1    talk, minimally resisting and superficially and things

2    not being internalized, and then being released into

3    society and becoming a great risk.  It's clear that

4    this crime was beyond the bare minimum necessary to

5    commit a murder second.  Under the case law, it's

6    clear.  He got a global at 75.  And based on his lack

7    of programming, lack of parole plans, to commit an

8    offense and his serious record, and his recent 128s, I

9    would submit that the inmate is completely unsuitable

10   for parole at this time and would ask for a lengthier

11   denial than one year for him to get back involved in

12   his programming, and maybe to absorb the A.A., N.A.

13   tenets and to shore up his parole plans.  Thank you.

14         **PRESIDING COMMISSIONER BRYSON:**  Thank you.

15   Counsel, you may proceed with your statement.

16         **ATTORNEY GUNING:**  Thanks.  Mr. Williams, as

17   noted, has been convicted of second-degree murder.

18   He's been incarcerated since 1987, which is close to

19   20 years.  I would submit you look at his matrix.  He

20   is beyond the time required by the matrix.  And I

21   would like this panel to take a look at the matrix to

22   see what kind of time that you feel he would need to

23   do.  He has been incarcerated.  He is now 57 years

24   old, which I think is an age where the risk of

25   recidivism is severely impacted.  In fact, according

26   to the studies, the willingness of individuals after

27   that age to go back to the life of crime decreases

60

1    dramatically, and given the fact he's well beyond that
2    age, I would ask you to consider that as well.  He had
3    a one-year denial in 2004.  Then he had a one-year
4    stip last year.  The one thing I'm looking at here,
5    and I'm trying to figure out whether it's someone that
6    (indiscernible) this.  And I'm looking at the
7    recommendations by the panels both last year and in
8    2004.  They make no recommendations and they made no
9    requests of Mr. Williams, at least from what I'm
10   looking at right here.  And it is oftentimes normally
11   you have some concerns about self-help or you have
12   some concerns about therapy.  Unless you're going to
13   annotate that, you're going to check that off.  That
14   didn't happen here and I don't know why, but it hasn't
15   happened for the last two years.  And as to the last
16   two panels to the side, they could (indiscernible) Mr.
17   Williams, but they didn't -- he didn't address those
18   issues, and at least with regards to the one that I'm
19   looking at here.  Now pre-conviction factors.  I
20   submit that he had a stable family environment, but I
21   would concur that in time, as a result of his
22   involvement with drugs, the stability of his home was
23   probably impacted as a result of his activity with
24   drugs.  But one thing I will note is this.  In 1970 is
25   when he started having these problems with the
26   narcotics is the same time you start seeing these
27   convictions with the adult -- in the adult arena.  So

61

1    I think there's a direct correlation between what
2    happened in terms of being involved in drugs and his
3    involvement with being arrested.  And if you look at
4    his file, he's correct.  Almost all of his arrests
5    and/or convictions from what I can tell are all drug-
6    type related instances, the majority of which are for
7    forgery during that span from 1970 until the time of
8    the offense, which was 1984.  He didn't get a GED it's
9    my understanding while he was in the streets at the
10   Job Corps, and he has continued with his education
11   from that point.  He's got two years of college.  He's
12   a paralegal, which would indicate that he's a very
13   intelligent individual.  He does value education, and
14   he has a very favorable aspect of his life.  I do
15   believe that with regards to where he is now, he's
16   developed an awful lot of skills over time.  He's got
17   a lot of vocational skills that he didn't have prior
18   to the offense.  And these are not just your normal
19   run of the mill skills.  These are very, very valuable
20   and very lucrative skills on the outside.  He can make
21   a good living once he's released.  As you know, Title
22   XV does not require support with regards to
23   employment.  That is neither this panel nor other
24   panels have asked -- haven't asked for that.  They
25   asked for reasonable marketable skills, and that's
26   what he's got.  I'll speak to reasonable parole plans,
27   and he has marketable skills, and he fits under that

62

1    criteria.  With regards to commitment offense, it was

2    a heinous offense, and we acknowledge that.  But

3    again, this is a second-degree offense, and this was a

4    trial.  And I would submit that if you look at the

5    transcripts, that the theory put forth by the District

6    Attorney's office at that particular time was not

7    premeditation; that the theory put forth by the D.A.'s

8    office at that particular time, that being caused by

9    injury.  I don't have the transcripts in front of me,

10   but I submit that's what happened here.  And he has

11   (indiscernible) his innocence as to being actually

12   involved with the killing of Tequila Hawkins.  Some of

13   the variables the panel has to look at has to do with

14   post-conviction factors, psychological evaluations,

15   etc.  Granted 95 -- the most recent evaluation of 2005

16   could be more favorable.  We acknowledge that.  But in

17   1999, he has a good evaluation.  And the D.A. raises

18   the fact that they want that favorable evaluation.  So

19   we're having the psychologist going back and forth as

20   to how they're viewing him, which is of concern to me,

21   that when you've got no standards -- I mean there's no

22   consistency as to the evaluations by the psychologist,

23   it impacts the credibility of all the evaluations, all

24   three of those.  I'll ask this panel to consider that.

25   And the evaluation can cause no threat, the average

26   threat, as compared to the average citizen.  Yet in

27   2005, now we've got a completely different evaluation

63

1    which lowered (indiscernible). And I would disagree
2    with the doctor's assessment that he has minimal
3    involvement in A.A. and N.A. His progress reports
4    indicate his involvement in A.A. and N.A. over the
5    years, not only partial participation, but almost
6    complete participation, five of five, six of six, in
7    different quarters. So I'm not really sure where is
8    it that this psychological is referring to regarding
9    his minimal participation in those programs. It's 11
10   plus years. That's a long time to be involved in
11   those programs. It should be noted that those last
12   115s (indiscernible), if you're concerned about his
13   narcotics involvement, it was back in the '92, '93
14   timeframe. So he was involved in that program for 11
15   plus years. Since that time, (indiscernible) for
16   narcotic use and/or paraphernalia. So that would
17   indicate to me that he does have or he has come to
18   grips with the problems associated with that in his
19   life. I would like to comment that the use --
20   comments that (indiscernible) available in the
21   community. No. The reality is it's available in this
22   community. If he's got an issue with drugs, he could
23   do it in here with no problem, and he's probably got
24   the savvy that he has to get away with it. He
25   doesn'that, so I think he's come to grips with this
26   problem in that arena. He is well educated. He has
27   done self-help. He has done lots of vocations. I

64

1   think he's done an awful lot since he's been

2   incarcerated.  Some credit for that.  I think he has

3   marketable skills.  I think that he has to get a

4   letter of support with regards to his residence plans.

5   I agree with that aspect.  But aside from that, I

6   think he's programmed exceptionally over the years.

7   And I will submit on that.

8         **PRESIDING COMMISSIONER BRYSON:**  Thank you.  Now,

9   sir, we would like to give you an opportunity to

10  address this panel regarding your suitability for

11  parole.

12        **INMATE WILLIAMS:**  Thank you.  First, I'd like to

13  address something that the District Attorney said.

14        **PRESIDING COMMISSIONER BRYSON:**  Only address to

15  the panel.

16        **INMATE WILLIAMS:**  Yeah.  She said that I

17  confessed.  That's not true.  I've already taken it

18  once to the Federal Court to get them to remove untrue

19  stuff that they had in here for years, like my

20  juvenile armed robbery, and they finally took all that

21  stuff out there.  I had to go to Federal Court, file a

22  lawsuit and do all that.  It's not true.  There was

23  nothing in my trial ever about a confession.  What

24  occurred was I was kicking drugs, this habit that I

25  had been running.  I was sick.  They brought me over

26  for an interview room.  I told them I wanted a lawyer.

27  They refused to give me a lawyer.  They locked me in a

65

1   cold room for hours. When they finally came in and
2   started talking to me, they refused to listen to
3   anything I said. I told them I didn't do it. I
4   didn't have to do it. We made two sets of tapes. The
5   first set of tape that I made, it was about a hour and
6   a half. I told them I didn't do it. I didn't do it.
7   I came back in. She was already unconscious. I told
8   them. That was the first tape. There's two tapes,
9   and this is factual. Then they wasn't satisfied with
10  that. They wouldn't let me go back to the cell. They
11  wouldn't let me go. They kept me locked up. I kept
12  asking for a lawyer over and over. They refused to
13  give me. They held me over there about eight hours.
14  Finally they came back and they said, "Mr. Williams,
15  if you want to get out of here," they promised me that
16  they was going to take me to get me some drug
17  medication. That was a lie. They never did that.
18  They kept me over there until I finally made the
19  second tape. The second tape, I told them I may have
20  hit the child a couple of times, anything to get up
21  out of there. But I specifically stated in that last
22  tape I did not kill the child. That's what she's
23  calling a confession and that's not true. There were
24  both -- two tapes in there, both of those tapes. And
25  that's absolutely true. I went on a suppression
26  hearing on that.

27           **PRESIDING COMMISSIONER BRYSON:**  Okay.

66

1        **INMATE WILLIAMS:**  They did not --

2        **PRESIDING COMMISSIONER BRYSON:**  Sir, I don't

3    want to interrupt you, but let me tell you this, okay?

4    We have to abide by the findings of this court.  We

5    have to do that at this hearing.

6        **ATTORNEY GUNING:**  That's true, but I mean --

7        **PRESIDING COMMISSIONER BRYSON:**  And --

8        **ATTORNEY GUNING:**  He was raising the issue of

9    whether or not he made a confession.  I think he has a

10   right to --

11       **INMATE WILLIAMS:**  That's true.  That's not in no

12   court records, none.

13       **PRESIDING COMMISSIONER BRYSON:**  Okay.  You've

14   made that point and we will consider that.  We need to

15   hear from you why we should parole you.

16       **INMATE WILLIAMS:**  Okay.  I'm a different person,

17   not because I received some type of divine

18   enlightenment.  I got older and wiser.  I don't want

19   to hurt anyone, not a bird, not a plant, nothing.

20   I've never been accused in my life of hitting a woman,

21   never, of hitting a child, never, never.  This is the

22   first thing that I've ever had that concerns any

23   violence.  The one little fight that I had in prison

24   was I was attacked first and I defended.  That's all.

25   I know about murder, and I brought this up, just about

26   drugs.  This is my uncle, he was a famous jazz

27   musician.  He was the hunted murderer in Oakland.  His

67

1    name was Billy Beard, very famous.  He was a
2    (indiscernible) when he was 19.  Played with all the
3    jazz (indiscernible).  This article talks about it.
4    He was murdered.  Okay.  One thing my uncle told me.
5    My uncle fought heroin addiction for over 40 years.
6    All the big jazz greats of the times was into that
7    back then.  And one day, I had a discussion with him,
8    and I told my uncle about my life and how it was just
9    tearing me down.  I couldn't seem to get off of it.
10   And he told me this.  He said, "Sonny, I went through
11   that for 40 years.  It took me 40 years to get that
12   out my blood."  He said, "I went through programs.  I
13   went through everything.  Nothing works."  And anybody
14   know about A.A., N.A., everybody -- all our visitors
15   will talk about multiple relapses.  So even when
16   you're in a program, they relapse.  But he said it
17   comes a point when you stop.  And he said he reached
18   that point.  It took him 40 years to get there.  I've
19   been past that point.  I'm not going to use no drugs.
20   I don't care what happens today.  You know, I know I
21   can't get no parole.  I don't have parole plans.  I
22   know I don't have adequate parole plans.  I mean I'm
23   not unintelligent.  But what I'm saying to you is I'm
24   not going to hurt anybody.  I don't have a reputation,
25   even in the hunting world when I was out there, I had
26   no reputation for doing harm to anybody.  I'm not like
27   that.  I'm not going to do that.  I don't care.  When

68

1    I go back out here, I'm going to do my regular
2    program.  I'm going to keep getting involved.  People
3    come to me.  They talk to me.  I talk to other people
4    when they have problems.  That's the mode I'm in.  I
5    like studying.  I'm going to go back there.  I'm going
6    to study.  I'm going to read.  I'm going to do all the
7    things I need to do.  I'm not going to do nothing to
8    anyone.  Like I said, I think that I've grown too old
9    and too wise to not understand that my life has been
10   self-destructive.  I blame myself.  I don't blame the
11   system.  I blame myself.  So all I can say is believe
12   me, I'm not going to harm nobody.
13          **PRESIDING COMMISSIONER BRYSON:**  Okay.
14          **INMATE WILLIAMS:**  Yeah.
15          **PRESIDING COMMISSIONER BRYSON:**  Thank you.  We
16   will now recess for deliberations.  The time is 10:20.
17                    **R E C E S S**
18                      --o0o--
19
20
21
22
23
24
25
26
27

# EXHIBIT "E"

BOARD OF PRISON TERMS                                                    STATE OF CALIFO

# LIFE PRISONER DECISION FACE SHEET

## PERIOD OF CONFINEMENT

### (RECORDS OFFICER USE ONLY)

| | YR | MO |
|---|---|---|
| TENTATIVE COMPUTATION SUBJECT TO BPT ACTION | | |
| Adjusted Period of Confinement ................................................. | | |
| Date Life Term Begins ......................................................... + | | |
| At Large Time ..................................................................... + | | |
| PAROLE DATE ..................................................................... = | | |

### MISCELLANEOUS

*Denied 3 yrs*

*1. Disc free*
*2. upgrade. voc*
*3. AA/NA*

PENAL CODE SECTION 3042 NOTICES    ☒ SENT    (Date) __MAY 22, 1996__

COMMITMENT OFFENSE

| PC 187 / PC 12022 (B) | MURDER 2NS. / USE OF DEADLY WPN |
|---|---|
| (Code Section) | (Title) |
| ALA 80451 | 01 |
| (Case Number) | (Count Number) |

| Date Received by CDC | Date Life Term Begins | Controlling MEPD |
|---|---|---|
| 01/21/87 | | 12/28/96 |

| Type of Hearing | If Subsequent Hearing, Date of Last Hearing |
|---|---|
| ☒ INITIAL   ☐ SUBSEQUENT (Hearing No.) _____ | |

Department Representative

| Counsel for Prisoner | Address |
|---|---|
| District Attorney Representative | County |

## PAROLE HEARING CALENDAR

*This form and the panel's statement at the conclusion of the hearing constitute a __proposed__ decision and order of the Board of Prison Terms. The decision becomes effective when issued following the decision review process.*

By:

| | | Date |
|---|---|---|
| Presiding (Name) | | |
| Concurring (Name) | | Date |
| Concurring (Name) | | Date |

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DAT |
|---|---|---|---|---|
| WILLIAMS, ABE JR. | D-48163 | CSP-CORCORAN | 7/96 | 07/31/96 |

BPT 1001 (REV. 1/91)                                                    PERMANENT AD

52

1              CALIFORNIA BOARD OF PRISON TERMS

2                 D E C I S I O N

3          PRESIDING COMMISSIONER GILLIS:  Okay, we're

4    back on the record and all those who were previously

5    identified have returned.  We'll also note again for

6    the record that since the power's out at the

7    institution we're using two handheld tape recorders,

8    so if it's not all audible to the transcriber, we

9    apologize.  Mr. Williams, the panel has unanimously

10   determined that you're not suitable for parole at this

11   time and that you would pose an unreasonable risk of

12   danger and a threat to public safety.  We base that on

13   the following factors.  The commitment offense was

14   cruel and dispassionate.  The victim was abused.

15   These conclusions are drawn from the statement of

16   facts wherein the prisoner, over a period of time,

17   beat the three-year-old victim, resulting in her

18   death.  Under previous record, the prisoner has an

19   escalating pattern of criminal conduct which began at

20   an early age and extended over a long period of time.

21   He has an unstable social history which included the

22   heavy use of drugs and narcotics.  He dropped out of

23   school at an early age.  Also, he's failed at previous

24   attempts to correct his criminality.  That included

25   two prior prison terms and parole.  Under

26   institutional behavior, he has not completed a

27   **ABE WILLIAMS**    D-48163    **DECISION PAGE 1**    7/31/96

53

1    vocation that can be put to use upon release and has

2    not had sufficient participation in AA or NA.  The

3    psychiatric factors:  The report dated May 8, 1996 by

4    Dr. Evans is not totally supportive of release.

5    Dr. Evans states that his outside violence is above

6    average for individuals with alcohol or heroin use.

7    Under remarks, the panel finds that in view of the

8    prisoner's long criminal history and his negative

9    behavior while in the institution, there is no

10   indication that he would behave differently if

11   paroled.  We do recognize the gains that the prisoner

12   has made and we commend him for his participation in

13   the Laubach program.  He's also been disciplinary-free

14   since 1993.  However, these positive aspects do not

15   outweigh the factors of unsuitability.  We also find

16   that it is not reasonable to expect that parole would

17   be granted within the next three years and we base

18   that upon the following factors:  Again, the

19   commitment offense.  It was cruel and callous.  The

20   three-year-old victim, a vulnerable young victim, who

21   relied on adults for her support and care was tied --

22   her hands and feet, she was beaten, resulting in her

23   death.  It was a cruel and callous crime.  Secondly, a

24   longer period of time is required in view of the

25   prisoner's long history of criminality.  He's had two

26   prior prison terms, multiple contacts with law

27   **ABE WILLIAMS      D-48163      DECISION PAGE 2      7/31/96**

1    enforcement, he's had county jail time and none of
2    these things seemed to deter his criminality. Also,
3    the prisoner has committed multiple CDC 115 violations
4    since coming into the institution which included
5    stimulants and sedatives and this is important in that
6    the prisoner's long history of substance abuse -- it
7    indicates that he's not changed his behavior. Also,
8    the psychiatric report by Dr. Evans dated May of '96
9    indicates a need for a longer period of observation.
10   And finally, with the prisoner's long history of
11   substance abuse he needs some substance abuse
12   programming; specifically AA or NA and he's not had
13   sufficient participation in that. Recommendations are
14   that you remain disciplinary-free for your next
15   hearing -- disciplinary-free, period. Also, that you
16   upgrade vocationally -- some kind of a certificated
17   program; that you participation in self-help and
18   therapy programming; and also, that you work on your
19   parole plans. And we realize that the vocational and
20   self-help programs are dependent upon what's available
21   at the institution, but if it becomes available to
22   you, then we'd like you to participate. I'll give you
23   a copy of the tentative decision and I'll ask if any
24   of the panel members have any comments. Mr. Baker?
25            COMMISSIONER BAKER: No, I don't have any
26   comments.
27   ABE WILLIAMS      D-48163      DECISION PAGE 3      7/31/96

55

1          PRESIDING COMMISSIONER GILLIS:  Mr. Douglas?

2          DEPUTY COMMISSIONER DOUGLAS:  I think you're on

3      the right track.

4          INMATE WILLIAMS:  Okay.

5          DEPUTY COMMISSIONER DOUGLAS:  Good luck to you.

6          INMATE WILLIAMS:  All right.

7          PRESIDING COMMISSIONER GILLIS:  Good luck to

8      you.  That concludes the hearing.

9                          --oOo--

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25      PAROLE DENIED THREE YEARS

26      EFFECTIVE DATE OF THIS DECISION_____            OCT 2 3 1996

27      ABE WILLIAMS      D-48163     DECISION PAGE 4          7/31/96

# EXHIBIT "F"

BOARD OF PRISON TERMS                                          STATE OF CALIFORNIA
**LIFE PRISONER DECISION FACE SHEET**

| PERIOD OF CONFINEMENT | | | |
|---|---|---|---|
| *(RECORDS OFFICER USE ONLY)* | | | |
| | **YR** | **MO** | **DAY** |
| Adjusted Period of Confinement............................................................ | | | |
| Date Life Term Begins........................................................................... | +87 | 1 | 21 |
| At Large Time........................................................................................ | + | | |
| PAROLE DATE........................................................................................ | = | | |

| MISCELLANEOUS |
|---|

Denied 2 years

Panel recommendations and requests:
_____ Become ____✓____ Remain disciplinary free.
_____ Work towards reducing his/her custody level.
___✓___ Upgrade ____✓____ vocationally ____✓____ educationally
___✓___ Participate in ____self-help (and) ____✓____ therapy.
_____ Transfer to _____ Cat. X ____ Cat. T.

PENAL CODE SECTION 3042 NOTICES  ☒ SENT       (Date) 8/6/99

COMMITMENT OFFENSE

| 187 W/ 12022(B) & 667.5(B) 2 | MURDER 2ND W/USE DW & 2 PPT-NV |
|---|---|
| (Code Section) | (Title) |
| 80451 | **01** |
| (Case Number) | (Count Number) |

| Date Received by CDC 1/21/87 | Date Life Term Begins 1/21/87 | Controlling MEPD 12/28/96 |
|---|---|---|
| Type of Hearing ☐ INITIAL   ☒ SUBSEQUENT (Hearing No.) **1** | | If Subsequent Hearing, Date of Last Hearing 7/96 |

Department Representative
**JOY KELLAM TYLER, C & PR**

| Counsel for Prisoner **PATRICK SPARKS** | Address |
|---|---|
| District Attorney Representative THOMAS A ROSS | County ALAMEDA |

| PAROLE HEARING CALENDAR |
|---|

*This form and the panel's statement at the conclusion of the hearing constitute a proposed decision and order of the Board of Prison Terms. The decision becomes effective when issued following the decision review process.*

By:

| Presiding (Name) | Date 9/21/99 |
|---|---|
| Concurring (Name) | Date |
| Concurring (Name) | Date |

| NAME **WILLIAMS, ABE** | CDC NUMBER **D-48163** | INSTITUTION **CTF** | CALENDAR 7/99 | HEARING DATE 9/21/99 |
|---|---|---|---|---|

BPT 1001 (Rev. 1/91)

C-FILE COPY

36

1    CALIFORNIA BOARD OF PRISON TERMS

2             D E C I S I O N

3         PRESIDING COMMISSIONER GIAQUINTO:    All right,

4    We're back on record at 2:05.    We denied your parole.

5    The Panel reviewed all the information received from

6    the public and relied on the following circumstances

7    in concluding that the prisoner is not suitable for

8    parole.    He would pose an unreasonable risk of danger

9    to society and a threat to public safety if released

10   from prison.    The offense was carried out in a callous

11   manner with a disregard for the suffering of another

12   in a dispassionate manner.    These conclusions were

13   drawn from the statement of facts wherein the prisoner

14   assaulted this child, a three-year-old victim, and as

15   a result of the assault upon her she (inaudible).    She

16   succumbed to those injuries of blunt force trauma.

17   The prisoner has an escalating pattern of conduct

18   which included prior incarceration in state prison on

19   at least three occasions.    He had been arrested for

20   such things as parole violation on a couple of

21   occasions, had gone to CRC and had been arrested for

22   forgery and burglary and receiving stolen property,

23   passing bad checks.    He had used heroin, cocaine,

24   marijuana.    The prisoner has not sufficiently

25   participated in self-help or therapy.    The Panel makes

26   the following findings.    That the prisoner's gains are

27   ABE WILLIAMS, JR.    D-48163    DECISION PAGE 1 .  9/21/99

37

1    recent and he must demonstrate an ability to maintain

2    gains over an extended period of time.   The Panel

3    notes that it was a short six years ago when the

4    prisoner got his last 115.   He should be commended for

5    participating in such things as life skills.   He is of

6    course working as a clerk and he has not completed a

7    vocation, per se, but when you do look at some of the

8    stuff that he has had including that -- I don't know

9    what I just did with it -- well, some of the stuff

10   that he has completed, highlighted.   The machinist,

11   apprentice tool and dye maker, and linear mill

12   specialist, and I think also a paralegal and things of

13   that nature, plus he had some skills before he came to

14   prison.   And he was involved in Breakthrough Barriers

15   and things like that.   As far as the vocation goes, he

16   does have skills in some areas that he could probably

17   make a living in and we would be remiss to not at

18   least acknowledge those for what they are.   However,

19   these positive aspects of his behavior do not outweigh

20   the factors of unsuitability.   This is a two-year

21   denial.   The Panel finds that it is not reasonable to

22   expect a parole be granted in the following two years.

23   Number one, for the life crime wherein this prisoner

24   murdered this three-year-old girl.   He tied her up,

25   beat her, and she succumbed as a result to blunt force

26   trauma.   He has completed necessary programming which

27   ABE WILLIAMS, JR.    D-48163   DECISION PAGE 2   9/21/99

38

1   is essential to his adjustment.  He needs additional

2   time to gain such programming.  And he's also been

3   given plenty of opportunities in the past by society

4   in that he was placed on parole on several occasions

5   and violated parole, then the CRC, then the prison.

6   The Panel recommends that the prisoner remain

7   disciplinary free and continue to upgrade vocationally

8   and educationally and participate in available self-

9   help and therapy that is available to him.  That ends

10  the reading of the decision.  I did read both jurors'

11  statements.  It was enlightening and it gave me pause

12  for thought, but we have to accept as true the court

13  findings.  And the court findings and what that jury

14  found was that you were guilty of second-degree

15  murder.  If there is some reason in the future why

16  that is overturned, then more power to you.  But I do

17  believe that I read all of them.  Actually I read a

18  couple of the other documents that were in there, too,

19  and their concerns about, one, they expressed some

20  concerns about your representing yourself after you

21  fired your attorney and that manslaughter issue.  I

22  don't know whether the judge spoke to that issue.  But

23  that's beyond our ability to deal with those issues.

24  You understand that, right?

25          INMATE WILLIAMS:  Yes, Sir.

26          PRESIDING COMMISSIONER GIAQUINTO:  All right.

27  ABE WILLIAMS, JR.   D-48163   DECISION PAGE 3 . 9/21/99

39

1    Mr. Patterson, any comments?

2         DEPUTY COMMISSIONER PATTERSON:  As far as I can

3    tell, that document is not in your C file.  You should

4    talk to your counselor if you want it to be made part

5    of your C file.

6         INMATE WILLIAMS:  Okay.

7         DEPUTY COMMISSIONER PATTERSON:  I've looked

8    through there.  I can't find it.  The one you gave to

9    the Panel in '96.  It may be in there.  There's your

10   file.  It's pretty thick but I flipped through the

11   section where it should be and I didn't locate it.

12   Now maybe it's in there.  You should do an Olson

13   review.  If it's not in there, you should talk to your

14   counselor about getting it in.

15        INMATE WILLIAMS:  Yes, Sir.

16        PRESIDING COMMISSIONER GIAQUINTO:  Mr. Hepburn,

17   any comments?

18        COMMISSIONER HEPBURN:  No comments.

19        PRESIDING COMMISSIONER GIAQUINTO:  I want to

20   wish you good luck.

21        INMATE WILLIAMS:  All right.  Thank you very

22   much.

23        PRESIDING COMMISSIONER GIAQUINTO:  Same to you,

24   Mr. Williams.

25   PAROLE DENIED TWO YEARS

26   EFFECTIVE DATE OF THIS DECISION    OCT 0 8 1999

27   ABE WILLIAMS, JR.  D-48163   DECISION PAGE 4 .  9/21/99

# EXHIBIT "G"

BOARD OF PRISON TERMS

STATE OF CALIFORNIA

# LIFE PRISONER DECISION FACE SHEET

## PERIOD OF CONFINEMENT

### (RECORDS OFFICER USE ONLY)

|  | YR | MO | DAY |
|---|---|---|---|
| Adjusted Period of Confinement .......................... |  |  |  |
| Date Life Term Begins ........................................ | + |  |  |
| At Large Time ..................................................... | + |  |  |
| PAROLE DATE *Denied 1 yr. Pl. on 2/2003. Cal fer Sub #4* | = |  |  |

## MISCELLANEOUS

*1 year Denial*

Panel Recommendations And Requests:
_____ Become ✓ Remain Disciplinary Free.
_____ Work Towards Reducing His/Her Custody Level.
✓ Upgrade _____ Vocationally _____ Educationally,
✓ Participate in _____ Self-Help (and) _____ Therapy.
_____ Transfer To _____ Cat. X _____ Cat. T.

PENAL CODE SECTION 3042 NOTICES   ☒ SENT   (Date) _____ 12-19-2002

COMMITMENT OFFENSE

| P187, P12022(B) | MURDER 2ND W/USE OF DEADLY WEAPON |
|---|---|
| (Code Section) | (Title) |
| 80451 | 1 |
| (Case Number) | (Count Number) |

| Date Received by CDC | Date Life Term Begins | Controlling MEPD |
|---|---|---|
| 5-27-84 | 1-21-87 | 10-29-1996 |

| Type of Hearing | If Subsequent Hearing, Date of Last Hearing |
|---|---|
| ☐ INITIAL  ☒ SUBSEQUENT (Hearing No.) 3 | 2-7-2002 |

Department Representative
CARLA SAWYER, BPT DESK

| Counsel for Prisoner | Address |
|---|---|
| CANDICE CHRISTENSEN | SACRAMENTO, CA |

| District Attorney Representative | County |
|---|---|
|  | ALAMEDA, CA |

## PAROLE HEARING CALENDAR

*This form and the panel's statement at the conclusion of the hearing constitute a proposed decision and order of the Board of Prison Terms. The decision becomes effective when issued following the decision review process.*

By:

| Presiding (Name) | Date | 2 |
|---|---|---|
| Concurring (Name) | Date | - 6 |
| Concurring (Name) | Date | -03 |

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|---|---|---|---|---|
| WILLIAMS, ABE | D-48163 | MCSP | 2-2003 | 2-6-2003 |

BPT 1001 (REV. 1/91)

PERMANENT ADDEN

42

```
1              CALIFORNIA BOARD OF PRISON TERMS

2                     D E C I S I O N

3              DEPUTY COMMISSIONER COLDREN:  We're on

4    record, side two.

5              PRESIDING COMMISSIONER MOORE:  All right,

6    Abe Williams, CDC number D-48163.  The Panel

7    reviewed all information received from the public

8    and relied on the following circumstances in

9    concluding that the prisoner is not suitable for

10   parole.  Mr. Williams, this is a one year denial.

11   The offense was carried out in an especially

12   cruel and callous manner.  The offense was

13   carried out in a dispassionate manner.  The

14   offense was carried out in a manner that

15   demonstrates an exceptionally callous disregard

16   for human sufferings.  The victim was three years

17   of -- three years of age, Tequila Hawkins.  The

18   prisoner tied the victim's hands, one to one door

19   and her feet to another door, and beat the victim

20   until she lost consciousness.  The child was

21   taken to the hospital by her mother and pronounced

22   dead on arrival.  The cause of death was blunt

23   trauma to the head.  However, the prisoner denies

24   this.  He says that he did not commit this crime

25   and that the perpetrator would be the victim's

26   mother.  The prisoner was under the influence of

27   ABE WILLIAMS  D-48163   DECISION PAGE 1   2/6/03
```

1    heroin and he absconded right after the events
2    took place.  Nevertheless, the prisoner has been
3    tried and adjudicated through this process and
4    was convicted of the -- causing the demise of a
5    young three-year-old.  Previous record, the
6    prisoner has an escalating pattern of criminal
7    conduct and violence.  He has a history of
8    unstable, tumultuous relationships with others in
9    terms of problems -- numerous problems with
10   alcohol and drugs.  The prisoner had a prior term,
11   prison term down at the CRC for his drug problem.
12   He failed probation -- strike that, failed parole
13   for that particular time, and he's failed parole a
14   couple of times.  The prisoner failed to profit
15   from society's previous attempts to correct his
16   criminality.  Such attempts included probation,
17   county jail time and a prior prison term as
18   already mentioned before as well as failed --
19   failure on parole some two times.  And the
20   prisoner has an unstable social history, prior
21   criminality, and prior criminality, which includes
22   arrests and convictions for burglary, two of
23   those.  Two for receiving stolen property.  Two
24   arrests and convictions for -- actually they are
25   for violation of his probation and then there was
26   a bad checks and then Health and Safety violation
27   **ABE WILLIAMS  D-48163   DECISION PAGE 2   2/6/03**

1    that he returned to prison for.  Now, the
2    institutional behavior, the prisoner has not
3    sufficiently participated in beneficial self-help
4    and therapy at this time.  He's failed to
5    demonstrate evidence of positive change.
6    Misconduct while incarcerated includes one 115,
7    however, not serious.  An administrative 115 that
8    probably should not have been written.  However,
9    it was an administrative 115 back in 2001 that
10   we're not counting heavily on.  Parole plans, the
11   prisoner lacks realistic parole plans in that he
12   does not have a viable residential plan in the
13   last county of legal residence nor does he have an
14   acceptable employment plan.  3042 notices, the
15   Hearing Panel notes responses to 3042 notices
16   indicate opposition to a finding of parole
17   suitability, specifically the District Attorney's
18   office of Alameda County sent a letter in
19   opposition from the District Attorney himself.
20   The letter was signed January 2003 by Timothy J.
21   Wellman, that's W-E-L-L-M-A-N, in opposition to a
22   finding of suitability today as well as the
23   Oakland -- a letter from the Oakland Police
24   Department.  The police department, which was the
25   law enforcement agency that investigated the case.
26   And again this letter is from the -- signed by
27   **ABE WILLIAMS  D-48163   DECISION PAGE 3   2/6/03**

```
 1   two individuals from the homicide section of the
 2   Oakland Police Department, and that would be
 3   Sergeant James A. Rullamas, Rullamas, and that
 4   would be spelled capital R-U-L-L-A-M-A-S, a
 5   sergeant.  And then there is Lieutenant Jim Emery,
 6   and that would be capital E-M-E-R-Y, a lieutenant
 7   of the homicide section of the Oakland Police
 8   Department wrote a letter as well in January of
 9   2003 in opposition to a finding of suitability at
10   this time.  Other information bearing on the
11   suitability would be that the prisoner's
12   counselor, a CCI B. L. Patton, P-A-T-T-O-N, wrote
13   in the current Board report that the prisoner
14   would pose an unknown degree of threat at this
15   time.  Remarks to the prisoner, the prisoner's
16   gains are recent and he must demonstrate the
17   ability to maintain these gains over an extended
18   period of time.  Nevertheless, the prisoner
19   should be commended.  He completed Conflict
20   Resolution in the past.  He's been in the 12-step
21   NA program.  He has positive reports as a porter.
22   He's completed computer repair.  He's certified
23   paralegal and he is 15 units short of an AA
24   degree as well as receiving positive or excellent
25   reports in the office services related
26   technologies program as well as he had his high
27   ABE WILLIAMS  D-48163   DECISION PAGE 4   2/6/03
```

46

1    school equivalency completed in October of 2002.

2    However, these positive aspects of his behavior

3    don't outweigh the factors of unsuitability at

4    this time.  Mr. Williams, this is a one year

5    denial as mentioned before.  The Panel recommends

6    to you to become and to remain disciplinary free.

7    If it's available to you, to upgrade vocationally

8    and educationally as well as if it's available to

9    you to participate in beneficial self-help and

10   therapy programming at this time.  As well, we

11   have received information that you have presented

12   to us here today and we're going to request that

13   an investigation into that -- into your

14   allegations that you made today.  We don't know

15   what will come from that, but we will request that

16   on your behalf.

17          INMATE WILLIAMS:  Thank you.

18          PRESIDING COMMISSIONER MOORE:  All right.

19   This will conclude our hearing today.

20   Commissioner, any comments to the prisoner?

21          DEPUTY COMMISSIONER COLDREN:  Good luck,

22   sir.

23          INMATE WILLIAMS:  Thank you very much,

24   Sir.

25          PRESIDING COMMISSIONER MOORE:  Good luck to

26   you, Mr. Williams.

27   ABE WILLIAMS  D-48163   DECISION PAGE 5   2/6/03

47

1           INMATE WILLIAMS:  Thank you.

2           PRESIDING COMMISSIONER MOORE:  The time is

3     approximately 0950.

4                        --o0o--

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    PAROLE DENIED ONE YEAR

26    FINAL DATE OF DECISION_____MAY 0 7 2003_____

27    ABE WILLIAMS  D-48163   DECISION PAGE 6   2/6/03

48

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, Sandy Tillman, a duly designated
transcriber, CAPITOL ELECTRONIC REPORTING, do
hereby declare and certify under penalty of
perjury that I have transcribed tape(s) which
total one in number and cover a total of pages
numbered 1 through 47, and which recording was
duly recorded at MULE CREEK STATE PRISON, at IONE,
CALIFORNIA, in the matter of the SUBSEQUENT
PAROLE CONSIDERATION HEARING of ABE WILLIAMS,
CDC No. D-48163 on FEBRUARY 6, 2003, and that the
foregoing pages constitute a true, complete, and
accurate transcription of the aforementioned
tape(s) to the best of my ability.

I hereby certify that I am a disinterested
party in the above-captioned matter and have no
interest in the outcome of the hearing.

Dated February 24, 2003, at Sacramento
County, California.

Sandy Tillman
Transcriber
CAPITOL ELECTRONIC REPORTING

# EXHIBIT "H"

LIFE PRISONER HEARING DECISION FACE SHEET

| | Records Use Only |
|---|---|
| [ ] PAROLE GRANTED – (YES) CDC: Do not release prisoner before Governor's review. | Parole Release Date_____ YR          MO.          DAY |
| [ ] PAROLE DENIED – (NO)  *denie (1) yur* | Attach Prison Calculation Sheet |
| [ ] AGREED UNSUITABLE (Attach 1001A Form) FOR:_____YEAR(S)  *Denied 1yr* | *New psy report* |
| [ ] HEARING POSTPONED/REASON:_____  *Place on 5/2005 calendar* | |

## PANEL RECOMMENDATONS AND REQUESTS

**The Board Recommends:**

[ ] No more 115's or 128A's     [ ] Stay discipline free
[ ] Work to reduce custody level   [ ] Learn a trade*        [ ] Earn positive chronos
[ ] Get self-help*           [ ] Get therapy*          [ ] Get a GED*

[ ] Recommend transfer to _____
[ ] Other_____
*These programs are recommended if they are offered at your prison and you are eligible/able to participate

| Penal Code 3042 Notices | [x] Sent | Date: MARCH 26, 2004 | |
|---|---|---|---|

| Commitment Offense(s) | P187, P12022(B) | MURDER 2ND W/USE OF DEADLY WEAPON | |
|---|---|---|---|
| | Code(s) | | Crime(s) |
| | 80451 | | 1 |
| | Case #(s) | | Count #(s) |

| Date Inmate Came to CDC 05/27/84 | Date Life Term Began 01/21/87 | Minimum Eligible Parole Date 10/29/1996 |
|---|---|---|

[ ] Initial Hearing    [X]Subsequent (Hearing No.) ___4___    Date of Last Hearing _02/06/03_

CDC Representative:  Delores Chavier, BPT Desk

Attorney for Prisoner: Rhonda Skipper-Dotta        Address: Galt, CA

D.A. Representative:                    County: Alameda

This form and the Board's decision at the end of the hearing is only <u>proposed</u> and NOT FINAL.  <u>It will not become final until it is reviewed.</u>

Chair _____  Date _____

Panel Member _____  Date _____

Panel Member _____  Date _____

| NAME WILLIAMS, ABE | CDC # D-48163 | PRISON MCSP/IONE | CALENDAR 02/2004 | DATE 05/13/04 |
|---|---|---|---|---|

BPT 1001 (REV. 08/03)

58

1          **CALIFORNIA BOARD OF PRISON TERMS**

2                    **D E C I S I O N**

3          **PRESIDING COMMISSIONER WELCH:**  Mr. Williams,

4     we do have a decision.  First of all, everyone

5     that was here before have returned.  The Panel

6     reviewed all the information received from the

7     public and relied on the following circumstances

8     in concluding that the prisoner is not suitable

9     for parole and would pose an unreasonable risk of

10    danger to society or a threat to public safety if

11    released from prison.  Number one is the crime.

12    The crime was carried out in an especially cruel

13    and callous manner.  Since this is the type of

14    crime that certainly shocks the consciousness of a

15    community.  It's a child, a defenseless child;

16    three years old who was brutally murdered.  The

17    offense was carried out in a dispassionate and

18    calculated manner.  Certainly if the record is

19    correct, the child was abused during the offense.

20    The offense was carried out in a manner that shows

21    a total callous disregard for another human being.

22    Not to mention the vulnerable, the most vulnerable

23    in our society; the young, the young that depends

24    on us to be caregivers.  The motive for the crime

25    was inexplicable. And that I guess that's one of

26    the problems.  There's no motive for this crime.

27    **ABE WILLIAMS   D-48163  DECISION PAGE 1   5/13/04**

1    The conclusions was drawn from the Statement of

2    Facts, wherein on May 24th, 1984, the victim,

3    Tequilla Hawkins, age three and the mother,

4    Deborah Harris, the prisoner was with

5    (indiscernible) Williams had tied the victim's

6    hands to one door and feet to another door.  He

7    beat her until she lost consciousness.  And the

8    child was taken to the emergency room by Deborah

9    Harris and was pronounced dead on arrival from

10   blunt trauma.  On previous, the prisoner does have

11   an escalating pattern of criminal conduct.  That

12   is two prior prison terms.  He have a history of

13   violations of the law.  He failed previous grants

14   of probation and parole.  He failed to profit from

15   society's previous attempts to correct his

16   criminality.  That included a (indiscernible) with

17   adult offenses, adult probation, parole, county

18   jail, and a prior prison term.  Under unstable

19   social history, certainly an element of unstable

20   social history would be the prisoner's criminality

21   and his lifelong use of drugs or his use of drugs

22   at the time.  The prisoner has programmed in

23   recent times.  He's demonstrated he can program.

24   Recent psychological report dated 6/16/1999, by

25   Joe Reed, indicate the prisoner have a low in

26   terms of being in custody.  His violence potential

27   **ABE WILLIAMS  D-48163  DECISION PAGE 2   5/13/04**

 1    is low and if he's released to the community, it's

 2    no more than the average citizen, according to Joe

 3    Reed, psychological report dated 6/16/1999.  We'll

 4    request a new psychological evaluation.  The

 5    prisoner does have what appears to be realistic

 6    residential plans.  However, he needs to work on

 7    his employment plans.  However, he does appear to

 8    have realistic job skills or marketable skills.

 9    The Hearing Panel notes that responses to Penal

10    Code 3042 notices indicating opposition to a

11    finding of suitability.  Specifically the Deputy

12    District Attorney from Alameda spoke in opposition

13    and the Police Department from Oakland submitted a

14    letter in opposition.  The Panel makes the

15    following findings:  That the prisoner needs to

16    continue to involve himself in the kinds of

17    programs that he's currently involved in; the

18    kinds that would enable him to be able to face,

19    discuss, understand, and cope with stressful

20    situations in a non-destructive manner.  Until

21    enough gains is made -- is made -- is made, the

22    Panel feels that the prisoner would continue to be

23    unpredictable and a threat to others.

24    Nevertheless, there's some things we want to

25    commend him for.  We want to commend him for his

26    outstanding participation in an array of self-help

27    **ABE WILLIAMS  D-48163  DECISION PAGE 3   5/13/04**

```
 1   programs.  His work ethic (indiscernible)
 2   participated in the programs that he participated
 3   in; Anger Management, just to name a few.  Tutor
 4   Education; all those kinds of things we want to
 5   commend him for.  However, those positive aspects
 6   of his behavior does not outweigh the factors of
 7   unsuitability.  Parole is going to be denied for
 8   one year. The Panel recommend that he remain
 9   disciplinary free and he continues to participate
10   in positive kinds of programs.  That he continue
11   to work in the self-help area and he continue to
12   participate in educational and vocational
13   programs.  We are requesting a new psychological
14   evaluation to be completed.  That concludes the
15   reading of the decision.  Good luck to you,
16   Mr. Williams.  Commissioner Wolk, do you have any
17   comments?
18        DEPUTY COMMISSIONER WOLK:  I'm just suggesting
19   you have a solid job offer the next time you have
20   your hearing.
21        INMATE WILLIAMS:  All right.
22        DEPUTY COMMISSIONER WOLK:  Good luck to you.
23        PRESIDING COMMISSIONER WELCH:  Good luck to
24   you, sir.
25        INMATE WILLIAMS:  All right, thank you.
26        PRESIDING COMMISSIONER WELCH:  That concludes
27   ABE WILLIAMS  D-48163  DECISION PAGE 4   5/13/04
```

1    this hearing at approximately 2:40 p.m.

2                        --o0o--

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23    PAROLE DENIED ONE YEAR

24    THIS DECISION WILL BE FINAL ON:_____ SEP 10 '__

25    YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT

26    DATE, THE DECISION IS MODIFIED.

27    ABE WILLIAMS  D-48163  DECISION PAGE 5   5/13/04

63

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, SANDRA TRIPLETT, a duly designated transcriber, CAPITOL ELECTRONIC REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total one in number and cover a total of pages numbered 1 through 62, and which recording was duly recorded at MULE CREEK STATE PRISON, at IONE, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of ABE WILLIAMS, CDC No. D-48163, on MAY 13, 2004, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated May 26, 2004, at Sacramento County, California.

Sandra Triplett
Transcriber
**CAPITOL ELECTRONIC REPORTING**

# EXHIBIT "I"

**BOARD OF PRISON TERMS**                                        STATE OF CALIFORNIA
**LIFE PRISONER: PAROLE CONSIDERATION PROPOSED DECISION:**
                                   **DENY PAROLE**

                                      *one*

**☒ PAROLE DENIED FOR:**          (1)    2    3    4    5    **YEARS**

If this decision is final, you WILL NOT get paroled. The Board will send you a copy of the decision. It will indicate the reasons you did not get paroled. If this decision is not final, the Board will set up another hearing. You can read the laws about your hearing. You can find the laws at California Code of Regulations, Title 15, section 2041.

**RECOMMENDATIONS**

The Board Recommends:

[ ] No more 115's or 128A's                [ ] Learn a trade*
[ ] Work to reduce custody level           [ ] Get therapy*
[ ] Get self-help*                         [ ] Earn positive chronos
[ ] Stay discipline free                   [ ] Get a GED*

[ ] Recommend transfer to _____
[ ] Other

_____
_____

* These programs are recommended if they are offered at your prison and you are eligible/able to participate.

---

**HEARING PANEL**

Name _____          Date _____

Name _____          Date _____

Name _____          Date

---

| NAME | CDC# | PRISON | DATE |
|------|------|--------|------|
| WILLIAMS, ABE | D-48163 | MCSP-IONE | 5-13-04 |

BPT 1005(b)                                        Distribution: White-C File
(REV 04/04)                                                    Canary-BPT

BOARD OF PRISON TERMS                                                              STATE OF CALIFORNIA
# LIFE PRISONER PAROLE CONSIDERATION WORKSHEET

[ ]  INITIAL HEARING                         [X] SUBSEQUENT HEARING

| PRISONER'S NAME | CDC NUMBER |
|---|---|
| WILLIAMS, ABE | D-48163 |
| DATE OF HEARING | LOCATION |
| 05/13/04 | MULE CREEK STATE PRISON-IONE |

## LEGAL STATUS

| DATE RECEIVED | DATE LIFE TERM STARTS (If different) | COUNTY |
|---|---|---|
| 05/27/84 | 01/21/87 | ALAMEDA |
| OFFENSE | | CASE NUMBER |
| MURDER 2ND W/ USE OF DEADLY WPN. | | 80451 |
| COUNT NUMBER(S) | PENAL CODE SECTION(S) VIOLATED | |
| 01 | P187, P12022(B) | |
| TERMS | MEPD | |
| 15 TO LIFE | 10/29/1996 | |

### OTHER COMMITMENT OFFENSES *OR* STAYED COUNTS

| STAYED | OFFENSE | CODE SECTION | COUNTY | CASE NUMBER | COUNT NUMBER |
|---|---|---|---|---|---|
| [ ] | | | | | |
| [ ] | | | | | |
| [ ] | | | | | |

## PRESENT AT HEARING

| PANEL MEMBER | PANEL MEMBER | PANEL MEMBER |
|---|---|---|
| | | |

OTHERS PRESENT:

[ ]  PRISONER (IF ABSENT, WHY)_____

[ ]  ATTORNEY_____

[ ]  DEPUTY D.A._____COUNTY OF _____

[ ]  OTHERS:_____

## STATEMENT OF FACTS

[X] THE HEARING PANEL INCORPORATES BY REFERENCE FROM THE DECISION OF THE HEARING HELD
   ON _____, PAGES _____ THROUGH _____.

[ ] THE STATEMENT OF FACTS IS

   [X] QUOTED FROM THE BOARD REPORT, DATED _2 / 0 5/, PAGE(S)_____.

   [ ] QUOTED FROM THE PROBATION OFFICER'S REPORT, PAGE(S)_____.

   [ ] QUOTED FROM THE COURT OPINION, PAGE(S)_____.

STATE OF CALIFORNIA

| | Records Use Only |
|---|---|
| [ ] PAROLE GRANTED – (YES)<br>CDC: Do not release prisoner before<br>Governor's review. | Parole Release Date_____<br>YR          MO          DAY |
| [ ] PAROLE DENIED – (NO) | Attach Prison Calculation Sheet |
| [✓] AGREED UNSUITABLE (Attach 1001A Form) FOR:___ | YEAR(S) Schedule $^{10}/_{06}$ |
| [ ] HEARING POSTPONED/REASON:_____ | |

## PANEL RECOMMENDATONS AND REQUESTS

The Board Recommends:
[ ] No more 115's or 128A's
[ ] Work to reduce custody level
[ ] Get self-help*

[ ] Stay discipline free
[ ] Learn a trade*
[ ] Get therapy*

[ ] Earn positive chronos
[ ] Get a GED*

[ ] Recommend transfer to _____
[ ] Other_____
*These programs are recommended if they are offered at your prison and you are eligible/able to participate

| Penal Code 3042 Notices | [X] Sent | Date: August 26, 2005 |
|---|---|---|

| Commitment Offense(s) | P187; P12022 (B) | MURDER 2ND, USE OF DEADLY WPN. |
|---|---|---|
| | Code(s) | Crime(s) |

| | 80451 | 1 |
|---|---|---|
| | Case #(s) | Count #(s) |
| Date Inmate Came to CDC<br>05/27/1984 | Date Life Term Began<br>01/21/1987 | Minimum Eligible Parole Date<br>10/29/1996 |

[ ] Initial Hearing     [X] Subsequent (Hearing No.) __5__     Date of Last Hearing __05/13/04__

CDC Representative: Delores Chavier, BPT Desk

| Attorney for Prisoner: Ben Ramos | Address: Citrus Heights, CA |
|---|---|
| D.A. Representative: | County: Alameda |

This form and the Board's decision at the end of the hearing is only proposed and NOT FINAL. It will not become final until it is reviewed.

| Chair _____ | Date _____ |
|---|---|
| Panel Member _____ | Date _____ |
| Panel Member _____ | Date _____ |

| NAME<br>WILLIAMS, ABE | CDC #<br>D-48163 | PRISON<br>MCSP-IONE | CALENDAR<br>05/2005 | DATE<br>10/14/05 |
|---|---|---|---|---|

BPT 1001 (REV. 08/03)

BOARD OF PRISON TERMS
LIFE PRISONER HEARING – EXTRAORDINARY ACTION AND DECISION

STATE OF CALIFORNIA
BPT 1001A (Rev. 10/89)

| ACTION TYPE (select one) | ☐ Waiver of Appearance | ☐ Request for Postponement | ☑ Waiver of Parole Consideration Hearing- Stipulation of Unsuitability | |
|---|---|---|---|---|
| HEARING TYPE (select one) | ☐ Parole Consideration | ☐ Progress | ☐ Rescission | Hearing Date |

## WAIVER OF RIGHT TO ATTEND HEARING

I understand that I am scheduled for the Board of Prison Terms hearing indicated above.

☐ I do not wish to attend my Board hearing and do not wish to be represented at the hearing. The hearing will be held in my absence.

☐ I do not personally wish to attend my hearing but I do wish to be represented by counsel at the hearing.

 ☐ I will employ counsel to represent me at the hearing.

 ☐ I cannot afford counsel and wish counsel appointed to represent me.

## POSTPONEMENT

I understand that I am scheduled for the Board of Prison Terms hearing indicated above.

☐ I hereby request that the hearing indicated above be Postponed to _____ .

 The reasons for my request for a postponement are stated below.

## WAIVER OF HEARING AND STIPULATION TO UNSUITABILITY

I understand that I am scheduled for the Board of Prison Terms hearing indicated above.

☐ I waive my right to a parole consideration hearing and I waive the right to have an attorney represent me at a hearing in my absence. I find that I am unsuitable for parole based on my reasons given on this form and therefore request that you find me unsuitable.

 ☑ One-year Denial       ☐ Two-year Denial       ☐ Three-year Denial

PRISONER'S REASON(S) FOR REQUEST:
(For Example: Psychiatric Evaluation Not Supportive, Programming Inadequate, Cat H Incomplete, etc.)

To obtain support letters, a
job offer letter, support letter
from the victim's relative, and to
resolve legal issues pending in
Eastern District Federal Court

| | Date |
|---|---|
| Signature of Prisoner | 10/13/05 |
| Signature of Attorney (if applicable) | 10/13/05 |
| Signature and Title of Witness (CDC) | |

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | DATE |
|---|---|---|---|---|
| WILLIAMS ABE | D-49163 | MULE CREEK | OCTOBER | 10/13/0. |

BOARD OF PRISON TERMS
LIFE PRISONER HEARING – EXTRAORDINARY ACTION AND DECISION

STATE OF CALIFORNIA
BPT 1001A (Rev. 10/89)

☐ I certify to the best of my knowledge and information, the foregoing reasons as stated by the prisoner are accurate, and that the prisoner was capable of making a knowledgeable decision regarding his/her hearing.

The following information is submitted for the Board's consideration in making their decision:

_____

_____

_____

_____

| C&PR Signature | Date |
|---|---|
| | |

*FOR BOARD OF PRISON TERMS USE ONLY*

## DECISION / ORDER

### WAIVER OF RIGHT TO ATTEND HEARING

1. ☐ Request is denied.

   ☐ Request is granted. Hearing will be conducted in absence of prisoner.

### POSTPONEMENT

2. ☐ Request is denied.

   ☐ Request is granted. Grant based on a finding of good cause. Place on _____ calendar.

### WAIVER OF HEARING AND STIPULATION TO UNSUITABILITY

3. ☐ Request is denied.

   ☒ Request is granted. The Board agrees to enter into the stipulation, on a finding of good cause, offered by the prisoner on the waiver of his/her Life Parole Consideration Hearing and orders a:
   ☒ One-year denial    ☐ Two-year denial*    ☐ Three-year denial**

   \* The Board must find it unreasonable to expect that the prisoner would be eligible for parole during the second, or second and third year, and the Board must state the reasons for its finding.

   \*\* In addition to the above (*), the prisoner must have been convicted of more than one offense which involves the taking of a life.

(The basis of the finding of good cause for postponement or multiple-year denial must be stated below.)

   ☐ Good cause based on the reasons given by the prisoner.

Other comments (if applicable):

Prisoner + claims 15 letters had been sent + not made it into file.

_____

Signature of BPT Commissioners

1. _____    Date 10

2. _____    Date 13

| BPT Action Taken At: | ☐ BPT Headquarters | ☒ Institution | | 0: |
|---|---|---|---|---|
| NAME | CDC NUMBER | INSTITUTION | CALENDAR | DATE |

# EXHIBIT "J"

# MULE CREEK STATE PRISON
**Ione, California**

## BOARD OF PRISON TERMS
## LIFE-TERM MENTAL HEALTH EVALUATION

*A comprehensive evaluation according to the Revised 1998 Format has been completed and, on the whole, is considered valid. The current report is an update and will address those areas that are dynamic in nature and could have changed since the last report. It should be read in the context of the original comprehensive evaluation.*

*Calendar Year of 2005*

## CLINICAL EVALUATION

### IDENTIFYING INFORMATION
Mr. Williams is a 55-year-old (DOB: 11-11-49) African-American male, who us currently serving a fifteen-years-to-life term for Second Degree Murder. The inmate does not have any disabilities according to the Americans with Disabilities Act. The inmate was informed that the purpose of the interview was to complete a report for the Board of Prison Terms for their use in making a determination regarding his parole. The inmate stated that he understood the nature, purpose and import of the evaluation.

### SOURCES OF INFORMATION
The inmate's Central File and Unit Health Record were reviewed. The inmate was seen for a one-hour assessment interview (2-18-05). The history and description of the crime are detailed elsewhere and will not be repeated here. Mr. Williams has several prior psychological evaluations in his file with the determination that he has no serious psychopathology or mental disorder, with which I concur.

### REFERRAL ISSUES
For this report, the BPT has requested the following issues be addressed:

1. the prisoner's violence potential in the free community
2. the significance of alcohol/drugs as it relates to the commitment offense and an estimate of the prisoner's ability to refrain from use/abuse of same when released
3. the extent to which the prisoner has explored the commitment offense and come to terms with the underlying causes
4. the need for further therapy programs while incarcerated

### CURRENT MENTAL STATUS

Mr. Williams presented as a neatly dressed and groomed 55-year-old African-American man. His grooming and hygiene were good. He reported he understood the purpose of the evaluation.

His speech was clear, evenly paced and appropriately modulated. He was oriented to person, place, and year, month, date, and day. He responded to questions openly, and appeared to answer them to the best of his ability. He is considered to be a good historian.

He reported that his mood was "pretty happy." His mood was observed to be neither depressed nor elated during most of the evaluation. His moment-to-moment mood state was congruent with the content of his speech. There was no evidence of unusual emotional expression, physiological disturbance, or physical slowness or acceleration during the evaluation. Based on the content and his usage of language he appears to function in the low average range intellectual of ability. His level of consciousness was not impaired. His remote, recent, and immediate memory did not appear to be impaired, and he was able to provide adequate detail regarding his background history, and the circumstances of his commitment offense.

His response to comparison of two similar items revealed good abstract thinking. He was able to comprehend simple proverbs and situational problems. His thought processes were logical and coherent. There was no evidence of perceptual or communication disorder. He denied auditory or visual hallucinations, and there was no evidence of thought disorder, paranoia, intrusive thoughts, delusions, perceptual disorders, or obsessive thinking. He denied suicidal or homicidal ideation, and does not have any active plan or intent for the same. He is able to carry out daily activities. He is not taking any psychotropic medications. He is not involved in the Mental Health Program. In summary, the mental status examination finds him to be functioning without significant emotional or cognitive impairment.

### *UPDATED HISTORY AND PERSONAL GROWTH*

Since his last Psychological Evaluation in May 1999, Mr. Williams has attended several different self-help programs. He has attended classes in Thinking Errors, Problem Solving, Abuse and Addiction, Anger Management, Self-Esteem, First Step, Relapse Prevention, Life Management and Values for Responsible Living. He has also participated in the Office Services Vocational Program and when he completed that he was hired as an aid for the program. In addition to his time in Office Services, he has also learned computer repair. He received his GED in 2003 because they could not verify his original GED from Job Corps.

Mr. Williams has participated in NA/AA for the past 10-11 years and continues to attend NA/AA meetings. He stated that the last time he had a drink was in 1988. He was able to describe what it was like for him to work through the 12 steps in adequate detail. However, he was not able to recite the 12 steps and did not know the 12 traditions of NA/AA or the history of the movement. He stated that he has never had a sponsor and has never been a sponsor to anyone else. He said that he does not have any temptation to drink because the consequences of doing so are so dire. He has hepatitis C and his liver is "bad." He also stated that he thinks about what it would do to his family. His wife of many years is still supportive of him. When he paroles he said that he will continue going to meetings and will only hang around with people who are sober.

He stated that he first began using drugs after he was involved in a car accident and was given morphine in the hospital. After a 3-month hospital stay he said that he was "hooked" on it. He

began using heroine after he returned home because he "liked the high." Before the accident he said that he only experimented with drugs.

In regard to his crime and the underlying causes, he states that he was living the "drug lifestyle" and this led to his apathy. He stated that he knew that the victim's mother was beating her but did nothing about it. He denied any other responsibility for the crime itself. He said that when he walked into the apartment the victim was already unconscious. He said that he took the child to the hospital but then left because he was wanted on a parole violation. He described the victim's mother as crazy. He said that she was a heavy drug user as well. Mr. Williams reported that he feels very badly for the victim, but adamantly denies harming her in any way.

## *DIAGNOSTIC IMPRESSION*

|  |  |
|---|---|
| **AXIS I:** | Polysubstance Dependence, In Institutional Remission<br>Alcohol Dependence, In Institutional Remission |
| **AXIS II:** | No diagnosis currently. History of Antisocial Personality<br>Disorder |
| **AXIS III:** | Hepatitis C |
| **AXIS IV:** | incarcerated |
| **AXIS V:** | Current GAF: 75 |

## *CONCLUSIONS*

What is the prisoner's violence potential in the free community?

The following are the factors that *increase* Mr. Williams's risk for violence:

1. It is unclear what role Mr. Williams played in the commitment offense. At the least he was negligent. At the most he was extremely callous and cruel in his treatment of the victim. If the inmate's version of the offense is true, he seems to have accepted appropriate responsibility for his actions.

2. Substance abuse played a large role in the commitment offense. Mr. William's health condition is a significant barrier to relapse. However, he does not seem to have done the work necessary to remain sober. His participation in AA/NA seems minimal. He does not know the 12 steps and has never had a sponsor. Also, his description of his participation in NA/AA seems to be at a superficial level.

The following are the factors that *decrease* Mr. Williams's risk for violence:

1. Mr. Williams has successfully participated in work, vocational, education and self-help programs while incarcerated.

2. He has had no disciplinary infractions for fighting since 1992, and has no history of convictions for violent crimes (other than the commitment offense).

3. He has maintained strong family bonds throughout his years of incarceration.

Given the factors mentioned above, this examiner concludes that Mr. Williams is in the **Low to Moderate** Risk category for violence should he parole.

What is the significance of alcohol/drugs as it relates to the commitment offense and an estimate of the prisoner's ability to refrain from use/abuse of same when released?

1. Substance abuse played a large role in the commitment offense. Mr. William health condition is a significant barrier to relapse. However, he does not seem to have done the work necessary to remain sober. His participation in AA/NA seems minimal. He does not know the 12 steps and has never had a sponsor. Also, his description of his participation in NA/AA seems to be at a superficial level.

2. However, Mr. Williams appears to have made some progress in dealing with his addictions. He has attended AA/NA for many years and states that he understands the consequences of using again. He considers himself an addict and plans to continue attending meetings when he paroles.

What is the extent to which the prisoner has explored the commitment offense and come to terms with the underlying causes?

1. Mr. Williams states that he accepts responsibility for his behavior. He reports that he was not involved in the murder of his victim but he did nothing to prevent the abuse the he new was taking place. He accepts full responsibility for not intervening.

2. Mr. Williams has come to understand that his involvement in the "drug lifestyle" led to his apathy towards his victim. He states that he is completely committed to sobriety and has no desire to return to this lifestyle.

What is the need for further therapy programs while incarcerated?

1. I recommend that Mr. Williams continue to participate in programs designed to help him understand and deal with his addictions.

WILLIAMS, Abe                    D-48163                         2-18-05
                   BOARD OF PRISON TERMS EVALUATION

2. He needs to work harder on the 12 steps of AA/NA and work to put together a strong relapse prevention plan.

3. I do not recommend treatment for any psychiatric conditions at this time.


_____

Frank D. Weber, Ph.D.
Clinical Psychologist, CF

Orig:  BPT
  cc:   Med. File, Inmate


WILLIAMS, Abe                    D-48163                         2-18-05
                    BOARD OF PRISON TERMS EVALUATION

# EXHIBIT "K"

PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PRISON TERMS
PAROLE CONSIDERATION HEARING
JULY 1999 LIFER CALENDAR

CORRECTIONAL TRAINING FACILITY, SOLEDAD
MAY 24, 1999

This is the second psychological evaluation for the Board of
Prison Terms on inmate Abe Williams, Jr.  This report is
based upon a personal clinical interview of the inmate,
conducted on 05/24/99, as well as a review of his Central
file and unit health record.  This clinical interview and a
review of all pertinent documents were for the express
purpose of preparing this report.

I.    IDENTIFYING INFORMATION:

      Inmate Williams is a 49-year-old, married, black male
      who was born on 11/11/49.  He stated that his religious
      affiliation is Muslim.  He had no obvious unusual
      physical characteristics and he denied having any
      nicknames or aliases.

II.   DEVELOPMENTAL HISTORY:

      Inmate Williams denied any history of birth defects or
      developmental problems, a history of cruelty to animals
      or arson, or any significant childhood medical
      illnesses.  He also denied a history of physical or
      sexual abuse as either a perpetrator or a victim.

III.  EDUCATIONAL HISTORY:

      Inmate Williams attended public school and completed
      the tenth grade.  He received his GED in 1966 while in
      the Job Corps.  He is only 15 units away from obtaining
      his AA degree.  He last attended school in 1996.  He
      denied any history of special education or academic or
      behavioral problems in school.  He has no current
      involvement or interest in educational activities.

IV.   FAMILY HISTORY:

      Inmate Williams' mother and father are deceased.  His
      mother died in 1989 and was a housewife.  His father
      died in 1993 and was a hospital administrator.  His
      early relationship with his parents was warm,

WILLIAMS      D-48163      CTF-NORTH      07/01/99      gj

WILLIAMS, ABE, JR.
CDC NUMBER:  D-48163
BPT PSYCHOLOGICAL EVALUATION
PAGE TWO

supportive and nonabusive.  However, his father was
later often absent due to military activities.  When he
was six, his mother was hospitalized at Napa State
Hospital for approximately 11 years.  His father later
remarried when the inmate was ten years of age.  His
stepmother was always emotionally distant and their
relationship was difficult, although there was never
any physical abuse.  His current relationship with his
stepmother is friendly, although she neither writes,
calls nor visits.

He has two brothers and three sisters, all of whom he
has maintained no contact with except for one sister.
His younger sister writes and calls.  Because she lives
out of state and the distance involved, she does not
visit.

There is no significant crime or substance abuse
history in the family, other than that of his own.

V.    **PSYCHOSEXUAL DEVELOPMENT AND SEXUAL ORIENTATION:**

This inmate is a heterosexual male.  He denied any
history of high-risk sexual behavior or sexually
aggressive behavior.

VI.   **MARITAL HISTORY:**

Inmate Williams has been married twice.  His first
marriage ended due to irreconcilable differences, but
there was no abuse in this relationship.  He is still
married to his second wife and the marriage is warm,
supportive and nonabusive.  He has two daughters, a 25-
year-old daughter and a 17-year-old daughter, both of
whom he has maintained no contact.  He also has a
32-year-old, adopted son, but also maintains no contact
with him.  There has never been any abuse.

VII.  **MILITARY HISTORY:**

Inmate Williams denied any history of military service.

VIII. **EMPLOYMENT AND INCOME HISTORY:**

Before his current incarceration, inmate Williams
worked as a cook, for the U.S. Postal Service, doing

WILLIAMS    D-48163    CTF-NORTH    07/01/99    gj

WILLIAMS, ABE, JR.
CDC NUMBER: D-48163
BPT PSYCHOLOGICAL EVALUATION
PAGE THREE

metal polishing, and worked in a temporary clerical and
labor job. While incarcerated, he has worked as a
machinist tool and dye maker. He also completed a six
month training course in blueprint reading. He worked
for one year in vocational computers. He worked two
years towards obtaining his paralegal degree and has
completed one year of business courses. His stated
current vocational interests and aptitudes include
computers.

IX.   **SUBSTANCE ABUSE HISTORY:**

Inmate Williams acknowledged having a substance abuse
history. He said he has been dependent upon heroin and
has abused alcohol. He has attended Alcoholics
Anonymous and Narcotics Anonymous since 1993. He
acknowledges substance abuse as a continuing problem
and showed good understanding of his addiction.

X.    **PSYCHIATRIC AND MEDICAL HISTORY:**

Inmate Williams has prior psychiatric diagnoses of
Alcohol Dependence, Opioid Dependence, Cocaine Abuse
and Antisocial Personality Disorder. He denied any
history of  psychiatric hospitalizations, but did have
a brief hospitalization in 1969 for treating a broken
jaw, and later in 1971 following an auto accident, in
which he broke his right leg and nose. He denied a
history of serious accidents or head injuries, a
history of suicidal or homicidal assaultive behavior
(excluding the committing offense), or a history of
seizures or other neurological conditions. He denied
any significant disabilities, impairments or illnesses.
He does not take any medication.

XI.   **PLANS IF GRANTED RELEASE:**

If granted parole, he hopes to move to Alameda County
and live with his wife, who has agreed to this
arrangement. Alternatively, he would like to live in
Sacramento, where his wife is currently working. His
financial and vocational plans include machinist tool
and dye, paralegal work and data processing. His
prognosis for successful community living is very good.

WILLIAMS    D-48163    CTF-NORTH    07/01/99    gj

WILLIAMS, ABE, JR.
CDC NUMBER:  D-48163
BPT PSYCHOLOGICAL EVALUATION
PAGE FOUR


### CLINICAL ASSESSMENT

## XII.  CURRENT MENTAL STATUS/TREATMENT NEEDS:

During the clinical interview, inmate Williams was
alert and oriented to person, place and time.  He was
well dressed and groomed.  His speech was articulate
and contextually meaningful.  His mood and affect were
within normal limits and his behavior was appropriate
to the setting.  No evidence of a mood or thought
disorder was demonstrated.  His estimated level of
intellectual functioning was within the average range.

### CURRENT DIAGNOSTIC IMPRESSIONS:

AXIS I:    Opioid Dependence, Alcohol Dependence and
           Cocaine Abuse, in sustained full remission
           in a controlled environment.
AXIS II:   No Contributory Personality Disorder.
AXIS III:  No Contributory Physical Disorder.
AXIS IV:   Incarceration.
AXIS V:    GAF = 90.

This inmate has attended a number of self-help groups,
including the aforementioned attendance at Alcoholics
Anonymous and Narcotics Anonymous since 1993.  He
completed the Breaking Barriers program, the Literacy
Life Skills program with six laudatory chronos, and he
completed the Life Skills Peer Tutors program.

His current level of insight and judgment in general
and specifically regarding his commitment offense are
good and support a positive prediction of successful
adaptation to community living.

## XIII. REVIEW OF LIFE CRIME:

Inmate Williams described the circumstances surrounding
his commitment offense.  He denied killing the three-
year-old victim.  He said his girlfriend, a cocaine
addict, battered her young daughter and finally beat
her to death.  This, of course, is inconsistent with
the record.  He did demonstrate empathy for the victim
and this appeared to be both genuine and appropriate.


WILLIAMS      D-48163      CTF-NORTH      07/01/99      gj

WILLIAMS, ABE, JR.
CDC NUMBER: D-48163
BPT PSYCHOLOGICAL EVALUATION
PAGE FIVE

XIV. ASSESSMENT OF DANGEROUSNESS:

A. His violence potential within a controlled setting
   is considered to be below average relative to this
   Level II inmate population. This conclusion is
   based upon a number of factors.

   On the one hand, he has a rather extensive adult
   criminal record. He was found guilty of forgery in
   1968, 1969, 1974 and 1976, and he was found guilty
   of forgery and burglary in 1977, and guilty of
   forgery in 1979. He has received four CDC-115s:
   in 1988, possession of pruno; in 1992, fighting
   (which he described as a fist fight and resulted in
   no injuries); in 1993, refusal to work; and in
   1993, guilty of possession of a syringe. He also
   has five CDC-128 violations, the last one received
   in 1995.

   However, on the other hand, he has no juvenile
   crime record. None of his adult convictions
   involved crimes of violence. He has received no
   CDC-115s in over six years, or a CDC-128 in four
   years.

   In light of these factors, he is considered to have
   a below average violence potential relative to this
   Level II inmate population.

B. If released to the community, his violence
   potential is considered to be no more than the
   average citizen in the community.

C. Polysubstance abuse does present possible risk
   factors which may be precursors to violence for
   this individual.

XV. CLINICIAN OBSERVATIONS/COMMENTS/RECOMMENDATIONS:

1) This inmate is competent and responsible for his
   behavior. He has the capacity to abide by
   institutional standards and has done so during his
   incarceration period.

WILLIAMS    D-48163    CTF-NORTH    07/01/99    gj

WILLIAMS, ABE, JR.
CDC NUMBER:  D-48163
BPT PSYCHOLOGICAL EVALUATION
PAGE SIX

     2)   This inmate does not have a mental disorder which
           would necessitate treatment either during his
           incarceration period or upon parole.

     3)   This inmate has a history of polysubstance abuse
           and continued participation in Alcoholics Anonymous
           or Narcotics Anonymous is suggested both during his
           incarceration and as a contingency of parole.

*Joe Reed*

JOE REED, Ph.D., J.D.
Staff Psychologist
Correctional Training Facility, Soledad


*Bruce Bakeman, Ph.D.*

BRUCE M. BAKEMAN, Ph.D.
Senior Psychologist
Correctional Training Facility, Soledad

JR/gj

d:  06/16/99
t:  07/01/99

WILLIAMS     D-48163     CTF-NORTH     07/01/99     gj

# EXHIBIT "L"

1   ELECTED NOT TO GO INTO THE LAW OF HOMICIDE, SPECIFICALLY,

2   HOMICIDE.

3          HOMICIDE MEANS THE KILLING OF ONE HUMAN BEING BY

4   ANOTHER.  IT MAY BE JUSTIFIABLE.  IT MAY BE ACCIDENTAL OR IT MAY

5   BE PREMEDITATED OR IT MAY BE IMPLIED MALICE MURDER.  ANY SPECIES

6   OF HOMICIDE CRIMINAL OR NON-CRIMINAL IS HOMICIDE:  ONE PERSON

7   KILLS ANOTHER.

8          NOW, MURDER AS WE'RE TALKING ABOUT HERE IN THIS

9   COURTROOM, MURDER IS THE UNLAWFUL KILLING OF A HUMAN BEING WITH

10  MALICE AFORETHOUGHT.

11          AGAIN, MALICE AFORETHOUGHT IS OF TWO VARIETIES,

12  EXPRESS MALICE WHERE THERE IS MANIFEST BY WORD OR DEED AN INTENT

13  UNLAWFULLY TO TAKE THE LIFE OF A FELLOW CREATURE:

14          SOMEONE GOES OUT AND AMBUSHES SOMEONE.  IF SOMEONE

15  GOES OUT AND DELIBERATELY KILLS SOMEONE, IF THIS DEFENDANT ON

16  MAY 27TH 1984 HAD SAID:  DEBRA, I'M GOING TO KILL THAT LITTLE

17  KID.  I'M SICK AND TIRED OF HER FOULING HER PANTS.  AND SHE'S

18  RESTRAINED AND PROCEEDED TO KILL HER, WE WOULD HAVE EVIDENCE OF

19  EXPRESS MALICE.  WE DO NOT HAVE THAT IN THIS CASE.

20          AND I DO NOT CONTEND THAT WHICH IS NOT IN THE

21  EVIDENCE.

22          NOW, MURDER OF THE SECOND DEGREE IS THE UNLAWFUL

23  KILLING OF A HUMAN BEING AS THE DIRECT CAUSAL RESULT OF AN

24  INTENTIONAL ACT INVOLVING A HIGH DEGREE OF PROBABILITY THAT IT

25  WILL RESULT IN DEATH, WHICH ACT IS DONE FOR A BASE ANTI-SOCIAL

26  PURPOSE AND WITH A WANTON DISREGARD FOR HUMAN LIFE.

27          OR THE NATURAL CONSEQUENCES OF WHICH ARE DANGEROUS TO

28  LIFE, WHICH ACT WAS DELIBERATELY PERFORMED BY A PERSON WHO KNOWS

# EXHIBIT "M"

M-1

# Michael G. McCarthy

Investigator
1050 54th Street
Sacramento, California 95819
(916) 453-0508

January 29,1993

TO THE NINTH DISTRICT COURT OF APPEAL:

I Michael G. McCarthy, a California licensed private investigator, do hereby swear under penalty of perjury and laws of the state of California that the following is true and correct.

On January 23,1993, I met with William H. Hara at his residence in Hayward, California and acquired a further statement from him that will do much to clarify his recollection of being the jury foreman of my client's, Abe Williams Jr., trial jury and his present feelings regarding the outcome of their de. beration.

I swear under penalty of perjury and the laws of the state of California that attached statement is in fact the statement I acquired from William H.Hara on January 23,1993.

If you have any questions, please feel free to contact me at your convenience.

Dated _1 - 2 9 - 9 3_

SUBSCRIBED AND SWORN TO BEFORE ME

THIS.29th.DAY OF..January..19.93

NOTARY PUBLIC
Sacramento, California
My commission expires:8/19/93



LUPE M. RANGEL
NOTARY PUBLIC
SACRAMENTO COUNTY, CALIFORNIA
My Commission Expires August 19, 1993

Lic. No. PI14404

Statement of __William H. Hara__          Phone _____

Business Address _____          Phone _____•____
                    270 Poplar             (510)
Home Address Hayward, Ca. 94541            Phone __538-4642_____

I, WILLIAM H. HARA, DO HEREBY SWEAR THAT THE FOLLOWING IS TRUE
AND CORRECT TO THE BEST OF MY KNOWLEDGE AND RECOLLECTION.

MR. McCARTHY, MR. WILLIAMS'S INVESTIGATOR, HAS ASKED ME
AGAIN TO PROVIDE A STATEMENT AS TO MY JURY RECEIVING 4 VERDICT
DEFINITIONS.  THIS IS TO CLARIFY MY MEMORY OF US ACTUALLY
RECEIVING DEFINITIONS FOR 4 VERDICTS.  I DO RECALL RECEIVING
THOSE 4 VERDICT DEFINITIONS, BUT I DO NOT ACTUALLY RECALL
THE VERDICTS THEMSELVES.

ALSO, MR. McCARTHY AND I HAD PREVIOUSLY DISCUSSED MY
FEELINGS IN REGARD TO THE CASE FACTS AND I FELT THAT IF AN
INSTRUCTION WAS GIVEN FOR INVOLUNTARY MANSLAUGHTER, PER A
PHOTOCOPY OF SUCH DEFINITION PROVIDED TO ME BY MR. McCARTHY,
I WOULD HAVE VOTED FOR IT BECAUSE IT'S DEFINITION FIT THE
FACTS.  IN FACT, THE JURY, WHICH I WAS FOREMAN, HAD VOTED
6 TO 6 FOR THE LONGEST TIME.  I CANNOT RECALL HOW OR WHEN
WE EVENTUALLY ALL VOTED FOR 2ND DEGREE MURDER.

THE FOREGOING IS TRUE AND CORRECT, AND I SWEAR UNDER
THE PENALTY OF PERJURY AND THE LAWS OF THE STATE OF CALIFORNIA
, THAT IT IS THUS - TRUE.

                        WILLIAM HARA

Signed at Hayward, Ca. __ this _23_ day of _January_____ 1993

Note: This is an exact transcription of William H. Hara's
      Affidavit, except scratched out mistakes with initials
      of Hara, have been excluded.

Statement of William H. Hara

Business Address _____ Phone _____

Home Address 270 Poplar Hayward CA 94541    (510)
Phone 538-464

W.D.H  I, William H. Hara, Do HEREBY SWEAR THAT THE
FOLLOWING is TRUE AND correct to the BEST OF my KNOWledge
And Recollection.

MR. McCARTHY, MR William's INVESTIGATOR, has asked
me again to provide a statement as to my jury receiving
4 VERDICT DEFINITIONS. That is to clarify my memory of the W.H.
us receiving Actually receiving Definitions for 4 VERDICTS
I do recall receiving those 4 verdict definitions, but
do not actually recall the verdicts themselves.

Also, MR. McCARTHY AND I HAD previously discussed my
my feelings IN regard to the case facts and I Felt that if
AN instruction Was given for INvoluntary MANsluughter, or
a photocopy of such definition provided me by Mr. McCarthy,
I would have voted for it be cause it's definition fit the
facts. In fact, the jury, which I was foreman, had
voted 6 to 6 for the longest time. I cannot recall
how or when we eventually all voted for 2nd Degree
Murder.

The Aforegoing is true and correct, and I swear
under the penalty of perjury W.H.D And the laws of the
State of California, that it is true - True.

William Hara

Signed at Hayward Ca this 23rd day of January 19 93.
Witness Michael J. McCarthy

M-2

*ϝ - ϛ*

# *Michael G. McCarthy*

Investigator
1050 54th Street
Sacramento, California 95819
(916) 453-0508

JANUARY 7,1993

TO THE U.S. COURT OF APPEALS FOR THE NINTH DISTRICT:

I,MICHAEL G. MCCARTHY, A CALIFORNIA LICENSED PRIVATE INVESTIGATOR, DO HEREBY SWEAR, THAT ON DECEMBER 19,1992, I MET WITH GAIL ELISE HALL AT HER RESIDENCE AND ACQUIRED HER AFFADAVIT, WHICH A TRUE COPY OF SAID AFFADAVIT IS HEREIN ATTACHED.

I SWEAR UNDER THE LAWS OF THE STATE OF CALIFORNIA, THAT THE AFORE-GOING STATEMENT IS TRUE AND CORRECT UNDER THE PENALTY OF PERJURY.

ALSO, I ACQUIRED THIS STATEMENT FROM GAIL HALL WITH HER UNDERSTAND-ING THAT IT WOULD BE SUBMITTED TO THE NINTH CIRCUIT COURT OF APPEAL ON BEHALF OF ABE WILLIAMS JR..

AGAIN, I SWEAR THAT THE FOREGOING IS TRUE AND CORRECT UNDER THE PENALTY OF PERJURY GOVERNED BY THE LAWS OF THE STATE OF CALIFORNIA.

VERY TRULY YOURS,

MICHAEL G. MCCARTHY

SUBSCRIBED AND SWORN TO BEFORE ME
THIS 7th DAY OF January 19 93
NOTARY PUBLIC

LUPE M. RANGEL
NOTARY PUBLIC
SACRAMENTO COUNTY, CALIFORNIA
My Commission Expires August 19, 1993

Lic. No. PI14404

Statement of ____GAIL ELISE HALL   DOB 5-25-56____ Phone_____

Business Address ____N/A_____ Phone_____
                  33882 HITEHEAD LANE,                 (510)
Home Address ____FREEMONT, CA. 94555_____ Phone__749-9031

I, GAIL HALL, DO SWEAR THAT THE FOLLOWING IS TRUE AND CORRECT
TO THE BEST OF MY KNOWLEDGE AND TRUE FEELINGS.

    I HAVE REVIEWED WITH MICHEAL G. McCARTHY, MR. WILLIAMS
INVESTIGATOR, COURT TRANSCRIPTS, WHERE DEBRA HARRIS HAD TAKEN
THE FIFTH AMENDMENT IN ORDER NOT TO INCRIMINATE HERSELF.   IF
I HAD KNOWN THIS I TRULY FEEL THAT WITH THIS INFORMATION, I
WOULD NOT HAVE FOUND ABE WILLIAMS JR. GUILTY OF MURDER, AS
I WOULD HAVE INTELLECUALIZED THAT WITH THE TESTIMONY WE DID GET,
ABE POKING AT TEQUILA AND A SIDEWAYS SWAT, HE WOULD NOT HAVE
ADMINISTERED A FATAL BLOW.   AND THAT DEBRA HARRIS HAD PLAYED A
SIGNIFICANT PART IN TEQUILA'S DEATH.

    I ALSO KNOW THAT IF A MANSLAUGHTER CHARGE HAD BEEN GIVEN
AS PART OF THE INSTRUCTIONS, I WOULD HAVE FOUND ABE WILLIAMS
OF THIS TYPE OF CRIME, AS IT TRULY FIT THE FACTS.

    ALSO, I THOUGHT THROUGHOUT THE TRIAL THAT MR. WILLIAMS
MUST BE CRAZY TO REPRESENT HIMSELF AND IF I HAD KNOWN THAT HE
HAD NO OTHER CHOICE AND ALSO HAD NO ADDITIONAL TIME TO PREPARE
AFTER MR. SPEAR, HIS PUBLIC DEFENDER HAD BEEN FIRED BY MR.
WILLIAMS I BELIEVE I COULD NOT HAVE FOUND MR. WILLIAMS GUILTY,
AS I WOULD HAVE SEEN THIS AS BEING UNFAIR AND A MISCARRIAGE OF
JUSTICE.

    AND AGAIN WITH THE THINKING THAT WE WOULD BELIEVE THAT THE
COURT WOULD PROVIDE ALL ALTERNATIVE AS TO THE CHARGES, BUT

DID NOT DO SO, IT INFLUENCED ME AS BELIEVING THAT SOMEHOW THE
FACTS HAD TO FIT INTO 2ND DEGREE ONLY, AS IT WAS PAST EITHER,
FELONY CHILD BATTERY OR MISDEMENOR CHILD BATTERY, I.E., A
KILLING.

I DO HEREBY SWEAR THAT THE FOLLOWING IS TRUE UNDER PENALTY
OF PERJURY UNDER THE LAWS OF THE STATE OF CALIFORNIA.

GIAL ELISE HALL

Statement of _____

Business Address ___ N/D ___                    Phone _____

Home Address 33 EE2 - WHITEHEAD LANE, FREMONT CA 94555 Phone (510) 794-903

I, GAILE. HALL, DO SWEAR THAT THE FOLLOWING IS TRUE TO THE BEST OF MY KNOWLEDGE AND TRUE FEELINGS.

I HAVE REVIEWED WITH MICHAEL E. MCCARTHY, MR. WILLIAMS' INVESTIGATOR, COURT TRANSCRIPTS WHERE ERRA HARRIS HAD TAKEN THE FIFTH AMENDMENT IN ORDER NOT TO INCRIMINATE HERSELF. IF I HAD KNOWN THIS I TRULY FEEL THAT WITH THIS INFORMATION I WOULD NOT HAVE FOUND ABE WILLIAMS JR. GUILTY OF MURDER, AS I WOULD HAVE INTELLECTUALIZED THAT WITH THE TESTIMONY WE DID GET ABE AKINS IF TE GUILA AND A SIDE WAYS SWAT HE WOULD NOT HAVE ADMINISTERED A FATAL BLOW. AND THAT ERRA HARRIS HAD PLAYED A SIGNIFICANT PART IN TE GUILA'S DEATH.

I ALSO KNOW THAT IF A MANSLAUGHTER CHARGE HAD BEEN GIVEN. AS PART OF THE INSTRUCTIONS, I WOULD HAVE FOUND ABE WILLIAMS GUILTY OF THIS TYPE OF CRIME, AS IT TRULY FIT THE FACTS.

ALSO I THOUGHT THROUGHOUT THE TRIAL THAT MR. WILLIAMS MUST BE CRAZY TO REPRESENT HIMSELF. AND IF I HAD KNOWN THAT HE HAD NO

Signed at Fremont, Calif. this 19 day of DECEMBER 19 92

Witness _____   12-19-92

Gail Elise Hall

Statement of GAIL ELISE HALL DOB 5-21-56

Business Address N/A                                                    Phone

Home Address 33882 - WHITEHEAD LANE, FREMONT, CA 94555    Phone (510) 794-903

OTHER CHOICE AND ALSO HAD NO ADDITIONAL TIME
TO PREPARE AFTER MR. SPEAR, HIS PUBLIC DE-
FENDER HAD BEEN FIRED BY MR. WILLIAMS
I BELIEVE I COULD NOT HAVE FOUND MR.
WILLIAMS GUILTY, AS I WOULD HAVE SEEN
THIS AS BEING UNFAIR AND A MISCARRING
OF JUSTICE -
AND AGAIN WITH THE THINKING THAT WE
WOULD BELIEVE THAT THE COURT WOULD HAVE PRO-
VIDED ALL ALTERNATIVE AS TO THE CHARGES
BUT DID NOT DO SO, IT INFLUENCED US ME
AS BELIEVING THAT SOMEHOW THE FACTS HAD
TO FIT INTO 2ND DEGREE ONLY AS IT WAS
PAST EITHER, FELONY CHILD BATTERY OR MISDE-
MENOR CHILD BATTERY, I.E, A KILLING,
I DO HEREBY SWEAR THAT THE
FOLLOWING IS TRUE UNDER PENALTY OF PER-
JURY UNDER THE LAWS OF THE STATE
OF CALIFORNIA. GH

Gal Elise Hill

Signed at Fremont, CALF this 19 day of DECEMBER 19 92
Witness                                    12-19-92



*Michael G. McCarthy*

Investigator
1050 54th Street
Sacramento, California 95819
(916) 453-0508

JANUARY 11, 1993

TO THE U.S. COURT OF APPEALS FOR THE NINTH DISTRICT:

I, MICHAEL G. MCCARTHY, A CALIFORNIA LICENSED PRIVATE INVESTIGATOR, DO HEREBY SWEAR, THAT ON JANUARY 11,1992, I MET WITH LAWRENCE J. CRUZ AT HIS RESIDENCEIN SAN LEANDRO, CALIFORNIA AND ACQUIRED HIS AFFADAVIT, WHICH A TRUE COPY OF SAID AFFADAVIT IS HEREIN ATTACHED.

ALSO, LAWRENCE J. CRUZ UNDERSTANDS THAT HIS STATEMENT IS TO BE SUB-MITTED TO THE NINTH DISTRICT COURT OF APPEALS ON BEHALF OF ABE WILLIAMS JR..

I, MICHAEL G. MCCARTHY, DO HEREBY SWEAR UNDER THE PENALTY OF PER-JURY AND THE LAWS OF THE STATE OF CALIFORNIA, THAT THE AFOREGOING IS TRUE AND CORRECT.

VERY TRULY YOURS,

MICHAEL G. MCCARTHY

SUBSCRIBED AND SWORN TO BEFORE ME
THIS 11th DAY OF January 19 93

NOTARY PUBLIC



LUPE M. RANGEL
NOTARY PUBLIC
SACRAMENTO COUNTY, CALIFORNIA
My Commission Expires August 19, 1993

Lic. No. PI14404

Statement of _Laurence J. Cruz_

Business Address _N/A_                                      Phone _N/A_

Home Address _1099 - Belleau Street_                        (510) 357-2112
_San Francisco, CA  94579_                                  Phone

I, Laurence J. Cruz, do hereby swear that the following is true and correct in accordance with my actual feelings and thoughts.

I do state that if an instruction for involuntary manslaughter had been given by Judge Fisher I did and do believe that I would have chosen to vote for that verdict, due to the fact that the case facts would and did show the boy (the Williams) he had been drinking and doing some drugs which precluded his having malice or intent regarding his actions. Thus, I do feel that the my choice would have definitely been for a guilt vote for involuntary manslaughter. Also because there was a good reason child I didn't feel I could vote for either felony or misdemeanor child battery and was either forced or coerced into voting as I did for the murder charge. L Cruz

_Laurence J Cruz_

Signed at _San Francisco CA_ this _10th_ day of _January_ 19 _93_.
Witness _____                     1-10-93

Page No. 1 of 1

Statement of  LAWRENCE J. CRUZ                        Phone _____

Business Address   N/A _____                Phone _____
                   1099 - BELLEAU STREET              (510) _____
HOme Address  SAN LEANDRO, CA. 94579 _____       Phone 357-2726


I, LAWRENCE J. CRUZ, DO HEREBY SWEAR THAT THE FOLLOWING
IS TRUE AND CORRECT IN ACCORDANCE WITH MY ACTUAL FEELINGS
AND THOUGHTS.

I DO STATE THAT IF AN INSTRUCTION FOR INVOLUNTARY
MANSLAUGHTER HAD BEEN GIVEN  BY JUDGE TABER, I DID AND DO
BELIEVE THAT I WOULD HAVE CHOSEN TO VOTE FOR THAT VERDICT DUE
TO THE FACT THAT THE CASE FACTS WOULD AND DID SHOW THE BOY ABE
WILLIAMS JR. HAD BEEN DRINKING AND DOING SOME DRUGS WHICH
PRECLUDED HIS HAVING MALICE OR INTENT REGARDING HIS ACTIONS.
THUS, I DO FEEL THAT MY CHOICE WOULD HAVE DEFINITELY BEEN FOR
A GUILT VOTE FOR INVOLUNTARY MANSLAUGHTER.

ALSO BECAUSE THERE WAS A DEAD PERSON (CHILD) I DIDN'T
FEEL I COULD VOTE FOR EITHER FELONY OF MISDAMEANOR CHILD
BATTERY, AND WAS EITHER FORCED OR COHERSED INTO VOTING AS I
DID FOR THE MURDER CHARGE.

                    LAWRENCE J. CRUZ

# EXHIBIT "N"

1   ARE THE FELONY AND MISDEMEANOR STEPS.

2        THE COURT:  OKAY.  SO THAT THOSE ARE CLEARLY LESSER

3   INCLUDEDS, I WOULD THINK.

4        MR. PLATT:  WELL, BUT FOR THE DEATH OF THE CHILD.

5        THE COURT:  WELL, NOW, THIS LAST HOMICIDE I HAD, WHICH AND

6   I THINK EVERY HOMICIDE I'VE EVER HAD HAD LESSER INCLUDED

7   OFFENSES, INCLUDED 245'S; BUT WE DON'T GO -- I DON'T THINK WE

8   APPROPRIATELY GO TO A 245 BECAUSE THERE IS MORE SPECIFIC

9   SECTIONS DEALING WITH HOMICIDE OF CHILDREN.

10        MR. PLATT:  THAT IS CORRECT, YOUR HONOR.

11        THE COURT:  ALL RIGHT.  BUT I'VE ALWAYS GIVEN A 245.  IN

12   FACT, THE VERY LAST MURDER CASE I HAD, THE JURY CAME IN WITH A

13   245 GROWING OUT OF THE MURDER CASE, AND THERE WAS, THE VICTIM

14   WAS A DEAD BODY.  SO THAT DOESN'T PRECLUDE CONDUCT THAT'S

15   SOMETHING LESS THAN MURDER.

16        MR. PLATT:  WELL --

17        THE COURT:  SO, I THINK YOU'VE CONVINCED ME THAT

18   MANSLAUGHTER ISN'T PRESENT BY THE WAY -- NO, I'M IN ERROR.  IN

19   THE LAST CASE IT WASN'T A 245 THEY CAME IN WITH.  WELL, NO,

20   THERE WAS AN PLEA OUT ON MANSLAUGHTER, WHICH IS A DIFFERENT

21   SITUATION.

22        BUT IN OUR CASE I GUESS, BECAUSE OF A FREAKY

23   LEGISLATION, SPREAD APART BY TIME IN WHICH THEY HADN'T

24   CORRELATED THE TWO SECTIONS, MANSLAUGHTER SEEMS TO BE OUT; BUT

25   ANYWAY --

26        MR. SPEAR:  DID YOUR HONOR --

27        THE COURT:  AND ANYWAY, THAT'S ANOTHER SITUATION AND I

28   SHARE THESE THOUGHTS WITH YOU SO THAT WHEN YOU HAVE TIME, YOU

$Exh, N$

1   ARE THE FELONY AND I

2        THE COURT:  OKA                    RE CLEARLY LESSER

3   INCLUDEDS, I WOULD T

4        MR. PLATT:  WELL        ... ...E DEATH OF THE CHILD.

5        THE COURT:  WELL, NOW, THIS LAST HOMICIDE I HAD, WHICH AND

6   I THINK EVERY HOMICIDE I'VE EVER HAD HAD LESSER INCLUDED

7   OFFENSES, INCLUDED 245'S; BUT WE DON'T GO -- I DON'T THINK WE

8   APPROPRIATELY GO TO A 245 BECAUSE THERE IS MORE SPECIFIC

9   SECTIONS DEALING WITH HOMICIDE OF CHILDREN.

10       MR. PLATT:  THAT IS CORRECT, YOUR HONOR.

11       THE COURT:  ALL RIGHT.  BUT I'VE ALWAYS GIVEN A 245.  IN

12  FACT, THE VERY LAST MURDER CASE I HAD, THE JURY CAME IN WITH A

13  245 GROWING OUT OF THE MURDER CASE, AND THERE WAS, THE VICTIM

14  WAS A DEAD BODY.  SO THAT DOESN'T PRECLUDE CONDUCT THAT'S

15  SOMETHING LESS THAN MURDER.

16       MR. PLATT:  WELL --

17       THE COURT:  SO, I THINK YOU'VE CONVINCED ME THAT

18  MANSLAUGHTER ISN'T PRESENT BY THE WAY -- NO, I'M IN ERROR.  IN

19  THE LAST CASE IT WASN'T A 245 THEY CAME IN WITH.  WELL, NO,

20  THERE WAS AN PLEA OUT ON MANSLAUGHTER, WHICH IS A DIFFERENT

21  SITUATION.

22       BUT IN OUR CASE I GUESS, BECAUSE OF A FREAKY

23  LEGISLATION, SPREAD APART BY TIME IN WHICH THEY HADN'T

24  CORRELATED THE TWO SECTIONS, MANSLAUGHTER SEEMS TO BE OUT; BUT

25  ANYWAY --

26       MR. SPEAR:  DID YOUR HONOR --

27       THE COURT:  AND ANYWAY, THAT'S ANOTHER SITUATION AND I

28  SHARE THESE THOUGHTS WITH YOU SO THAT WHEN YOU HAVE TIME, YOU

1    MR. SPEAR:   YES, IT -- WELL, COULD I BE HEARD ON THIS

2  PERHAPS?

3    THE COURT:   DO YOU WANT HIM TO BE HEARD?

4    MR. WILLIAMS:   YES, I DO.

5    THE COURT:   ALL RIGHT.

6    MR. SPEAR:   BECAUSE THE LAST TIME THIS WAS DISCUSSED I WAS

7  SITTING BACK THERE WOEFULLY SILENT.

8    YOUR HONOR, I'VE READ THE CASE OF THE PEOPLE VS.

9  WRIGHT, WHICH IS RELIED UPON HERE.  PEOPLE VERSUS WRIGHT, THE

10  ERROR WAS TO GIVE AN INVOLUNTARY INSTRUCTION BASED ON THE

11  COMMISSION OF A MISDEMEANOR INHERENTLY DANGEROUS TO HUMAN LIFE.

12    NOW, YOU KNOW, AFTER THAT PHRASE, DURING THE

13  COMMISSION OF A MISDEMEANOR, WHICH IS INHERENTLY DANGEROUS TO

14  HUMAN LIFE, NAMELY, THE OFFENSE OF, THERE IS THE WORD "OR".

15    NOW, IF THE WRIGHT CASE THEY SAID IT WAS ERROR TO GIVE

16  THE INSTRUCTION BASED ON, NUMBER ONE, THERE DURING THE

17  COMMISSION OF A MISDEMEANOR INHERENTLY DANGEROUS TO HUMAN LIFE.

18    NOBODY IN THAT CASE ASKED FOR AN INVOLUNTARY

19  INSTRUCTION BASED ON, NUMBER TWO, WHICH IS IN THE COMMISSION OF

20  AN ACT INHERENTLY UNLAWFUL, ETCETERA, AND THEN THAT'S COMBINED

21  WITH CAL. JIC. 8. 46 FOR AN ALTERNATIVE INSTRUCTION.

22    THE WRIGHT CASE SAID THAT POSSIBLY THE EVIDENCE

23  SUPPORTED AN INFERENCE OF CRIMINAL NEGLIGENCE WARRANTING AN

24  INSTRUCTION ON NEGLIGENT MANSLAUGHTER HAD THE DEFENSE REQUESTED

25  ONE, BUT THEY DIDN'T IN THAT CASE.

26    MR. PLATT:   YES, BUT THE COURT AT PAGE 14 OF THE SAME

27  OPINION ALSO SAID THAT WHERE YOU HAVE A ACTOR AS OPPOSED TO

28  SUFFERER, YOU'RE NOT ENTITLED TO AN INVOLUNTARY MANSLAUGHTER

1    WHICH ARE SUCH A DEPARTURE AS WOULD BE THE CONDUCT OF AN

2    ORDINARILY PRUDENT OR CAREFUL MAN IN SIMILAR CIRCUMSTANCES AS TO

3    BE CONTRARY TO A PROPER REGARD FOR HUMAN LIFE; OR IN OTHER

4    WORDS, A DISREGARD FOR HUMAN LIFE OR AN INDIFFERENCE TO THE

5    CONSEQUENCES.

6        ✓ WELL, IT SEEMS TO FIT THE FACTS HERE.  I'M STRUGGLING

7    WITH SOME OF THE LEGAL CONCEPTS BECAUSE THEY CAME AT DIFFERENT

8    TIMES.

9        MR. PLATT:  OKAY.

10       THE COURT:  AND I'M ACKWARD HERE AND I'M ASHAMED OF HAVING

11   SOME OF THIS ON THE RECORD; BUT AS I TOLD YOU, I HAPPEN TO SEE

12   THINGS MORE CLEARLY BY TALKING, AND I'M HOPING THAT IT WILL HELP

13   MR. WILLIAMS.

14       MR. PLATT:  OKAY.  NOW, I MAINTAIN --

15       THE COURT:  OKAY.  NOW BUT HOLD ON A SECOND; BUT IN THIS

16   CASE, COULDN'T THE FACT BE THAT, YES, HE MIGHT BE ABLE TO

17   DISCIPLINE THE CHILD FOR SOILING HER PANTIES -- WAS THERE ONE

18   OTHER THING?

19       MR. SPEAR:  WITHOUT CRYING.

20       THE COURT:  BEING DEFIANT WITHOUT CRYING.  THAT ONE IS

21   PRETTY WEAK; BUT ANYWAY, THE PANTIES SITUATION, USING A BIG

22   STICK, YOU BETTER BE CAREFUL BECAUSE THAT'S A DANGEROUS

23   INSTRUMENTALITY ON A 3 YEAR OLD.  MAYBE ON A 16 YEAR OLD KID

24   THAT'S A DIFFERENT THING, BUT ON A 3 YEAR OLD, AND IT CERTAINLY

25   REFLECTS A DISREGARD FOR HUMAN LIFE IF IT'S WIELDED IN A CERTAIN

26   FASHION OR AT THE VERY LEAST, AN INDIFFERENCE TO THE

27   CONSEQUENCES:  I DON'T CARE WHAT HAPPENS.

28       MR. PLATT:  PRECISELY.

1    THE COURT:  NOW, YOU SAY THAT THAT --

2    MR. PLATT:  I AGREE FACTUALLY, YOU'RE THERE.  NOW, BUT I
3    DON'T WANT TO INTERRUPT YOU.

4    THE COURT:  OH, BUT IF I'M THERE FACTUALLY, THEN ISN'T THAT
5    A POSSIBILITY?

6    MR. PLATT:  NO.

7    THE COURT:  WHY?

8    MR. PLATT:  BECAUSE THE LAW OF CALIFORNIA THAT PREEMPTED
9    THAT POSSIBILITY, WE HAVE TWO STATUTES, 273 (A)(2), A NON
10   DANGEROUS MISDEMEANOR, 273 (A)(1), AN INHERENTLY DANGEROUS
11   FELONY.  IF THE ACTOR, THE DEFENDANT, ACTS WITH A GROSS
12   NEGLIGENCE THAT YOU HAVE JUST IDENTIFIED, THE DEFENDANT HAS
13   VIOLATED ONE OF THE TWO STATUTES (A)(1) OR (A)(2).

14   THE COURT:  THEY, (A)(2), THEY DON'T USE GROSS, THOUGH.
15   THAT'S THE PROBLEM.

16   MR. PLATT:  PEOPLE VERSUS PEABODY IDENTIFIES CRIMINAL
17   NEGLIGENCE AS THE LEAST QUANTUM OF MENS RE THAT MAY ACCOMPANY A
18   CONVICTION FOR 273 (A)(1).

19   THE COURT:  WHAT YOU'RE SAYING IS THAT UNTIL THE ENACTMENT
20   OF 273 (A)(1) --

21   MR. PLATT:  WE COULD HAVE HAD AN INVOLUNTARY MANSLAUGHTER
22   RESULT.

23   THE COURT:  THEN IT WOULD BE INVOLUNTARY UNDER JUST GENERAL
24   LAW OF INVOLUNTARY MANSLAUGHTER.

25   MR. PLATT:  WE COULD CONCEIVABLY HAVE HAD.

26   THE COURT:  WELL, I UNDERSTAND IT HAS TO BE LIMITED TO THE
27   FACTS.  BUT YOU COULD FACTUALLY HAVE AN INVOLUNTARY MANSLAUGHTER
28   ON A BEATING CASE INVOLVING A CHILD.

# EXHIBIT "O"

CRIMINAL HISTORY TRANSCRIPT    FOR OFFICIAL USE ONLY
*UNAUTHORIZED USE IS A CRIMINAL OFFENSE*

| CII NUMBER | DOB | SEX | RACE | HGT | WGT | EYE | HAIR | POB |
|------------|-----|-----|------|-----|-----|-----|------|-----|
| A05119467 | 11-11-48 | M | B | 511 | 150 | BRO | BRO | CA |

NAMES
| | |
|---|---|
| 01 WILLIAMS,ABE JR | 02 RANKINS,ROBERT |
| 03 WILLIAMS,ABBE | 04 WILLIAMS,JAMES |
| 05 WILLIAMS,ROBERT | 06 WILLIAMS,ABE |
| 07 MILLER,TED E | 08 WILLIAMS,ABE B JR |
| 09 WILLIAMS,JAMES TEHEDAUS | 10 TATE,GENE |
| 11 WILLIAMS,ABRAHAM | 12 THOMAS,KENT |
| 13 WILLIAMS,SONNY | 14 WILLIAMS,SONNY JR |
| 15 CLARK,LARRY DAVID | 16 WILLIAMS,DAVID |
| 17 HAMILTON,DAVID | 18 HAMILTON,GARY DAVID |

MISCELLANEOUS NUMBERS
FBI-00127814H
DOB-11-11-49    01-16-49
CDL-N8788584
SOC-560829509    560829545    560829543    560829548
INN-CDC-B099692    CDC-D048163

SCARS/MARKS/TATTOOS
SC R HND    SC R LEG    SC R THGH    NM R ARM    NM L ARM

OCCUPATIONS
LABORER    POSTAL INSPECT
POSTAL CLERK    METAL POLISH
ESPOSITO PLATNG    POST OFFICE
CLERK    TYPIST

FPC HENRY    FPC NCIC
16 M 1 U OII 11    16140613111208111406
   M 1 U IOO 6

DATE    AGENCY/FILE NUMBER    NAME COUNT    ACTION

ARREST/DETAINED/CITED
11-26-69  DCJLWASHINGTON    06    01  BURGLARY:SECOND DEGREE
       162083

(CONTINUED PAGE 002)
05380

CRIMINAL HISTORY TRANSCRIPT          FOR OFFICIAL USE ONLY
*UNAUTHORIZED USE IS A CRIMINAL OFFENSE*

| DATE | AGENCY/FILE NUMBER | NAME | COUNT | ACTION |
|---|---|---|---|---|

ARREST/DETAINED/CITED
11-25-70  NYSOBUFFALO          13    01   IMPERSONATION
          44752

ARREST/DETAINED/CITED
11-26-70  NYPDHAMBURG          14    01   IMPERSONATION
          870206

ARREST/DETAINED/CITED
12-23-70  NYMRBUFFALTO         14    01   MISCELLANEOUS OFFENSE
          2324 2545                          -CONVICTED
                                      SEN:
                                      , 1 YR,
                                      COM:
                                      CHRG-CONDEALED RECORDS AND
                                      THINGS OF VALUE FROM POST OFFICE

FEDERAL/OUT OF STATE CUSTODY
05-25-71  VAFPPETERSBURG       01    01   ILLEGAL ENTRY
          34169-118-C
                                      02   -PROBATION VIOL
                                      RECEIVE/ETC KNOWN STOLEN
                                      PROPERTY
                                      SEN:
                                      , 1 YR,

ARREST/DETAINED/CITED
12-09-73  CAPDOAKLAND          01    01   23102(A) VC-MISD DRUNK
          246981                          DRIVING ON HIGHWAY
                                           -ACTION PENDING
                                      23102 VC-MISDEMEANOR/DUI
                                      LIQUOR/DRUG

COURT ACTION
02-19-74  CAMCOAKLAND          01    01   MINOR TRAFFIC
                                           -CONVICTED-PLED GUILTY

(CONTINUED PAGE 003)                                     05361

```
┌──────────────────────────────────────────────────────────────────────┐
│     CRIMINAL HISTORY TRANSCRIPT          FOR OFFICIAL USE ONLY         │
│          *UNAUTHORIZED USE IS A CRIMINAL OFFENSE*                      │
└──────────────────────────────────────────────────────────────────────┘
```

| DATE | AGENCY/FILE NUMBER | NAME | COUNT | ACTION |
|------|---------------------|------|-------|--------|
| | | SEN: | | |
| | | | | , , FINE |

ARREST/DETAINED/CITED
04-25-74   CAIDALAMEDA CO                 01     01   459 PC-BURGLARY
           14348AGG441
                                                      -ACTION PENDING

                                          COM:
                                          PD OAKLAND ARR

COURT ACTION
11-04-74   CAMCOAKLAND                    01     01   459 PC-BURGLARY
           60024-2
                                                      -DISMISSED/FOJ/MOTION OF
                                                       PROSECUTOR

                                                 02   459 PC-BURGLARY
                                                      -DISMISSED/FOJ/MOTION OF
                                                       PROSECUTOR

ARREST/DETAINED/CITED
06-11-74   CAIDALAMEDA CO                 03     01   459 PC-BURGLARY
           25365AGG441
                                                      -ACTION PENDING

                                          COM:
                                          PD OAKLAND ARR

COURT ACTION
12-04-74   CAMCFRESNO                     03     01   459 PC-BURGLARY
           62290-9B
                                                      -CONVICTED-JUDGEMENT
                                                       SUSPENDED

                                                 02   459 PC-BURGLARY
                                                      -DISMISSED/FOJ/MOTION OF
                                                       COURT

                                                 03   496 PC-RECEIVE/ETC KNOWN
                                                      STOLEN PROPERTY


   (CONTINUED PAGE 004)                                            05382

CRIMINAL HISTORY TRANSCRIPT          FOR OFFICIAL USE ONLY
*UNAUTHORIZED USE IS A CRIMINAL OFFENSE*

| DATE | AGENCY/FILE NUMBER | NAME | COUNT | ACTION |
|------|--------------------|------|-------|--------|
| | | | | -DISMISSED/FOJ/MOTION OF COURT |

ARREST/DETAINED/CITED
11-15-74   CAIDALAMEDA CO          01     01   23102 VC-MISDEMEANOR/DUI
           51375AGG441                              LIQUOR/DRUG

                                          COM:
                                          ARR BY PD OAKLAND

ARREST/DETAINED/CITED
11-15-74   CAIDALAMEDA CO          01     01   459 PC-BURGLARY
           66548AGG441
                                                 -ACTION PENDING

                                          COM:
                                          ARR BY PD OAKLAND

COURT ACTION
12-04-74   CAMCOAKLAND             01     01   459 PC-BURGLARY
           69702-2
                                                 -CONVICTED-PLED GUILTY
                                          SEN:
                                          , 365 DS CJ 20 DS JDG SS FOR
                                          TIME SERVED,

ARREST/DETAINED/CITED
06-05-75   CAIDALAMEDA CO          01     01   496 PC-RECEIVE/ETC KNOWN
           36866AGG441                           STOLEN PROPERTY

                                          02   470 PC-FORGERY

                                          03   484E PC-THEFT OF CREDIT
                                               CARD

                                          04   -PROBATION VIOL
           51375AGG441                         23103 VC-RECKLESS DRIVING
                                                 -ACTION PENDING
                                               23103 VC-RECKLESS DRIVING

(CONTINUED PAGE 005)
                                                                    05383

CRIMINAL HISTORY TRANSCRIPT                    FOR OFFICIAL USE ONLY
*UNAUTHORIZED USE IS A CRIMINAL OFFENSE*

| DATE | AGENCY/FILE NUMBER | NAME | COUNT | ACTION |
|------|--------------------|------|-------|--------|

COM:
PD ALAMEDA ARR

COURT ACTION
07-09-75   CAMCOAKLAND                    01      01   23103 VC-RECKLESS DRIVING
           46817-6
                                                        -FOR DISPOSITION SEE
                                                          COMMENT
                                               COM:
                                               DISPO-PARK DEPT

COURT ACTION
07-14-75   CAMCALAMEDA               01      01   470 PC-FORGERY
           24958-4
                                                  -CONVICTED-PLED GUILTY

                                          02   470 PC-FORGERY
                                                  -CONVICTED-PLED GUILTY
                                               SEN:
                                               , 360 DS JL 180 DS SS, CNTS 1&2

ARREST/DETAINED/CITED
02-20-76   CAIDALAMEDA CO             01      01   496 PC-RECEIVE/ETC KNOWN
           12527AGG441                              STOLEN PROPERTY
                                                    -ACTION PENDING

                                               COM:
                                               PD OAKLAND ARR

COURT ACTION
05-07-76   CASCOAKLAND               01      01   470 PC-FORGERY
           61565
                                                  -CONVICTED-PLED GUILTY
COURT ACTION
07-01-76   CASCOAKLAND               01      01   470 PC-FORGERY
           61565
                                                  -SENTENCED
                                               SEN:
                                               ST PRISON TERM SS-36 MO PROB,
                                               365 DS JL COND OF PROB,

(CONTINUED PAGE 006)                                                    05384

CRIMINAL HISTORY TRANSCRIPT          FOR OFFICIAL USE ONLY
                *UNAUTHORIZED USE IS A CRIMINAL OFFENSE*

DATE        AGENCY/FILE NUMBER       NAME  COUNT            ACTION

ARREST/DETAINED/CITED
03-29-76   CAIDALAMEDA CO          01    01   476A PC-NONSUFFICIENT
           22160AGG441                        FUNDS:CHECKS

                                        02   476A PC-NONSUFFICIENT
                                             FUNDS:CHECKS

                                        03   476A PC-NONSUFFICIENT
                                             FUNDS:CHECKS
                                             -ACTION PENDING

                                        COM:
                                        PD OAKLAND ARR

COURT ACTION
05-07-76   CASCOAKLAND             01    01   476A PC-NONSUFFICIENT
           61832                             FUNDS:CHECKS
                                             -DISMISSED

                                        02   476A PC-NONSUFFICIENT
                                             FUNDS:CHECKS
                                             -DISMISSED
                                        COM:
                                        DISPO-DISM PURSUANT TO 61565 DEF
                                        DISCH

ARREST/DETAINED/CITED
03-05-77   CAIDALAMEDA CO          07    01   496 PC-RECEIVE/ETC KNOWN
           08424AGG441                       STOLEN PROPERTY

                                        COM:
                                        PD OAKLAND ARR

ARREST/DETAINED/CITED
04-05-77   CAIDALAMEDA CO          06    01   470 PC-FORGERY
           24273AGG441
                                        COM:
                                        CHRG-2 ADD CNTS 470 PC

                                        02   496 PC-RECEIVE/ETC KNOWN
                                             STOLEN PROPERTY

(CONTINUED PAGE 007)                                         05385

CRIMINAL HISTORY TRANSCRIPT          FOR OFFICIAL USE ONLY
*UNAUTHORIZED USE IS A CRIMINAL OFFENSE*

| DATE | AGENCY/FILE NUMBER | NAME | COUNT | ACTION |
|------|--------------------|------|-------|--------|
| | | | | -ACTION PENDING |
| | | | | 470 PC-FORGERY |

COM:
PD HAYWARD ARR

COURT ACTION
04-27-77   CAMCHAYWARD          06    01   470 PC-FORGERY
           93624
                                              -DISCHARGED

COM:
CHRG-3 ADD CNTS 470 PC
DISM-DISCHARGED

ARREST/DETAINED/CITED
05-27-77   CAPDRICHMOND         01    01   CHARGE UNDEFINED
           61011
                                              -REL/TOT US MARSHAL

COM:
CHRG-TITLE #18-495, 1708 E/R US
MARSHAL

                                02    470 PC-FORGERY
                                       -ACTION PENDING
                                       -WARRANT
                                       470 PC-FORGERY

COURT ACTION
00-00-00   CASCCONTRA COSTA CO  01    01   470 PC-FORGERY
           20736
                                              -CONVICTED-PLED GUILTY/
                                               CHANGE OF PLEA

COURT ACTION
01-26-78   CASCCONTRA COSTA CO  01    01   470 PC-FORGERY
           20736
                                              -CONV-PROC SS/COMM 3051
                                               WI NARCOTICS

COURT ACTION
10-30-79   CASCCONTRA COSTA CO  01    01   470 PC-FORGERY
           20736
                                              -PROBATION TERMINATED

CRIMINAL HISTORY TRANSCRIPT          FOR OFFICIAL USE ONLY
*UNAUTHORIZED USE IS A CRIMINAL OFFENSE*

DATE     AGENCY/FILE NUMBER     NAME   COUNT        ACTION

ARREST/DETAINED/CITED
05-27-77   CASOMARTINEZ            01      01   470 PC-FORGERY
           22908-J

                                           02   FEDERAL OFFENSE
                                      COM:
                                      CHRG-18 US TITLE 495/1708
                                      FORGERY-REC STOLEN MAIL

                                      COM:
                                      E/R US MARSHAL

ARREST/DETAINED/CITED
07-14-77   CAIDALAMEDA CO          08      01   459 PC-BURGLARY
           48458AGG441

                                           02   475 PC-POSSESS FORGED
                                                NOTES

                                           03   475 PC-POSSESS FORGED
                                                NOTES

                                           04   475A PC-POSSESS BAD CHECK/
                                                MONEY ORDER
                                      COM:
                                      PD OAKLAND ARR

COURT ACTION
09-23-77   CASCOAKLAND             08      01   487 PC-GRAND THEFT
           64988
                                                -CONVICTED-PLED GUILTY/
                                                CHANGE OF PLEA

                                           02   496 PC-RECEIVE/ETC KNOWN
                                                STOLEN PROPERTY
                                                -DISMISSED/FOJ/MOTION OF
                                                PROSECUTOR

(CONTINUED PAGE 009)                                              05387

CRIMINAL HISTORY TRANSCRIPT              FOR OFFICIAL USE ONLY
*UNAUTHORIZED USE IS A CRIMINAL OFFENSE*

| DATE | AGENCY/FILE NUMBER | NAME | COUNT | ACTION |
|---|---|---|---|---|

COURT ACTION
11-17-77   CASCOAKLAND                    08    01   3051 W&I-NARC ADDICT
           64988                                       COMMITMENT:SUPR CRT CONV
                                                       -PROCEEDINGS SUSPENDED

COURT ACTION
01-26-79   CASCOAKLAND                    08    01   487 PC-GRAND THEFT
           64988
                                                     -SENTENCED
                                               SEN:
                                               PROC SS, ,

ARREST/DETAINED/CITED
07-15-77   CAIDALAMEDA CO                  06    01   -FAIL TO APPEAR
           29888 AGG441                              470 PC-FORGERY

                                             COM:
                                               PD OAKLAND ARR

COURT ACTION
09-23-77   CASCOAKLAND                     06    01   470 PC-FORGERY
           64505
                                                     -DISMISSED

                                               02   470 PC-FORGERY
                                                    -DISMISSED

                                               03   470 PC-FORGERY
                                                    -DISMISSED

                                               04   487 PC-GRAND THEFT
                                                    -DISMISSED

                                               05   470 PC-FORGERY
                                                    -CONVICTED

COURT ACTION
11-17-77   CASCOAKLAND                     06    01   470 PC-FORGERY
           64505
                                                     -CONV-PROC SS/COMM 3051
                                                      WI NARCOTICS

(CONTINUED PAGE 010)                                                05388

CRIMINAL HISTORY TRANSCRIPT          FOR OFFICIAL USE ONLY
*UNAUTHORIZED USE IS A CRIMINAL OFFENSE*

| DATE | AGENCY/FILE NUMBER | NAME | COUNT | ACTION |
|---|---|---|---|---|

COURT ACTION
01-26-79   CASCOAKLAND          06     01   470 PC-FORGERY
           64505
                                            -SENTENCED
                                      SEN:
                                      JUDGEMENT SUSPENDED.,

ARREST/DETAINED/CITED
07-18-77   CAIDALAMEDA CO        01     01   -FAIL TO APPEAR
           49351 AGG441                      470 PC-FORGERY

                                      COM:
                                      PD OAKLAND ARR

ARREST/DETAINED/CITED
07-30-78   CAIDALAMEDA CO        09     01   475 PC-POSSESS FORGED
           50981AGG441                       NOTES

                                        02   14601(A) VC-DRIVE W/
                                             SUSPENDED LICENSE

                                      COM:
                                      PD SAN LEANDRO ARR

COURT ACTION
11-09-78   CASCOAKLAND           09     01   470 PC-FORGERY
           H-935
                                             -DISMISSED/FOJ/MOTION OF
                                             PROSECUTOR

                                        02   475 PC-POSSESS FORGED
                                             NOTES
                                             -DISMISSED/FOJ/MOTION OF
                                             PROSECUTOR

                                        03   470 PC-FORGERY
                                             -CONVICTED-PLED GUILTY

(CONTINUED PAGE 011)                                              05389

CRIMINAL HISTORY TRANSCRIPT          FOR OFFICIAL USE ONLY
*UNAUTHORIZED USE IS A CRIMINAL OFFENSE*

| DATE | AGENCY/FILE NUMBER | NAME | COUNT | ACTION |
|------|--------------------|------|-------|--------|

COURT ACTION
12-07-78  CASCOAKLAND          09    01  470 PC-FORGERY
          H-935
                                              -CONVICTED-COMMITTED TO
                                               PRISON

ARREST/DETAINED/CITED
08-20-78  CAIDALAMEDA CO        11    01  470 PC-FORGERY
          8055967 AGG441
                                          COM:
                                          PD HAYWARD ARR

CDC CUSTODY
12-13-78  CASDCORRECTIONS       01    01  470 PC-FORGERY
          B-99692
                                          SEN:
                                          , 1 YR 4 MO,

                              07-06-79  -PAROLED
                                         RECEIVED BY:
                                         CAPACONTRA COSTA CO

                                          COM:
                                          SEN FROM ALAMEDA CO

ARREST/DETAINED/CITED
09-04-79  CAIDALAMEDA CO        01    01  470 PC-FORGERY
          61552AGG441
                                      02  470 PC-FORGERY

                                      03  476A PC-NONSUFFICIENT
                                          FUNDS:CHECKS

                                      04  476A PC-NONSUFFICIENT
                                          FUNDS:CHECKS

                                      05  496 PC-RECEIVE/ETC KNOWN
                                          STOLEN PROPERTY

(CONTINUED PAGE 012)                                          05390

CRIMINAL HISTORY TRANSCRIPT          FOR OFFICIAL USE ONLY
*UNAUTHORIZED USE IS A CRIMINAL OFFENSE*

DATE          AGENCY/FILE NUMBER      NAME  COUNT          ACTION

                                            06   -FAIL TO APPEAR
                                                 470 PC-FORGERY
                                            COM:
                                            CHRG-WARRANT ARR FOR 470 PC FROM
                                            SO MARTINEZ

                                            COM:
                                            PD SAN LEANDRO ARR

CDC CUSTODY
10-24-79  CASDCORRECTIONS          06    01  VIOLATION OF PAROLE
          B-99692

                                       02  470 PC-FORGERY
                                            SEN:
                                            , 2 YR,

                                       01-03-81  -PAROLED
                                                  RECEIVED BY:
                                                  CAPAALAMEDA CO

CDC CUSTODY
12-01-82  CASDCORRECTIONS          06    01  VIOLATION OF PAROLE
          B99692
                                            COM:
                                            TO FINISH TERM OF 12-13-78

                                       03-11-83  -PAROLED
                                                  RECEIVED BY:
                                                  CAPAALAMEDA CO

ARREST/DETAINED/CITED
08-29-81  CAPDSAN FRANCISCO       16    01  476 PC-MAKE/PASS
          375135                            FICTITIOUS CHECK

                                       02  470 PC-FORGERY

                                       03  475 PC-POSSESS FORGED
                                            NOTES

(CONTINUED PAGE 013)                                    05391

CRIMINAL HISTORY TRANSCRIPT FOR OFFICIAL USE ONLY

*UNAUTHORIZED USE IS A CRIMINAL OFFENSE*

| DATE | AGENCY/FILE NUMBER | NAME | COUNT | ACTION |
|---|---|---|---|---|
| ARREST/DETAINED/CITED | | | | |
| 03-14-82 | CAIDALAMEDA CO 2020271AGG441 | 06 | 01 | -WARRANT 476A PC-NONSUFFICIENT FUNDS:CHECKS |
| | | | | COM: ENROUTE NEWARK PD WARR #64506 |
| | | | | COM: NEWARK PD ARR |
| COURT ACTION | | | | |
| 04-02-82 | CAMCFREMONT 64506 | 06 | 01 | 476A PC-NONSUFFICIENT FUNDS:CHECKS -CONVICTED-JAIL/JAIL SS MISDEMEANOR PER 17PC |
| | | | | SEN: 001 YEARS JAIL |
| | | | | COM: 1 DS JL SS |
| ARREST/DETAINED/CITED | | | | |
| 10-10-82 | CAIDALAMEDA CO 2083255AGG441 | 01 | 01 | 4573.6 PC-POSS DRUGS/ALCOHOL/ETC IN PRISN/JAIL ARRESTED BY: CASOOAKLAND |
| ARREST/DETAINED/CITED | | | | |
| 04-15-83 | CAIDALAMEDA CO 3032494AGG441 | 06 | 01 | 11550 H&S-USE/UNDER INFLUENCE CONTROL SUBST ARRESTED BY: CAPDOAKLAND |
| COURT ACTION | | | | |
| 08-25-83 | CAMCOAKLAND 217822 | 06 | 01 | 11550 H&S-USE/UNDER INFLUENCE CONTROL SUBST -DISMISSED |
| | | | 02 | 11550 H&S-USE/UNDER INFLUENCE CONTROL SUBST -DISMISSED/FOJ/INSUFFICIENT EVIDENCE |

(CONTINUED PAGE 014)

CII NUMBER:A05119467  NAME:WILLIAMS,ABE JR

CRIMINAL HISTORY TRANSCRIPT         FOR OFFICIAL USE ONLY
*UNAUTHORIZED USE IS A CRIMINAL OFFENSE*

| DATE | AGENCY/FILE NUMBER | NAME | COUNT | ACTION |
|------|-------------------|------|-------|--------|

ARREST/DETAINED/CITED
07-21-83  CAIDALAMEDA CO             13    01   11550 H&S-USE/UNDER
          3063825AGG441                          INFLUENCE CONTROL SUBST
                                                 ARRESTED BY:
                                                 CAPDOAKLAND

                                     02   -WARRANT
          3032494AGG441                   -FAIL TO APPEAR
                                           11550 H&S-USE/UNDER
                                           INFLUENCE CONTROL SUBST
                               COM:
                               WARR NBR C217822

CDC CUSTODY
10-12-83  CASDCORRECTIONS            01    01   VIOLATION OF PAROLE
          B99692
                               COM:
                               TO FINISH TERM OF 121378

                               01-21-84   -PAROLED FROM CDC
                                           RECEIVED BY:
                                           CAPAALAMEDA CO

ARREST/DETAINED/CITED
05-17-84  CAIDALAMEDA CO             18    01   11550(A) H&S-USE/UNDER
          47813AGG441                            INFL CONTRLD SUBSTANCE
                                                 ARRESTED BY:
                                                 CAPDOAKLAND

ARREST/DETAINED/CITED
06-01-84  CAIDALAMEDA CO             06    01   10851 VC-TAKE VEHICLE
          4052456AGG441                          WITHOUT OWNER'S CONSENT
                                     06-05-84   -PROSECUTOR REJECT/REL
                                                 DETENTION ONLY
                                                 ARRESTED BY:
                                                 CAPDOAKLAND

(CONTINUED PAGE 015)                                                05393

CRIMINAL HISTORY TRANSCRIPT          FOR OFFICIAL USE ONLY
*UNAUTHORIZED USE IS A CRIMINAL OFFENSE*

| DATE | AGENCY/FILE NUMBER | NAME | COUNT | ACTION |
|------|--------------------|----|----|--------|

ARREST/DETAINED/CITED
06-02-84  CAIDALAMEDA CO              06    01   187 PC-MURDER
          4052669AGG441
                                          ARRESTED BY:
                                          CAPDOAKLAND

CDC CUSTODY
01-21-87  CASDCORRECTIONS            01    01   187 PC-MURDER:SECOND
          D48163                               DEGREE
                                               -USED WEAPON
                                               -W/PRIOR PRISON
                                          SEN:
                                          018 YEARS TO LIFE PRISON
                                               COUNTY SENTENCED FROM:
                                               ALAMEDA CO
                                          COURT #:80451

END OF TRANSCRIPT                                           05394

## UNITED STATES DEPARTMENT OF JUSTICE
### FEDERAL BUREAU OF INVESTIGATION
### IDENTIFICATION DIVISION
### WASHINGTON, D.C. 20537

The following FBI record, NUMBER    127 814 H    , is furnished FOR OFFICIAL USE ONLY
Information shown on this Identification Record represents data furnished FBI by fingerprint contributor
WHERE DISPOSITION IS NOT SHOWN OR FURTHER EXPLANATION OF CHARGE OR DISPOSITION I
DESIRED, COMMUNICATE WITH AGENCY CONTRIBUTING THOSE FINGERPRINTS.

| CONTRIBUTOR OF FINGERPRINTS | NAME AND NUMBER | ARRESTED OR RECEIVED | CHARGE | DISPOSITION |
|---|---|---|---|---|
| DC Jail Wash DC | Abe Williams 162083 | 11-26-69 | Burg II | |
| SO Buffalo NY | Sonny Williams 44752 | 11-25-70 | Sec 190.25-1 PL Crim Imnpers | |
| PD Hamburg NY | Sonny Williams Jr 870206 | 11-26-70 | Sect 501-4a NY Vehicle And Traffic Unlic Operator Sect 190:25 NY Penal Law Crim Impersonation | |
| USM Buffalo NY | Sonny Williams Jr 2324 2545 | 12-23-70 | T-18 Sec 641 Condealed records And Things of value from post office | Misc Crim #108-6 mos conc/w 1971- 40-1 yr viol prob trsfd to Lewisburg PA enroute to Petersburg V on chg of poss Postal equipment T 18 Sec 641 |

MASTER
1-4 (Rev. 7-19-77)

MASTER

3-24-87

# UNITED STATES DEPARTMENT OF JUSTICE
### FEDERAL BUREAU OF INVESTIGATION
#### IDENTIFICATION DIVISION
#### WASHINGTON, D. C. 20537

4

127 814 H

Use of the following FBI record, NUMBER                    , is REGULATED BY LAW. It is furnished I
OFFICIAL USE ONLY and should ONLY BE USED FOR PURPOSE REQUESTED. When further explanation of arrest charge o
disposition is needed, communicate directly with the agency that contributed the fingerprints.

| CONTRIBUTOR OF FINGERPRINTS | NAME AND NUMBER | ARRESTED OR RECEIVED | CHARGE | DISPOSITION |
|---|---|---|---|---|
| CA Medical Facility Vacaville CA | Abe Williams Jr. B 99692 SID 5119467 | 12-13-78 | Alameda SC#H-935 ct 1 Forg(470PC) | 1 yr 4 mos 7-6-79 par to Contra Costa Co |
| PD San Leandro CA | Abe Williams Jr 61552AGG441 SID 5 119 467 | 9-4-79 | 470 PC (Forg) 2 cts 476a PC (NSF-Checks) 2 cts 496 PC (Recvg etc kn stln prop) Contra Costa S/O 470 PC/ w/pr FTA Wrnt | |
| St Bu of Cr Ident & Inv Sacramento CA | Abe Williams B-99692 SID A05119467 | 10-24-79 FP 7-1-80 | Ct.1 Forg (470 PC) | 2 years |
| PD San Fran CA | David Williams 375135 SID 5119467 | 3-29-81 | Make/pass ficititious checks Forgery Pass Forged notes. | |
| CAID Alameda Co Oakland CA | David Williams 63444 AG6441 SID 5119467 | 8-21-81 Prt Rec 4-6-82 | 487 PC Grand Theft | |
| CA Med FAC Vacaville CA | Abe Williams Jr B-99692 SID 05119467 | 10-12-83 | Parole Violater | RTC |

3-24-87

## UNITED STATES DEPARTMENT OF JUSTICE
### FEDERAL BUREAU OF INVESTIGATION
#### WASHINGTON, D.C. 20537

2

The following FBI record, NUMBER    127 814 H    , is furnished FOR OFFICIAL USE ONLY.
Information shown on this Identification Record represents data furnished FBI by fingerprint contributors. WHERE
FINAL DISPOSITION IS NOT SHOWN OR FURTHER EXPLANATION OF CHARGE IS DESIRED, COMMUNICATE
WITH AGENCY CONTRIBUTING THOSE FINGERPRINTS.

| CONTRIBUTOR OF FINGERPRINTS | NAME AND NUMBER | ARRESTED OR RECEIVED | CHARGE | DISPOSITION |
|---|---|---|---|---|
| Fed Ref Petersburg Va | Abe Williams Jr #34169-118-C | 5-25-71 | unlawful entry vio prob conceal prop stln fr PO | 1 yr regular |
| DC Jail Wash DC | Sonny Williams Jr. #162083 | 9-23-71 | recomm from Shaw residence (1) | |
| CSC | Abe Williams Jr NY-73 103461 | 7-17-73 | | terminated 1-25-74 |
| PD Oakland CA | Abe Williams Jr 246981 | 12-9-73 | 23102A VC (drk dr) | $182 traffic schoolsohoo of 23103 a lesser c |
| PD Oakland CA | Abe Williams Jr. AGG441 | 4-25-74 | burg 459 PC | dism on chg o. 459 PC on 2 c' |
| PD Oakland CA | Abbe Williams 25365AGGA41 SID 5119462 | 6-11-74 | 459 PC Burglary | |
| PD Oakland CA | Abe Williams 66548AGG441 SID 5119467 | 11-15-74 | 459 PC burg | jail on chg of misd sec 459 F 365 das CJ; 2C das J/S for TS |
| PD Alameda CA | Abe Williams Jr 36866AGG441 SID 5 119 467 | 6-5-75 | receiving stln prop forg theft of credit card | 360/180 das ja on chg of 470 forg |

Notations indicated by * are NOT based on fingerprints in FBI files but are listed only as investigative leads as
being possibly identical with subject of this record.

IDENTIFICATION DIVISION

MASTER
1-4 (Rev. 5-9-72)

MASTER

3-24-87    ER

3

# UNITED STATES DEPARTMENT OF JUSTICE
## FEDERAL BUREAU OF INVESTIGATION
### IDENTIFICATION DIVISION
### WASHINGTON, D.C. 20537

## 127 814 H

The following FBI record, NUMBER _____, is furnished FOR OFFICIAL USE ONLY.
Information shown on this Identifcation Record represents data furnished FBI by fingerprint contributors.
WHERE DISPOSITION IS NOT SHOWN OR FURTHER EXPLANATION OF CHARGE OR DISPOSITION IS
DESIRED, COMMUNICATE WITH AGENCY CONTRIBUTING THOSE FINGERPRINTS.

| CONTRIBUTOR OF FINGERPRINTS | NAME AND NUMBER | ARRESTED OR RECEIVED | CHARGE | DISPOSITION |
|---|---|---|---|---|
| PD Oakland CA | Abe Williams 12527AGG441 SID 5119467 | 2-20-76 | poss stln porp | Pr susp Term 36 mos & 365 das jail on chg of 470 PC susp term 36 and 365 das jail |
| PD Oakland CA | Abe Williams Jr 22160AGG441 SID 5119467 | 3-29-76 | Forg Check writing 3 cts | Prison |
| PD Hayward CA | Abe Williams 24273 AGG 441 | 4-5-77 | 3 cts 470 PC-3 cts Forg & 496PC-Poss of stln prop | Dism on chg of 4 cts of F 470 PC. |
| PD Richmond Ca | Abe Williams Jr 61011 | 5-27-77 | MCW Vio Fel Forg | Not Guilty on chg of 470 PC. |
| Contra Costa Co J1 Martinez CA | Abe Williams Jr 22908-J | 5-27-77 | 470 PC Forg 495/170A Forg & Receipt of Stln Mail | Bay Docket 177511 Entr//USM |
| PD Oakland CA | Abe B Williams Jr 48458AGG441 SID 5119467 | 7-14-77 | burg poss forg papers poss forg notes chks to defraud | |
| PD San Leandro CA | James Tehedaus Williams 50981AGG441 SID 511 9467 | 7-30-78 | 475 PC (Poss. forged notes)/ 14610a cv (Poss alter/fict/susp. driv. lic). | |
| PD Hayward CA | Abraham Williams 8055967 AGG441 | 8-20-78 | 470 PC forgery | |

MASTER
MASTER
3-24-87
1-4 (Rev. 7-19-77)

5

# UNITED STATES DEPARTMENT OF JUSTICE
## FEDERAL BUREAU OF INVESTIGATION
### IDENTIFICATION DIVISION
#### WASHINGTON, D. C. 20537

127 814 H

Use of the following FBI record, NUMBER _____, is REGULATED BY LAW. It is furnished OFFICIAL USE ONLY and should ONLY BE USED FOR PURPOSE REQUESTED. When further explanation of arrest charge or disposition is needed, communicate directly with the agency that contributed the fingerprints.

| CONTRIBUTOR OF FINGERPRINTS | NAME AND NUMBER | ARRESTED OR RECEIVED | CHARGE | DISPOSITION |
|---|---|---|---|---|
| CAID Alameda Co Oakland CA | Gary David Hamilton 47813 AGG441 SID 5 119-467 | 5-17-84 | 11550(a) HS Under the Influence of a narcotic | |
| CAID Alameda Co Oakland CA | Abe Williams 52455 AGG441 SID 05119467 | 6-1-84 | 10851(a)VC Auto | Released |
| CA Med Fac Vacaville CA | Abe Williams Jr D 48163 SID 05119467 | 1-21-87 | ALA 80451 Ctl Murder 2nd (187PC)w/use of deadly wpn (12022(B)PC)PPT: 2 | Total term 15yrs to lif cs to 3yrs total term 18yrs to lif |

# EXHIBIT "P"

NAME: **WILLIAMS**                    CDC #. **D48163**                    CDC 128B

Inmate WILLIAMS has been voluntarily attending the NA program. Inmate WILLAMS has attended 6 of 6 meetings available during the quarter(s) of July 1, 2003 through September 30, 2003.

Orig: C-File
cc:  Sponsor
     Inmate

M. Valdez
Community Resource Manager
Mule Creek State Prison

J. Texeira
NA Staff Sponsor
Facility C

DATE: **October 1, 2003**     Self-Help Group/NA     MCSP INFORMATIONAL CHRONO

NAME and NUMBER     **WILLIAMS**     **D-48163**     **14-122L**     CDC-128-B Rev. 4/74

Inmate **WILLIAMS** has been voluntarily attending the Facility "C" Narcotics Anonymous self-help program.  Inmate **WILLIAMS** attended 9 of 9 meetings available during the quarter of October 1, 2003 through December 31, 2003.

orig: C-File
  cc: Sponsor
      Inmate

W. Valdez
Community Resource Manager
Mule Creek State Prison

Adulah Francis
N.A. Staff Sponsor
Fac."C", MCSP-Ione

January 2, 2004
DATE          Self-Help / Narcotics Anonymous

GENERAL CHRONO

NAME and NUMBER     **WILLIAMS**     **D-48163**     **14-122L**     CDC-128-B (Rev. 4/7

Inmate WILLIAMS has been voluntarily attending the Facility "C" Narcotics Anonymous Self-Help Group.  Inmate WILLIAMS attended 10 of 12 meetings available during the time period of January 1, 2004 through March 31, 2004.

orig: C-File
  cc: Writer
      Inmate

J. Texeira, Staff Sponsor
Narcotics Anonymous
Facility "C", MCSP

March 31, 2004

NAME and NUMBER                    Williams    T-39410    Transferred              CDC 128-B Rev. 4/74

Inmate Williams has been voluntarily attending the Facility 'C' Narcotics Anonymous Self-Help
Group.  Inmate Williams attended 2 of 5 meetings available during the quarter of January 1,
2004 through March 31, 2004.

Orig:  C-File
  cc:  Writer
       Inmate

Adulah Francis, Staff Sponsor
Narcotics Anonymous
Facility "C", MCSP

DATE       3-31-04    (SELF-HELP / NARCOTICS ANONYMOUS)    MCSP

GENERAL CHRONO



# CERTIFICATE OF ATTENDANCE

*Narcotics Anonymous*

**Williams,** D-48163

in recognition of 1 year of continuous attendance
from September 2002 to September 2003

Mule Creek State Prison

NAME    WILLIAMS    CDC# D-48163    14-132    CDC-128B

Inmate ___WILLIAMS___ has been voluntarily attending the Alcoholics Anonymous program. Inmate ___WILLIAMS___ has attended __5_ of __5_ meetings available during the quarter of ___JULY 2003___ through ___SEPTEMBER 2003___.

MIKE VALDEZ
Community Resource Manager
Mule Creek State Prison

ADULAH FRANCIS
AA Staff Sponsor
Facility "C"

DATE    OCTOBER 1, 2003                    MCSP INFORMATIONAL CHRONO


WILLIAMS    D-48136    C-14-122    CDC-128B

INMATE WILLIAMS HAS BEEN VOLUNTARILY ATTENDING THE ALCOHOLICS ANONYMOUS PROGRAM. INMATE WILLIAMS HAS ATTENDED 12 OF 12 MEETINGS AVAILABLE DURING THE QUARTER 10-01-03 THROUGH 12-31-03.

MIKE VALDEZ
COMMUNITY RESOURCE MANAGER
MULE CREEK STATE PRISON

ADULAH FRANCIS
A A STAFF SPONSOR
C FACILITY

1-12-04


NAME and NUMBER    Williams    D-48163    14-122    CDC-128-B Rev 4/74

Inmate _Williams_____ has been voluntarily attending the Alcoholics Anonymous program. Inmate __Williams_____ has attended __4_ of __9_ meetings available duri the quarter of _JANUARY 2004_____ _____ through _MARCH 2004_____.

ADULAH FRANCIS    M&SSI
AA STAFF SPONSOR
FACILITY "C" MCSP

Original:C-File
    cc:Writer
        Inmate


DATE    APRIL 1, 2004                    GENERAL CHRONO

NAME and NUMBER  Williams, Abe Jr., D-48163

CDC-128-B (Rev. 4/74)

Williams, Abe Jr., D-48163 has successfully completed the "Breaking Barriers" program by completing a thirty (30) hour program participation.  This inmate was a program participant from Feb. 26, 1991 to Mar. 11, 1991.  "Breaking Barriers is a voluntary self-help program".

SOL IRVING
Correctional Counselor
Breaking Barriers Program Manager
CMF-South, Level III

cc: Central File
    Counselor
    Inmate
    File

DATE                                                                    GENERAL CHRONO

NAME and NUMBER        WILLIAMS, A.      D-48163                    CDC-128-B (Rev. 4/7.

Inmate WILLIAMS, A., D-48163 has successfully completed the "Breaking Barriers" seminar. Subject complied with all requirements and participated satisfactorily in all phases of the program which included workshops, team work, and personal homework. Subject was an asset to the seminar.

cc: C-file
    Education
    Inmate

TIMOTHY C. ABBOTT
Pre-Vocational Instructor
CSP-Solano III

DATE 04/19/93  INFORMATIVE: BREAKING BARRIERS SEMINAR      GENERAL CHRONO

CDC-128-B (Rev. 4/74)

NAME AND NUMBER:    WILLIAMS  D48163    C13-229L          M.C.S.P.
Mr. Williams, D48163, (13-229L) volunteered for and actively participated in a Conflict Resolution workshop November 4-6, 2002. This workshop focused on improving communication skills and avoiding violence when conflict occurs. Mr. Williams presented a positive attitude during this workshop and was polite to all staff and peers that participated.

CC:  Central File                                J. Rillos
     CCI                                          Re-Entry Instructor
     Writer
     Inmate
Date: November 8, 2002      INFORMATIONAL CHRONO              MCSP

LIAMS    D-48163    3CO  17L

NAME and NUMBER                                                                    CDC-128-B (Rev. 4/74)
Lifeskills Tutor since: 17 Jun 1995.    Hours this quarter (Jul-Sept):  60
                                         Yearly total (1996):          ?20

Inmate WILLIAMS is to be congratulated for successfully participating in the LITERACY THINKING
AND ORGANIZATION LIFESKILLS SELF-HELP PROGRAM in its volunteer classroom format as a
TUTOR/INSTRUCTOR.  He has provided sixty (60) hours of instruction this quarter to other inmates
in thinking skills, organizational skills, practical life skills, positive self-esteem, personal
values, work values, and people values.  As a tutor/instructor, he has taken the initiative to
become a positive role model and is developing his own self-confidence through the use of public
speaking skills.  Inmate WILLIAMS is to be commended for his continuing efforts to help men
develop cognitive skills as well as prosocial traits of character.  It is hoped that this
program will benefit men as they seek to become effective, constructive, respectful,
self-improving, and contributing members of society.

ORIGINAL: C-FILE          _____          _____
     COPY: CC-1      MR. F. KONG              MR. W. EDMISTON
             INMATE     S.A.I. (A)              LITERACY FACILITATOR
DATE 28 SEPTEMBER 1996    LAUDATORY CHRONO      CSP-CORCORAN              GENERAL CHRONO

---

**NAME**  WILLIAMS, A        **NUMBER**  D48163      **CELL**  RA-122L      **CDC-128B**

Inmate WILLIAMS, A D48163 has successfully completed a course in the cause, prevention, treatment and
management of Sexually Transmitted Disease.

**Original:**   Central File
**cc:**         IPEP File
                Inmate

_____
Peer Education Coordinator

**DATE:** 7/27/00                                                    **N-1277**
                                                            **GENERAL CHRONO**

---

NAME and NUMBER        **Williams    D-48163    14-122L**        CDC-128-B (Rev. 4/74)

On 8/25/03 inmate Williams D-48163, TEAVC.203, has successfully completed the Vocational
Education, Office Services Interactive Journaling: Abuse & Addiction workbook.  This is a five
hour activity.

Orig:  C-File
  cc:  Writer
       Inmate
       CCI

_____
P. Babrah
Instructor
Facility "C", Second Watch

DATE     8/25/03    (INFORMATIONAL)    MCSP                    GENERAL CHRONO

NAME and NUMBER          **Williams**    **D-48163**    **14-122L**          CDC-128-B (Rev. 4/74)

On 8/25/03 inmate Williams D-48163, TEAVC.203, has successfully completed the Vocational Education, Office Services Interactive Journaling: First Step workbook. This is a five hour activity.

Orig: C-File
  cc:  Writer
       Inmate
       CCI

P. Babrah
Instructor
Facility "C", Second Watch


DATE     8/25/03    (INFORMATIONAL)    MCSP                    GENERAL CHRONO


NAME and NUMBER          **Williams**    **D-48163**    **14-122L**          CDC-128-B (Rev. 4/74)

On 8/25/03 inmate Williams D-48163, TEAVC.203, has successfully completed the Vocational Education, Office Services Interactive Journaling: My Change Plan workbook. This is a five hour activity.

Orig: C-File
  cc:  Writer
       Inmate
       CCI

P. Babrah
Instructor
Facility "C", Second Watch


DATE     8/25/03    (INFORMATIONAL)    MCSP                    GENERAL CHRONO


NAME and NUMBER          **Williams**    **D-48163**    **14-122L**          CDC-128-B (Rev. 4/74)

On 8/25/03 inmate Williams D-48163, TEAVC.203, has successfully completed the Vocational Education, Office Services Interactive Journaling: Self-Esteem workbook. This is a five hour activity.

Orig: C-File
  cc:  Writer
       Inmate
       CCI

P. Babrah
Instructor
Facility "C", Second Watch


DATE     8/25/03    (INFORMATIONAL)    MCSP                    GENERAL CHRONO

NAME and NUMBER          **Williams**     **D-48163**     **14-122L**          CDC-128-B (Rev. 4/74)

On 8/25/03 inmate Williams D-48163, TEAVC.203, has successfully completed the Vocational Education, Office Services <u>Interactive Journaling: Life Management</u> workbook.  This is a five hour activity.

Orig: C-File
 cc:  Writer                                                  P. Babrah
      Inmate                                                 · Instructor
      CCI                                                    Facility "C", Second Watch


DATE       8/25/03       (INFORMATIONAL)       MCSP                    GENERAL CHRONO


NAME and NUMBER          **Williams**     **D-48163**     **14-122L**          CDC-128-B (Rev. 4/74)

On 8/25/03 inmate Williams D-48163, TEAVC.203, has successfully completed the Vocational Education, Office Services <u>Interactive Journaling: Values for Responsible Living</u> workbook.  This is a five hour activity.

Orig: C-File
 cc:  Writer                                                  P. Babrah
      Inmate                                                  Instructor
      CCI                                                     Facility "C", Second Watch


DATE       8/25/03       (INFORMATIONAL)       MCSP                    GENERAL CHRONO


NAME and NUMBER          **Williams**     **D-48163**     **14-122L**          CDC-128-B (Rev. 4/74)

On 8/25/03 inmate Williams D-48163, TEAVC.203, has successfully completed the Vocational Education, Office Services <u>Interactive Journaling: Thinking Errors</u> workbook.  This is a five hour activity.

Orig: C-File
 cc:  Writer                                                  P. Babrah
      Inmate                                                  Instructor
      CCI                                                     Facility "C", Second Watch


DATE       8/25/03       (INF 'MATIONAL)       MCSP                    GENERAL CHRONO

NAME and NUMBER          **Williams**    **D-48163**    **14-122L**          CDC-128-B (Rev. 4/74)

On 8/25/03 inmate Williams D-48163, TEAVC.203, has successfully completed the Vocational Education, Office Services <u>Interactive Journaling: Anger</u> workbook. This is a five hour activity.

Orig:  C-File
  cc:  Writer
      Inmate
      CCI

P. Babrah
Instructor
Facility "C", Second Watch

DATE      8/25/03      (INFORMATIONAL)      MCSP                    GENERAL CHRONO

NAME and NUMBER          **Williams**    **D-48163**    **14-122L**          CDC-128-B (Rev. 4/74)

On 8/25/03 inmate Williams D-48163, TEAVC.203, has successfully completed the Vocational Education, Office Services <u>Interactive Journaling: The Con Game</u> workbook. This is a five hour activity.

Orig:  C-File
  cc:  Writer
      Inmate
      CCI

P. Babrah
Instructor
Facility "C", Second Watch

DATE      8/25/03      (INFORMATIONAL)      MCSP                    GENERAL CHRONO

NAME and NUMBER          **Williams**    **D-48163**    **14-122L**          CDC-128-B (Rev. 4/74)

On 8/25/03 inmate Williams D-48163, TEAVC.203, has successfully completed the Vocational Education, Office Services <u>Interactive Journaling: Relapsers</u> workbook. This is a five hour activity.

Orig:  C-File
  cc:  Writer
      Inmate
      CCI

P. Babrah
Instructor
Facility "C", Second Watch

DATE      8/25/03      (INFORMATIONAL)      MCSP                    GENERAL CHRONO

NAME and NUMBER          **Williams**    **D-48163**    **14-122L**          CDC-128-B (Rev. 4/74)

On 5/28/03 inmate Williams D-48163, OSS-C.223, has successfully completed the Vocational Education, Office Services <u>Stress Management Class</u>. This is a ten hour activity.

Orig:  C-File
  cc:  Writer
       Inmate
       CCI

P. Babrah
Instructor
Facility "C", Second Watch

DATE      5/28/03      (INFORMATIONAL)      MCSP                GENERAL CHRONO


NAME and NUMBER          **Williams**    **D-48163**    **14-122L**          CDC-128-B (Rev. 4/74)

On 5/28/03 inmate Williams D-48163, OSS-C.223, has successfully completed the Vocational Education, Office Services <u>Problem Solving Class</u>. This is a ten hour activity.

Orig:  C-File
  cc:  Writer
       Inmate
       CCI

P. Babrah
Instructor
Facility "C", Second Watch

DATE      5/28/03      (INFORMATIONAL)      MCSP                GENERAL CHRONO


NAME and NUMBER          **Williams**    **D-48163**    **14-122L**          CDC-128-B (Rev. 4/74)

On 5/28/03 inmate Williams D-48163, OSS-C.223, has successfully completed the Vocational Education, Office Services <u>Anger Management Class</u>. This is a ten hour activity.

Orig:  C-File
  cc:  Writer
       Inmate
       CCI

P. Babrah
Instructor
Facility "C", Second Watch

DATE      5/28/03      (INI .MATIONAL)      MCSP                GENERAL CHRONO

STATE OF CALIFORNIA

DEPARTMENT OF CORRECTIONS
CDC 128 B (8/87

NAME and NUMBER   WILLIAMS, A.  D-48163, 3C05-219L

INMATE WILLIAMS WAS ASSIGNED TO THE VOCTIONAL COMPUTER PROGRAM 3/15/95 THROUGH 11/7/95.
WILLIAMS WAS A MOTIVATED STUDENT IN THE TIME ASSIGNED HE COMPLETED AND RECEIVED CERTIFICATES
FOR THE FOLLOWING: COMPUTER ORIENTATION, BASIC (BEGINNING PROGRAMMING LANG.), MICROSOFT
WORD5, (WORD PROCESSING), EXCEL 4.0 (SPREADSHEET), WORDPERFECT 5.1(WORD PROCESSING), DOS
(OPERATING SYSTEM), WINDOWS 3.1 (ENVIRONMENT) AND EQUIPMENT UTILIZATION.  WILLIAMS HAS A TYPING
SKILLS OF 35+ WPM.  WILLIAMS CURRENTLY HAS BASIC ENTRY LEVEL COMPUTER JOB SKILLS AND IS A SELF
STARTER.

CC:   CENTRAL FILE ✓
      ED-FILE
      VOC-FILE
      COUNSELOR
      INMATE
DATE    7/3/96

B. PENLAND, INSTRUCTOR
VOCATIONAL COMPUTERS

INFORMATIONAL          CSP-CORCORAN      GENERAL CHRONO

NAME and NUMBER    WILLIAMS    D-48163   9-111-L

CDC-128-B (Rev. 4/74)

Inmate Williams entered the Vocational Computer Repair program on April 21, 2001, and departed on October 25, 2001. During
that time Inmate Williams completed all course work that applied to the following parts of the Computer Repair curriculum:
V03.01.01, Program Introduction; V03.01.02, DC Math; V03.01.03, DC Electronics; V03.01.05, AC Math. Inmate Williams
completed these sections with an average score of 93%. Inmate Williams additionally completed the Computer Demolition portions
of the curriculum under my supervision, by taking apart and restoring 286, 386, and Pentium version computers. Inmate Williams
further assisted the Vocational Computer Repair program by writing a step by step procedure for the Demolition process. Inmate
Williams' was reassigned due to his medical condition and the temporary closure of the Computer Repair program. I found Inmate
Williams to be an asset to this program while he was able to participate

CC:    Central File
       CC-I
       Inmate
       File

DATE    20202

N. DELA CRUZ, INSTR.
Computer Repair
CSP-Solano, Level-II

P. G. Gutierrez SVI(+)

INFORMATIVE

NAME and NUMBER        WILLIAMS    D-48163   14-213L

CDC-128-B Rev. 4/74

On 12/15/02   Inmate WILLIAMS assigned to OSS-C.223 has successfully completed Orientation
Safety, Beginning Typing, Word Processing, Study Skills and Job Preparation of the Vocationa
Education Office Service curriculum.   Currently, WILLIAMS is working on the followin
curriculum:   Small Business, Desk Top Publishing, Business Math, and Business English.  H
was assigned to the class on 9/24/02 and his performance has been excellant.  He is gainin
marketable skills in all areas of the Office Services work field. WILLIAMS has also complete
the voluntary Conflict resolution program offered in the class.  He works dilegently and i
an excellant student.

Orig:  C-File
  cc:  Writer
       Inmate

P. BABRAH
VOC ED INSTRUCTOR
Facility "C", 2nd/W

DATE         12/15/02     (INFORMATIONAL)    MCSP          GENERAL CHRONO

NAME and NUMBER   **WILLIAMS**   **D-48163**   **RA-122L**   CDC-128-B (Rev. 4/7

Inmate Williams, D-48163, RA-122L, has been assigned as Third Watch Commander's Clerk since March of 1997 and during this time he has competently and diligently performed the many duties associated with his job. His preparation and distribution of paper work is meticulous thus ensuring that all documents and paperwork are prepared accurately. Williams' duties include (but are not limited to) preparing: (1) "Watch Reports", (2) "A.O.D. Reports", (3) Daily "Out Counts", (4) "Plan of Operations" for Emergencies and Institutional Lockdowns, (5) Memorandums, (6) "Fire Evacuation Drill Reports", (7) "Inventory Supply Orders", (8) "Lateral Transfer" packages, and (9) "Work Orders" for Institutional repair needs, etc. During this time Williams has worked overtime for periods of up to ten (10) weeks straight when there was no relief clerk assigned. Additionally, Inmate Williams is computer literate and types 55 words per minute and operates both the Standard and Resopgraph GR-1700 Rapid Copiers. In this position of trust, Williams stability and reliability, has made him an asset to the smooth, orderly, and efficient operation of Third Watch at CTF-North.

ORIG:  C-FILE
      CC-I
DATE  INMATE   **04/22/99**

J.F. CULLITON, LIEUTENANT
THIRD WATCH COMMANDER
CTF-NORTH FACILITY   GENERAL CHRONO

STATE OF CALIFORNIA   DEPARTMENT OF CORRECTIONS
CDC 128 B (4/74)

NAME AND NUMBER   **WILLIAMS**   **D-48163**   **RA-129L**

## ARTS IN CORRECTIONS - CREATIVE WRITING:

Williams has been a participant in the "Arts In Corrections -- Creative Writing Program" since March of 1997 through October 2000. Williams has taken several sets of courses in the following writing disciplines: (1) Journalism; (2) Fiction and Non-Fiction Writing; (3) Novel and Short Story Writing; (4) Play Writing; (5) Screen Play Writing; and (6) Poetry Writing. Williams is a gifted writer and he has utilized the Creative Writing courses to hone his writing skills. Williams has been an active class participant and assisted new students with their writing, thereby helping to make this program successful. Williams has contributed to a CTF Anthology of Inmate Writings; participated in an audio taping of Inmate Poetry for Public Radio; and Williams wrote a Play and acted in its production at CTF-North for the North inmate population.

Orig: Central File
  cc: Unit File
     Writer
     Inmate
     CCI

J. BOWERS
CENTRAL EDUCATION
CTF-CENTRAL

DATE  12-26-00   (INFORMATIVE)   **GENERAL CHRONO**

NAME  WILLIAMS, A.    NUMBER  D48163    CELL  RA-122L    CDC-128B

Inmate WILLIAMS, A. D48163 has completed the "DESTINOS" Video Tele-Course, lessons 1 – 26. He is to be commended for his desire to learn a second language and his tenacity to complete the assigned homework, lessons and tests.

Original:  C-File
cc:    Education File
       Destinos File
       Inmate

*L. Strauss*
**L. Strauss**
**Destinos Coordinator**

ND-0005

**GENERAL CHRONO**

**DATE: July 21, 2000**

---

FINAL GRADE REPORT

| | | | | | | |
|---|---|---|---|---|---|---|
| BIP 2 | BASIC PROGRAMMING | 1.5 | 1.5 | A | 6.0 |
| BIP 50 | INTRO TO COMPUTERS | 1.0 | 1.5 | C | 3.0 |
| ENGL 2 | INTRO TO LITERATURE | 3.0 | 3.0 | C | 6.0 |

| | | | |
|---|---|---|---|
| 6.0 | 6.0 | 15.0 | 2.50 | CURRENT | FALL '? |
| 0.0 | 0.0 | 0.0 | 0.00 | CUMULATIVE |

---

**SOLANO**
**COMMUNITY COLLEGE**

| GRADE | GRADING SYSTEM | GRADE POINTS PER CREDIT |
|---|---|---|
| A | EXCELLENT | 4 |
| B | GOOD | 3 |
| C | AVERAGE | 2 |
| D | MINIMUM PASSING | 1 |
| F | NOT PASSING | 0 |

GRADES NOT INCLUDED IN G.P.A.

| | |
|---|---|
| W | OFFICIAL WITHDRAWAL |
| I | INCOMPLETE |
| CR | CREDIT (C OR ABOVE) |
| NC | NO CREDIT |
| IP | IN PROGRESS |
| RD | REPORT DELAYED |

EXPLANATION ON REVERSE SIDE

WILLIAMS, ABE
PO BOX 4000 D-48163 11-22
VACAVILLE    CA 95696

STUDENT GRADE REPORT

L A COMMUNITY COLLEGE DIST.
INSTRUCTIONAL TELEVISION-LA
855 N. VERMONT AVE.
LOS ANGELES        CA  90029

| GRADE | POINTS PER UNIT | GRADE | POINTS PER UNIT |
|-------|-----------------|-------|-----------------|
| A  EXCELLENT | 4 | CR  CREDIT | 0* |
| B  GOOD | 3 | NC  NO CREDIT | 0* |
| C  SATISFACTORY | 2 | I  INCOMPLETE | 0* |
| D  PASSING, LESS | 1 | W  WITHDREW | 0* |
|    THAN SATISFACTORY | | IP  IN PROGRESS | 0* |
| F  FAILING | 0 | RD  REPORT DELAYED | 0* |
| | | CR  CREDIT BY | |
| | | EXAMINATION | 0* |

*COURSES ARE NOT INCLUDED IN THE COMPUTATION OR GRADE POINT AVERAGE

TO THE STUDENT

YOUR PROGRESS HAS BEEN SATISFACOTRY IF YOUR CUMULATIVE
GRADE POINT AVERAGE IS 2.00 OR HIGHER, AND IF LESS THAN 50% OF
YOUR TOTAL UNITS ARE "W", "I", OR "NC".

IF YOUR PROGRESS HAS NOT BEEN SATISFACTORY, PLEASE NOTE
THE INFORMATION PRINTED BELOW. REFER TO THE SECTION ON *academic standards for probation* IN THE COLLEGE CATALOG, AND CONSULT
A COUNSELOR

| SEMESTER GRADE POINT AVERAGE | 4.000 |
|---|---|

| SUBJECT AND DESCRIPTION | | | GRADE | UNITS | GRADE REPORTED |
|---|---|---|---|---|---|
| BUSINESS LAW 1 | LAW | 1 | A | 3.0 | 12.0 |

SEMESTER TOTALS MAY CONTAIN
NON-DEGREE APPLICABLE COURSES.

| STUDENT NUMBER | SEMESTER/YEAR | SEMESTER TOTALS | UNITS ATTEMPTED | UNITS COMPLETED | GRADE POINTS |
|---|---|---|---|---|---|
| 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 | FALL 95 | | 3.0 | 3.0 | 12.0 |

WILLIAMS ABE
4001 KING AV/ED DEPT
CORCORAN CA        93212

DPS-060 (REV 3-90)

---

AME & NUMBER    WILLIAMS, ABE                # D-48163    C-13-229L        CDC-128-B(Rev.4/74

On  9-26-02    Inmate    WILLIAMS                earned the following scores on the GED Test:
                                        At: CREEKSIDE ADULT SCHOOL.

| TEST | 1. | Writing Skilis | 560 | | |
|------|----|----|-----|---|---|
| | 2. | Social Studies | 630 | PASSED | X |
| | 3. | Science | 550 | FAILED | |
| | 4. | Int. Lit. & Arts | 640 | | |
| | 5. | Mathematics | 480 | | |
| | | TOTAL | 2860 | | |
| | Standard Score Average | | 572 | | |

*L. Bernardo*

L. Bernardo
Academic Instructor, Fac. "C"
MCSP/Ione

rig:   Central File
cc:    CC I
       GED Coordinator
       Education File
       Lit. Coordinator
       Writer
       Inmate

Date:  11-5-02        (Informative)            MCSP/Ione            GENERAL
                                                                    CHRONO

IFORNIA DEPARTMENT OF EDUCATION Case 3:08-cv-02167-MHP    Document 4-4    TESTS OF GENERAL EDUCATIONAL DEVELOPMENT (GED) Filed 04/25/2008    Page 15 of 91
TE GED OFFICE

Issued by the California Department of Education

**FICIAL REPORT OF GED TEST RESULTS**

004 (11/01)



| AMINEE:  ABE WILLIAMS | TEST LANGUAGE:  ENGLISH |
|---|---|
| TE OF BIRTH:  11/11/1949 | CERTIFICATE NUMBER:  1082002JS477 |
| ED IDENTIFICATION NUMBER:  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 | DATE OF ISSUE:  10/8/2002 |

| EST RESULTS | TEST DATE | FORM | STANDARD SCORE | PERCENTILE RANK FOR U.S. |
|---|---|---|---|---|
| 3T 1  Language Arts, Writing | 9/26/2002 | IB | 560 | 73 |
| 3T 2:  Social Studies | 9/26/2002 | IB | 630 | 90 |
| 3T 3:  Science | 9/26/2002 | IB | 550 | 69 |
| 3T 4:  Language Arts, Reading | 9/26/2002 | IB | 640 | 92 |
| 3T 5  Mathematics | 9/26/2002 | IB | 480 | 42 |
| passing standard is a minimum of 410 on each of the five tests in the ery AND an average (mean) score of 450 on the total battery. | STANDARD SCORE TOTAL | | 2860 | |
| | STANDARD SCORE AVERAGE | | 572 | |

ilts on each of the five GED Tests are given as standard scores ranging from 200 to 800 and percentile ranks ranging from 1 to 99; higher scores
It from correctly answering more test questions. The average standard score for graduating high school seniors is 500; standard scores above 500 are
re those of the typical recent high school graduate. The percentile ranks show the percent of the graduating seniors who earned scores at or below
e of the examinee.

- Examinee:                                                                                                      10/8/2002

gratulations! You have achieved passing scores on the General Educational Development Test. We are pleased to present you with
`alifornia High School Equivalency Certificate. By law, the enclosed certificate is the equivalent of a high school diploma for
loyment purposes and must be accepted as such by all state and local public agencies in the state of California. The upper half of this
i is your Official Report of GED Scores.

**NFIDENTIALITY:** The California Department of Education considers your records confidential. We will not release them to any
'idual or agency, other than an Official GED Testing Center, without a signed release from you.

**'LICATE RECORDS:** If you need copies of your records, you must submit a signed request or an "Application to Release GED
rds" form available from a Local GED Testing Center. In your request please include: Full name, GED ID number (in most cases
social security number), date of birth, where you tested, and the last date you tested. Please do not request records by telephone,
mile, email, or in person. Send requests to the address below and allow 6 to 8 weeks for delivery. Correspondence should be
essed to: **STATE GED OFFICE, California Department of Education, P.O. Box 710273, Sacramento, CA  94244-0273.**

**ANGES/ERRORS:** GED scores, like high school or college records, are permanent. The information on the official documents
ld reflect the information provided to the testing center at the time of testing. If you should discover an error on these official
ments, contact the agency where you took the GED test. They will provide you with information on how to correct document errors.

Mark E. Fetler

**MARK E. FETLER**
**STATE GED ADMINISTRATOR**

ABE WILLIAMS
201 WATERMAN RD
IONE, CA 95

NING: This document is invalid if duplicated or altered in any way. If you attempt to photocopy this document the word "copy" will appear in the background.

**NOT AN OFFICIAL TRANSCRIPT**    **ACADEMIC HISTORY**    **NOT AN OFFICIAL TRANSCRIPT**

WILLIAMS, ABE

PO BOX CDC/D48163
FOLSOM, CA 95671

COUNSELOR: 000

SACRAMENTO CITY COLLEGE
3835 FREEPORT BLVD.
SACRAMENTO, CA 95822

02/28/90

SSN: 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

MAJOR: 1-904    BUSINESS MGMT/OFF ADMIN                    HIGHEST HONORS
--------------------------------------------------------------------------------

HIGH SCH LAST ATTENDED: ALAMEDA COUNTY      COLLEGE LAST ATTENDED: CHABOT COLLEGE      PHONE:
H.S. GRAD: YES        YEAR: 1966            SEM/YEAR ENTERED: F87                     BIRTHDATE: 11/11/49
RESIDENCE: 1000                             ACADEMIC STANDING: GOOD STANDING          SEX: M

| DEPARTMENT | DESCRIPTION | UNITS ATT | UNITS COMP | G D | GRADE PNTS |
|---|---|---|---|---|---|
| ----- FALL 1987 ----- | | | | | |
| ENGL 001A | COLLEGE COMPOSITION | 3.00 | 3.00 | C | 6.00 |
| HIST 018 | HISTORY OF THE U S | ( .00) | .00 | W | .00 |
| SEM: | PCT= 0%,GPA=2.00 | 3.00* | 3.00* | | 6.00* |
| CUM: | PCT= 0%,GPA=2.00 | | | | |
| ----- SPRING 1988 ----- | | | | | |
| BUS 020 | INTRO TO BUSINESS | 3.00 | 3.00 | A | 12.00 |
| PSYC 001 | GENERAL PRINCIPLES | 3.00 | 3.00 | B | 9.00 |
| SEM: | PCT= 0%,GPA=3.50 | 6.00* | 6.00* | | 21.00* |
| CUM: | PCT= 0%,GPA=3.00 | | | | |
| ----- FALL 1988 ----- | | | | | |
| MGMT 060 | PSYCH HUMAN RELATION | 3.00 | 3.00 | A | 12.00 |
| PHIL 006 | INTRO TO PHILOSOPHY | 3.00 | 3.00 | A | 12.00 |
| SEM: | PCT= 0%,GPA=4.00 | 6.00* | 6.00* | | 24.00* |
| CUM: GOOD STAND PCT= 0%,GPA=3.40 | | | | | |
| ----- SPRING 1989 ----- | | | | | |
| PHIL 009 | WORLD RELIGIONS | 3.00 | 3.00 | B | 9.00 |
| SPEE 001 | SPEECH COMMUNICATION | 3.00 | 3.00 | A | 12.00 |
| SEM: | PCT= 0%,GPA=3.50 | 6.00* | 6.00* | | 21.00* |
| CUM: GOOD STAND PCT= 0%,GPA=3.42 | | | | | |
| ----- FALL 1989 ----- | | | | | |
| POL S001 | INTRO TO GOVT U S | 3.00 | 3.00 | A | 12.00 |
| PSYC 007 | HUMAN BEHAVIOR | 3.00 | 3.00 | A | 12.00 |
| SEM: | PCT= 0%,GPA=4.00 | 6.00* | 6.00* | | 24.00* |
| CUM: GOOD STAND PCT= 0%,GPA=3.55 | | | | | |
| SCC CUM: | PCT= 0%,GPA=3.55 | 27.00* | 27.00* | | 96.00* |

REQUESTOR: DOLANL

**NOT AN OFFICIAL TRANSCRIPT**

# DESTINOS

## VIDEO TELE-COURSE

This is to certify that

### A. WILLIAMS

Has successfully completed a
course of instruction in

### SPANISH

Date: July 21, 2000



L. Strauss
Destinos Coordinator

ND-0005

# State of California

# High School Equivalency Certificate



This is to certify that

## ABE WILLIAMS

has met the standards established by the California State Board of Education for successful completion of the tests of General Educational Development and is therefore entitled to this High School Equivalency Certificate.

October 8, 2002



_President of the California State Board of Education_

_State Superintendent of Public Instruction_

10820021547/

# State of California

# High School Equivalency Certificate

October 16, 2002



This is to certify that

## ABE WILLIAMS

has met the standards established by the California State Board of Education for successful completion of the tests of General Educational Development and is therefore entitled to this High School Equivalency Certificate.

President of the California State Board of Education

State Superintendent of Public Instruction



# Business Training Institute

21649 US19 North
Suite 200
Clearwater, Florida 34625
813-791-7833

STUDENT GRADE REPORT

Student Name: _____ WILLIAMS, ABE ___ SS #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

Location: _____ VACAVILLE _____

Completion Date: _____ November 24, 1992 _____

Quarter Completed: _____ Fall, 1992 _____

Program/Course:    SMALL BUSINESS OPERATION

| COURSE NO. | CREDIT | COURSE TITLE | GRADE | GPA | COMMENT |
|---|---|---|---|---|---|
| MG-100 | 4 | STARTING A NEW ENTERPRISE | | | |
| EN-100 | 4 | ORAL COMMUNICATION | | | |
| BU-107 | 2.5 | GENERAL MATH | | | |
| CO-100 | 3 | INTRODUCTION TO COMPUTERS | | | |
| BU-100 | 4 | SMALL BUSNESS MANAGEMENT | | | |
| BU-207 | 4 | BUSINESS LAW | A | 4.0 | |
| BU-215 | 2.5 | BUSINESS MATH | | | |
| EN-200 | 3 | WRITTEN COMMUNICATION | | | |
| BU-200 | 4 | BUSINESS ETHICS | A | 4.0 | |
| MG-200 | 4 | SUPERVISION | | | |
| AC-100 | 3 | ACCOUNTING I | A- | 3.5 | |
| WP-100 | 2.5 | WORD PROCESSING | | | |
| SO-120 | 4 | ECONOMICS | | | |
| MG-150 | 4 | SELLING | | | GRADING |
| DP-100 | 2.5 | MICROS & SPREADSHEET I | | | |
| AC-105 | 3 | ACCOUNTING II | | | A=4.0 GPA |
| MG-120 | 4 | MARKETING | | | B=3.0 GPA |
| BU-300 | 4 | BUSINESS STRATEGIES | | | C=2.0 GPA |
| DP-105 | 2.5 | MICROS & SPREADSHEET II | | | D=1.0 GPA |
| BU-305 | 3 | BUSINESS CASE STUDIES | A | 4.0 | F<1.0 GPA |
| AC-215 | 4 | FINANCE | | | I=Incomplete |
| MG-250 | 4 | ADVERTISING | | | W=Withdrawal |
| CP-100 | 3 | CAREER PLANNING | | | |
| MG-299 | 2.5 | BUSINESS PLAN | | | |

Bill Jueure
INSTRUCTOR



# Business Training Institute

21649 US19 North
Suite 200
Clearwater, Florida 34625
813-791-7833

STUDENT GRADE REPORT

Student Name: __WILLIAMS, ABE    SS #560-82-95__45

Location: __VACAVILLE__

Completion Date: __November 24, 1992__

Quarter Completed: __Fall, 1992__

Program/Course:    SMALL BUSINESS OPERATION

| COURSE NO. | CREDIT | COURSE TITLE | GRADE | GPA | COMMENT |
|---|---|---|---|---|---|
| MG-100 | 4 | STARTING A NEW ENTERPRISE | | | |
| EN-100 | 4 | ORAL COMMUNICATION | | | |
| BU-107 | 2.5 | GENERAL MATH | | | |
| CO-100 | 3 | INTRODUCTION TO COMPUTERS | A | 4.0 | |
| BU-100 | 4 | SMALL BUSNESS MANAGEMENT | | | |
| BU-207 | 4 | BUSINESS LAW | A | 4.0 | |
| BU-215 | 2.5 | BUSINESS MATH | | | |
| EN 200 | 3 | WRITTEN COMMUNICATION | | | |
| BU-200 | 4 | BUSINESS ETHICS | | | |
| MG-200 | 4 | SUPERVISION | | | |
| AC-100 | 3 | ACCOUNTING I | | | |
| WP-100 | 2.5 | WORD PROCESSING | | | |
| SO-120 | 4 | ECONOMICS | | | |
| MG-150 | 4 | SELLING | | | GRADING |
| DP-100 | 2.5 | MICROS & SPREADSHEET I | | | |
| AC-105 | 3 | ACCOUNTING II | | | A=4.0 GPA |
| MG 120 | 4 | MARKETING | | | B=3.0 GPA |
| BU-300 | 4 | BUSINESS STRATEGIES | | | C=2.0 GPA |
| DP-105 | 2.5 | MICROS & SPREADSHEET II | | | D=1.0 GPA |
| BU-305 | 3 | BUSINESS CASE STUDIES | | | F<1.0 GPA |
| AC-215 | 4 | FINANCE | | | I=Incomplete |
| MG-250 | 4 | ADVERTISING | | | W=Withdrawal |
| CP-100 | 3 | CAREER PLANNING | | | |
| MG-299 | 2.5 | BUSINESS PLAN | | | |

Bill Leasure
INSTRUCTOR



# Business Training Institute

### West Palm Beach, Florida

## This Certifies That

### ABE WILLIAMS, JR.

Has Satisfactorily completed Small Business Operations prescribed for Graduation from this School and is therefore awarded this

## Diploma

Given this 24th day of NOVEMBER nineteen hundred and NINETY-TWO

_James L. Steinhauer_
Director
JAMES L. STEINHAUER



# Business Training Institute

21649 US19 North
Suite 200
Clearwater, Florida 34625
813-791-7833

STUDENT FINAL TRANSCRIPT

Student Name: WILLIAMS, ABE JR.                 SS# 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

Address: _____ P.O. BOX 4000 _____      City:_____ State: ____

Enrolled: SEPT. 1990 Graduated: NOV. 1992 Dropped: _____ Term: _____

Program/Course:    SMALL BUSINESS OPERATION

| COURSE NO. | CREDIT | COURSE TITLE | GRADE | GPA | COMMENT |
|---|---|---|---|---|---|
| MG-100 | 4 | STARTING A NEW ENTERPRISE | A | 4.0 | FINAL |
| EN-100 | 4 | ORAL COMMUNICATION | A | 4.0 | TRANSCRIPT |
| BU-107 | 2.5 | GENERAL MATH | A | 4.0 | |
| CO-100 | 3 | INTRODUCTION TO COMPUTERS | A | 4.0 | |
| BU-100 | 4 | SMALL BUSINESS MANAGEMENT | A | 4.0 | |
| BU-207 | 4 | BUSINESS LAW | A | 4.0 | |
| BU-215 | 2.5 | BUSINESS MATH | A | 4.0 | |
| EN-200 | 3 | WRITTEN COMMUNICATION | A | 4.0 | |
| BU-200 | 4 | BUSINESS ETHICS | A | 4.0 | |
| MG-200 | 4 | SUPERVISION | A | 4.0 | |
| AC-100 | 3 | ACCOUNTING I | A | 4.0 | |
| WP-100 | 2.5 | WORD PROCESSING | A | 4.0 | |
| SO-120 | 4 | ECONOMICS | A | 4.0 | |
| MG-150 | 4 | SELLING | A | 4.0 | GRADING |
| DP-100 | 2.5 | MICROS & SPREADSHEET I | A | 4.0 | |
| AC-105 | 3 | ACCOUNTING II | A | 4.0 | A=4.0 GPA |
| MG-120 | 4 | MARKETING | A | 4.0 | B=3.0 GPA |
| BU-300 | 4 | BUSINESS STRATEGIES | A | 4.0 | C=2.0 GPA |
| DP-105 | 2.5 | MICROS & SPREADSHEET II | A | 4.0 | D=1.0 GPA |
| BU-305 | 3 | BUSINESS CASE STUDIES | A | 4.0 | F<1.0 GPA |
| AC-215 | 4 | FINANCE | A | 4.0 | I=Incomplete |
| MG-250 | 4 | ADVERTISING | A | 4.0 | W=Withdrawal |
| CP-100 | 3 | CAREER PLANNING | A | 4.0 | |
| MG-299 | 2.5 | BUSINESS PLAN | A | 4.0 | |

OVERALL GPA:    4.0

SEAL

*James L. Swinlaur*

DIRECTOR

# Certificate

## of

# Occupational Title and Classification

This is to certify that

ABE WILLIAMS

has been engaging in the following occupational categories:

| Title | Hours | Occupational Group Arrangement | Worker Trait Group | Competency Level (1) Skilled (3) Familiarization (2) Semi-skilled (4) Unsatisfactory |
|---|---|---|---|---|
| MACHINIST APPRENTICE TOOL AND DIE MAKER LINER MILL SPECIALIST | 4,200 | PRISON INDUSTRY AUTHORITY | TOOL AND DIE | SKILLED |

_Mike Faiella_
Supervisor/Foreman

M. M. FAIELLA     INDUSTRIAL SUPERVISOR

MAY 7, 1990
Date

California Correctional Industries
Folsom, CA 95671

* Denotes Dictionary of Title Code Numbers

The Los Rios Institute for
Business, Government & Industry
*Los Rios Community College District*

## Awards this
## Certificate of Completion

*Blueprint Reading*

in

*Abe Williams, Jr.*

to

_____
Coordinator

_____
Instructor

1/2/90
Date

_____
Director

American River College  /  Cosumnes River College  /  Sacramento City College

*Southern Career Institute*

Hereby awards this

# Diploma

to

## ABE WILLIAMS JR.

In Recognition of Completion of the

## Paralegal Specialized Practices Program

With all the rights, privileges and immunities thereunto appertaining.

Given this **19th** day of **March** A.D.

19 **92** under the seal of Southern Career Institute,

Boca Raton, Florida.

*Susan F. Schurz*
Director of Education

*President*



PARALEGAL SPECIALIZED PRACTICES PROGRAM #4007
Official Transcript

**SOUTHERN CAREER INSTITUTE**
SCHOOL OF PARALEGAL STUDIES

FOR:    ABE WILLIAMS                          SS#:    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

The lessons are evaluated as follows:
      90-100    Excellent                70-79      Passing
      80- 89    Good               Below 70  Unsatisfactory

            LESSON EXAMS                                    GRADE

1.      Criminal Law                                          100
2.      Corporations                                          96
3.      Wills, Trusts and Estates                             98
4.      Client Psychology and Interviewing                    96
5.      Contracts                                             94
6.      Taxes/Debtor-Creditor Relationships                   100
7.      Bookkeeping and Office Procedures                      100
8.      Ethics                                                100
9.      Civil Law Procedures                                  100
10.     Real Estate                                           100
11.     Legal Research                                        100
12.     General Consideration/Final Exam                       90

        Total number of Extra Credit Points given      [ 37 ]

              A grade of Satisfactory or Unsatisfactory
              is given for Advanced Specialized Courses

                    ADVANCED LEGAL RESEARCH

Unit #1    Introduction/Primary Sources/
           Legal System/Legal Research          100%
Unit #2    Case Findings/Secondary Sources      100%

                    ADVANCED LITIGATION

Unit #1    Jurisdiction/Pleadings               100%
Unit #2    Discovery/The Trial                  100%

           FINAL GRADE POINT AVERAGE (GPA)      [ 98 ]

Registrar _____ Date of Graduation __3-19-92_

        This form is not official unless affixed with school seal

                    ATTORNEY INSTRUCTION SINCE 1976
164 West Royal Palm Road  Boca Raton FL 33432  Phone (407) 368-2522  FAX (407) 368-6827

                                                                  SCI 107

Southern Career Institute

*presents this*

Certificate of Completion

*Basic Paralegal Skills*

to

Abe Williams Jr.

*This certifies that the aforementioned has completed the foundation level paralegal studies at Southern Career Institute, and in doing so has satisfied the requirements for advancement into the specialized section of the Paralegal Specialized Practices Program.*

*Given this* ___19th___ *day of* ___August___ *A.D. 19* ___91___ *under the seal of Southern Career Institute at Boca Raton, Florida.*

Susan F Schutz
*Director of Education*

J.R. Brogman
*President*



*Southern Career Institute*

School of Paralegal Studies

*Certificate of Achievement*

to

# Abe Williams Jr.

*This Certificate of Achievement acknowledges and commends the high standards of academic ability you have shown. You have demonstrated outstanding performance throughout your course of paralegal studies and exemplary effort, dedication and personal motivation to be successful in your professional field.*

*Given this* ___19th___ *day of* ___August___ *A.D. 19* __91__ *under the seal of Southern Career Institute, Boca Raton, Florida*



_Susan F. Schurz_
Director of Education

President



# Certificate of Vocational Achievement

Visions Adult School

Vocational Education Programs

Have Conferred Upon

**ABE WILLIAMS**

This is Award of Distinction For

Participation and Notable Performance

In

**INTRODUCTION TO BASIC PROGRAMMING V01.01.03**

With All the Rights and Privileges Pertaining Thereto

Presented This _21_ Day of _SEPTEMBER_ 19 _95_

_Supervisor of Education_

_Vocational Supervisor_

_Vocational Instructor_

5787

_Certificate Number_

# Certificate of Vocational Achievement

*Visions Adult School*

*Vocational Education Programs*

*Have Conferred Upon*

## ABE WILLIAMS

*This Award of Distinction For*

*Participation and Notable Performance*

*In*

**MICROSOFT EXCEL 4.0**

*Presented This 15th Day of December 19 95*

*With All the Rights and Privileges Pertaining Thereto*

_____        _____
Supervisor of Education                Vocational Instructor

_____        _____
Vocational Supervisor                  5971
                                        Certificate Number

# Certificate of Vocational Achievement

*Visions Adult School*

*Vocational Education Programs*

*Have Conferred Upon*

**ABE    WILLIAMS**

*This Award of Distinction For*

*Participation and Notable Performance*

*In*

**INTRODUCTION TO DOS**

*With All the Rights and Privileges Pertaining Thereto*

Presented This __21__ Day of __SEPTEMBER__ 19 __95__

_____
Supervisor of Education

_____
Vocational Supervisor

_____
Vocational Instructor

5786
Certificate Number

# Certificate of Vocational Achievement

*Visions Adult School*

*Vocational Education Programs*

*Have Conferred Upon*

## ABE WILLIAMS

*This Award of Distinction For*

*Participation and Notable Performance*

*In*

**WORDPERFECT 5.1**

*With All the Rights and Privileges Pertaining Thereto*

Presented This 15th Day of December 1995

_____
Supervisor of Education

_____
Vocational Supervisor

_____
Vocational Instructor

5972
Certificate Number

# Certificate of Vocational Achievement

*Visions Adult School*

*Vocational Education Programs*

*Have Conferrd Upon*

**ABE WILLIAMS**

*This Award of Distinction For*

*Participation and Notable Performance*

*In*

**MICROSOFT WORD 5.0**

*With All the Rights and Privileges Pertaining Thereto*

*Presented This* 27th *Day of* August 19 95

Supervisor of Education

Vocational Supervisor

Vocational Instructor

5750

Certificate Number



# Certificate of Vocational Achievement

*Visions Adult School*

*Vocational Education Programs*

*Have Conferred Upon*
**ABE WILLIAMS**

*This Award of Distinction For*

*Participation and Notable Performance*

*In*
**COMPUTER APPLICATIONS**

*With All the Rights and Privileges Pertaining Thereto*

Presented This ___13___ Day of ___JUNE___ 19 ___95___

Supervisor of Education

Vocational Supervisor

Vocational Instructor

5542



Certificate of Vocational Achievement

*Visions Adult School*

*Vocational Education Programs*

*Have Conferred Upon*

***ABE WILLIAMS***

*This Award of Distinction For*

*Participation and Notable Performance*

*In*

**BASIC MATH**

*With All the Rights and Privileges Pertaining Thereto*

Presented This ___28___ Day of ___JUNE___ 19__95__

Supervisor of Education

Vocational Supervisor

Vocational Instructor

5664

Certificate Number



# Certificate of Vocational Achievement

*Visions Adult School*

*Vocational Education Programs*

*Have Conferred Upon*

**ABE WILLIAMS**

*This Award of Distinction For*

*Participation and Notable Performance*

*In*

**BINARY MATH**

*With All the Rights and Privileges Pertaining Thereto*

*Presented This* __24__ *Day of* __AUGUST__ __19__ __95__

Supervisor of Education

5692

# CREEKSIDE ADULT SCHOOL
## OFFICE SERVICES



*Record of Completion*

*In accordance with high academic standards*

## ABE WILLIAMS, JR.

*has satisfactorily completed the Office Services curriculum as follows:*

| Course Number | COURSE TITLE | Course Number | COURSE TITLE |
|---|---|---|---|
| *V01.02.01* | Orientation | *V01.04.05* | Data Base |
| *V01.02.02* | Shop and/or Site Safety | *V01.04.07* | Word Processing Using Microsoft Word |
| *V01.02.03* | Beginning Typing | *V01.04.09* | Microsoft Spread Sheet Software |
| *V01.02.04* | Alphabetical Filing | *V01.04.10* | Microsoft Desktop Publishing |
| *V01.02.05* | Proofreading, Punctuation, and Spelling | *V01.04.11* | New Technology / Microsoft Powerpoint |
| *V01.02.06* | Electronic Calculations | *V01.04.13* | Job Prep II / Anger & Stress Management |
| *V01.03.03* | Intermediate Typing | *V01.05.03* | Advanced Typing |
| *V01.03.04* | Business English | *V01.05.04* | Bookkeeping / Recordkeeping / Accounting |
| *V01.03.05* | Business Math | *V01.05.05* | Business Law |
| *V01.03.07* | Job Prep I & Problem Solving Skills | *V01.05.06* | Small Business / Light Industry Education |
| *V01.04.03* | Electronic Typing Review | *V01.05.07* | Final Job Prep III / Career Exploration |

All work completed is graded as follows:

    100% - 80%  = Pass
    Below 80%   = Fail

**Completion Date: September 30, 2003**

Vocational Instructor:



P. Babrah

Supervisor of Vocational Instruction:

V. Powell



Accreditation No.
0395000999

STATE OF CALIFORNIA

## Creekside Adult School

# CERTIFICATE OF COMPLETION

awarded to

*Abe Williams*

who has successfully completed the following certification

Office Services Completion Of All Phases: One Through Four (VO1.02, VO1.03, VO1.04, VO1.05). and is hereby honored and congratulated for achieving this commendable goal.

Class: Vocational Office Services

WESTERN ASSOCIATION OF SCHOOLS AND COLLEGES
Accreditation No 039500099

Log # BA0365E2D43163

July 31, 2003
Date

Instructor

Supervisor of Academic/Vocational Instruction

# Certificate of Educational Achievement

*Visions Adult School*

*Academic Education Programs*

*Have Conferred Upon*

A B E   W I L L I A M S

*This Award of Distinction For*

*Participation and Notable Performance*

*In*

THE LITERACY LIFESKILLS SELF-HELP PROGRAM II

AS ASSOCIATE TUTOR/INSTRUCTOR

*With All the Rights and Privileges Pertaining Thereto*

Presented This ___5TH___ Day of ___AUGUST___ 19 95

*Supervisor of Education*

*Academic Super/sor*

*Academic Instructor*

629

*Certificate Number*



# Certificate of Educational Achievement

## Visions Adult School

Academic Education Programs

Have Conferred Upon

A B E   W I L L I A N S

This Award of Distinction For

Participation and Notable Performance

In

THE LITERACY LIFE SKILLS SELF-HELP PROGRAM II

With All the Rights and Privileges Pertaining Thereto

Presented This 10 th Day of ___JUNE___ 19 _95_



_____
Supervisor of Education

_____
Academic Instructor

_____
Academic Supervisor

L.S. 174
Certificate Number

# Certificate of Educational Achievement

*Visions Adult School*

*Academic Education Programs*

*Have Conferred Upon*

A B E   W I L L I A M S

*This Award of Distinction For*

*Participation and Notable Performance*

*In*

LITERACY LIFESKILLS SELF-HELP PROGRAM II — TUTOR/INSTRUCTOR TRAINING

*With All the Rights and Privileges Pertaining Thereto*

Presented This ___5th___ Day of ___August___ 19 _95_

_____
*Supervisor of Education*

_____
*Academic Supervisor*

_____
*Academic Instructor*

641
*Certificate Number*



Certificate of Educational Achievement

Visions Adult School

Academic Education Programs

Have Conferred Upon

A B E   W I L L I A M S

This Award of Distinction For

Participation and Notable Performance

In

THE LITERACY LIFESKILLS SELF-HELP PROGRAM II

AS TUTOR-INSTRUCTOR

With All the Rights and Privileges Pertaining Thereto

Presented This 21st Day of October 19 95

Supervisor of Education
Academic Supervisor

Academic Instructor

No. 932
Certificate Number



# Certificate of Educational Achievement

*Visions Adult School*

*Academic Education Programs*

*Have Conferred Upon*

A B E   W I L L I A M S

*This Award of Distinction For*

*Participation and Notable Performance*

*In*

PRODUCTION OF THE LITERACY LIFESKILLS VIDEO SERIES

*With All the Rights and Privileges Pertaining Thereto*

Presented This 21st Day of October 19 95

_____
*Supervisor of Education*

_____
*Academic Supervisor*

_____
Academic Instructor

No. 944
*Certificate Number*

# Certificate Of Academic Achievement

*Visions Adult School*

*Academic Education Programs*

*Have Conferred Upon*

**A B E   W I L L I A M S**

*This Award of Distinction*

*For*

*Participation and Notable Performance*

*in*

**THE LITERACY THINKING LIFESKILLS SELF-HELP PROGRAM**

**As Tutor/Instructor**

*With All the Rights and Privileges Pertaining Thereto*

*Presented This* 24th *Day of* **February** 19 **96**

No. 1036

*Certificate Number*

_____
*Supervisor of Education*

_____
*Academic Supervisor*

_____
*Academic Instructor*

# Certificate Of Academic Achievement

*Visions Adult School*
*Academic Education Programs*
*Have Conferred Upon*

A B E   W I L L ̈ A M S

*This Award of Distinction*
*For*
*Participation and Notable Performance*
*in*

THE LITERACY ORGANIZATION LIFESKILLS SELF-HELP PROGRAM

*With All the Rights and Privileges Pertaining Thereto*
*Presented This  27th Day of*   **April**   *1996*

Supervisor of Education

Academic Supervisor

No. A047

Academic Instructor

Certificate Number



# Certificate Of Academic Achievement

*Visions Adult School*

*Academic Education Programs*

*Have Conferred Upon*

A B E   W I L L I A M S

*This Award of Distinction*

*For*

*Participation and Notable Performance*

*in*

LITERACY  THINKING  LIFESKILLS  TUTOR/INSTRUCTOR  TRAINING
AS  PRESENTER

*With All the Rights and Privileges Pertaining Thereto*

*Presented This 20th Day of*   **April**  **19 96**

_____
*Supervisor of Education*

_____
*Academic Supervisor*

_____
*Academic Instructor*

No.  A032

_____
*Certificate Number*



# Certificate Of Academic Achievement

*Visions Adult School*

*Academic Education Programs*

*Have Conferred Upon*

A B E   W I L L I A M S

*This Award of Distinction*

*For*

*Participation and Notable Performance*

*in*

THE LITERACY THINKING LIFESKILLS SELF-HELP PROGRAM

AS TUTOR/INSTRUCTOR

*With All the Rights and Privileges Pertaining Thereto*

*Presented This* 20th *Day of* **April** 19 96

No. A024

Supervisor of Education

Academic Supervisor

Academic Instructor

Certificate Number

# Certificate Of Academic Achievement

*Visions Adult School*

*Academic Education Programs*

*Have Conferred Upon*

## Abe Williams

*This Award of Distinction*

*For*

*Participation and Notable Performance*

*in*

## The Literacy Organization and Interaction
## Lifeskills Self-Help Program

*With All the Rights and Privileges Pertaining Thereto*

*Presented This* **22nd** *Day of* **June** *19* **96**

_____        _____
Supervisor of Education              Academic Instructor

_____        **1538**
Academic Supervisor                 Certificate Number

# Certificate Of Academic Completion

Visions Adult School

Academic Education Programs

Have Conferred Upon

**Abe Williams**

This Award of Distinction

For

Participation and Notable Performance

in

**The Literacy Thinking, Organization, and Interaction LifeSkills Self-Help Program As Tutor / Instructor**

With All the Rights and Privileges Pertaining Thereto

Presented This 22nd Day of **June** 1996

_Bob Buckner_
Supervisor of Education

_D. Charles_
Academic Supervisor

_(signature)_
Academic Instructor

1325
Certificate Number

1        9        9        5



# **California**Literacy

# C E R T I F I C A T E

## O F

## A P P R E C I A T I O N

### T O

**A B E   W I L L I A M S**

FOR YOUR COMMITMENT AND
DEDICATED SERVICE AS A VALUED
TUTOR FOR THE LAUBACH & LIFE SKILLS
PEER TUTORS PROGRAM AT CORCORAN
STATE PRISON.



*Glenn B. Henderson,*
**Board President**

*Juanita Stanley,*
**Executive Director**

*California Literacy, Inc.*
*NOVEMBER 1995*

# CONFLICT RESOLUTION WORKSHOP

This is to certify that

*Abe Williams, Jr.*

Has successfully completed the basic course in

**NON-VIOLENT CONFLICT RESOLUTION**

This 6th day of November, 2002



_____
Lead Facilitator

_____
Associate Warden, Central Services

Case 3:08-cv-02167-MHP    Document 4-4    Filed 04/25/2008    Page 53 of 91



# CERTIFICATE OF COMPLETION

This Certifies That

**ABE WILLIAMS, JR.**

Has Successfully Completed

**14TH** Day Of **APRIL** 19 **93**

## BREAKING BARRIERS PROGRAM

The Pacific Institute

Program Manager

THE GREAT SEAL OF THE STATE OF CALIFORNIA · EUREKA ·

Facilitators

*Certificate of Merit*

*This Certificate of Merit is presented to*

**ABE WILLIAMS**

ONE YEAR ATTENDANCE    (4/26/95 - 4/26/96)    D-48163

*In Recognition of Outstanding achievement in*

*ALCOHOLICS ANONYMOUS Level III Dry and Sober*

*Presented this* ___9TH___ *day of* ___MAY___ ___1996___

DEBBY MITCHELL, STAFF SPONSOR

G. ROBLES, AW (A) CENTRAL SERVICES



# CERTIFICATE OF PARTICIPATION

May all who come hereafter know that

## Mr.  Williams

has participated in the
**"Alcoholic Anonymous Program"**

from  __Jan 97__  to  __March 98__



_Madge Owens_
Sponsor
Correctional Training Facility
Soledad, CA

March 10, 1998
Date

ARTS IN CORRECTIONS

# CERTIFICATE OF RECOGNITION

Abe (Sonny) Williams, Jr.

*is hereby saluted, commended*
*and otherwise recognized*
*for participating in*

Three programs in creative writing and screenwriting (54 hours total)

This ___24th___ day of ___September___ 19 _98_

DULY ATTESTED & AUTHORIZED BY

Dan Bessie, INSTRUCTOR

JACK BOWERS
ARTIST/FACILITATOR

GREAT SEAL OF
ARTS IN CORRECTIONS

# CERTIFICATE OF COMPLETION

## BE IT KNOWN THAT

### SONNY WILLIAMS

HAS SATISFACTORILY COMPLETED ARTS IN CORRECTIONS COURSE WORK IN THE

FOLLOWING SUBJECT AREA (S)

### POETRY WRITING

DULY ATTESTED TO THIS 27TH DAY OF MARCH, 1999, BY

CLAIRE BRAZ-VALENTINE, INSTRUCTOR

JACK BOWERS, ARTIST FACILITATOR

# CERTIFICATE OF COMPLETION

BE IT KNOWN THAT

HAS SATISFACTORILY COMPLETED ARTS IN CORRECTIONS COURSE WORK IN THE

FOLLOWING SUBJECT AREA (S)

*Sonny Williams*

## CREATIVE NON-FICTION

DULY ATTESTED TO THIS 25TH DAY OF MAY, 2000, BY

ANNE STEINHARDT, WRITING TEACHER

JACK BOWERS, ARTIST FACILITATOR

# CERTIFICATE OF COMPLETION

BE IT KNOWN THAT

*ABRAHAM WILLIAMS*

HAS SATISFACTORILY COMPLETED ARTS IN CORRECTIONS COURSE WORK IN

*JOURNALISM*

DULY ATTESTED TO THIS 1ST DAY OF NOVEMBER 2000, BY

ANNE STEINHARDT, WRITING INSTRUCTOR

JACK BOWERS, ARTIST FACILITATOR

# EXHIBIT "Q"

LIFE PRISONER EVALUATION
SUBSEQUENT PAROLE CONSIDERATION HEARING
OCTOBER 2006CALENDAR

WILLIAMS, ABE JR.        D-48163

I.  COMMITMENT FACTORS:

   A.  LIFE CRIME:

Inmate Williams was received into the California Department of Corrections on 1-21-1987, from Alameda County (case # 80451) subsequent to a conviction for Murder in the second degree. He is serving a sentence of 15 years to life plus 3 years, with a minimum eligible parole date (MEPD) of 11-13-97. A Weapon type (BELT) was used in the commission of this crime. Victim: Tequila Hawkins, age 3 Source: .CDC 188C Legal Status, Probation Officer's report (POR)

   1.  Summary of Crime:

Per the POR, on May 24, 1984, between the hours of 6:00 a. m. and 11:55 p.m. Williams was in the 922 "E" Street apartment with the victim, Tequila Hawkins, age 3 and the victims mother, Deborah Harris. Williams tied the victim's hands to one door and feet to another door and beat her until she lost consciousness. The child was taken to Merritt Hospital Emergency Room by Deborah Harris and was pronounced dead on arrival. The cause of death was blunt trauma to the head.

   2.  Prisoner's Version:

Williams read his version as documented in his September 2001 Subsequent Parole Consideration Report. He indicated that it was still valid and did not wish to change his statement. That report reflects the following:

Williams maintains his innocence. He feels bad and remorseful in that he could have prevented the death of Tequila. Williams feels that if he had reported the abuse to the authorities, the victim would still be alive. At the time Williams states that he was selfish by only thinking of himself and his drug habit. Williams states that he had lived with the victim and her mother, Deborah Harris, for about two months, during which time he had noticed the victim with bruises and signs of abuse by Harris. Twice he intervened but for the most part stayed out of it. William's main concern was to have a place to stay, some female companionship, and maintaining his drug habit. Looking back on what took place on May 27, 1984, Williams feels that he should have reacted differently when he walked into the apartment, saw Harris crying and Tequila laying on the bed motionless. Williams claimed even though he administered CPR and drove Harris and the victim to the Hospital, things would have turned out differently had he not been absconding from the law and under the influence of Heroin.

3. Aggravating/Mitigating Circumstances:

    a) Aggravating Factors:

- The victim was particularly vulnerable.
- The prisoner had a special relationship of confidence and trust with the victim, as he had been living with her and her mother.
- During the commission of the crime the prisoner had a clear opportunity to cease but instead continued.
- The prisoner was on probation or parole or was in custody or had escaped from custody at the time the crime was committed.

    b) Mitigating Factors:

- The prisoner tried to help the victim or sought aid after the commission of the crime or tried to dissuade a crime partner from committing other offenses.

B. MULTIPLE CRIMES:

None

## II. PRECONVICTION FACTORS:

Remains the same as stated in the Sub # 5 Parole Consideration Hearing report.

    A. JUVENILE RECORD: Juvenile records are sealed.

    B. ADULT CONVICTIONS AND ARRESTS: William's extensive adult arrest history is as follows; He was arrested in November 1974 for Burglary and Receiving Stolen Property and released in April of 1975. He was arrested in 1975 for Burglary and placed on 3 years probation with six months in county jail. He violated probation with an arrest for Forgery and served additional County jail time. In 1976 he was arrested for Receiving Stolen Property and for Forgery. He was placed on three years felony probation with one year in the county jail. On November 17th, 1977 subject was committed to state prison to serve a one year and four month term for Forgery. He paroled to Contra Costa County on July 6th, 1979. He violated his parole on October 24th, 1979 and was returned to custody. Williams was arrested in 1982 for passing bad checks and was sentenced to one year in county jail. He paroled on March 7th, 1983. He was returned to custody on a parole violation for a Health and Safety Code violation on October 12th, 1983 and was again paroled on January 21, 1984. Source documents: Life Prisoner Report dated July 19th, 2001, CI&I, and Probation Officer's Report.

C. PERSONAL FACTORS: Williams is the third of seven children born to Abe Williams and Josie Byrd. His parents were separated in 1957. His father retired in 1964 after a career in the Air Force. At the time of the crime his father was retired from his job as a hospital administrator in Chicago, Illinois. His mother had a history of mental illness and had spent seven years in Napa State Hospital. She was discharged in 1964. At the time of the commitment offense his mother was living in Kansas and Williams did have contact with her. His mother passed away in 1989. Williams has two sisters who reside in San Leandro, Ca. They correspond and visit with him on a regular basis. He has two brothers and one sister who currently reside in Chicago, Illinois. He indicates that he has remained in contact with all of his brothers and sisters. He states that one brother has passed away. Williams joined the Job Corps in 1966, studying Electronics for a period of six months. He states that he was sent to live with his stepbrother in Washington D.C. after which he returned to Oakland and has lived there since that time. Williams entered Berkley High School in September 1966 and dropped out in the later part of the year in 1966 to join the Job Corps. Williams states that he received his GED and a certificate of completion in Electronics Assembly while in the Job Corps. He indicates that he completed approximately two years of college credits or approximately 66 units while incarcerated. In 1970 Williams married Patricia Shipman. They separated in 1973 and have no children as a result of that union. Williams did father a child with Linda Brown. He has had no contact for years with this child.

Williams states that his work history consist of working in all areas of the restaurant business. He stated that once he tired of the restaurant business he signed on with the United States Postal Service. He has been self-employed as a Credit Consultant. Williams has a long history of heroin abuse, at one point in 1978 admitting to a $100.00 per day habit. He began experimenting with drugs in 1967 beginning with marijuana. He states that he began to use Heroin in the mid1970's, and in the mid to late 1970's became addicted to heroin and cocaine. Williams states that in 1970 he was in a serious car accident and received major injuries. He states that he became addicted to prescription drugs as a result.

## III. POSTCONVICTION FACTORS:

Williams last appeared before the board on 10-14-05 for his Subsequent #5 hearing. At that time, the board recommended that he be denied parole for one year.

A. SPECIAL PROGRAMMING/ACCOMODATIONS: Williams did not have any disabilities that prevented him from participating in any programs.

B. CUSTODY HISTORY: For more details, refer to the placement, custody, and work record categories on the attached post conviction progress report and previous post conviction progress reports.

C. THERAPY AND SELF-HELP ACTIVITIES: For more information refer to the group activities and psychiatric treatment categories on the attached post conviction progress report and previous post conviction progress reports.

D. <u>DISCIPLINARY HISTORY:</u> For more information, refer to the prison behavior category on the attached post conviction progress report and previous post conviction progress reports.

E. <u>OTHER:</u> None

IV. <u>FUTURE PLANS:</u>

A. <u>RESIDENCE:</u> Williams indicated he did not wish to change his residence plans from his last report. The previous report documents the following: He will now reside with his brother in law, John Boston Jr. at 22135 Sevilla road #39 in Hayward, Ca. 94541. His telephone number is (510) 886-8813. His sister, Inez Williams- Boston has set up a financial account in the amount of $5000.00 in lieu of an immediate job placement. His sister, Inez resides at 16915 President Dr. San Leandro, Ca. 94578. Her Telephone number is (510) 276-4535.

B. <u>EMPLOYMENT:</u> Williams indicated that he did not wish to change his employment plans from his last report. The previous report documents the following: Williams indicates that his plan is to utilize the computer skills he has acquired while in prison to pursue a career in computers. He states that he could pursue other potential employment opportunities including work as a paralegal and a machinist. If given a date by the Board of Prison Terms he will provide specific employment opportunities.

C. <u>ASSESSMENT:</u> None

V. <u>USINS STATUS:</u>

Not Applicable.

VI. <u>SUMMARY:</u>

A. Prior to release, the prisoner could benefit from:

1. Continued disciplinary free behavior.
2. Upgrading academically/vocationally.
3. Participation in self-help/therapy programs.

B. This report is based on a short interview with the prisoner on 7-19-06, incidental contact on the facility, and a review of his central file lasting approximately four hours.

C. Prisoner was afforded an opportunity to review his central file in order to prepare for his appearance before the Board of Prison Terms and chose to decline the review (see CDC 128B dated 7-19-06).

D. No accommodation for the purposes of effective communication is required per the Armstrong Remedial Plan (ARP).

Prepared by:

*M. Bennett*

M. BENNETT
Correctional Counselor I
Facility B

Reviewed by:

*Brazil*

J. BRAZIL
Correctional Counselor II
Facility B

- 5 -

**LIFE PRISONER: POSTCONVICTION PROGRESS REPORT**

☐ DOCUMENTATION HEARING

☒ PAROLE CONSIDERATION HEARING

☐ PROGRESS HEARING

**INSTRUCTIONS**
TO CDC STAFF:   DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT
TO BPT STAFF:   FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY
ESTABLISHED, i.e., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT.  SEE BPT §§2290 - 2292, 2410 AND 2439.

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 01-29-05 to 01-28-06 | | | **PLACEMENT:**   Williams remained at Mule Creek State Prison (MCSP) Sensitive Needs Yard (SNY). **CUSTODY:**         Williams retained Medium A (MED A) Custody during this reporting period. **VOCATIONAL TRAINING:** None noted during this reporting period. **ACADEMICS:**  None noted during this reporting period. **WORK RECORD:** Williams is currently assigned as a clerk. CDC 101 Work Supervisor's Report's dated 3-15-05, 6-19-05, 9-27-05, and 12-26-05 all reflect satisfactory job performance.  **GROUP ACTIVITIES:**  None  noted  during  this  reporting  period. **PSYCHIATRIC TREATMENT:** None noted during this reporting period.   **PRISON BEHAVIOR:** Williams was issued one CDC 128-A dated 9-12-05 for Misuse of Indigent Envelopes.  He was advised that any future violations of this nature would result in progressive disciplinary action. **OTHER:** None |
| 01-29-06 to 07-25-06 | | | **PLACEMENT:** Williams remained at MCSP-III SNY. **CUSTODY:** Williams retained MED A Custody during this reporting period. **VOCATIONAL TRAINING:** None noted during this reporting period. **ACADEMICS:** None noted during this reporting period. **WORK RECORD:** Williams continues his work assignment as a clerk. CDC 101 Work Supervisor's Report dated 3-15-06, reflect satisfactory job performance. **GROUP ACTIVITIES:** None noted during this reporting period. **PSYCHIATRIC TREATMENT:** None noted during this reporting period.   **PRISON BEHAVIOR:** Williams was issued one CDC 128-A dated 2-5-06 for Failure to Stand During a Standing Count. He was advised that any future violations of this nature would result in progressive disciplinary action. **OTHER:** None. |

CORRECTIONAL COUNSELOR SIGNATURE

M. Bennett

DATE

7-25-06

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|---|---|---|---|---|
| WILLIAMS, ABE | D-48163 | MCSP | 10-2006 | SUB |

1 of 1

# EXHIBIT "R"

# REQUEST FOR COPY OF THE RECORD OF THE HEARING

_Abe Williams, Jr._
NAME

_D-48163_
CDC NUMBER

_Mule Creek State Prison_
LOCATION OF HEARING

_Sixth Subsequent Parole Consideration Hearing_
TYPE OF HEARING

_November 29, 2006_
DATE OF HEARING

_Sandra Bryson (Presiding Comm.) & Chuck Wolf (Deputy Comm.)_
PANEL MEMBER

REQUEST A COPY OF THE TAPE RECORDING OF MY:

☐  PAROLE REVOCATION HEARING OR REVOCATION EXTENSION HEARING.

☐  MENTALLY DISORDERED OFFENDER HEARING.

☐  SVP PROBABLE CAUSE HEARING.

☒  ISL PAROLE CONSIDERATION HEARING.

IF YOU ARE REQUESTING THAT A TAPE BE SENT TO A COUNTY JAIL, CHECK WITH THE JAILER TO MAKE SURE THAT IT WILL BE DELIVERED. IF IT WILL NOT, PLEASE SPECIFY ANOTHER ADDRESS TO WHICH THE TAPE SHOULD BE SENT.

PLEASE MAIL THE REQUESTED RECORD TO:

_Abe Williams, Jr.    (D-48163) (B-9-127L)_
NAME

_P.O. Box 409040, MCSP_
ADDRESS

_Ione,    CA    95640-9000_
CITY                          STATE          ZIP CODE

SIGNATURE
_Abe Williams, Jr._

CDCT 1084 (Rev. 1/96)

FROM:   ABE WILLIAMS, JR.
        D-48163  B-9-127L
        MULE CREEK STATE PRISON
        P.O. BOX 409040
        IONE, CA 95640-9000
        IN PRO SE


   TO:  BOARD OF PRISON TERMS / BOARD OF PAROLE HEARINGS
        1515 "K" STREET, 6th FLOOR
        SACRAMENTO, CALIFORNIA 95814


   RE:  PAROLE CONSIDERATION HEARING TRANSCRIPTS / TAPE RECORDING


DATE:   APRIL 2, 2007


To whom it may concern,

        This is a formal request to obtain a copy of the tape recording
of my November 29, 2006, Sixth Subsequent Parole Consideration
Hearing. I have attached a copy of BPT Form 1084 (Rev. 1/96) request-
ing a copy of that taped hearing.

        There are several reasons for a request of the actual tape
recording of that hearing, they are as follows:

        (1) After careful review of the transcription of that tape
in the form of typed transcript, which I received via CDC at MCSP
on  March 14, 2007, I found substantial errors of a relevant and
material nature.

        (2) Including among the numerous errors in the transcript,
were statements made by both me (inmate) and the actual Board
Commissioners who were present and conducting the hearing.

        (3) These wrongly transcribed statements and remarks by me
and Board Commissioners deal with issues that go directly to the
issues that deal with parole suitability vs non-suitability, e.g.,
facts regarding the commitment offense, prison program and other
relevant and material facts.

        (3) I intend to file a writ of habeas corpus regarding my
parole denial and the two-year denial, however, because in many
places my parole Consideration hearing Transcripts do no accurately
reflect the discussions and statement made by me and the Board
Commissioners, I will require a copy of the actual tape recording
of my hearing, which I am entitled to per CCR.

        Below, a list a "few" of the many incorrectly transcribed
portions of the transcripts I received of my hearing:

A.     During a discussion with Deputy Commissioner Wolf regarding
my prison vocational progress, Commissioner Wolf asks:

WOLF: Did you get tired of doing that or why did you get out
      of that?

I/M WILLIAMS: Well, I because I transferred over to BER and they
              don't have office services over there.

WOLF: Is BER a less -- what do you call it?

Although the transcripts reflect myself and the commissioner referr-
ing to BER, in fact, no one ever used those initials. What was actually
said was that I transferred from California State Prison Solano, to
Mule Creek State Prison to take the Office Services Computer
vocation, and no one ever said anything about any BER. (This error
in the transcripts appears at page 25, lines 22-27, and page 26,
lines 1-4.)

B.     Again, at page 26, commissioner Wolf, is discussing my transfer
and the following transcript errors appear:

WOLF: It's more secure?

I/M WILLIAMS: Yes. It's more. It's a safety needs job.

What was actually said, was that "It was a safety needs prison" and
that's why I had to transfer from Solano Prison to Mule Creek State
Prison, and why I did not complete the entire Computer Repair
Vocation at Solano, which is what we were discussing. (This error
appears at page 26, lines 5 through 8.)

C.     At page 29, at lines 5 through 22, I and Commissioner Wolf are
discussing self-help programs I have attended and my discussions
regarding my participation in the Thinking Life Skills Program
do not accurately reflect what was actually said.

D.     At page 33, lines 1 through 27, I'm discussing a CDC-128A
Chrono that was given for failing to stand for count, an adverse
document, however, the transcription of this discussion distorts
what is actually being said, and gives an altered account   of
events.   In addition, page 34 also contains considerable errors.

E.     In discussions regarding a drug trafficking CDC-115 that
the Sacramento Superior Court ordered dismissed and expunged from
my CDC C-File, the discussions at page 37, lines 1 through 27 have
some significant errors, which alters those discussions.

F.     At page 38, lines 1 through 27, there are discussions between
me and Commissioner Wolf about my medical condition, in particular
my Hepatitis-C condition and its effect on my recent prison
program. In the transcripts, that condition is repeatedly referred
to as FC, which no one at my hearing referred to it as.

        It is my belief, and the transcripts reflect this fact, that
the transcriber "Robert Donaldson" had considerable confusion over

                                    2

what he heard. It is clear he improvised at many portions of the transcripts, and that those improvisations, incorrectly reflect the substance and results of what was actually being said, greatly prejudicing me.

There are many other errors, to numerous to lay out here, however, if I'm not given copies of my tape recording of that hearing, I will seek discover and production of documents from the court, including the filing of a civil action.

I have forwarded copies of this request to the following;

Governor Arnold Schwarzenegger
State Legislature Gloria Romaro
Citizen's For Fair Parole Hearings
Federal Judge Thelton E. Henderson

Respectfully Submitted,

Dated: April 2, 2007

Abe Williams, Jr.
D-48163

3

D-48663  B-9-127L

M.C.S.P

P.O. Box 409040

IONE, CA 95640-9000

Board of Prison Hearings

1515 "K" Street L4th El

Sacramento.

BOAR515*TIME 0143596 1206 20 04/13/07
FBOARD OF PRISON TERMS
POBOX 942883 RTN TO SEND
SACRAMENTO CA 94283-0001

4-5-07

UNITED STATES POSTAGE
02 1M
0004214248   APR 09 2007
$ 00.000
MAILED FROM ZIPCODE 95640

# EXHIBIT "S"

1

PETITIONER'S DECLARATION IN SUPPORT OF AA/NA ISSUE

2

I, Abe Williams, Jr., declare:

3

1) I was raised a Christian and grew up attending church

4

on a regular basis, which included bible school on Wednesday and

5

Friday evenings, and regular services on Sundays.

6

2) In 1976, I converted to Islam, after becoming deeply

7

disenchanted with what I saw as deep hypocrisy in the Christian

8

religion.

9

3) In the early 1990's I became equally disenchanted with what

10

I saw as the same hypocrisies in Islam, especially with the

11

rising extremism of those religions.     .

12

 4) Despite my involvement in religion over the many years

13

and extensive studies on world religions, the mystical and

14

superstitious aspects of religion has never set well with me from

15

the time I was a young child. That is, the supernatural and devine

16

aspect of religion.

17

5) I was interested in religion mostly as seeking a moral

18

compass so-to-speak, however, for most part, it failed to deliver.

19

6) I have not functioned in any religious community since

20

the early 1990's and even though I have attended AA and NA because

21

of the Board's requirement, I've never felt comfortable because

22

they are clearly religiously based and that comes through in all

23

group meetings despite the fiction "the higher power" as the

24

individual sees it.

25

7) Now, my views are mostly atheistic, and I have been reading

26

and studying e.g., "The God Dellusion" by Richard Dawkins;"Letters

27

to A Christian Nation" by Sam Harris and dozens of other such

28

1

books.

8) I simply do not believe any more in a divine being, such as a God, especially as interpreted by Judaism, Christianity or Islam. In fact, those concepts seem infantile to me.

9) I'm a person who must take personal responsiblity for my own actions and not excuse them because of a savior or devil. I cannot afford to hide behind the crutch of a savior having died for me, and must know consequences flow from my actions and deed of which I am directly responsible for. Religion robs me of this.

10) I attended both AA and NA from 1993 through 2004. And although I no longer attend because of my negative religious beliefs, I still read books and study on narcotics and alcohol addiction, as well as other self help areas. And documents attached as part of Exh.**P**, demonstrate my participation in such self-help programs voluntarily outside of the AA or NA programs.

11) I have not raised this issue in my PSH because I believe the Board will react negatively, because many of the Board members expressed their strong religious beliefs during informal moments at my hearings, which are often not taped. And, Commissioner Wolff at my 2006 PSH informed me that his Church provides life prisoners parole support letters if contacted. And I believe, that Board members like Presiding Commissioner Sandra Bryson at my 2006 PSH, come with predetermined agendas to find prisoners like me not suitability for parole, and would use a declaration by me of non-religion to deny me parole, even though she would never let such bias appear on the record, nonetheless, just as she manipula-ted my parole hearing facts unfairly regarding my past criminal

2

1   and social histories to find me not suitable for parole, I believe
2   her and other Board members like her would do the same with any
3   information shared by me in this declaration.

4       12) Most important, after serving over twenty-four (24) years
5   of incarceration for a crime I did not commit, and after having
6   experienced and dealt with the California criminal justice and
7   prison systems for an equal amount of time, I'm absolutely positive
8   there can be no God, because if there were such an entity, it must
9   cruel and vicious beyond description and unworthy of anyone's
10  worship.

11

12      · I declare the above to be true and correct under the penalty
13  of perjury.

14

15  Dated: July ____, 2007                          _____
16                                                  Abe Williams, Jr.

17

18

19

20

21

22

23

24

25

26

27

28

3

# EXHIBIT "T"

STATE OF CALIFORNIA
CREDIT/TERM COMPUTATION

A.  MAXIMUM ELIGIBLE PAROLE DATE (LIFERS)

1.  _01-21-87_  +  _18-00_  =  _01-21-200._
    RECEIVED DATE        TOTAL TERM         BASE DATE

2.  Less total preconfinement credit     -     _137,_

3.  MAXIMUM ELIGIBLE PAROLE DATE     =     _04-21-200,_

                                    · Vest /    _73_
                                              4-18-2004

B.  GOOD TIME CREDIT

1.  Received date or 7-1-77
    whichever is later     -   _01-21-87_

2.  Days in custody of department  =  _5204_

3.  Postsentence     +     _7_

4.  Days in custody on which
    GTC may be earned     =     _5211_

5.  ÷ 3 = GOOD TIME CREDIT     =     _1737_

C.  MINIMUM ELIGIBLE PAROLE DATE (A-3 minus B-5)  =  _07-19-1996_

COMMENTS:                    115 of 12-14-87   +      ·46  _94(4:_

                             5-5-88   +      120

                                            _2-15-97_
                                            1-1-97   _1t_

=====================================
Computed by _P. Furnoisio_     _3-11-87_
            Case Records _Spec_     date

Audited by _____     _____
            Case Records         date
=====================================

NAME _Williams_     NUMBER     INSTITUTION     DATE
                    _D48163_     _LPU_     _3-11-87_

CDC 679aL  (Rev 2/83)

RECALCULATION OF MEPD FOR 15-LIFE AND 25-LIFE PRISONERS
RECEIVED PRIOR TO 5-27-87
PURSUANT TO IN RE MONIGOLD (1988) 205 CAL. APP. 3d 1224
NO DSL TERM OR DSL TERM COMPLETED

```
. CREDITS VESTED PER PC2934 (If offense date prior to 1-1-83)
   1.  Total days served prior to waiver date (Waiver date
       - received date + postsentenced credit)          =_____
   2.  A1 + 2 (round down)                               =_____
   3.  Less credits lost per PC2932                      -_____
   4.  Credits to be vested                              -_____
=================================================================
. MAXIMUM ELIGIBLE PAROLE DATE
   1.  _1-21-87_  +  _18 yrs_                        = 1-21-2005
       RECEIVED DATE    TOTAL TERM                       BASE DATE
   2.  Less total preconfinement credit             -  1371
   3.  Less A4 OR vest 1/2 postsentence credit      -    3
   4.  MAXIMUM ELIGIBLE PAROLE DATE                  = 4-18-2001

. WORKTIME CREDIT PER PC2933/PC2934                          314    48C
   1.  Less NET worktime credit earned from waiver/                 766
       received date through 2-15-89 or end of DSL   -  ~~484~~
       term if later
   2.  Current MEPD (cannot exceed B4)               = 6-8-2000

'. GOOD TIME CREDIT PER PC2931
   1.  Date credit applied through (2-15-89
       or date DSL term ends if later)     - 2-15-89
   2.  Days left to serve                  =  4131
   3.  Divide by 3 (round up)              =           = 1377
   4.  PC Balance (D3 + 4)                 =  344
   5.  BC Balance (D4 x 3)                 = 1033
===============================================================
. RECALCULATED MEPD (C2 - D3)                         = 8-31-96
   1.  Add credits lost for CDC 115's after D1    + PC_____ BC_____
   2.  Subtract restorations for credit losses in E1 - PC____BC_____
   3.  New PC/BC Balance              PC=____BC=____
   4.  Add any 7 or 9 year MEPD CS Life term(s)          +   0

. ADJUSTED MEPD (E + E1 - E2 + E4)                    = 8-31-96
===============================================================
. INITIAL PAROLE CONSIDERATION HEARING               = 7-95
   (13 months prior to F)                               MONTH/YEAR

. NEXT DOCUMENTATION HEARING  #_2_                    = 3-93
                                                        MONTH/YEAR
===============================================================
```

Your Minimum Eligible Parole Date has been recalculated pursuant to
In Re Monigold and you have been granted _____ days worktime credit
from _____ through 2-15-89/the end of your DSL term (circle one).
Your recalculated/adjusted (circle one) MEPD is _____. Your initial
life parole consideration hearing will be scheduled during the month
of _____/first available calendar (circle one).

_Olson_                        _4-18-90_
CASE RECORDS STAFF              DATE

_D-48163_    _Williams_        _Fol_
NUMBER        NAME              INSTITUTION

                                              7-31-90
/89

RECALCULATION OF MEPD FOR I5-LIFE AND 25-LIFE PRISONERS
RECEIVED PRIOR TO 5-27-87
PURSUANT TO IN RE MONIGOLD (1988) 205 CAL. APP. 3d 1224
NO DSL TERM OR DSL TERM COMPLETED

A. CREDITS VESTED PER PC2934 (If offense date prior to 1-1-83)
   1. Total days served prior to waiver date (Waiver date
      - received date + postsentence credit)              = _____
   2. A1 + 2 (round down)                                  = _____
   3. Less credits lost per PC2932 (PRIOR TO WAIVER        - _____
   4. Credits to be vested                                 = _____
=================================================================

B. MAXIMUM ELIGIBLE PAROLE DATE
   1. _1-21-87_  +  _18_                           = _1-21-2005_
      RECEIVED DATE   TOTAL TERM                     BASE DATE
   2. Less total preconfinement credit             - _1371_ = 4-21-2
   3. Less A4 OR vest 1/2 postsentence credit       - ___3___
   4. MAXIMUM ELIGIBLE PAROLE DATE                  = _4-18-2001_

C. WORKTIME CREDIT PER PC2933/PC2934               480
   1. Less NET Worktime credit earned from waiver/ -166 Credit loss
      received date through 2-15-89 or end of DSL    - _314_
      term if later
   2. Current MEPD (cannot exceed B4)              = _6-8-2000_

D. GOOD TIME CREDIT PER PC2931
   1. Date credit applied through (2-15-89
      or date DSL term ends if later)    - _2-15-89_
   2. Days left to serve                 = _4131_
   3. Divide by 3 (round up)                              = _1377_
   4. PC Balance (D3 ÷ 4)                = _344_
   5. BC Balance (D4 x 3)                = _1033_
=================================================================
E. RECALCULATED MEPD (C2 - D3) 115 of 9-27-90 30 days LOC = _8-31-96 + 3t_
   1. Add credits lost for CDC 115⁰'s after D1          + PC 30 BC_____ 9-βc
   2. Subtract restorations for credit losses in E1  - PC 30 BC_____
   3. New PC/BC Balance                          PC=344 BC=1033
   4. Add any 7 or 9 year MEPD CS Life term(s) 344    1033+
      115 of 9-27-90 restored per med.order            8-31-96
F. ADJUSTED MEPD (E + E1 - E2 + E4)                 = _9-30-96_
=================================================================
G. INITIAL PAROLE CONSIDERATION HEARING             = _8-95-9-95_
   (13 months prior to F)                             month/year

H. NEXT DOCUMENTATION HEARING   # _2_                = _3/93_
                                                      month/year
=================================================================
   Your Minimum Eligible Parole Date has been recalculated pursuant to
   In Re Monigold and you have been granted _____ days worktime credit
   from _____ through 2-15-89/the end of your DSL term (circle one).
   Your recalculated/adjusted (circle one) MEPD is _____. Your initial
   life parole consideration hearing will be scheduled during the month
   of _____/first available calendar (circle one).

   _J.Kanno_                           _11-19-90_
   CASE RECORDS STAFF                    DATE

   _D-48163_          _WILLIAMS, ABE JR._      _CMF-S_
   NUMBER                NAME                INSTITUTION
   5/89               FORM A - SIDE 1

RECALCULATION OF MEPD FOR 15-LIFE AND 25 LIFE PRISONERS
RECEIVED PRIOR TO 5-27-87
PURSUANT TO IN RE MONIGOLD (1988) 205 CAL. APP. 3d 1224
NO DSL TERM OR DSL TERM COMPLETED

A.    CREDITS VESTED PER PC2934 (If offense date prior to 1-1-83)
    1.    Total days served prior to waiver date (Waiver date
          - received date + postsentence credit )                    = _____
    2.    A1 + 2½ ( round down )                                      = _____
    3.    Less credits lost per PC2932                                - _____
    4.    Credits to be vested                                        - _____

B.    MAXIMUM ELIGIBLE PAROLE DATE
    1.    $\underline{87-01-21}$ + $\underline{18\ yrs}$              = $2005-01-21$
          RECEIVED DATE         TOTAL TERM                           BASE DATE
    2.    Less toal preconfinement credit                            - $137$
    3.    Less A4 OR vest 1/2 postsentence credit                    - $3$
    4.    MAXIMUM ELIGIBLE PAROLE DATE                               = $2001-04-18$

C.    WORKTIME CREDIT PER PC2933/PC2934
    1.    Less NET worktime credit earned from waiver/               - $314$              $481$
          received date through 2-15-89 or end of DSL                                     $-16$
          term if later                                                                   $31$
    2.    Current MEPD ( cannot exceed B4 )                          = $2000-06-08$

D.    GOOD TIME CREDIT PER PC2931
    1.    Date credit applied through ( 2-15-89                      - $89-0215$
          or date DSL term ends if later)                           = $4131$
    2.    Days left to serve                                                              = $1377$
    3.    Divide by 3 ( round up )                                   = $344$
    4.    PC Balance ( D3 + 4 )                                      = $344$
    5.    BC Balance ( D4 x 3 )                                      = $1038$

E.    RECALCULATED MEPD ( C2 - D3 )                                  = $96-08-31$         $8-31-94$
    1.    Add credits lost for CDC 115's after D1                    + PC $90$ BC $30$    $330+3$
    2.    Subtract restorations for credit losses in E1              - PC ___ BC ___      $8-26-9$
    3.    New PC/BC Balance                         PC= $254$ BC= $1003$
    4.    Add any 7 or 9 year MEPD CS Life term(s)                   + _____

F.    ADJUSTED MEPD ( E + E1 - E2 + E4 )                            = $96-12-29$

G.    INITIAL PAROLE CONSIDERATION HEARING                          = $11/95$            $7/96$
      ( 13 months prior to F )                                        MONTH/YEAR
H.    NEXT DOCUMENTATION HEARING #_____                         = _____
                                                                     MONTH/YEAR

Your Minimum Eligible Parole Date has been recalculated pursuant to
In Re Monigold and you have been granted _____ days worktime credit
from _____ through 2-15-89 / the end of your DSL term ( circle one ).
Your recalculated / adjusted (circle one ) MEPD is _____. Your initial
life parole consideration hearing will be scheduled during the month of _____/ first
available calendar ( circle one ).

_____                    $9-20-93$
CASE RECORDS STAFF                           DATE

_____$D48163$_____          _____$Williams$_____          _____$7o1$_____
NUMBER                          NAME                       INSTITUTION

RECALCULATION OF MEPD FOR 15-LIFE AND 25-LIFE PRISONERS
RECEIVED PRIOR TO 5-27-87
PURSUANT TO IN RE MONIGOLD (1988) 205 CAL. APP. 3d 1224
NO DSL TERM NOT COMPLETED

A.  CREDITS VESTED PER PC2934 (If offense date prior to 1-1-83)
   1.  Total days served prior to waiver date (Waiver date
       - received date + postsentence credit )                    = _____
   2.  A1 + 2 ( round down )                                       = _____
   3.  Less credits lost per PC2932                                - _____
   4.  Credits to be vested                                        - _____

B.  MAXIMUM ELIGIBLE PAROLE DATE
   1.  _1-21-87_  +  _18_                                          = _1-21-2005_
       RECEIVED DATE   TOTAL TERM                                      BASE DATE
   2.  Less toal preconfinement credit                             - _13 71_
   3.  Less A4 OR vest 1/2 postsentence credit                     - _3_
   4.  MAXIMUM ELIGIBLE PAROLE DATE                                = _4-18-2001_

C.  WORKTIME CREDIT PER PC2933/PC2934
   1.  Less NET worktime credit earned from waiver/
       received date through 2-15-89 or end of DSL                 - _315_
       term if later
   2.  Current MEPD ( cannot exceed B4 )                           = _6-7-2000_

D.  GOOD TIME CREDIT PER PC2931
   1.  Date credit applied through ( 2-15-89
       or date DSL term ends if later)                    - _2-15-89_
   2.  Days left to serve                                 = _4130_        = _1377_
   3.  Divide by 3 ( round up )
   4.  PC Balance ( D3 + 4 )                              = _344_
   5.  BC Balance ( D4 x 3 )                              = _1033_

E.  RECALCULATED MEPD ( C2 - D3 )                                  = _8-30-96_
   1.  Add credits lost for CDC 115's after D1                     + PC _30_ BC _240_
   2.  Subtract restorations for credit losses in E1               - PC ____ BC ____
   3.  New PC/BC Balance                              PC= _314_ BC= _793_
   4.  Add any 7 or 9 year MEPD CS Life term(s)                    + _____

F.  ADJUSTED MEPD ( E + E1 - E2 + E4 )                             = _5-27-97_

G.  INITIAL PAROLE CONSIDERATION HEARING                           = _4/96_
   ( 13 months prior to F )                                           MONTH/YEAR
H.  NEXT DOCUMENTATION HEARING #_____                         = _____
                                                                      MONTH/YEAR

Your Minimum Eligible Parole Date has been recalculated pursuant to
In Re Monigold and you have been granted ____ days worktime credit
from ____ through 2-15-89 / the end of your DSL term ( circle one ).
Your recalculated / adjusted (circle one ) MEPD is _____.  Your initial
life parole consideration hearing will be scheduled during the month of _____/ first available
calendar ( circle one ).

_C Jull_                          _6-20-94_
CASE RECORDS STAFF                DATE

_D-48163_        _Williams_                    _CSP/SAC_
NUMBER            NAME                          INSTITUTION

A 524  12/89

# EXHIBIT "U"

**John Boston Jr.,**
**22135 Sevilla, Rd. #39**
**Hayward, CA 94541**
**(510) 886-8813**

Dated: November 24, 2003

Carol Daley, Chairperson
Board of Prison Terms
428 "J" Street, 6th Floor
Sacramento, CA. 95814


Re: Abe Williams, Jr. D 48163
2004 BPT Parole Suitability Hearing


BPT Commissioners,

My name is John Boston, Jr., and I'm writing this letter in support of paroling Abe Williams, Jr.

I work for Sea Land Inc., a major import and export company. I'm a Supervisor earning $135,000 per year. I'm also a licensed real estate broker. I am related to Abe by marriage and have agreed to allow him to reside at my residence upon release. I will assist Abe in every way possible to help him reintegrate back into society.

I know Abe was convicted of a serious crime, however, I believe he has done a great deal to rehabilitate himself and prepare to be successful once released. His family and I have a great deal of empathy and sympathy for the victim's family in this case; however, because he has served in excess of 20 years, I hope that the BPT will grant Abe parole.

Respectfully Submitted


John Boston Jr.,

*[signature]*

8

**Inez Williams**
**16915 President Dr.**
**San Leandro, CA 94578**
**(510) 276-4535**

Dated: November 24, 2003

Carol Daley, Chairperson
Board of Prison Terms
428 "J" Street, 6th Floor
Sacramento, CA. 95814

Re: Abe Williams, Jr. D 48163
2004 BPT Parole Suitability Hearing

California Board of Prison Terms,

My name is Inez Williams Boston, and I am the sister of Abe Williams, Jr. whose upcoming parole hearing is the subject of this letter. I am a law abiding citizen, now retired after over 30 years working in the real estate field. I own my own home, and have arranged for Abe to live nearby with my husband, John Boston, Jr., at his condominium in Hayward, California. A letter from John Boston, Jr. is attached along with this one, for the Board's review.

I am writing this letter in support of my brother Abe, in hopes that he will be paroled soon. I am aware that my brother was convicted of a serious crime and my endorsement of his parole is in no way meant to minimize that fact, however, I do believe that my brother is prepared mentally and spiritually to reenter society as a productive and law abiding person.

I have kept up with my brother's progress over the years he has been incarcerated, and I know he has gained a great deal of academic and vocational education in order to gain employment and to ensure his success once released. Over these years, Abe has addressed his drug addiction problems and is ready to lead a productive life. When Abe is paroled, I and my other family members are prepared to support and assist him in anyway we can.

Because my brother does not have a job upon release, I have set up a bank account in the sum of five thousand dollars to assist him. These funds will be administered by me, to help support Abe financially until he is gainfully employed. Verification of this account can be obtained by contacting me at my above listed address and phone number. If I am not at home when you call, please leave your number and I will contact you immediately and make available to your agency, the bank account number and any other pertinent information you desire.

In closing, I wish to reiterate my support for my brother Abe, and hope the Board will grant him parole soon. Thank you for your consideration in this matter..

Sincerely

Inez Williams

9

POST-INCARCERATION MATRIX
"GOALS" TIME SCHEDULE

NOVEMBER 2006 PBH

ABE WILLIAMS, JR.
D-48163

| | EDUCATION | HOUSING | ADDICTIONS | ECONOMIC | EMPLOYMENT | FREE TIME |
|---|---|---|---|---|---|---|
| **FIRST MONTH** | UPGRADE MY COMPUTER & PARA LEGAL SKILLS | LIVE WITH MY SISTER WHILE SAVING FOR MY OWN APARTMENT | (1) MAINTAIN SOBRIETY (2) JOIN AA | OPEN SAVINGS ACCOUNT | MAINTAIN FULLTIME EMPLOYMENT | ADHERE TO PAROLE |
| **SIXTH MONTH** | RESEARCH COLLEGE AND/OR VOCATIONAL PROGRAMS | OBTAIN OWN APARTMENT | (1) MAINTAIN SOBRIETY (2) JOIN NA | BEGIN TO BUILD CREDIT & CONTINUE TO SAVE | MAINTAIN FULLTIME EMPLOYMENT OBTAIN A PARTTIME JOB | ADHERE TO PAROLE DO VOLUNTEER WORK IN THE COMMUNITY |
| **FIRST YEAR** | USING GRANTS AND STUDENT LOANS, ENROLL IN COLLEGE OR VOCATIONAL EDUCATION | BEGIN TO SAVE TO PURCHASE OWN HOME FOR LIVING AND BUSINESS | (1) MAINTAIN SOBRIETY (2) VOLUNTEER TO SPEAK AT ADDICTION PROGRAMS. | BEGIN TO LOOK INTO STARTING OWN INTERNET PARA LEGAL BUSINESS | SEEK EMPLOYMENT AS IN PARA LEGAL OR COMPUTER FIELDS | ADHERE TO PAROLE DO VOLUNTEER WORK IN THE COMMUNITY |
| **THIRD YEAR** | START PARA LEGAL ON-LINE AS A PARTTIME VENTURE IN SPARE TIME | CONTINUE TO SAVE TO PURCHASE MY COMBINATION HOME & BUSINESS | (1) MAINTAIN SOBRIETY (2) ASSIST OTHERS IN SOBRIETY | BEGIN TO FINANCE ON-LINE BUSINESS VENTURE | CONTINUE TO UPGRADE BOTH COMPUTER & PARA LEGAL SKILLS | ADHERE TO PAROLE CONTINUE VOLUNTEER WORK |
| **FIFTH YEAR** | OBTAIN A DEGREE IN BOTH PARA LEGAL & COMPUTERS (ADVANCED DEGREES) | SEEK TO PURCHASE OWN BUILDING | (1) MAINTAIN SOBRIETY (2) ASSIST OTHERS IN SOBRIETY | FINANCE AND OPERATED FULLTIME ON-LINE BUSINESS | SELF-EMPLOYED AND EMPLOYING OTHERS ESPECIALLY THOSE WITH PRIOR ADDICTIONS | ADHERE TO PAROLE DISCHARGE PAROLE? |
| **REST OF LIFE** | TRY TO LEAVE A LEGACY BETTER THEN THE FIRST 50 YEARS | MAINTAIN MY RESIDENCE | (1) ALWAYS MAINTAIN SOBRIETY & ASSIST OTHERS IN DOING SAME | PAY MY BILLS AND MAINTAIN GOOD CREDIT | CONTINUE TO UPGRADE MY SKILLS | LEAD A GOOD HONEST LIFE & ALWAYS HELP OTHERS |

July 21, 2007

Carol Daley, Chairperson
Board of Prison Terms
428 "J" Street 6th Floor
Sacramento, CA 95814

Re: Abe Williams, Jr. D 48163

California Board of Prison Terms,

My name is Inez Williams Boston, and I am the sister of Abe Williams, Jr. whose
upcoming parole hearing is the subject of this letter. I am a law abiding citizen, now
retired after over 30 years working in the real estate field. I own my home, and have
arranged for Abe to live with my husband, John Boston, Jr., at his condominium in
Hayward, California. A letter from John Boston, Jr. is attached along with this one, for
the Board's review.

I am writing this letter in support of my brother Abe, in hopes that he will be paroled
soon. I am aware that my brother was convicted of a serious crime and my endorsement
of his parole is in no way meant to minimize that fact. However, I do believe that my
brother is prepared mentally and spiritually to re-enter society as a productive and law
abiding person.

I have kept up with my brother's progress over the years he has been incarcerated, and I
know he has gained a great deal of academic and vocational education in order to gain
employment and to ensure his success once released. Over the years, Abe has addressed
his drug addition problems and is ready to lead a productive life. When Abe is paroled, I
and my other family members are prepared to support and assist him in anyway we can.

Because my brother does not have a job upon release, I have set up a bank account in the
sum of five thousand dollars to assist him. These funds will be administered by me, to
help support Abe financially until is gainfully employed. Verification of this account can
be obtained by contacting me at my address listed below. If I am not home when you call
please leave me a message and I will contact you immediately and make available the
information you might require.

In closing, I wish to reiterate my support for my brother Abe, and I hope and pray the
Board will grant him parole soon. Thank you for you consideration in this matter.

Sincerely,

Inez Williams Boston (510) 276-4535)
16915 President Drive
San Leandro, CA 94578

July 21, 2007

Carol Daley, Chairperson
Board of Prison Terms
428 "J" Street, 6th Floor
Sacramento, CA 95814
Re: Abe Williams, Jr. D 48163

BPT Commissioners,

My name is John Boston, Jr., and I'm writing this letter in support of Abe Williams, Jr.

I work for Sea Land Inc., a major import and export company now for 33 years. I'm a Supervisor earning $135,000 per year. I am also a licensed real estate broker. I am related to Abe by marriage and have agreed to allow him to reside at my residence upon release. He will not be required to pay any rent or utilities. I will assist Abe in every way possible to help him reintegrate back into society.

I know Abe was convicted of a serious crime, however, I believe he has done a great deal to rehabilitate himself and prepare to be successful once released. His family and I have a great deal of empathy and sympathy for the victim's family in this case; however, because he as served in excess of 20 years, I hope that the BPT will grant Abe parole.

Respectfully Submitted,

John H. Boston Jr.

22135 Sevilla Road Unit #39
Hayward, CA 94541
(510) 886-8113

## PAROLE RELEASE PLANS

Upon release Williams plans to be a productive and socially responsible citizen, refraining from any criminal conduct, use alcohol, drugs, or intoxicants of any kind. Also upon release, Williams plans to join and remain part of an AA, NA or any other available long term 12 step programs.

Upon parole release, Williams plans to reside with his brother-in-law in Alameda County at the following address:

<div align="center">

John Boston, Jr.
22135 Sevilla Rd. #39
Hayward, California 94541
(510) 886-8813

</div>

Williams does not have a firm verifiable job offer at this time. He does however, plan to actively seek employment upon his release and obtain employment shortly thereafter. With his work experience while incarcerated and his vocational skills he plans to pursue a career in the clerical field as an administrative assistant. Upon release Williams will have a source of revenue available to him, to assist him in his initial employment pursuits. His sister, Inez Williams Boston, has set up a bank account in the sum of Five Thousand Dollars to be utilized to ensure he will have adequate funds available to support himself until he does become gainfully employed. He will be residing with his brother-in-law the sum of $5,000 will be sufficient until employment is gained. No rent or other living costs will be necessary. Information regarding the account (e.g., account number, etc.) can be obtained by contacting:

<div align="center">

Inez Williams
16915 President Dr.
San Leandro, California 94578
(510) 276-4535

</div>

Note: See attached Parole Support letters of John Boston, Jr. and Inez Williams.

<div align="center">

7

</div>

| | FOR COURT USE ONLY |
|---|---|
| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, state bar number, and address)*<br>Abe Williams, Jr. (In Pro Per)<br>D-48163  B-9-127L<br>M.C.S.P.<br>P.O. BOX 409040<br>Ione, CA 95640-9000<br>TELEPHONE NO.:                           FAX NO.:<br>ATTORNEY FOR *(Name)* | |
| **COURT** Alameda County Superior Court<br>STREET ADDRESS: 1225 Fallon Street<br>MAILING ADDRESS:  Oakland, CA 94612<br>CITY AND ZIP CODE:<br>BRANCH NAME: | |
| PETITIONER/PLAINTIFF: ABE WILLIAMS, JR.<br><br>RESPONDENT/DEFENDANT: M. Martel (A) Warden | |
| **PROOF OF SERVICE BY MAIL** | CASE NUMBER: |

1. I am at least 18 years of age, not a party to this action, and I am a resident of or employed in the county where the mailing took place.

2. My residence or business address is: Mule Creek State Prison, P.O. BOX 409040, Ione, California 95640

3. I served a copy of the following documents *(specify)*: Petition for Writ of Habeas Corpus
   [x] Petition for Writ of Habeas Corpus        [ ]

by enclosing them in an envelope AND
   a. [  ] **depositing** the sealed envelope with the United States Postal Service with the postage fully prepaid.
   b. [X] **placing** the envelope for collection and mailing on the date and at the place shown in item 4 following our ordinary business practices. I am readily familiar with this business's practice for collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service in a sealed envelope with postage fully prepaid.

4. The envelope was addressed and mailed as follows:
   a. Name of person served: First Appellate District   || STATE ATTORNEY GENERAL
   b. Address: Court, 350 McAllister Street         P. O. Box 944255
              San Francisco, CA 94102-3600         Sacramento, CA 94244
   c. Date mailed:
   d. Place of mailing *(city and state)*: Ione , California

5. I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: February 18, 2008

Abe Williams, Jr.
_____
(TYPE OR PRINT NAME)

▶ *[signature]*
(SIGNATURE OF PERSON COMPLETING THIS FORM)

**PROOF OF SERVICE BY MAIL**

UNITED STATES DISTRICT COURT

NORTHERN   DISTRICT OF CALIFORNIA

ABE WILLIAMS, JR.

v.

Case Number: C-91-02589-JPV

M. MARTEL (A) WARDEN

/

**PROOF OF SERVICE
BY MAIL**

I hereby certify that on   April *23*, 2008   , I served a copy

of the attached *Petitioner's Separately Bound Supp. Documents*

by placing a copy in a postage paid envelope addressed to the person(s) hereinafter listed, by

depositing said envelope in the United States Mail at   IONE, CALIFORNIA 95640   :

```
Clerk, of the United States District Court
450 GOLDEN GATE AVE.
SAN FRANCISCO, CA 94102-3483
```

I declare under penalty of perjury that the foregoing is true and correct.

*Abe Williams Jr.*

ABE WILLIAMS, JR.